B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>PALMETTO STATE ARMORY, LLC | DEFENDANTS<br><br>IKON WEAPONS, LLC |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>William Walt Pettit<br>Hutchens Law Firm LLP<br>6230 Fairview Road, Suite 315, Charlotte, NC 28210<br>Telephone: 704-362-9255 | ATTORNEYS (If Known)<br>John C. Woodman<br>Essex Richards<br>1701 South Boulevard, Charlotte, NC 28203<br>Telephone: 704-377-4300 |
| PARTY (Check One Box Only)<br>□ Debtor       □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    ☒ Other<br>□ Trustee | PARTY (Check One Box Only)<br>☒ Debtor       □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Declaratory Judgment and Injunctive Relief

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- □ 11-Recovery of money/property - §542 turnover of property
- □ 12-Recovery of money/property - §547 preference
- □ 13-Recovery of money/property - §548 fraudulent transfer
- □ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- □ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- □ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- □ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- □ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- □ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- □ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- □ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
- □ 61-Dischargeability - §523(a)(5), domestic support
- □ 68-Dischargeability - §523(a)(6), willful and malicious injury
- □ 63-Dischargeability - §523(a)(8), student loan
- □ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- □ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- □ 71-Injunctive relief – imposition of stay
- ☒ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- □ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- □ 01-Determination of removed claim or cause

**Other**
- □ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
- □ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Ikon Weapons, LLC | BANKRUPTCY CASE NO.<br>22-30424 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Western | DIVISION OFFICE<br>Charlotte | NAME OF JUDGE<br>J. Craig Whitley |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>9/21/22 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>William Walt Pettit | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

B2500A (Form 2500A) (12/15)

# United States Bankruptcy Court

<u>Western</u> District Of <u>North Carolina</u>

| | | |
|---|---|---|
| In re <u>Ikon Weapons, LLC</u>, | ) | Case No. <u>22-30424</u> |
| Debtor | ) | |
| | ) | Chapter <u>11</u> |
| | ) | |
| <u>Palmetto State Armory, LLC</u> | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. _____ |
| | ) | |
| <u>Ikon Weapons, LLC</u> | ) | |
| Defendant | ) | |

## SUMMONS IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall file a motion or answer to the complaint within 35 days.

Address of the clerk:    U.S. Bankruptcy Court
Charles R Jonas Federal Building
Western District of North Carolina
401 West Trade Street, Suite 2500
Charlotte, NC 28202

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

Name and Address of Plaintiff's Attorney:    Wiliam Walt Pettit
Hutchens Law Firm LLP
6230 Fairview Road, Suite 315
Charlotte, NC 28210

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

_____ (Clerk of the Bankruptcy Court)

Date: _____    By: _____ (Deputy Clerk)

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| IN RE:<br><br>IKON WEAPONS, LLC,<br><br>          Debtor. | CASE NO. 22-30424<br>CHAPTER 11 |
| PALMETTO STATE ARMORY, LLC,<br><br>          Plaintiff,<br><br>vs.<br><br>IKON WEAPONS, LLC,<br><br>          Defendant. | ADV. PROC. NO.: 22- |

**COMPLAINT**

Plaintiff Palmetto State Armory, LLC (hereinafter "Plaintiff"), complaining of Defendant Ikon Weapons, LLC (hereinafter "Debtor"), alleges and avers as follows:

**PARTIES, JURISDICTION AND VENUE**

1.    Plaintiff is limited liability company duly organized and operating under the laws of the State of South Carolina and is in the business of selling firearms and firearms-related equipment and goods on a retail basis.

2.    Debtor is a limited liability company duly organized and operating under the laws of the State of North Carolina and is a firearms manufacturer, purchaser, and importer.

3.    The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334, and the "Referral Order" entered by the Chief United States District Court Judge for the Western District of North Carolina. The Court also has jurisdiction over this proceeding pursuant to 28

1

U.S.C. §§ 151 and 157(b) in that it is a "core proceeding." To the extent that this matter is not a "core proceeding," which Plaintiff denies, Plaintiff consents to the Bankruptcy Court entering a final and dispositive order in this matter.

4.      Pursuant to 28 U.S.C. §§ 1408 and 1409, venue is proper in this District since the Debtor filed its Chapter 11 proceeding in this District.

## GENERAL ALLEGATIONS

5.      On June 16, 2021, Plaintiff and the Debtor entered into a Purchase Agreement whereby Debtor agreed to sell, and Plaintiff agreed to purchase, 8,000 Yugoslavian AK-47 kits. *See* Ex. A, Common Pleas Compl. ¶ 6 & Compl. Ex. A (the "Original Agreement"); Ex. B, Defs.' Am. Answer ¶ 6. The purchase price for these firearms kits was $3,760,000.00, and Plaintiff agreed to deposit half of this amount to Debtor in order to secure Debtor's performance of the Original Agreement. Compl. Ex. A at 1–2. The Debtor, for its part, agreed to deliver these firearms kits "FOB USA Charleston SC." Compl. Ex. A at 1.

6.      The next day, the parties amended the Original Agreement to provide that Plaintiff would, when appropriate, and as a condition precedent to Plaintiff receiving the firearms kits, deposit the entire purchase price with the Debtor rather than the 50% agreed to in the Original Agreement. Compl. ¶ 7 & Compl. Ex. B; Defs.' Am. Answer ¶ 7. In exchange for this material alteration of the Original Agreement, Mr. Deaza pledged to transfer to Plaintiff 100% of the stock in the Debtor "if for any reason the Buyer does not receive the products FOB Charleston, SC on or before November 30th, 2021, or receive a full refund of all monies paid by the same date." Compl. Ex. B at 1 (emphasis added). Plaintiff thereafter deposited the full purchase price of $3,760,000.00 with the Debtor in two equal installments of $1,880,000.00 on June 17, 2021 and August 20, 2021. *See* Ex. C, Debtor's First Bank Account Records, at 3, 11. The second deposit

2

was made after Mr. Deaza provided photographs of products that he represented to be "his eyes on" the firearms that he was prepared to acquire once the second deposit was made.

7.    On August 31, 2021, Plaintiff and the Debtor entered into a second transaction with the Debtor whereby Plaintiff agreed to purchase from the Debtor an additional number of firearms kits made from firearms manufactured by Zastava Arms, evidenced by an invoice dated that same day. Compl. ¶ 8 & Compl. Ex. C (the "Second Agreement"); Defs.' Am. Answer ¶ 8. Under the terms of the Second Agreement, Plaintiff agreed to pay $3,722,520.00 for the Zastava Arms, and further agreed to advance 20% of the purchase price ($744,504.00) to the Debtor in order to secure the Debtor's performance of the Second Agreement. *Id.* On September 1, 2021, Plaintiff deposited $744,504.00 into the Debtor's bank account. *See* Ex. C at 15.

8.    On November 6, 2021, after continued delays by the Debtor in delivering the contracted-for firearms kits, Plaintiff and the Debtor amended the Original Agreement once more to extend the delivery date to March 1, 2022. Compl. ¶ 9 & Compl. Ex. D; Defs.' Am. Answer ¶ 9.[1] Then, on February 28, 2022, after still further delays by the Debtor in delivering the firearms kits, Plaintiff agreed to extend the delivery date one final time "for a period not exceeding ninety (90) days through June 1, 2022." Compl. ¶ 9 & Ex. E; Defs.' Am. Answer ¶ 9. In exchange for Plaintiff agreeing to this further and final delay in the delivery of the firearms kits, and also

---

[1] This document contains a scrivener's error denoting the date for delivery as March 1, 2023. In fact, and contrary to Defendants' assertion in their Amended Answer, all parties understood and agreed that the new delivery date for the firearms kits under this amendment was March 1, 2022, not March 1, 2023. *See* Ex. D, Affidavit of Jamin McCollum ¶ 9. This understanding is plainly demonstrated both in email communications between the parties and by the final amendment entered into between the parties on February 28, 2022, which extended the delivery date "for a period not exceeding ninety (90) days through June 1, 2022." Compl. Ex. E.

3

agreeing to pay the cost of freight which was not part of the original contract,[2] Mr. Deaza agreed to personally guarantee performance of both the Original Agreement and the Second Agreement: "To the extent that either of the entire transactions as contemplated are not completed, Suliban Esteban Deaza, will be liable to the Buyer for whatever deficiency the Buyer experiences including all associated fees of collection specifically but not limited to attorney fees." Compl. Ex. E.

9.      The Debtor failed to complete the delivery of the firearms kits by June 1, 2022. On June 2, 2022, Plaintiff sent a notice of default to the Debtor and Mr. Deaza and demanded that the default be cured within 30 days, either by delivering the products as agreed or by returning the full amount of the deposits paid by Plaintiff. Compl. Ex. F. The Debtor and Deaza failed to cure their default within that 30-day period, and Plaintiff thereafter initiated an action in the Court of Common Pleas for Lexington County, South Carolina on July 6, 2022 asserting claims, among other things, for breach of contract, fraud, unjust enrichment, conversion, and for an accounting. *See* Ex. A.

10.     The Debtor and Deaza answered the Complaint on August 4, 2022, and then filed an Amended Answer on August 24, 2022. In their Amended Answer, the Debtor and Deaza admitted that the agreements between the parties, as amended, are valid and binding, and also admitted that Plaintiff paid the full amount of the deposits called for in those agreements. *See, e.g.*, Defs.' Am. Answer ¶¶ 46, 64. The Debtor and Deaza further admitted that they have neither (1) performed the agreements nor (2) returned the funds that Plaintiff deposited. *See, e.g., id.* ¶¶ 41 & 42, 48, 54.

---

[2] This alteration to the parties' agreement was handwritten into the February 28, 2022, amendment by Mr. Deaza himself. This material alteration of the parties' agreement results in a significant amount of the costs of the transaction being shifted to Plaintiff and represents additional consideration.

11.     On August 25, 2022, Plaintiff began a deposition of the Debtor pursuant to Rule 30(b)(6), SCRCP. At that deposition, in which Deaza testified on behalf of the Debtor, Deaza made alarming statements indicating that the Debtor did not intend to deliver the firearms kits that were purchased with Plaintiff's deposited funds to Plaintiff. More particularly, Deaza took the position that Plaintiff had somehow breached the parties' agreement by seeking to be repaid for the Debtor's and Deaza's failure to perform the agreements. Based on this erroneous argument, Deaza asserted that the Debtor is now the rightful owner of the firearms products that it acquired for Plaintiff and with Plaintiff's funds, and that the Debtor is free to dispose of the firearms products as it sees fit and keep the money. *See* Ex. E, Rule 30(b)(6) Deposition of the Debtor, at 57–59.

12.     Based in part on these statements, Plaintiff on August 31, 2022, filed a Motion for Preliminary Injunction in the Common Pleas action requesting that the Debtor and Deaza be enjoined from selling, transferring, disposing of, or encumbering certain assets which rightfully belong to Plaintiff, including the funds that Plaintiff deposited and any firearms or related products which were purchased with Plaintiff's deposited funds, as well as other assets which could be used to satisfy a judgment in the Common Pleas action. The Chief Administrative Circuit Court Judge for Lexington County, South Carolina scheduled a status conference to address that motion on September 2, 2022, at 10 a.m. At 8:48 a.m. on that day, the Debtor filed its Voluntary Petition in this case, and then at 9:36 a.m. filed a Motion to Extend the Automatic Stay to Deaza, which is scheduled for hearing before this Court on October 11, 2022.

13.     On September 6, 2022, the Debtor filed its first day motions requesting, among other relief, that it be permitted to use cash collateral to continue operating its business. The Court held a hearing in this case on September 8, 2022, at which counsel for all parties appeared. The Court adjourned the hearing so that counsel for the various parties could discuss a resolution of

5

the Motion to Use Cash Collateral along with other issues raised in Plaintiff's Response; the Court reconvened the hearing on that motion after a recess and counsel for all of the parties noted on the record their agreement to allowing the use of some cash collateral by the Debtor for a limited period, in a limited amount, and on other certain terms and conditions.

14.    Further, at the hearing Debtor's counsel represented that there were a number of containers of parts, firearms kits, and other items which were either en route to the Port of Charleston or had recently arrived there. The Debtor has also represented that the costs of these various items are approximately $800,000.00 to $900,000.00. However, based upon the packing list and invoices for those shipments, it appears that the Debtor may have paid $1.5 million or more for these goods using funds deposited with it by PSA. The parties have agreed that Plaintiff has the right to inspect those firearms products in the containers and, among other things, verify that the quantity, type, and condition is as represented on the packing lists and purchase orders; however, based on the statements of Debtor's counsel in Court and Mr. Deaza's sworn testimony, it is clear that Debtor intends to sell those firearms products to third parties in direct competition with Plaintiff.

15.    There can be no doubt that these firearms kits and parts were purchased with Plaintiff's funds. The Debtor's financial records show that, prior to receiving the $4.5 million that Plaintiff advanced to the Debtor, it was a small, severely undercapitalized business losing money. The Debtor simply had no way to acquire these firearms products before receiving Plaintiff's funds. Now, having taken Plaintiff's money and welched on its deal with Plaintiff—a deal that it now appears the Debtor never had the ability or even the intention to honor—the Debtor intends to use Plaintiff's funds as an interest-free loan to operate its business and compete directly with Plaintiff. This Court should not permit this fraud and injustice to happen.

6

## FIRST CLAIM FOR RELIEF
(Declaratory Judgment)

16.    The allegations of paragraphs 1 through 15 of Plaintiff's Complaint are incorporated herein by reference.

17.    As explained in Plaintiff's Response to Emergency Motion of the Debtor for Authority to Use Cash Collateral, the funds paid by Plaintiff to the Debtor were for a specific purpose and thus were earmarked or entrusted funds. The U.S. District Court for the Western District of North Carolina in *Campbell v. Hanover*, 457 B.R. 452 (2011) affirmed the decision of the Bankruptcy Court that the earmarking doctrine had been adopted by the Fourth Circuit. This case involved an action to recover on an alleged preferential transfer, but the findings and holding regarding the earmarking doctrine remain pertinent here.

18.    Further, the earmarking doctrine has been applied in many contexts. In *Price Chop per Supermarkets, Inc.*, 40 B.R. 816 (Bank. Cal. 1984), which was cited with approval by the Eleventh Circuit in *Bank of Martin County*, 845 F.2d 293, 297 (11th Cir. 1988), the earmarking doctrine applied to a post-petition transfer. The trustee in that case was unable to set aside a post-petition transfer of stock because the earmarking doctrine applied and the stock was not deemed to be property of the bankruptcy estate. Many other courts have applied the earmarking doctrine when facts demonstrate that the lender (Plaintiff is not a lender) dictated the recipient of the funds that would not have otherwise been provided to the debtor but for the agreement to pay the funds for the designated purpose. *See, e.g., Coral Petroleum, Inc. v. Banque Paribas-London (In re Coral Petroleum, Inc.)*, 797 F.2d 1351 (5th Cir. 1986) (funds pledged by solvent indirect offshore subsidiary of debtor to re-pay debtor's loan never came into the general control of the debtor and were deemed to be earmarked funds); *Tolz v. Barnett Bank of South Florida, N.A.. (In re Safe-T-*

7

*Brake)*, 162 B.R. 359 (Bankr. S.D. Fla. 1993) (debtor did not have dispositive control over funds secured creditor wire transferred to lien claimant pursuant to closing of loan and were deemed to be earmarked funds); *In re Hood*, 118 B.R. 417 (Bankr. D.S.C. 1990) (checks written by third-party, cashed by debtor, and provided to creditor as cashier's checks to satisfy antecedent debts of debtor and to prevent levy on inventory after judgment were deemed to be earmarked funds). Because the Debtor acquired these firearms kits and parts using funds remitted by Plaintiff to the Debtor for the specific and exclusive purpose of purchasing firearms kits for the Plaintiff, these firearms kits and parts are not property of the estate. Accordingly, the Debtor does not have any right to use this property.

19.     As noted in paragraph 4d of the Purchase Agreement entered into by the parties on June 16, 2021, title to the firearms kits passed to Plaintiff when Plaintiff paid the Debtor 100% of the total amount due. *See* Compl. Ex. A. This amount has been paid. *See* Ex. C. Accordingly, while there are subsequent amendments to this Agreement, the provision regarding transfer of title was not changed and Plaintiff now owns the kits or parts purchased. Alternatively, Plaintiff has equitable title or, at a minimum, an equitable lien on the firearms kits and parts. *See Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171 (2d Cir. 2006). Thus, all firearms kits or other property acquired from the proceeds remitted by Plaintiff to the Debtor to purchase the kits are property of Plaintiff. As such, the Debtor does not have a right to sell these firearms kits or other property and should rather be required to deliver them to Plaintiff.

20.     Plaintiff is entitled to a declaratory judgment, pursuant to the provisions of 28 U.S.C. § 2201 and based on the theories of constructive trust, resulting trust, equitable title and the earmarking doctrine, determining that: (a) Plaintiff is the owner of the goods or personal property in the containers; (b) Plaintiff is the owner of the funds in the bank accounts of the Debtor; and (c)

8

Plaintiff is the owner of all property (real or personal) acquired by the Debtor from the funds paid by Plaintiff to the Debtor.

## SECOND CLAIM FOR RELIEF
(Injunctive Relief)

21.    The allegations of paragraphs 1 through 20 of Plaintiff's Complaint are incorporated herein by reference.

22.    Plaintiff requests that the Court enter an order enjoining the Debtor from disposing of any items of personal property in the containers presently at the Port in Charleston, South Carolina pending further Order of the Court. Plaintiff submits that, in the absence of this relief, it will not be possible for Plaintiff to be made whole from the tortious and fraudulent acts that the Debtor committed, and Plaintiff will be permanently and irreparably deprived of property which rightfully belongs to it.

23.    When ruling on a motion for injunctive relief, bankruptcy courts normally consider (1) the debtor's reasonable likelihood of reorganization; (2) the imminent risk of irreparable harm to the debtor's estate in the absence of an injunction; (3) the balance of the harms between the debtor and its creditor; and (4) whether public policy weighs in favor of an injunction. *In re Bestwall LLC*, 606 B.R. 243, 253 (Bankr. W.D.N.C. 2019).

24.    The goods and personal property in the containers, which Plaintiff seeks to have the disposition thereof enjoined, rightfully belong to Plaintiff. That is because the money that the Debtor used to acquire this property was entrusted to it by Plaintiff for the sole and exclusive purpose that the Debtor would use those funds to acquire and deliver firearms kits to Plaintiff. Having in fact used Plaintiff's funds to acquire this property, such property rightfully belongs to Plaintiff and are not property of the Debtor's estate.

9

25.     For these reasons, Plaintiff respectfully requests that the Court enter an order enjoining the Debtor from disposing of the goods or personal property in the containers pending further order of the Court.

WHEREFORE, Plaintiff prays the Court as follows:

1.     That, pursuant to Plaintiff's First Claim for Relief, the Court enter a declaratory judgment, pursuant to the provisions of 28 U.S.C. § 2201, that Plaintiff has legal title and is the owner all of (a) the goods or personal property in the containers; (b) the funds in the bank accounts of the Debtor; and (c) all personal property acquired by the Debtor from the funds paid by Plaintiff to the Debtor;

2.     That, pursuant to Plaintiff's Second Claim for Relief, the Court enter an order enjoining the sale or disposition of any of the goods or personal property in the three containers pending further order of this Court; and

3.     For such other and further relief as the Court may deem just and proper.

This the _____ day of September, 2022.

HUTCHENS LAW FIRM LLP


By: /s/ William Walt Pettit
    William Walt Pettit
    N.C. Bar No. 9407
    6230 Fairview Road, Suite 315
    Charlotte, N.C. 28210
    Telephone: (704) 362-9255
    Email: walt.pettit@hutchenslawfirm.com

10

WILLOUGHBY & HOEFER, P.A.


By: /s/ Michell Willoughby
       Mitchell Willoughby
       S.C. Bar No. 6161
       930 Richland Street
       Columbia, SC 29201
       Telephone: (803) 252-3300
       Email: mwilloughby@willoughbyhoefer.com

       *Attorneys for Palmetto State Armory, LLC*

# EXHIBIT A

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| COUNTY OF LEXINGTON | ) | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| | ) | |
| PALMETTO STATE ARMORY, LLC, | ) | C/A NO. 2022-CP-32-_____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **SUMMONS** |
| | ) | |
| IKON WEAPONS, LLC and SULIBAN | ) | |
| ESTEBAN DEAZA, | ) | |
| | ) | |
| Defendants. | ) | |

TO THE DEFENDANTS ABOVE-NAMED:

**YOU ARE HEREBY SUMMONED** and required to answer the complaint herein, a copy

of which is herewith served upon you, and to serve a copy of your answer to this complaint upon

the subscriber, at the address shown below, within thirty (30) days after service hereof, exclusive

of the day of such service, and if you fail to answer the complaint, judgment by default will be

rendered against you for the relief demanded in the complaint.


Respectfully submitted,


s/Mitchell Willoughby
Mitchell Willoughby, S.C. Bar No. 6161
Andrew J. D'Antoni, S.C. Bar No. 100919
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street (29201)
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
adantoni@willoughbyhoefer.com

*Attorneys for Plaintiff Palmetto State Armory, LLC*

July 6th, 2022
Columbia, South Carolina

1

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

| | |
|---|---|
| STATE OF SOUTH CAROLINA | )    IN THE COURT OF COMMON PLEAS |
| COUNTY OF LEXINGTON | )    FOR THE ELEVENTH JUDICIAL CIRCUIT |
| | ) |
| PALMETTO STATE ARMORY, LLC, | )    C/A NO. 2022-CP-32-_____ |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )           **COMPLAINT** |
| | ) |
| IKON WEAPONS, LLC and SULIBAN | )       **(Jury Trial Requested)** |
| ESTEBAN DEAZA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff Palmetto State Armory, LLC ("PSA"), complaining of Defendants Ikon Weapons, LLC ("Ikon") and Suliban Esteban Deaza ("Deaza"), alleges as follows:

1.      Plaintiff PSA is a South Carolina limited liability company with its principal place of business located in Lexington County, South Carolina.

2.      Defendant Ikon is a North Carolina limited liability company with its principal place of business located in North Carolina.

3.      Defendant Deaza is a citizen and resident of North Carolina and the founder and Chief Executive Officer of Ikon.

4.      Venue is proper in this Court pursuant to S.C. Code Ann. § 15-7-30, as PSA resides in Lexington County, South Carolina, and also because a substantial part of the events giving rise to this action took place in Lexington County.

## BACKGROUND

5.      In or about October 2020, Deaza reached out to PSA and proposed certain agreements to purchase firearms between Ikon and PSA. The proposed agreements were unsolicited by PSA, but Deaza was known to PSA based on certain previous interactions he had with PSA employees at a firearms show, and because he also held himself out as a prior part-owner

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

at PTR Industries, Inc., a well-known firearms manufacturer located in Horry County, South Carolina. As part of Ikon's efforts to secure an agreement with PSA, Deaza traveled to PSA's offices in Lexington County, South Carolina at 2121 Old Dunbar Road, West Columbia, SC 29172 on multiple occasions to propose firearms transactions. Due to Deaza's repeated representations of his ability to secure high value firearms from foreign governments, PSA became interested in a proposed agreement solicited by Deaza involving the purchase of a large number of AK-47 rifles (that could be converted into demilitarized weapons kits) which Deaza represented were located in Eastern Europe. To gain PSA's confidence on this prospective multi-million-dollar transaction, Deaza repeatedly represented that he and Ikon were, and repeatedly held himself and Ikon out as, sophisticated, reputable, and reliable dealers within the firearms industry, and fully capable of performing all of the promises and terms of the proposed agreement.

6.      Persuaded by Deaza's repeated representation of his abilities and trustworthiness, on June 16, 2021, PSA entered into a Purchase Agreement with Ikon in which Ikon agreed to sell, and PSA agreed to purchase, a number of Yugoslavian AK-47 kits (the "Original Agreement," attached as Exhibit A and incorporated herein by this reference as if repeated verbatim). Under the terms of the Original Agreement, Ikon agreed to deliver the products "FOB USA Charleston SC" in accordance with certain requirements and specifications provided under the Original Agreement. PSA agreed to pay Ikon $3,760,000.00 for said weapons kits, and further agreed to deposit and entrust 50% of the purchase price with Ikon, relying upon Deaza's representations of his and Ikon's ability to faithfully, timely, and fully perform all of the promises and terms of the agreement.

7.      The next day Deaza indicated that there was an urgent need for him to close the transaction immediately or risk losing the deal, representing that there was another buyer prepared

to seize this opportunity. Based on these representations, the security of pledged Ikon stock that was provided, as part of the transaction, and still believing Deaza was reliable and trustworthy, on June 17, 2021, the parties amended the Original Agreement to provide that PSA would deposit the entire purchase price rather than the 50% called for in the Original Agreement (the "First Amendment" attached hereto as Exhibit B and incorporated herein by this reference as if repeated verbatim). Among other reasons, including the express need for urgency and Deaza's repeated assurances of his expertise in the firearms industry and trustworthiness, PSA was willing to entrust the full purchase price to Deaza and Ikon due to Deaza's further representations at the time that he would demonstrate his good faith and trustworthiness by agreeing to transfer 100% of the stock in Ikon Weapons, LLC as security for the transaction "if for any reason the Buyer does not receive the products FOB Charleston, SC on or before November 30th, 2021, or receive a full refund of all monies paid by the same date." Upon the execution of the First Amendment, PSA fully performed its obligations under the Original Agreement by entrusting and paying 100% of the purchase price for the weapons kits to Defendants.

8.        Based upon further solicitations from and representations by Deaza, PSA agreed on or about August 31, 2021, to augment their original deal by purchasing from Ikon an additional number of firearms manufactured by Zavasta Arms (the "Second Agreement"; the invoice evidencing this Second Agreement is attached hereto as Exhibit C and is incorporated herein by this reference as if repeated verbatim). Under the Second Agreement, PSA agreed to purchase these additional firearms from Ikon for a total purchase price of $3,722,520, and further agreed to entrust the amount of $744,504 to Deaza and Ikon to secure the transaction for PSA, while providing sufficient funds to Defendants (as represented by Deaza) so that they could bind the transaction with their supplier or broker. Deaza later represented to PSA that he—without the

3

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

authorization of PSA—employed funds that were purportedly "refunded" by the third-party broker on the Original Agreement to finance the purchase of firearms under the Second Agreement.

9.    At the specific request of Deaza due to problems with full delivery of the promised weapons kits, on November 6, 2021, the parties amended their agreement to delay the delivery date of the products until not later than March 1, 2022 (this amendment is attached hereto as Exhibit D and incorporated herein by this reference as if repeated verbatim).[1] Thereafter, due to another specific request of Deaza due to continued problems with getting the weapons kits imported to the United States, on February 28, 2022, the parties amended their agreement once more (the "Second Amendment," attached hereto as Exhibit E and incorporated herein by this reference as if repeated verbatim). Faced with continued delays by Ikon in the delivery of the weapons kits and fulfillment of the agreement, the parties agreed that the delivery date for both the Original Agreement and the Second Agreement "shall be extended for a period not exceeding ninety (90) days through June 1, 2022." In exchange for this further material alteration of the parties' agreement, Deaza, "in his individual capacity," agreed that "[t]o the extent that either of the entire transactions as contemplated are not completed, Suliban Esteban Deaza, will be liable to Buyer for whatever deficiency the Buyer experiences including all associated fees of collection specifically but not limited to attorney fees."

10.    PSA only agreed to further delays on the delivery date under the amendments to the agreement based on repeated representations and unqualified assurances from Deaza that: (1) Ikon could and would deliver the weapons kits as promised; (2) that a significant part of Ikon's

---

[1] This amendment contains an inadvertent typo reciting a delayed delivery date of not later than March 1, 202**3**. In reality, however, the understanding of the parties was to delay the delivery date to not later than March 1, 202**2**, and the transaction thereafter proceeded and subsequent actions of the parties were consistent with this understanding.

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

performance under the agreements was completed in the form of the demilitarization of a large portion of the subject firearms located in Montenegro; (3) that the coronavirus pandemic was responsible for delaying the shipment of the weapons kits to the Port of Charleston; and (4) that multiple shipping containers filled with many of the promised weapons kits had already arrived at the Port of Charleston but due to port congestion and supply chain constraints, the products could not be unloaded from the shipping containers. However, when later pressed by PSA to provide shipping container numbers, so that PSA could assist in unloading the weapons kits, Deaza refused to supply any such verifying information, explaining that the shipping containers contained other customer products protected by non-disclosure agreements.[2]

11.    Ikon failed to complete the delivery of the products by June 1, 2022, as required by the parties' agreements. On June 2, 2022, PSA sent a notice of default to Ikon and Deaza and demanded, pursuant to the terms of the Original Agreement, that the default be cured within 30 days, either by the delivery of the products as contemplated under the agreements or by the return of the full amount of the deposit paid by PSA of $4,534,504.00 (the default letter is attached as Exhibit F and is incorporated herein by this reference as if repeated verbatim).

12.    Throughout the thirty-day cure period, Ikon and Deaza continued to represent and assure PSA, as it had done on numerous prior occasions, that Ikon had used PSA's deposited funds to purchase the subject firearms and that Ikon owned and had title in and to the subject firearms but that for certain vague reasons the products could not be timely shipped and delivered to the agreed upon destination. To ease its already rapidly growing concerns, PSA repeatedly requested that Ikon and Deaza provide PSA with financial documents in the form of bank account statements

---

[2] To date, there is no evidence whatsoever showing that a partial delivery of the promised weapons kits was ever made at the Port of Charleston.

5

sufficient to show that Ikon had indeed transferred the deposited and entrusted PSA funds to the third-party broker for the purchase of the subject firearms (as had been continually represented to PSA that such payments to the broker had been made in sufficient amounts to secure title to the weapons), but each time Ikon and Deaza refused to share any such materials. PSA further requested documents in the form of complete contracts sufficient to show that Ikon actually purchased and owned the subject firearms (as had been continually represented to PSA), but Ikon and Deaza refused to share any such materials.

13.     Thirty days have elapsed since the notice of default, and Ikon and Deaza have failed to cure the default under the agreements. PSA therefore brings this action to enforce its rights under the parties' agreements as well as at law and in equity.

## CAUSES OF ACTION

### Count I: Breach of Contract

14.     PSA repeats and realleges the previous allegations as though fully set forth herein.

15.     The Original Agreement, as amended, as well as the Second Agreement, are valid and binding contracts.

16.     Defendants breached their contractual obligations by failing to fulfil the terms of those agreements, and by failing to cure the default within the time allowed by the agreements.

17.     Defendants further breached the duty of good faith and fair dealing implied in the agreements by, among other things, failing to take reasonable steps and precautions to see that the terms of the agreement were fulfilled, failing to apply the deposits paid by PSA toward the performance of the agreements, and intentionally misleading PSA about Defendants' ability and intention to fulfill the terms of the agreements.

18.     PSA has satisfied all of its contractual obligations under the agreements.

6

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

19.    PSA has been substantially and materially damaged by Defendants' breach of the agreements and failure to perform and will continue to experience damage as a result of Defendants' breach.

20.    PSA is therefore informed and believes that it is entitled to (1) actual damages, (2) consequential damages, (3) attorney's fees, costs, and litigation expenses, (4) prejudgment interest at the highest legal rate, and (5) such other relief as is just, equitable, and proper.

### Count II: Fraud in the Inducement

21.    PSA repeats and realleges the previous allegations as though fully set forth herein.

22.    Defendants made certain representations to PSA to enter into the agreements and to pay the deposited amounts prior to performance of the agreements, including but not limited to: (1) that Ikon and Deaza had the ability to fulfill the terms of the agreements and deliver purchased products as promised; (2) that Defendants required pre-payment of the deposited amounts in order to complete the terms of the agreements; (3) that Defendants would use the amounts deposited by PSA to obtain and deliver the products as promised; and (4) that time was of the essence because another buyer(s) wanted to seize the deal.

23.    Each of the representations listed above was false, and Defendants also made other false representations to induce PSA to enter into the agreements.

24.    Each of the representations listed above, as well as the other false representations made by Defendants, was material to PSA's decision to enter into the agreements.

25.    Defendants knew that the above representations were false or had reckless disregard of the truth or falsity of each of the representations listed above, as well as other false representations made by Defendants.

7

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

26.    Defendants intended that PSA act upon each of the representations listed above, as well as the other false representations made by Defendants.

27.    PSA did not know of the falsity of the representations listed above or the other false representations made by Defendants.

28.    PSA relied on the truth of the representations listed above and the other false representations made by Defendants in making its decision to enter into the agreements and to entrust and deposit funds with Defendants.

29.    PSA had a right to rely on the truth of the representations listed above and the other false representations made by Defendants in making its decision to enter into the agreements.

30.    PSA has suffered and will continue to suffer consequent and proximate injuries and damages as a result of the misrepresentations listed above and the other misrepresentations made by Defendants.

31.    PSA is therefore informed and believes that it is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the fraudulent acts, omissions, and representations inducing PSA to enter the agreements in an amount to be determined by the finder of fact, (4) attorney's fees, costs, and litigation expenses, (5) prejudgment interest at the highest legal rate, and (6) such other relief as is just, equitable, and proper.

**Count III: Breach of Contract Accompanied by a Fraudulent Act**

32.    PSA repeats and realleges the previous allegations as though fully set forth herein.

33.    Defendants breached the agreements for the reasons stated above.

34.    Defendants intended to defraud PSA through their breach of the agreements.

35.    Defendants' breach of the agreements was accompanied by fraudulent acts, including, but not limited to, Defendants' dishonesty and unfair dealing toward PSA by

8

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

subsequently making repeated false assurances to PSA that Defendants had the ability to deliver the products as promised, that Defendants were making good faith efforts to complete the terms of the agreements when in fact they were not, and also by converting the funds deposited by PSA for obtaining the contracted-for products and applying those funds to, among other things, Defendants' unrelated debt and expenses, including Deaza's personal expenses.

36.    PSA has suffered and will continue to suffer consequent and proximate injuries and damages as a result of the misrepresentations and fraudulent acts listed above and other misrepresentations and fraudulent acts of Defendants.

37.    PSA is therefore informed and believes that it is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the fraudulent acts, omissions, and representations accompanying the breaches of the agreements in an amount to be determined by the finder of act, (4) attorney's fees, costs and litigation expenses, (5) prejudgment interest at the highest legal rate, and (6) such other relief as is just, equitable, and proper.

<u>**Count IV: Unfair Trade Practices – S.C. Code Ann. § 39-5-140**</u>

38.    PSA repeats and realleges the previous allegations as though fully set forth herein.

39.    In direct violation of South Carolina's Unfair Trade Practices Act, Defendants knowingly and willfully engaged in unfair and deceptive acts, including, without limitation, fraudulently inducing PSA to enter into the agreements and to deposit a substantial amount of money toward the performance of the agreements, and then converting PSA's deposited funds and applying those funds to, among other things, unrelated debts and expenses, including the personal expenses of Deaza.

40.    Defendants' unfair and deceptive acts were committed in the conduct of trade and commerce.

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

41.    Defendants' unfair and deceptive acts affect the public interest and demonstrate the potential for repetition, evidenced by the fact, among others, that Defendants repeatedly deceived and misled PSA in the course of these transactions, which transactions implicated international trade, regulation, and commerce.

42.    PSA has suffered and will continue to suffer substantial monetary and property loss as a result of Defendants' unfair and deceptive acts.

43.    PSA is therefore informed and believes that it is entitled to (1) actual damages, (2) consequential damages, (3) treble damages as a result of Defendants' intentional, willful, or knowing conduct in an amount to be determined by the finder of fact, (4) attorney's fees and costs, (5) prejudgment interest at the highest legal rate, and (6) such other relief as is just, equitable, and proper.

### Count V: Unjust Enrichment

44.    PSA repeats and realleges the previous allegations as though fully set forth herein.

45.    PSA conferred a benefit on Defendants by paying substantial deposits in order to secure Defendants' performance under the agreements.

46.    Defendants realized this benefit by taking possession of PSA's funds and retaining them for their personal use rather than using the deposited funds for their intended use in carrying out the terms of the agreements.

47.    Defendants failed to perform under the agreements.

48.    Despite having failed to perform the agreements, Defendants have never returned the funds that PSA deposited, as required by the agreements.

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

49.    Defendants thus retained the benefit of PSA's funds, and in fact applied those funds to their personal use, and for uses other than their intended purpose, and it would be inequitable and an unjust enrichment for Defendants to retain this benefit.

50.    PSA is therefore informed and believes that it is entitled to (1) full and complete restitution of the of the amount or value of the benefit conferred by PSA to Defendants, (2) full and complete disgorgement of all subsequent benefits or profits gained or earned from the unjust retention of the original benefit conferred by PSA to Defendants, (3) attorney's fees, costs, and litigation expenses, (4) prejudgment interest at the highest legal rate, and (5) such other relief as is just, equitable, and proper.

### Count VI: Conversion

51.    PSA repeats and realleges the previous allegations as though fully set forth herein.

52.    Pursuant to the agreements, PSA deposited and entrusted the total sum of $4,534,504.00 with Ikon to assist and fund Ikon in its performance under the agreements.

53.    The agreements provide in certain terms that Ikon was required to either deliver the contracted-for products or return PSA's deposited funds no later than June 1, 2022.

54.    Ikon and Deaza failed to either deliver the products as promised or return the deposited funds by June 1, 2022.

55.    Upon information and belief, Defendants used PSA's deposited funds not in furtherance of performance of the agreements, but rather converted these entrusted funds for their own personal use to expand and/or make certain improvements to Ikon's facilities and inventory, purchase a home and vehicles for personal use, and to pay off other debts and expenses belonging to Defendants, among other things, which were not authorized under the agreements.

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

56.    Given Defendants' failure to perform under the agreements, and given their conversion and unauthorized use of PSA's entrusted funds, Ikon and Deaza no longer have any right or title to PSA's deposited funds.

57.    Given Defendants' failure to perform under the agreements, PSA has sole right and title to the deposited funds.

58.    Despite demand for the return of these entrusted funds, Defendants have failed and refused to return PSA's deposited funds and continue to wrongfully exercise the right of ownership over those funds to the exclusion of PSA's rights.

59.    PSA has not authorized Defendants to continue to exercise control over the deposited funds and has in fact demanded the immediate return of those funds.

60.    Despite these demands, Defendants have refused to return the deposited funds and continue to exercise unauthorized rights over and possession of PSA's deposited funds to the exclusion of PSA's legitimate rights to the funds.

61.    PSA is therefore informed and believes that it is entitled to (1) actual damages, including, without limitation, the loss of use of the wrongfully detained deposited funds and the full amount of the deposited funds never returned, (2) punitive damages for the Defendants' intentional wrongdoing in an amount to be determined by the finder of fact, (3) attorney's fees, costs, and litigation expenses, (4) prejudgment interest at the highest legal rate, and (5) such other relief as is just, equitable, and proper.

## Count VII: Negligent Misrepresentation

62.    PSA repeats and realleges the previous allegations as though fully set forth herein.

63.    Defendants made numerous representations to PSA that it knew were false or should have known were false,  including, but not limited to: (1) that Ikon and Deaza had the

12

ability to fulfill the terms of the agreements and deliver purchased products as promised; (2) that Defendants required pre-payment of the deposited amounts in order to complete the terms of the agreements; (3) that time was of the essence to make pre-payment because another buyer(s) was prepared to seize the deal; (4) that Defendants would use the amounts deposited by PSA to obtain and deliver the products as promised;  (5) that partial delivery of the products had been made at the Port of Charleston, (6) that Defendants have ownership of and title in and to the weapons necessary to fulfill the terms of the agreement, and (7) Defendants have the weapons stored in storage facilities in Montenegro and Serbia and available for delivery.

64.    Defendants had a pecuniary interest in making these false representations, as they were made in the course of Ikon's business and because Defendants had received a substantial deposit of funds by PSA for the purchase of the promised products.

65.    Defendants, knowing that PSA was relying on their representations and assurances of complete performance under the agreements, owed a duty of care to see that they communicated truthful information to PSA.

66.    Defendants, however, breach that duty by failing to exercise due care and repeatedly making false and misleading representations and assurance to PSA relating to Defendants' ability to complete performance under the agreements.

67.    PSA justifiably relied on the repeated representations and assurances that Defendants could render complete performance under the agreements thereby inducing PSA to enter into the agreements, make a substantial deposit of funds for the purchase of the products, and enter into certain amendments to the agreements delaying delivery all for the benefit of Defendants.

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

68.    PSA has suffered a pecuniary loss in the amount of its substantial deposit of funds and other damages and costs incurred as the proximate result of relying on the repeated false representations and assurances made by Defendants.

69.    PSA is therefore informed and believes it is entitled to (1) actual damages, (2) consequential damages, (3) attorney's fees, costs, and litigation expenses, (4) prejudgment interest at the highest legal rate, and (5) such other relief as is just, equitable, and proper.

**Count VIII: Equitable Accounting**

70.    PSA repeats and realleges the previous allegations as though fully set forth herein.

71.    PSA reposed special trust and confidence in Defendants by entrusting to Ikon the amount of $3,722,520 for the purchase of products under the Original Agreement and $744,504 for the purchase of the products under the Second Agreement prior to Ikon performing under the agreements.

72.    PSA only entrusted these significant deposits of funds with Ikon based upon Defendants' repeated representations and assurances that Defendants were sophisticated, reputable, and trustworthy within the firearms industry; that Defendants had confidential international contacts that could broker the subject transactions; and that Defendants could and would deliver the products as promised.

73.    Defendants breached this special trust and confidence by, among other things, fraudulently inducing PSA to enter the agreements, intending to defraud PSA through their breach of the agreements, engaging in unfair and deceptive acts or practices, unjustly enriching themselves at the expense of PSA, converting the deposited PSA funds for unauthorized use, and making numerous representations relating to the agreements that they knew were false or should have known were false.

14

74.     An equitable accounting is necessary to prevent an unjust enrichment by disclosing Defendants' unauthorized use of PSA's deposited funds and all profits derived therefrom and requiring the relinquishment thereof and to further prevent such unjust enrichment by disclosing and requiring the relinquishment of profits received as the result of a breach of a confidential or fiduciary duty.

75.     PSA is therefore informed and believes it is entitled to (1) an accounting from Defendants of all money received from PSA in connection with the agreements and all subsequent profits gained or earned therefrom, (2) an order awarding PSA all damages as may be commensurate with the results of the accounting, (3) attorney's fees, costs, and litigation expenses, (4) prejudgment interest at the highest legal rate, and (5) such other relief as is just, equitable, and proper.

### Count IX: Attachment – S.C. Code Ann. § 15-19-10 *et seq.*

76.     PSA repeats and realleges the previous allegations as though fully set forth herein.

77.     Defendants breached their contractual obligations under the agreements for the reasons set forth above and are liable to PSA for actual, incidental, and consequential damages as a result of Defendants' breach.

78.     As a direct and proximate result of this breach, PSA is entitled to take possession of Defendants' assets and have those assets applied to any and all damages and expenses PSA experiences or incurs as a result of said breach, including reasonable attorneys' fees, costs, and litigation expenses incurred in this action.

### REQUEST FOR JURY TRIAL

79.     PSA respectfully requests a jury trial on all issues so triable.

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

**WHEREFORE**, having set forth its claims, PSA prays as follows:

1.     That the Court enter judgment against Defendants both individually and jointly and severally for the full extent of damages, actual, equitable and punitive, that PSA has suffered as a result of the harms caused by Defendants which are set forth in the allegations and claims above; that PSA recover all funds deposited with and entrusted to Defendants in the amount of $4,534,504.00; that Defendants be disgorged of all their unjustly acquired profits or benefits generated as a result of their wrongful conduct; that PSA recover prejudgment interest on the full amount of the funds deposited with and entrusted to Defendants at the highest rate permitted by law; that said amount be trebled under the provisions of the South Carolina Unfair Trade Practices Act; and that PSA be awarded the full amount of its attorney's fees, costs, and litigation expenses incurred for having to hire counsel and bring this lawsuit;

2.     That PSA be awarded all consequential damages suffered as a direct result of Defendants failing and refusing to perform under the terms of the agreements among the parties, including lost profits for the breaches of the agreements and for breaches of the common and statutory law claims asserted in this lawsuit;

3.     That PSA have and be awarded punitive damages against Defendants for the fraud, recklessness, gross negligence, and dishonesty of Defendants in an amount to be determined by the jury;

4.     That the Court order Defendants to transfer any and all interest, if any they have, in and to the weapons that Defendants have repeatedly represented they own in Montenegro and Serbia, to PSA;

5.     That the Court order a full and complete accounting of the books, records, and bank accounts of Ikon and Deaza to determine where the entrusted funds where spent, who benefited

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

from such expenditures, and any subsequent profits gained or earned with the entrusted funds, with the goal of determining if, to what extent, and where there are assets owned by Ikon and Deaza that are available to satisfy any judgment against them in this case;

6.    That the Court enjoin Defendants from wasting or expending any assets during the pendency of this lawsuit or otherwise encumbering its assets as such assets must be maintained and preserved to reimburse PSA for its losses, damages, prejudgment interest, attorney's fees, treble damages, punitive damages, litigation expenses, and costs or otherwise safeguarded to be available to satisfy any judgment awarded to PSA, as such assets have been secured with the funds entrusted to Defendants under the agreements;

7.    That the Court order that Defendants specifically perform the agreements, including the enforcement of PSA's security interest in Ikon Weapons, LLC, and direct that Defendants transfer ownership of Ikon, as well as all property and interests held by Ikon, and by Deaza in Ikon, to PSA;

8.    That the Court further order that the assets of Defendants be attached and enjoined in order to preserve and protect PSA's ability to recover under its claims asserted herein, pursuant to S.C. Code Ann. § 15-19-10 *et seq.*; and

9.    That the Court award to PSA such other and further relief as it deems just and proper.

SIGNATURE PAGE FOLLOWS

17

Respectfully submitted,

s/Mitchell Willoughby
Mitchell Willoughby, S.C. Bar No. 6161
Andrew J. D'Antoni, S.C. Bar No. 100919
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street (29201)
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
adantoni@willoughbyhoefer.com

*Attorneys for Plaintiff Palmetto State Armory, LLC*

July 6th, 2022
Columbia, South Carolina

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

# EXHIBIT A

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

## PURCHASE AGREEMENT

Thi s Purchase Agreement (the "Agreement "), is made effective as of June 16, 2021 (the "Effective Date"), by and between Palmetto State Armory, LLC a duly organized and existing entity under the laws of the State of South Carolina (referred to herein as "Buyer"), and Ikon Wapons, LLC, a limited liability company duly organized and existing under the laws of the State of North Carolina, United States of America (referred to herein as "Seller").

### Recitals:

Buyer will purchase from Seller and Seller will sell to Buyer certain product(s) as described herein.

In consideration of the above recitals and the covenants and conditions contained in this Agreement, and for good and valuable consideration, the parties agree as follows:

### 1.    Definition of Product and Purchase Order

The term "Product" means those items for which Buyer has issued a purchase order to Seller ("Purchase Order"), such Purchase Order attached hereto and incorporated herein. In particular, Buyer's Purchase Order refers to the attached Purchase Order:

| | |
|---|---|
| Date: | June 16, 2021 |
| Description: | AK-47 kits |
| | 5,500 Yugoslavian AK M70 Kit of Parts-Underfold Stock |
| | 2,500 Yugoslavian AK M70 Kit of Parts - Fixed Stock |
| Price: | $3,760,000.00 USD |
| Destination: | FOB USA Charleston SC. |
| Delivery Date: | |

### 2.    Term

The term of this Agreement shall commence on the Effective Date stated above.

### 3.    Issuance of Purchase Order

The Purchase Order issued by Buyer to Seller shall be governed by and be deemed to include the provisions of this Agreement. In the event of any inconsistency between the terms and conditions of this Agreement and the terms of the Purchase Order, the terms and conditions of this Agreement shall prevail.



ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

4.    **Packing, Shipping, Delivery, and Title**

(a)    All items shall be packed, marked, and shipped in a commercially reasonable manner.

(b)    Seller shall secure the Product delivered from foreign suppliers to the Destination, CIF Incoterms 2020/DDP. Buyer shall be responsible for any sales taxes, VAT taxes, and personal or ad valorem taxes.

(c)    Each shipment shall require the following documents (referred to herein as the "Shipping Documents"):

> (1) Original certificate of quality issued by SGS, an independent inspectioncompany;
> (2) Original certificate of origin;
> (3) Bill of lading, airway bill, or other transport document
> (4) Original commercial invoice;
> (5) Packing list; and
> (6) Certificate of freight prepaid and clear.

(d)    Notwithstanding anything to the contrary within, transfer of title to the Product occurs when the Seller has been paid 100% of the Total Amount Due.

5.    **Payment Terms**

(a)    Buyer shall deposit an amount equal to 50% of the total amount due for the totalvalue with the Seller within 3 days of the execution of this Agreement.

(b)    When Buyer's order is ready for shipment, Buyer will receive the Shipping Documents via email or fax. Upon receipt by Buyer of an SGS report with a "satisfactory" result and Shipping Documents confirming quantity, no later than 2:00 p.m. on the immediately following business day, Buyer shall transfer by wire transfer the remaining 50% of the total value due to Seller.

6.    **Breach of the Agreement**

(a)    Either party may cancel this Agreement in the event the other party is in default of any of the material provisions of this Agreement or is in default under any Purchase Order, and the fault is not cured within thirty (30) days of receipt by the other party of written notice from the non-defaulting party giving notice specifying the nature of the default an demanding the default be cured.

(b)    If Buyer fails to comply with any provision of this Agreement or a Purchase Order, Seller shall be entitled to any and all remedies provided in law or equity.

(c)    In the event this Agreement is terminated pursuant to Paragraph 6(a) by Buyer,

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

Buyer waives any and all claims for damages of any kind or nature against Seller, and as Buyer's sole and exclusive remedy Seller shall return the Buyer's Deposit in accordance with Buyer's written instructions.

(d)     Seller shall be entitled to an "extension of delivery" for each delivery of not more than twenty-one (21) consecutive days, provided that Seller serves notice to Buyer not later than the next business day following the last day of the delivery period and such extension is due to "Good Cause." Good Cause shall be defined as any delay caused by a supplier, carrier, government agency, transport intermediary, or any other party that is not under the direct control of Seller, and any Force Majeure event (as defined herein).

## 7.     Legal Provisions

(a)     Warranty. Seller warrants to Buyer that all products delivered under the Purchase Order shall be free from defects in materials and workmanship, that all products will conform to the requirements of the Purchase Order including, but not limited to, the applicable descriptions and specifications. Except for the warranty contained in this paragraph, such products are sold "as is, where is," without any warranty of merchantability of fitness for a particular purpose.

(b)     Confidential Information. Both parties shall regard as highly confidential all information developed by or communicated to it in the course of or in connection with its performance under this Agreement, and shall not, without the non-disclosing party's prior, express, and written approval, make any oral or written disclosure of the confidential information, either during or after the term of this Agreement, except to the disclosing party's employees and other authorized persons who may be designated to work with such party in performing under this Agreement.

(c)     Non-circumvention. Neither Party shall solicit or accept funds or information, directly or indirectly, from any from any (past, present, or prospective) client, investor, business partner, researcher, general partner, limited partner, prospective partner, shareholder, service provider or associate of the other party (each, an "**Exclusive Contact**"), unless the other party had a relationship with such Exclusive Contact pre-dating the Effective Date.

(d)     Notices. All notices and other communications required or authorized under this Agreement shall be given in writing either by personal delivery, facsimile , by email or by certified mail, as follows:

<div style="margin-left:2em;">

Seller:      Ikon Weapons LLC
             234 Liberty Hill Church Rd.
             Mt. Gilead, NC 27325


Buyer:      Palmetto State Armory
             3850 Fernandina Road
             Columbia, SC 29210

</div>

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

Ben Fortin
Ben.Fortin@PalmettoStateArmory.com

(e)    Compliance With Laws. In performing under this Agreement, all applicable governmental laws, regulations, orders, and other rules of duly-constituted authority will be followed and complied with in all respects by both parties. Further, both parties agree and warrant that in the performance of their obligations under this Agreement, they shall not take any action which will render the other party liable for a violation of the U.S. Foreign Corrupt Practices Act, which prohibits the offering, giving, or promising to offer or give, directly or indirectly, money or anything of value to any official of a government, political party or instrumentality thereof in order to assist it or Buyer in obtaining or retaining business.

(f)    Partial Invalidity. If any provisions of this Agreement or of any Purchase Order is or becomes void or unenforceable by force or operation of law, the other provisions shall remain valid and enforceable.

(g)    Modification. Oral statements and understandings are not valid or binding, and neither this Agreement nor any Purchase Order shall be changed or modified except by a writing signed by both parties.

(h)    Governing Law and Disputes. This Agreement is subject to, and to be construed in accordance with, South Carolina law.

(i)    Force Majeure. No party shall be liable for damage or delay caused by events beyond the reasonable control of the party, including, but not limited to, fire, explosion, flood, power failure, disruptions of telecommunications or other casualty accident, earthquake, landslide , hurricane, tropical storm, or other natural disaster, acts of war, blockade, boycott, strike, lockout, pandemic, embargo, lockdown, existing or future legislation or regulation or any action of any authority.

(j)    Right to Cancel. Seller shall have seven (7) days starting the day after Seller's Acceptance to obtain confirmation of delivery schedule as stated in the Agreement with Manufacturer. If Seller is unable to obtain confirmation with Manufacturer, or confirmation of an amended delivery schedule approved in writing by Buyer, which shall constitute a modification to this Agreement , Seller shall have the right to cancel this Agreement by written notice to Buyer. If this Agreement is canceled, Buyer's Deposit shall be returned to Buyer in full.

[Balance of this page intentionally left blank.]

Each party to this Agreement has executed as of the Effective Date in multiple counterpart, each of which shall be treated as an original.

**BUYER:**

By: _John Tweddl;_
_Gen. Counsel_

**SELLER:**

By: _____
_CEO MATT JUNE 16 2021_

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

# EXHIBIT B

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

**AMENDMENT TO PURCHASE AGREEMENT**

This Amendment to the Purchase Agreement entered into this 17 day of June 2021, by and between Ikon Weapons LLC ("Seller") and Palmetto State Armory, LLC ("Buyer"); individually known as a "Party", and collectively, the "Parties,"

WITNESSETH THAT:

Whereas, Ikon Weapons LLC ("Seller") and Palmetto State Armory, LLC ("Buyer") entered into a Purchase Agreement to sell/purchase certain AK part kits; and,

Whereas, as a condition precedent to Buyer receiving the aforementioned goods, it will be required to fully fund the transaction;

Whereas, Seller and Buyer agree to amend the terms referenced in said Purchase Agreement as follows:

Now, therefore in consideration of the mutual covenants and promises by and between the parties hereto made, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**Pledge and Security Provision**

As security for the transaction set forth in the Purchase Agreement the Seller hereby pledges as security in favor of the Buyer 100% of the Stock in Ikon Weapons LLC.  It is clearly understood by the parties that if for any reason the Buyer does not receive the products FOB Charleston, SC on or before November 30th, 2021, or receive a full refund of all monies paid by the same date, then the officers and directors of IKON WEAPONS LLC will deliver to Buyer all documents reasonable and necessary to transfer full and unencumbered ownership of IKON WEAPONS LLC to Buyer.

Further it is agreed and understood that all directors officers and employees of IKON WEAPONS LLC will remain in their current positions for a minimum of one year. Should any such person voluntarily leave their position prior to the one year period then they agree not to compete with IKON WEAPONS LLC for a period of one year after their separation.   These provisions apply to all employees but specifically and

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

not limited to Suliban Esteban Deaza.

In witness whereof, the parties have caused these presents to be executed by it's duly authorized officers or members under seal as of the day and year first above written as the date of these presents. All other terms of the Agreement not specifically modified in this Amendment shall remain in full force and effect.

**SELLER**
**IKON WEAPONS LLC**

Signature:
Name: Suliban Deaza
June 17 2021

**BUYER**
**PALMETTO STATE ARMORY LLC**

Signature: _____
Name:

# EXHIBIT C

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241



# INVOICE

Date: 8/31/21
Invoice #: 173

234 Liberty Hill Church Rd, Mt. Gilead, NC 27325 (843) 251-6488

CUSTOMER TO: BEN FORTIN
**PALMETTO STATE ARMORY**
3760 Fernandina Rd
Columbia, SC 29210

SHIP TO: BEN FORTIN
**PALMETTO STATE ARMORY**
3760 Fernandina Rd
Columbia, SC 29210

| S.O No | TERMS | FFL# | CFLC# |
|---|---|---|---|
| | DISTRIBUTOR | | |

| PO | QTY | DESCRIPTION | SERIAL No | PRICE EACH | AMOUNT |
|---|---|---|---|---|---|
| | 5,000 | ZASTAVA ARMS M70 | | $ 450.00 | $ 2,250,000.00 |
| | 1,500 | ZASTAVA ARMS M76 SEMI AUTO - Includes Case, 5 rd mags, sling, Bayonet and Deactivated Scope. | | $ 950.00 | $ 1,425,000.00 |
| | 297 | ZASTAVA ARMS Z10 AUTO | | $ 160.00 | $ 47,520.00 |
| | | | | | |
| | | PSA to cover shipping. 20% due upon receiving of this invoice | | | |
| | | First Bank in Florence, SC | | | |
| | | *ACCOUNT NUMBER: | | | |
| | | *ROUTING NUMBER | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | *SHIPPING NOT INCLUDED IN TOTAL | | | |

| | |
|---|---|
| Subtotal= | $ 3,722,520.00 |
| Due 8-31-21 20%= | $ 744,504.00 |

Thank you for you order don't hesitate to call us if you have any questions.

Page 1

# EXHIBIT D

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

# SECOND AMENDMENT TO PURCHASE AGREEMENT

This Second Amendment to the Purchase Agreement entered into this _6_ day of November 2021, by and between Ikon Weapons LLC ("Seller") and Palmetto State Armory, LLC ("Buyer"); individually known as a "Party", and collectively, the "Parties,"

WITNESSETH THAT:

Whereas, Ikon Weapons LLC ("Seller") and Palmetto State Armory, LLC ("Buyer") entered into a Purchase Agreement to sell/purchase certain AK part kits; and,

Whereas, the Seller has indicated that there will be a delay in the delivery of the Product

Whereas, Seller and Buyer agree to amend the terms referenced in said Purchase Agreement as follows:

Now, therefore in consideration of the mutual covenants and promises by and between the parties hereto made, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

While reserving all rights, Purchaser hereby extends the acceptance date for delivery of the Product through March 1, 2023.

In witness whereof, the parties have caused these presents to be executed by it's duly authorized officers or members under seal as of the day and year first above written as the date of these presents. All other terms of the Agreement not specifically modified in this Amendment shall remain in full force and effect.

| SELLER | BUYER |
|---|---|
| IKON WEAPONS LLC | PALMETTO STATE ARMORY LLC |
| Signature: | Signature: _____ |
| Name: Suliban Deaza | Name: |

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3024241

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

# EXHIBIT E

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

SECOND AMENDMENT TO PURCHASE AGREEMENT

This Second Amendment to the Purchase Agreement entered into this *26* day of February 2022, by and between Ikon Weapons LLC ("Seller"), Suliban Esteban Deaza, and Palmetto State Armory, LLC ("Buyer"); individually known as a "Party", and collectively, the "Parties,"

WITNESSETH THAT:

Whereas, Ikon Weapons LLC ("Seller") and Palmetto State Armory, LLC ("Buyer") entered into a Purchase Agreement to sell/purchase certain AK part kits; and,

Whereas, the parties acknowledge that there will be a delay in the delivery of the AK part kits;

Whereas, the parties wish to formally extend the delivery date and to further secure its position the Buyer will obtain a personal guaranty of Suliban Esteban Deaza as to the transaction;

Whereas, Seller and Buyer agree to amend the terms referenced in said Purchase Agreement as follows:

Now, therefore in consideration of the mutual covenants and promises by and between the parties hereto made, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

Delivery Date

The Delivery Date shall be extended for a period not exceeding ninety (90) days through June 1, 2022.

Guaranty

This Second Amendment so executed by Suliban Esteban Deaza in his individual capacity will serve as a personal performance guaranty in favor of the Buyer in the amount of the transaction in chief, that being $3,760,000* and his prior as of yet unfulfilled transaction with Zastava Arms in the amount of $3,722,520.— *$744,504* To the extent that either of the entire transactions as contemplated are not completed, Suliban Esteban Deaza, will be liable to the Buyer for whatever deficiency the Buyer experiences including all associated fees of collection specifically but not limited to attorney fees.

*Import fees, tax and Shipping not included.

[Signatures on following page.]

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

SELLER
IKON WEAPONS LLC

Signature:

Name: Suliban Deaza

SULIBAN ESTEBAN DEAZA

Signature:

BUYER
PALMITTO STATE ARMORY LLC

Signature:

Name: Jamin McCallum



ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

# EXHIBIT F

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

# WILLOUGHBY & HOEFER, P.A.
## ATTORNEYS & COUNSELORS AT LAW

MITCHELL M. WILLOUGHBY
JOHN M.S. HOEFER
RANDOLPH R. LOWELL**
TRACEY C. GREEN
CHAD N. JOHNSTON
JOHN W. ROBERTS
ELIZABETH ZECK*
ELIZABETHANN L. CARROLL
ANDREW J. D'ANTONI
R. WALKER HUMPHREY, II***
ANDREW R. HAND****
J. JOSEPH OWENS
MARGARET M. O'SHIELDS

ELIZABETH S. MABRY
J. PATRICK HUDSON
OF COUNSEL

JOSEPH H. FARRELL, III
SPECIAL COUNSEL

_____

*ALSO ADMITTED IN TEXAS
**ALSO ADMITTED IN WASHINGTON, D.C.
***ALSO ADMITTED IN CALIFORNIA
****ALSO ADMITTED IN NORTH CAROLINA

OFFICES:

**COLUMBIA**
930 RICHLAND STREET
P.O. BOX 8416
COLUMBIA, SC 29202-8416

AREA CODE 803
TELEPHONE 252-3300
FAX 256-8062

**CHARLESTON**
133 RIVER LANDING DRIVE
SUITE 200
CHARLESTON, SC 29492

AREA CODE 843
TELEPHONE 619-4426
FAX 619-4430

June 2, 2022

**VIA CERTIFIED MAIL, ELECTRONIC RETURN RECEIPT REQUESTED, AND EMAIL**
Mr. Suliban Deaza, CEO/Founder
Ikon Weapons, LLC
234 Liberty Hill Church Rd.
Mt. Gilead, NC 27325
suliban@ikonweapons.com

Mr. Suliban Deaza
Individually and as Personal Guarantor
1951 Pisgah Road, Suite 125
Florence, SC 29501
suliban@ikonweapons.com

RE:    **NOTICE OF SELLER'S DEFAULT ON PURCHASE AGREEMENT AND
          DEMAND THAT DEFAULT BE CURED WITHIN THIRTY (30) DAYS**

*June 16, 2021 Purchase Agreement By and Between Palmetto State Armory, LLC,
Buyer, and Ikon Weapons, LLC, Seller, as Amended by the Amendment to Purchase
Agreement, dated June 17, 2021 and Second Amendment to Purchase Agreement,
dated February 28, 2022*

*Agreement to Purchase Certain Zastava Arms Products*

Mr. Deaza:

         As you know, this law firm represents Palmetto State Armory, LLC ("PSA"). The purpose
of this letter is to provide written notice that Ikon Weapons, LLC ("Ikon") is in default and material
breach of the June 16, 2021 Purchase Agreement between Ikon and PSA, as amended by the

Mr. Suliban Deaza
June 2, 2022
Page 2 of 3

Amendment to Purchase Agreement, dated June 17, 2021, and Second Amendment to Purchase Agreement, dated February 28, 2022, (collectively, the "Original Agreement"), and the separate agreement between the parties to purchase certain Zastava Arms products (the "Second Agreement") due to Ikon's failure to deliver to PSA the agreed-upon products at the agreed-upon destination not later than June 1, 2022.

In our prior letter to Ikon, dated April 14, 2022,[1] we state in detail PSA's position and grounds for demanding that Ikon perform, as promised, under the agreements by, among other things, delivering the products under the agreements FOB USA Charleston SC not later than June 1, 2022, or providing a refund for the full amount ($4,534,504.00) deposited by PSA. We stated in no uncertain terms:

> [P]lease know that if Ikon fails to achieve the terms of the agreements by either delivering these products in full to PSA by June 1, 2022 or returning the full amount of money paid, PSA will seek any and all available remedies against Ikon and you, including the institution of litigation, execution of PSA's security interest in Ikon, enforcement of the personal guarantee that you provided for these transactions, and the recovery of its attorneys' fees and expenses in this matter.

In response to our April 14 letter, counsel for Ikon, Mr. Michael Beal, communicated to us by email, dated April 29, 2022, that Ikon "could not agree to a firm delivery date," and that although Ikon promised to deliver the products under both agreements by June 1, 2022 pursuant to the Second Amendment to the Purchase Agreement—a promise that you *personally* and *individually* guaranteed—you "now regret[ ] that decision." Regretting a contractual promise to perform, however, is not a defense to Ikon's default and material breach of the parties' agreements.

As of the date of this writing, Ikon has failed to perform under the agreements by failing to deliver the agreed-upon products FOB USA Charleston SC not later than June 1, 2022, as promised. Therefore, Ikon is in material breach of the agreements and, as stated above, notice of default is hereby provided. Further, pursuant to Paragraph 6(a) of the Original Agreement, PSA demands that Ikon, having written notice that it is in default and material breach, cure said default and material breach within thirty (30) days of the receipt of this letter by either:

(1) Delivering all products FOB USA Charleston SC, as promised, and in accordance with the specific terms of the Original Agreement and Second Agreement;[2] or

---

[1] Please note that this letter was sent by John Roberts, Esquire, formerly of this law firm. Mr. Roberts is no longer an attorney employed by the law firm of Willoughby & Hoefer, P.A., and thus, all future communications should be directed to the undersigned.

[2] As we explained in our email communication to Mr. Beal on April 29, 2022, the products delivered must conform to the exact descriptions in the agreements (no substitutes will be accepted) and must be fully available (cleared customs, etc.) to PSA not later than the expiration of the 30-day cure period. PSA will not, under any circumstances, accept any products which do not conform exactly to the product specifications agreed to, and Ikon simply bringing the products to a "free trade zone," as you previously suggested, is not acceptable performance.

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

Mr. Suliban Deaza
June 2, 2022
Page 3 of 3

ELECTRONICALLY FILED - 2022 Jul 06 10:49 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

(2) Immediately refunding to PSA the full amount of $4,534,504.00 deposited by PSA pursuant to the Original Agreement and Second Agreement.

Please know that failure to fully cure Ikon's default and material breach or refund the full amount deposited by PSA within this 30-day cure period _**will**_ result in PSA seeking any and all remedies against Ikon and you, personally, including initiating litigation in an appropriate judicial forum, execution of PSA's security interest in Ikon, and enforcement of the personal guarantee that you provided for these transactions and recovery of PSA's attorney's fees and expenses in this matter.

We reiterate what we stated in our April 14 letter that in any litigation PSA will seek to discover and obtain all documents, information, and materials relevant to Ikon's performance under the agreement and its communications with PSA and other third parties to verify whether the information provided to PSA has been accurate and whether Ikon knew, or should have known, it would be unable to perform under the agreements, notwithstanding its prior representations to PSA. Moreover, PSA will also seek financial documents from Ikon, you, and other third parties, including, without limitation, tax returns, account statements, checks, invoices, receipts, and other bookkeeping and financial materials, to determine the precise location and use of PSA's deposited funds, preserve and protect PSA's security interest in Ikon, and identify assets to satisfy a potential judgment.

That said, this letter, like the April 14 letter, puts Ikon on notice of forthcoming litigation (assuming it fails to fully cure or fully refund amounts deposited within the 30-day cure period), so Ikon is under a duty to preserve such documents, information, and materials, and to take no action that would deplete, diminish, or dissipate corporate assets.

Sincerely,

**WILLOUGHBY & HOEFER, P.A.**

_Mitchell Willoughby_

Mitchell Willoughby

cc:   Jamin McCallum (*via email only*)

Julian Wilson (*via email only*)

Ben Fortin (*via email only*)

Michael Beal, Esquire (*via email only*)
*Counsel for Ikon Weapons, LLC*

# EXHIBIT B

ELECTRONICALLY FILED - 2022 Aug 24 9:25 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | **ELEVENTH JUDICIAL CIRCUIT** |
| **COUNTY OF LEXINGTON** | ) | **C/A #2022-CP-32-02241** |
| | ) | |
| **Palmetto State Armory, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **DEFENDANTS' AMENDED ANSWER** |
| | ) | **TO PLAINTIFF'S COMPLAINT** |
| **Ikon Weapons, LLC and Suliban** | ) | |
| **Esteban Deaza,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

The Defendants, answering the Plaintiff's Complaint, would allege and show unto the Court as follows:

## **FOR A FIRST DEFENSE**

1. The allegations contained within paragraph 1 are admitted.

2. The allegations contained within paragraph 2 are admitted.

3. The allegations contained within paragraph 3 are admitted.

4. The allegations contained within paragraph 4 are denied.

5. The Defendants admit only so much of the allegations contained within paragraph 5 as could be construed to allege that the Plaintiff and the Defendant Ikon entered into an agreement by which Plaintiff was to purchase firearms from Ikon, that Deaza met with the Plaintiff at the location mentioned within said paragraph and that the firearms in question would be purchased through foreign governments.

6. The Defendants admit only so much of the allegations contained within paragraph 6 as could be construed to allege that the Plaintiff and the Defendant Ikon entered into an

agreement by which Plaintiff agreed to purchase and Ikon agreed to sell the firearms referenced in Exhibit "A," which speaks for itself.

7.    The Defendants admit only so much of the allegations contained within paragraph 7 as could be construed to allege that the parties entered into Exhibit "B," which speaks for itself; and that, at the request of the Plaintiff, additional funds were paid to Ikon to avoid any other potential buyers purchasing the firearms in question from the foreign government.

8.    The Defendants admit only so much of the allegations contained within paragraph 8 as could be construed to allege that the Plaintiff and the Defendant Ikon entered into Exhibit "C" to purchase additional weapons from Zastava Arms and that the amounts contained within paragraph 8 are correct and the deposit was paid by Plaintiff to bind the transaction.

9.    The Defendants admit only so much of the allegations contained within paragraph 9 as could be construed to allege that, due to problems relative to international events beyond the control of the Defendants, there were delays in the delivery of the firearms to be purchased and that the parties amended their agreement to delay the delivery date of the products until not later than March 1, 2023.  The Defendants further admit that Exhibits "D" and "E," which speak for themselves, were entered into between the parties.

10.   The Defendants admit only so much of the allegations contained within paragraph 10 as could be construed to allege that the Plaintiff began pressuring the Defendant Ikon to accelerate delivery, which was not within Ikon's power to do based on circumstances beyond its control and the Defendants specifically deny that they fabricated a story about weapons being located on shipping containers in Charleston Harbor and would assert that

ELECTRONICALLY FILED - 2022 Aug 24 9:25 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

ELECTRONICALLY FILED - 2022 Aug 24 9:25 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

story was fabricated by an agent of the Plaintiff and that the Defendants neither confirmed nor denied that story.

11.   The Defendants admit only so much of the allegations contained within paragraph 11 as could be construed to allege that, after the Plaintiff breached the terms of the agreements between the parties and demanded return of its deposits in April of 2022, the attorneys for the Plaintiff subsequently sent Exhibit "F," which speaks for itself.

12.   The Defendants would admit only so much of the allegations contained within paragraph 12 as could be construed to allege that Ikon used PSA's funds to purchase the subject firearms, that Ikon owned and had title in and to the subject firearms but that for reasons beyond Ikon's control, it has been and continues to be unable to export all of the firearms from their current locations.   The Defendants further allege that they have provided documents showing ownership to Plaintiff and have offered, repeatedly, to show the firearms, which are overseas, to a representative of the Plaintiff.

13.   The Defendants admit only so much of the allegations contained within paragraph 13 as could be construed to allege that thirty days have elapsed since Exhibit "F" was sent by the attorneys for the Plaintiff.

14.   In response to paragraph 14, the Defendants reiterate and reallege each and every allegation contained within this pleading as if set forth verbatim

15.   The allegations contained within paragraph 15 are conclusions of law and, as such, require no response from the Defendants.

16.   The allegations contained within paragraph 16 are denied.

17.   The allegations contained within paragraph 17 are denied.

18.   The allegations contained within paragraph 18 are denied.

19.    The allegations contained within paragraph 19 are denied.

20.    The allegations contained within paragraph 20 are denied.

21.    In response to paragraph 21, the Defendants reiterate and reallege each and every allegation contained within this pleading as if repeated verbatim.

22.    The Defendants admit only so much of the allegations contained within paragraph 22 as are contained in subparagraphs 1, 2 and 3.

23.    In response to paragraphs 23, 24, 25, 26, 27, 28 and 29, the Defendants deny that they made any false representations or made any representations with reckless disregard of their truth or falsity.

24.    The allegations contained within paragraph 30 are denied.

25.    The allegations contained within paragraph 31 are denied.

26.    In response to paragraph 32, the Defendants reiterate and reallege each and every allegation contained within this pleading as if repeated verbatim.

27.    The allegations contained within paragraph 33 are denied.

28.    The allegations contained within paragraph 34 are denied.

29.    The allegations contained within paragraph 35 are denied.

30.    The allegations contained within paragraph 36 are denied.

31.    The allegations contained within paragraph 37 are denied.

32.    In response to paragraph 38, the Defendants reiterate and reallege each and every allegation contained within this pleading as if repeated verbatim.

33.    The allegations contained within paragraph 39 are denied.

34.    The allegations contained within paragraph 40 are denied.

35.    The allegations contained within paragraph 41 are denied.

ELECTRONICALLY FILED - 2022 Aug 24 9:25 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

36. The allegations contained within paragraph 42 are denied.

37. The allegations contained within paragraph 43 are denied.

38. In response to paragraph 44, the Defendants reiterate and reallege each and every allegation contained within this pleading as if repeated verbatim.

39. The allegations contained within paragraph 45 are denied.

40. The allegations contained within paragraph 46 are denied.

41. The Defendants would admit only so much of the allegations contained within paragraph 47 as could be construed to allege that the Defendant Ikon has been unable to fully perform the agreements by exporting the firearms which it has purchased and which remain overseas due to circumstances beyond the control of the Defendants.

42. The Defendants admit only so much of the allegations contained within paragraph 48 as could be construed to allege that the Defendants have not returned the funds that PSA deposited.

43. The allegations contained within paragraph 49 are denied.

44. The allegations contained within paragraph 50 are denied.

45. In response to paragraph 51, the Defendants reiterate and reallege each and every allegation contained within this pleading as if repeated verbatim.

46. The allegations contained within paragraph 52 are admitted, which constitute full payment for the initial contract and a twenty (20%) percent deposit on the Zastava invoice.

47. In response to paragraph 53, the Defendants would assert that the agreements referenced within said paragraph speak for themselves.

ELECTRONICALLY FILED - 2022 Aug 24 9:25 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

ELECTRONICALLY FILED - 2022 Aug 24 9:25 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

48. In response to paragraph 54, the Defendants admit only so much of the allegations contained within said paragraph as could be construed to allege that the products have not yet been delivered and the funds used to purchase the products have not been refunded.

49. The allegations contained within paragraph 55 are denied.

50. The allegations contained within paragraph 56 are denied.

51. The allegations contained within paragraph 57 are denied.

52. The allegations contained within paragraph 58 are denied.

53. The Defendants would admit only so much of the allegations contained within paragraph 59 as could be construed to allege that on or about April 4, 2022, in breach of the agreement between the parties, the Plaintiff demanded return of the deposited funds.

54. The Defendants admit only so much of the allegations contained within paragraph 60 as could be construed to allege that the deposited funds have not been returned.

55. The allegations contained within paragraph 61 are denied.

56. In response to paragraph 62, the Defendants reiterate and reallege each and every allegation contained within this pleading as if repeated verbatim.

57. The allegations contained within paragraph 63 are denied.

58. In response to the allegations contained within paragraphs 64 and 65, the Defendants deny that they made any false representations.

59. The allegations contained within paragraph 66 are denied.

60. The allegations contained within paragraph 67 are denied.

61. The allegations contained within paragraph 68 are denied.

62. The allegations contained within paragraph 69 are denied.

63. In response to paragraph 70, the Defendants reiterate and reallege each and every allegation contained within this pleading as if repeated verbatim.

64. The Defendants admit only so much of the allegations contained within paragraph 71 as could be construed to allege that the sums set forth within said paragraph were paid to purchase products and make a deposit for products as set forth in the exhibits to the Complaint.

65. The allegations contained within paragraph 72 are denied.

66. The allegations contained within paragraph 73 are denied.

67. The allegations contained within paragraph 74 are denied.

68. The allegations contained within paragraph 75 are denied.

69. In response to paragraph 76, the Defendants reiterate and reallege each and every allegation contained within this pleading as if repeated verbatim.

70. The allegations contained within paragraph 77 are denied.

71. The allegations contained within paragraph 78 are denied.

72. The allegations contained within paragraph 79 require no response from the Defendants.

**FOR A SECOND DEFENSE**

73. Each and every allegation contained within the Complaint not hereinabove admitted, qualified or explained is denied and strict proof is demanded thereof.

**FOR A THIRD DEFENSE**

74. The allegations of the Complaint fail to state facts sufficient to constitute causes of action; therefore, the Defendants pray that the same be dismissed pursuant to Rule 12(b)(6), SCRCP.

ELECTRONICALLY FILED - 2022 Aug 24 9:25 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

ELECTRONICALLY FILED - 2022 Aug 24 9:25 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

## FOR A FOURTH DEFENSE

75.     This Court lacks jurisdiction over the Defendants, one of whom is a citizen and resident of North Carolina and the other which is a limited liability company with its principal place of business in North Carolina; therefore, the Defendants move that this matter be dismissed pursuant to Rule 12(b)(2), SCRCP.

## FOR A FIFTH DEFENSE

76.     The Defendants assert the defense of breach of contract by the Plaintiff as a complete defense to the allegations of the Complaint.

## FOR A SIXTH DEFENSE

77.     The Defendants assert the doctrine of unclean hands as a defense to the equitable causes of action.

## FOR A SEVENTH DEFENSE

78.     The Plaintiff's claims are barred to the extent that any alleged damages were caused by factors and conduct other than, and unrelated to, any conduct of the Defendants, including but not limited to the conduct of other entities or governments over which the Defendants had no control.

## FOR AN EIGHTH DEFENSE

79.     The Defendant, Suliban Esteban Deaza, asserts the defense of lack of consideration as a defense to the Plaintiff's First Cause of Action.

## FOR A NINTH DEFENSE

80.     The Defendants reserve the right to assert additional defenses (affirmative and otherwise) as this action progresses and discovery commences.

WHEREFORE, having fully answered the Plaintiff's Complaint, the Defendants pray that the same be dismissed, with costs.

August 24, 2022

*s/Michael S. Hopewell*
Michael S. Hopewell (S.C. Bar #65335)
Attorney for Defendants

ABBOTT, MCKISSICK & HOPEWELL, LLC
470 W. Evans Street
Post Office Box 148
Florence, SC  29503
(843) 669-0089
(843) 669-0085 fax
*mhopewell@amhattorneys.com*

ELECTRONICALLY FILED - 2022 Aug 24 9:25 AM - LEXINGTON - COMMON PLEAS - CASE#2022CP3202241

9

# EXHIBIT C

**Business Records Affidavit**

STATE OF ___North Carolina___

COUNTY OF ___Guilford___

Before me, the undersigned authority, personally appeared _Patricia T. Jones_ , (Affiant), who first being duly sworn or affirmed by me, under penalty of perjury, deposed as follows:

1. My name is ___Patricia T. Jones___ . I am over the age of 18 and fully competent to make this affidavit. The facts stated herein are true and correct and are based on my personal knowledge.

2. I am the custodian of the records of FIRST BANK, whose address is ___2604 Lawndale Dr, Greensboro NC 27408___ .

3. Produced in response to a subpoena from the law firm of Willoughby & Hoefer, P.A dated July 7, 2022. are records from said business, regarding the account(s) of ___IKON Weapons, LLC___

4. These said pages of records are kept by said business in the regular course of business.

5. The said records were made at or near the time of occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters.

6. The said records produced in response to Plaintiff's subpoena are the originals or exact duplicates of the originals.

_Patricia T. Jones_
Affiant's Signature

SUBSCRIBED AND SWORN TO OR AFFIRMED before me on the _19th_ day of _July_ , _2022_ by Affiant _Patricia T. Jones_

_[signature]_
Notary Public

_May 24, 2026_
My commission expires

MARK D CUMMINGS
NOTARY
PUBLIC
My Comm. Exp.
May 24, 2026
GUILFORD, NC

# FIRST BANK



MEMBER
**FDIC**
localfirstbank.com

IKON WEAPONS LLC
234 LIBERTY HILL CHURCH ROAD
MOUNT GILEAD NC 27306-6705

Page        1 of 8

| Statement Period: | June 01, 2021 Thru June 30, 2021 | Enclosure Count: | 12 |
| | | Account Number: | *****07790 |

| Account Name | Account Number | Balance |
|---|---|---|
| BUSINESS ESSENTIALS | XXXXXX7790 | 307,049.86 |

| BUSINESS ESSENTIALS | IKON WEAPONS LLC | Acct XXXXXX7790 |
|---|---|---|

| | | | |
|---|---|---|---|
| Beginning Balance | 6/01/21 | 89,263.95 | |
| Deposits / Misc Credits | 23 | 1,892,555.41 | |
| Withdrawals / Misc Debits | 79 | 1,674,769.50 | |
| ** Ending Balance | 6/30/21 | 307,049.86 | ** |
| Service Charge | | .00 | |
| Average Balance | | 329,741 | |
| Average Collected Balance | | 329,741 | |
| Minimum Balance | | 42,878 | |

## MISCELLANEOUS CREDITS

| Date | Amount |
|---|---|
| 6/01 | 756.49 |
| 6/01 | 1,778.67 |
| 6/02 | 1.00 |
| 6/03 | 111.67 |
| 6/04 | 215.92 |
| 6/07 | 217.37 |

# FIRST BANK



localfirstbank.com

IKON WEAPONS LLC

Page        2 of 8

Statement Period:        June 01, 2021 Thru  June 30, 2021        Account Number:        *****07790

## MISCELLANEOUS CREDITS

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 6/08 | 1,025.73 | |
| 6/09 | 8.46 | |
| 6/09 | 122.00 | |
| 6/11 | 811.93 | |
| 6/14 | 608.47 | |
| 6/14 | 2,434.43 | |
| 6/15 | 18.07 | |
| 6/16 | 602.60 | |
| 6/17 | 920.09 | |
| 6/17 | 1,880,000.00 | |
| 6/18 | 319.30 | |
| 6/21 | 319.30 | |
| 6/21 | 735.90 | |
| 6/22 | 319.30 | |
| 6/23 | 999.85 | |
| 6/24 | 119.63 | |
| 6/28 | 109.23 | |

# FIRST BANK


MEMBER
FDIC
localfirstbank.com

IKON WEAPONS LLC

Page        3 of 8

Statement Period:        June 01, 2021 Thru June 30, 2021                    Account Number:        *****07790

## CHECKS

\* indicates a skip in check numbers

| Check No. | Date | Amount | Check No. | Date | Amount | Check No. | Date | Amount |
|-----------|------|--------|-----------|------|--------|-----------|------|--------|
| 1094 | 6/01 | 750.00 | 1097* | 6/28 | 2,330.00 | 1099 | 6/24 | 37,000.00 |
| 1095 | 6/01 | 1,429.00 | 1098 | 6/18 | 2,000.00 | 1100 | 6/28 | 50,000.00 |

## MISCELLANEOUS DEBITS

| Date | Amount |
|------|--------|
| 6/01 | .13 |
| 6/01 | 2.62 |
| 6/01 | 41.11 |
| 6/01 | 1,200.00 |
| 6/02 | 5.27 |
| 6/02 | 24.12 |
| 6/03 | 4.79 |
| 6/04 | 432.99 |
| 6/07 | 3.17 |
| 6/07 | 15.73 |
| 6/07 | 822.99 |
| 6/08 | 1,200.00 |
| 6/08 | 5,100.00 |
| 6/09 | 16.54 |
| 6/10 | 12.20 |

PSA_0464

# FIRST BANK



localfirstbank.com

IKON WEAPONS LLC

Page        4 of 8

Statement Period:        June 01, 2021  Thru  June 30, 2021        Account Number:        *****07790

## MISCELLANEOUS DEBITS

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 6/11 | 22.22 | |
| 6/14 | .63 | |
| 6/14 | 2.55 | |
| 6/15 | 1,200.00 | |
| 6/16 | 40,659.14 | |
| 6/16 | 8.72 | |
| 6/16 | 1,004.99 | |
| 6/17 | 303.81 | |
| 6/17 | 17.68 | |
| 6/17 | 18.00 | |
| 6/18 | 1,212,500.00 | |
| 6/18 | 8.72 | |
| 6/18 | 310.99 | |
| 6/18 | 25.00 | |
| 6/21 | 1.34 | |
| 6/21 | 304.99 | |
| 6/21 | 504.99 | |
| 6/21 | 594.99 | |
| 6/21 | 714.59 | |
| 6/21 | 714.87 | |
| 6/21 | 999.85 | |
| 6/21 | 6,319.70 | |
| 6/22 | 150,000.00 | |

PSA_0465

# FIRST BANK



localfirstbank.com

IKON WEAPONS LLC

Page    5 of 8

Statement Period:    June 01, 2021 Thru June 30, 2021    Account Number:    *****07790

## MISCELLANEOUS DEBITS

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 6/22 | 16,240.53 | |
| 6/22 | 34,663.09 | |
| 6/22 | 2.79 | |
| 6/22 | 60.79 | |
| 6/22 | 504.99 | |
| 6/22 | 25.00 | |
| 6/23 | 504.99 | |
| 6/23 | 660.00 | |
| 6/25 | 3.05 | |
| 6/25 | 25.00 | |
| 6/28 | 25,000.00 | |
| 6/28 | 25,000.00 | |
| 6/28 | 720.00 | |
| 6/30 | 45,033.00 | |
| 6/30 | 25.00 | |

## ELECTRONIC TRANSACTION SUMMARY

| Date | Deposits | Withdrawals |
|------|----------|-------------|
| 6/01 | | 135.72 |
| 6/03 | | 205.60 |
| 6/08 | | 270.20 |

# FIRST BANK



MEMBER
**FDIC**  EQUAL HOUSING LENDER
localfirstbank.com

IKON WEAPONS LLC

Page          6 of 8

Statement Period:          June 01, 2021  Thru  June 30, 2021                    Account Number:          *****07790

## ELECTRONIC TRANSACTION SUMMARY

| Date | Deposits | Withdrawals |
|------|----------|-------------|
| 6/10 |          | 162.64      |
| 6/16 |          | 365.00      |
| 6/18 |          | 500.00      |
| 6/21 |          | 24.00       |
| 6/21 |          | 1,195.38    |
| 6/22 |          | 64.78       |
| 6/22 |          | 280.58      |
| 6/23 |          | 83.28       |
| 6/23 |          | 2,500.00    |
| 6/24 |          | 44.25       |
| 6/24 |          | 47.98       |
| 6/24 |          | 169.42      |
| 6/24 |          | 813.84      |
| 6/25 |          | 217.16      |
| 6/28 |          | 133.70      |
| 6/28 |          | 436.85      |
| 6/30 |          | 22.46       |

# FIRST BANK



MEMBER
**FDIC**
localfirstbank.com

IKON WEAPONS LLC

Page          7 of 8

Statement Period:          June 01, 2021  Thru  June 30, 2021          Account Number:          *****07790

## ELECTRONIC TRANSACTION SUMMARY

| Date | Deposits | Withdrawals | Location |
|------|----------|-------------|----------|

## DAILY BALANCE SUMMARY

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 6/01 | 88,240.53 | 6/10 | 81,666.44 | 6/21 | 698,114.38 |
| 6/02 | 88,212.14 | 6/11 | 82,456.15 | 6/22 | 496,591.13 |
| 6/03 | 88,113.42 | 6/14 | 85,495.87 | 6/23 | 493,842.71 |
| 6/04 | 87,896.35 | 6/15 | 84,313.94 | 6/24 | 455,886.85 |
| 6/07 | 87,271.83 | 6/16 | 42,878.69 | 6/25 | 455,641.64 |
| 6/08 | 81,727.36 | 6/17 | 1,923,459.29 | 6/28 | 352,130.32 |
| 6/09 | 81,841.28 | 6/18 | 708,433.88 | 6/30 | 307,049.86 |

PSA_0468

IKON WEAPONS LLC
234 LIBERTY HILL CHURCH ROAD
MOUNT GILEAD NC 27306-6705

Page          8 of 8

Statement Period:          June 01, 2021   Thru   June 30, 2021                    Account Number:          *****07790

PSA_0469

# FIRST BANK



localfirstbank.com

IKON WEAPONS LLC
234 LIBERTY HILL CHURCH ROAD
MOUNT GILEAD NC 27306-6705

Page        1 of 5

| | | Enclosure Count: | 5 |
|---|---|---|---|
| Statement Period: | August 01, 2021 Thru August 31, 2021 | Account Number: | *****07790 |

| Account Name | Account Number | Balance |
|---|---|---|
| BUSINESS ESSENTIALS | XXXXXX7790 | 1,889,391.04 |

| BUSINESS ESSENTIALS | IKON WEAPONS LLC | | Acct XXXXXX7790 |
|---|---|---|---|
| Beginning Balance | 8/01/21 | 270,009.52 | |
| Deposits / Misc Credits | 12 | 1,885,414.85 | |
| Withdrawals / Misc Debits | 36 | 266,033.33 | |
| ** Ending Balance | 8/31/21 | 1,889,391.04 | ** |
| Service Charge | | .00 | |
| Average Balance | | 913,773 | |
| Average Collected Balance | | 913,773 | |
| Minimum Balance | | 242,283 | |

## MISCELLANEOUS CREDITS

| Date | Amount |
|---|---|
| 8/02 | 299.00 |
| 8/02 | 299.00 |
| 8/05 | 107.86 |
| 8/11 | 299.00 |
| 8/13 | 799.00 |
| 8/20 | 368.99 |

# FIRST BANK



MEMBER
FDIC
localfirstbank.com

IKON WEAPONS LLC

Page        2 of 5

Statement Period:        August 01, 2021 Thru  August 31, 2021                Account Number:        *****07790

## MISCELLANEOUS CREDITS

| Date | Amount |
|------|--------|
| 8/20 | 1,880,000.00 |
| 8/23 | 877.00 |
| 8/23 | 1,468.00 |
| 8/24 | 299.00 |
| 8/30 | 299.00 |
| 8/31 | 299.00 |

## CHECKS

* indicates a skip in check numbers

| Check No. | Date | Amount | Check No. | Date | Amount | Check No. | Date | Amount |
|-----------|------|--------|-----------|------|--------|-----------|------|--------|
| 104 | 8/20 | 25,491.28 | 109* | 8/20 | 5,617.61 | | | |
| 106* | 8/18 | 10,000.00 | 1126* | 8/02 | 10,500.00 | | | |

## MISCELLANEOUS DEBITS

| Date | Amount |
|------|--------|
| 8/02 | 37.87 |
| 8/02 | 9.00 |
| 8/03 | 2.25 |
| 8/04 | 2,545.00 |
| 8/09 | 1.27 |
| 8/11 | 12.62 |
| 8/17 | 1,000.00 |

# FIRST BANK



localfirstbank.com

IKON WEAPONS LLC

Page        3 of 5

| Statement Period: | August 01, 2021 Thru August 31, 2021 | Account Number: | *****07790 |

## MISCELLANEOUS DEBITS

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 8/18 | 1.51 | |
| 8/19 | 17.07 | |
| 8/20 | 25.00 | |
| 8/20 | 28.31 | |
| 8/20 | 18.00 | |
| 8/23 | 8.18 | |
| 8/23 | 60.79 | |
| 8/24 | 98,500.00 | |
| 8/24 | 102,500.00 | |
| 8/24 | 55.00 | |
| 8/24 | 55.00 | |
| 8/27 | 1.27 | |
| 8/30 | 8.22 | |
| 8/30 | 8.92 | |
| 8/31 | 804.99 | |

## ELECTRONIC TRANSACTION SUMMARY

| Date | Deposits | Withdrawals | Location |
|------|----------|-------------|----------|
| 8/02 | | 2,500.00 | |
| 8/04 | | 195.00 | |
| 8/04 | | 343.26 | |

# FIRST BANK



localfirstbank.com

IKON WEAPONS LLC

Page        4 of 5

Statement Period:        August 01, 2021  Thru  August 31, 2021        Account Number:        *****07790

## ELECTRONIC TRANSACTION SUMMARY

| Date | Deposits | Withdrawals | Location |
|------|----------|-------------|----------|
| 8/13 | | 310.72 | |
| 8/13 | | 985.84 | |
| 8/16 | | 180.80 | |
| 8/16 | | 187.25 | |
| 8/19 | | 700.85 | |
| 8/26 | | 2,578.70 | |
| 8/30 | | 741.75 | |

## DAILY BALANCE SUMMARY

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 8/02 | 257,560.65 | 8/13 | 254,370.55 | 8/23 | 2,093,747.89 |
| 8/03 | 257,558.40 | 8/16 | 254,002.50 | 8/24 | 1,892,936.89 |
| 8/04 | 254,475.14 | 8/17 | 253,002.50 | 8/26 | 1,890,358.19 |
| 8/05 | 254,583.00 | 8/18 | 243,000.99 | 8/27 | 1,890,356.92 |
| 8/09 | 254,581.73 | 8/19 | 242,283.07 | 8/30 | 1,889,897.03 |
| 8/11 | 254,868.11 | 8/20 | 2,091,471.86 | 8/31 | 1,889,391.04 |

IKON WEAPONS LLC
234 LIBERTY HILL CHURCH ROAD
MOUNT GILEAD NC 27306-6705

Page        5 of 5

Statement Period:        August 01, 2021   Thru   August 31, 2021                    Account Number:        *****07790

PSA_0486

# FIRST BANK



MEMBER
**FDIC**
localfirstbank.com

**IKON WEAPONS LLC**
**234 LIBERTY HILL CHURCH ROAD**
**MOUNT GILEAD NC 27306-6705**

Page      1 of 6

| | | | |
|---|---|---|---|
| | | Enclosure Count: | 3 |
| Statement Period: | September 01, 2021 Thru September 30, 2021 | Account Number: | *****07790 |

| Account Name | Account Number | Balance |
|---|---|---|
| BUSINESS ESSENTIALS | XXXXXX7790 | 333,031.27 |
| BUSINESS ESSENTIALS | IKON WEAPONS LLC | Acct XXXXXX7790 |

| | | | |
|---|---|---|---|
| Beginning Balance | 9/01/21 | 1,889,391.04 | |
| Deposits / Misc Credits | 10 | 1,960,080.16 | |
| Withdrawals / Misc Debits | 46 | 3,516,439.93 | |
| ** Ending Balance | 9/30/21 | 333,031.27 | ** |
| Service Charge | | .00 | |
| Average Balance | | 1,650,396 | |
| Average Collected Balance | | 1,650,396 | |
| Minimum Balance | | 333,031 | |

## MISCELLANEOUS CREDITS

| Date | Amount | Activity Description |
|---|---|---|
| 9/01 | 377.99 | |
| 9/01 | 744,504.00 | |
| 9/03 | 227.97 | |
| 9/07 | 299.00 | |
| 9/07 | 484.20 | |
| 9/10 | 500.00 | |

# FIRST BANK



MEMBER
**FDIC**
localfirstbank.com

IKON WEAPONS LLC

Page       2 of 6

Statement Period:      September 01, 2021  Thru  September 30, 2021                Account Number:      *****07790

## MISCELLANEOUS CREDITS

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 9/13 | 299.00 | |
| 9/15 | 589.00 | |
| 9/17 | 299.00 | |
| 9/27 | 1,212,500.00 | |

## CHECKS

\* indicates a skip in check numbers

| Check No. | Date | Amount | Check No. | Date | Amount | Check No. | Date | Amount |
|-----------|------|--------|-----------|------|--------|-----------|------|--------|
| 107 | 9/03 | 20,000.00 | | | | | | |

## MISCELLANEOUS DEBITS

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 9/01 | 3.96 | |
| 9/01 | 18.00 | |
| 9/02 | 103,000.00 | |
| 9/02 | 312,532.00 | |
| 9/02 | 5.45 | |
| 9/02 | 31.55 | |
| 9/02 | 55.00 | |
| 9/02 | 55.00 | |
| 9/03 | 5.98 | |
| 9/08 | 363,816.60 | |
| 9/08 | 5,000.00 | |

PSA_0490

# FIRST BANK



MEMBER
**FDIC**
localfirstbank.com

IKON WEAPONS LLC

Page        3 of 6

Statement Period:      September 01, 2021  Thru  September 30, 2021          Account Number:      *****07790

## MISCELLANEOUS DEBITS

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 9/08 | 13.60 | |
| 9/08 | 25.00 | |
| 9/09 | 1.27 | |
| 9/13 | 357,496.89 | |
| 9/13 | 13.65 | |
| 9/13 | 25.00 | |
| 9/15 | 2,500.00 | |
| 9/15 | 133,952.00 | |
| 9/15 | 10,000.00 | |
| 9/15 | 6.33 | |
| 9/15 | 55.00 | |
| 9/15 | 55.00 | |
| 9/23 | 9,000.00 | |
| 9/27 | 471.24 | |
| 9/27 | 3,756.99 | |
| 9/27 | 18.00 | |
| 9/28 | 128,000.00 | |
| 9/28 | 804.99 | |
| 9/28 | 55.00 | |
| 9/29 | 1,862,000.00 | |
| 9/29 | 55.00 | |
| 9/30 | 188,317.47 | |
| 9/30 | 25.00 | |

9

## ELECTRONIC TRANSACTION SUMMARY

| Date | Deposits | Withdrawals | Location |
|------|----------|-------------|----------|
| 9/01 | | 2,500.00 | POS PUR IN CORE BUSINESS SOLUT |

PSA_0491

# FIRST BANK



MEMBER
FDIC
localfirstbank.com

IKON WEAPONS LLC

Page        4 of 6

Statement Period:      September 01, 2021  Thru  September 30, 2021          Account Number:        *****07790

## ELECTRONIC TRANSACTION SUMMARY

| Date | Deposits | Withdrawals | Location |
|------|----------|-------------|----------|
| 9/03 | | 343.32 | |
| 9/07 | | 87.70 | |
| 9/13 | | 200.00 | |
| 9/13 | | 400.00 | |
| 9/20 | | 232.50 | |
| 9/20 | | 3,903.68 | |
| 9/27 | | 400.00 | |
| 9/27 | | 400.00 | |
| 9/30 | | 3,225.00 | |
| 9/30 | | 3,576.76 | |

## DAILY BALANCE SUMMARY

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 9/01 | 2,631,751.07 | 9/07 | 2,196,646.24 | 9/10 | 1,828,289.77 |
| 9/02 | 2,216,072.07 | 9/08 | 1,827,791.04 | 9/13 | 1,470,453.23 |
| 9/03 | 2,195,950.74 | 9/09 | 1,827,789.77 | 9/15 | 1,324,473.90 |

PSA_0492

# FIRST BANK



localfirstbank.com

IKON WEAPONS LLC

Page        5 of 6

Statement Period:        September 01, 2021  Thru  September 30, 2021        Account Number:        *****07790

## DAILY BALANCE SUMMARY

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 9/17 | 1,324,772.90 | 9/27 | 2,519,090.49 | 9/30 | 333,031.27 |
| 9/20 | 1,320,636.72 | 9/28 | 2,390,230.50 | | |
| 9/23 | 1,311,636.72 | 9/29 | 528,175.50 | | |

PSA_0493

IKON WEAPONS LLC
234 LIBERTY HILL CHURCH ROAD
MOUNT GILEAD NC 27306-6705

Page        6 of 6

Statement Period:     September 01, 2021  Thru  September 30, 2021          Account Number:        *****07790

# FIRST BANK



localfirstbank.com

**IKON WEAPONS LLC**
234 LIBERTY HILL CHURCH ROAD
MOUNT GILEAD NC 27306-6705

Page        1 of 9

Enclosure Count:                    26
Account Number:              *****07790

Statement Period:        July 01, 2022 Thru July 31, 2022

| Account Name | Account Number | Balance |
|---|---|---|
| BUSINESS ESSENTIALS | XXXXXX7790 | 88,400.11 |

| BUSINESS ESSENTIALS | IKON WEAPONS LLC | Acct XXXXXX7790 |
|---|---|---|

|  |  |  |  |
|---|---|---|---|
| Beginning Balance | 7/01/22 | 106,953.16 | |
| Deposits / Misc Credits | 13 | 81,392.76 | |
| Withdrawals / Misc Debits | 88 | 99,945.81 | |
| ** Ending Balance | 7/31/22 | 88,400.11 | ** |
| Service Charge | | .00 | |
| Average Balance | | 98,048 | |
| Average Collected Balance | | 98,048 | |
| Minimum Balance | | 78,417 | |

## MISCELLANEOUS CREDITS

| Date | Amount | Activity Description |
|---|---|---|
| 7/06 | 15.30 | |
| 7/08 | 182.78 | |
| 7/08 | 2,866.65 | |
| 7/11 | 221.80 | |
| 7/12 | 23,000.00 | |
| 7/18 | 109.51 | |

# FIRST BANK



**MEMBER**
**FDIC**
localfirstbank.com

IKON WEAPONS LLC

Page        2 of 9

| Statement Period: | July 01, 2022 Thru July 31, 2022 | Account Number: | *****07790 |

## MISCELLANEOUS CREDITS

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 7/18 | 500.00 | |
| 7/18 | 50,000.00 | |
| 7/21 | 22.45 | |
| 7/21 | 721.36 | |
| 7/22 | 2,866.65 | |
| 7/26 | 237.33 | |
| 7/27 | 648.93 | |

## CHECKS

\* indicates a skip in check numbers

| Check No. | Date | Amount | Check No. | Date | Amount | Check No. | Date | Amount |
|-----------|------|--------|-----------|------|--------|-----------|------|--------|
| 1152 | 7/07 | 12.17 | 1163* | 7/25 | 478.50 | 1184 | 7/18 | 410.00 |
| 1153 | 7/27 | 3,000.00 | 1164 | 7/22 | 478.50 | 1185 | 7/19 | 10,000.00 |
| 1154 | 7/27 | 2,000.00 | 1165 | 7/22 | 903.50 | 1186 | 7/25 | 5,000.00 |
| 1157* | 7/27 | 2,500.00 | 1179* | 7/01 | 8,070.00 | 1187 | 7/25 | 2,200.00 |
| 1158 | 7/26 | 2,000.00 | 1180 | 7/01 | 10,000.00 | 1188 | 7/28 | 600.00 |
| 1159 | 7/27 | 7,500.00 | 1181 | 7/05 | 212.94 | 1189 | 7/29 | 275.16 |
| 1160 | 7/26 | 302.38 | 1182 | 7/21 | 721.36 | 1191* | 7/29 | 561.00 |
| 1161 | 7/25 | 6,000.00 | 1183 | 7/19 | 410.00 | 1193* | 7/29 | 611.00 |

## MISCELLANEOUS DEBITS

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 7/01 | 845.03 | |
| 7/01 | 2,352.79 | |

:07

# FIRST BANK



MEMBER
**FDIC**
localfirstbank.com

IKON WEAPONS LLC

Page        3 of 9

| Statement Period: | July 01, 2022 Thru July 31, 2022 | Account Number: | *****07790 |

## MISCELLANEOUS DEBITS

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 7/05 | .29 | |
| 7/05 | 35.70 | |
| 7/05 | 57.69 | |
| 7/05 | 147.00 | |
| 7/05 | 262.12 | |
| 7/05 | 604.99 | |
| 7/05 | 637.99 | |
| 7/05 | 1,036.19 | |
| 7/06 | 4.27 | |
| 7/08 | 5.49 | |
| 7/11 | 200.00 | |
| 7/11 | 181.85 | |
| 7/11 | 550.38 | |
| 7/11 | 845.03 | |
| 7/11 | 2,352.79 | |
| 7/12 | 5,000.00 | |
| 7/12 | 486.89 | |
| 7/12 | 1,605.44 | |
| 7/14 | 2.40 | |

# FIRST BANK



MEMBER
**FDIC**
localfirstbank.com

IKON WEAPONS LLC

Page        4 of 9

Statement Period:        July 01, 2022  Thru  July 31, 2022          Account Number:        *****07790

## MISCELLANEOUS DEBITS

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 7/15 | 17.35 | |
| 7/15 | 2,545.00 | |
| 7/18 | 845.03 | |
| 7/18 | 2,352.79 | |
| 7/18 | 18.00 | |
| 7/19 | .61 | |
| 7/19 | 57.69 | |
| 7/19 | 453.82 | |
| 7/19 | 1,576.93 | |
| 7/25 | 7.18 | |
| 7/25 | 16.43 | |
| 7/25 | 604.99 | |
| 7/25 | 845.05 | |
| 7/25 | 2,352.78 | |
| 7/26 | 227.18 | |
| 7/26 | 880.83 | |
| 7/26 | 994.88 | |
| 7/27 | 35.00 | |
| 7/29 | 1,000.00 | |

# FIRST BANK



localfirstbank.com

IKON WEAPONS LLC

Page        5 of 9

| Statement Period: | July 01, 2022 Thru July 31, 2022 | Account Number: | *****07790 |

## MISCELLANEOUS DEBITS

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 7/29 | .61 | |

## ELECTRONIC TRANSACTION SUMMARY

| Date | Deposits | Withdrawals |
|------|----------|-------------|
| 7/05 | | 11.51 |
| 7/05 | | 91.90 |
| 7/05 | | 127.43 |
| 7/05 | | 100.00 |
| 7/05 | | 358.09 |
| 7/06 | | 16.46 |
| 7/07 | | 75.94 |
| 7/07 | | 112.87 |
| 7/07 | | 203.56 |
| 7/08 | | 10.68 |
| 7/08 | | 36.52 |
| 7/08 | | 58.08 |
| 7/08 | | 100.00 |

# FIRST BANK



MEMBER
**FDIC**
localfirstbank.com

IKON WEAPONS LLC

Page        6 of 9

Statement Period:        July 01, 2022  Thru  July 31, 2022        Account Number:        *****07790

## ELECTRONIC TRANSACTION SUMMARY

| Date | Deposits | Withdrawals | Location |
|------|----------|-------------|----------|
| 7/11 |          | 22.44       |          |
| 7/11 |          | 95.83       |          |
| 7/11 |          | 121.91      |          |
| 7/11 |          | 37.00       |          |
| 7/11 |          | 73.19       |          |
| 7/11 |          | 99.10       |          |
| 7/11 |          | 1,655.10    |          |
| 7/13 |          | 192.49      |          |
| 7/14 |          | 27.72       |          |
| 7/15 |          | 25.00       |          |

## DAILY BALANCE SUMMARY

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 7/01 | 85,685.34 | 7/13 | 94,132.55 | 7/25 | 110,001.89 |
| 7/05 | 82,001.50 | 7/14 | 94,102.43 | 7/26 | 105,833.95 |
| 7/06 | 81,996.07 | 7/15 | 91,515.08 | 7/27 | 91,447.88 |
| 7/07 | 81,591.53 | 7/18 | 138,498.77 | 7/28 | 90,847.88 |
| 7/08 | 84,430.19 | 7/19 | 125,999.72 | 7/29 | 88,400.11 |
| 7/11 | 78,417.37 | 7/21 | 126,022.17 |      |          |
| 7/12 | 94,325.04 | 7/22 | 127,506.82 |      |          |

PSA_0611

IKON WEAPONS LLC
234 LIBERTY HILL CHURCH ROAD
MOUNT GILEAD NC 27306-6705

Page        7 of 9

Statement Period:        July 01, 2022  Thru  July 31, 2022                    Account Number:        *****07790

# EXHIBIT D

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
COUNTY OF LEXINGTON ) FOR THE ELEVENTH JUDICIAL CIRCUIT
 )
PALMETTO STATE ARMORY, LLC, ) C/A NO. 2022-CP-32-02241
 )
 Plaintiff, )
 )
 v. ) **AFFIDAVIT OF**
 ) **JAMIN MCCALLUM**
IKON WEAPONS, LLC and SULIBAN )
ESTEBAN DEAZA, )
 )
 Defendants. )
 )

PERSONALLY APPEARED before me, Jamin McCallum, who, being duly sworn, states as follows:

1. My name is Jamin McCallum, I am over eighteen years old and competent to provide testimony in this case based on my personal knowledge regarding the matters addressed herein. I affirm that all statements included herein are truthful and accurate.

2. I am a founder and principal of Plaintiff Palmetto State Armory, LLC ("PSA") in the above-captioned case, and the statements made in this affidavit are based upon my personal knowledge and involvement with PSA and the matters at issue in this litigation.

3. PSA contracted with Defendants Ikon Weapons, LLC ("Ikon") and Suliban Esteban Deaza for the purchase of a number of firearms which Defendants represented they could obtain from Eastern Europe and deliver to PSA in South Carolina. The circumstances and events surrounding those transactions, in which I was personally involved, are detailed in the Complaint filed in this case on July 6, 2022.

4. I have reviewed the Complaint and the allegations contained therein and represent and affirm that those allegations are true and correct to the best of my knowledge, with one

1

exception noted below. As to those allegations which are stated upon information and belief, I believe them to be true.

5.      In describing the transactions which took place between PSA and Ikon, the Complaint notes that PSA advanced the total sum of $4,534,504.00 to secure Ikon's performance of the agreements. I have reviewed the financial records of PSA and determined that the full sum that PSA advanced to Ikon in connection with these transactions was in fact $4,504,504.00, which is the amount called for in the parties' agreements. More particularly, PSA paid $1,880,000.00 to Ikon's bank account on June 17, 2022 and another $1,880,000.00 to that account on August 20, 2022, which represented the full purchase price under the Original Agreement for the 8,000 Yugoslavian AK-47 kits that Ikon agreed to sell and deliver to PSA. On September 1, 2022, PSA paid to Ikon's bank account the sum of $744,504.00, which represented 20% of the purchase price for the Second Agreement for the weapons manufactured by Zastava Arms. I note, however, that in addition to the amounts advanced by PSA to Ikon noted above, PSA also paid other various expenses of Ikon and Deaza toward the performance of the agreements, including but not limited to travel expenses.

6.      Attached as Exhibit A to the Complaint is a true and correct copy of the June 16, 2021 Purchase Agreement (the "Original Agreement") entered into between PSA and Ikon.

7.      Attached as Exhibit B to the Complaint is a true and correct copy of the June 17, 2021 amendment to the Original Agreement.

8.      Attached as Exhibit C to the Complaint is a true and correct copy of an invoice dated August 31, 2021 that PSA received from Ikon evidencing the parties' agreement for PSA to purchase certain additional firearms manufactured by Zastava Arms from Ikon (the "Second Agreement").

9.      Attached as Exhibit D to the Complaint is a true and correct copy of the November 6, 2021 amendment to the Original Agreement. I note that this document contains an error denoting the date for delivery of the firearms that PSA purchased from Ikon as being March 1, 2023. In fact, the parties agreed and understood that the new delivery date for these firearms under the November 6, 2021 amendment was to be March 1, 2022, not March 1, 2023. This was a typographical error in the November 6, 2021 amendment.

10.     Attached as Exhibit E to the Complaint is a true and correct copy of the February 28, 2022 amendment to the parties' agreements which, among other things, confirms that the delivery date was extended to June 1, 2022, and not thereafter.

11.     To date, Ikon and Deaza have wholly failed to perform the parties' agreements. The Defendants have delivered none of the firearms for which PSA contracted with Ikon and Deaza, and Defendants have failed and refused to return any portion of the funds that PSA advanced to Ikon for the performance of these agreements.

12.     I have reviewed the financial records which were produced to PSA in this case concerning Ikon's deposit account at First Bank. Based on the amount of money that Ikon has in that account, as well as my own training as a Certified Public Accountant,[1] I have grave concerns about Ikon's ability to pay any judgment in this case. At a minimum, given that Defendants have failed to deliver any of the firearms for which we contracted with them, PSA is entitled to the full return of the $4,504,504.00 which it advanced to Defendants for these transactions. The bank records for this account, which is the account that received the $4,504,504.00 advanced by PSA,

---

[1] I hold a Master's degree in accounting from Clemson University and practiced public accounting for several years as a licensed Certified Public Accountant. I also taught for several years at the University of South Carolina as an adjunct professor in the accounting department teaching accounting at the college level.

show that on July 29, 2022 there was only $88,400.11 in that account. Thus, it would appear highly unlikely that Ikon has the ability to pay PSA the money that it is owed in this case.

13.    Further, I note that the particular weapons that PSA purchased from Ikon can be difficult to obtain, and are not widely available for purchase in, the United States. Thus, PSA will be uniquely and irreparably harmed if those weapons are sold or transferred to a third party or otherwise disposed of by Defendants.

14.    Finally, I have reviewed the Motion for Preliminary Injunction to which this affidavit is attached and represent and affirm that the allegations contained therein are true and correct to the best of my knowledge. As to those allegations which are stated upon information and belief, I believe them to be true.

**FURTHER AFFIANT SAYETH NOT.**

_____
Jamin McCallum

Sworn to and Subscribed Before Me
This **31st** day of August, 2022.

_____
Notary Public for South Carolina
My Commission Expires: 02/04/2029

ELIZABETH KURTZ
NOTARY
PUBLIC
Exp. February 4, 2029
SOUTH CAROLINA

# EXHIBIT E

# Transcript of the Testimony of
# **Suliban Deaza**

**Date:** September 2, 2022



CREEL COURT REPORTING, INC.
Condensed Transcript and Word Index

1230 Richland Street
Columbia, SC 29201
Phone:  (803) 252-3445 / (800) 822-0896
Email: contact@creelreporting.com
Internet: https://creelreporting.com/

CREEL COURT REPORTING, INC.

Deaza, Suliban – Vol. I

---

**Page 1**

1   STATE OF SOUTH CAROLINA    ) COURT OF COMMON PLEAS
                               )
2   COUNTY OF LEXINGTON        ) C/A #: 2022-CP-32-02241
3
    PALMETTO STATE ARMORY, LLC,    )
4              Plaintiff,          )
                                   )
5   v.                             )
                                   )
6   IKON WEAPONS, LLC and SULIBAN  )
7   ESTEBAN DEAZA,                 )
                                   )
8              Defendants.         )
                                   )
9   _____)
10
                30(b)(6) VIDEO DEPOSITION OF
11
                    IKON WEAPONS, LLC
12
                 SULIBAN ESTEBAN DEAZA
13
                    ********
14
15              Thursday, August 25, 2022
16              9:45 a.m. - 4:50 p.m.
17
18       The video deposition of SULIBAN ESTEBAN DEAZA,
19   taken on behalf of the Plaintiff, at the offices of
20   Willoughby & Hoefer, P.A., 930 Richland Street,
21   Columbia, South Carolina, on the 25th day of August
22   2022, before Cortney N. Glover, Certified Court
23   Reporter and Notary Public in and for the State of
24   South Carolina, pursuant to Notice of Deposition
25   and/or agreement of counsel.

---

**Page 2**

                    APPEARANCES

3   Andrew J. D'Antoni, Esquire
4   Mitchell Willoughby, Esquire
5   Willoughby & Hoefer, P.A.
6   930 Richland Street
7   Post Office Box 8416 (29202)
8   Columbia, South Carolina  29201
9   Attorney for the Plaintiff
10
11  Michael S. Hopewell, Esquire
12  Abbott, McKissick & Hopewell, LLC
13  470 West Evans Street
14  Post Office Box 148
15  Florence, South Carolina  29503
16  Attorney for the Defendants
17
18  Also Present:
19  Brad Graham, Videographer, Take One Productions
20  Jamin McCallum, Palmetto State Armory
21
22              INDEX
23  MR. DEAZA:                     PAGE
24  Mr. D'Antoni . . . . . . EXAMINATION. . . . . . . . . . . . . .6
25

---

**Page 3**

1   Certificate . . . . . . . . . . . . . . . . . . . . . .255
2
3           EXHIBITS
4   Plaintiff's Exhibit Number 1 . . . . . . . . . . . . . . . .7
    (Summons and Complaint)
    Plaintiff's Exhibit Number 2 . . . . . . . . . . . . . . .13
5   (Notice of 30(b)(6) Deposition)
    Plaintiff's Exhibit Number 3 . . . . . . . . . . . . . . .113
6   (6/15/21 Email and Invoice)
    Plaintiff's Exhibit Number 4 . . . . . . . . . . . . . . .117
7   (6/15/21 Email and Invoice)
    Plaintiff's Exhibit Number 5 . . . . . . . . . . . . . . .122
8   (6/16/21 Email and Invoices)
    Plaintiff's Exhibit Number 6 . . . . . . . . . . . . . . .130
9   (Purchase Agreement)
    Plaintiff's Exhibit Number 7 . . . . . . . . . . . . . . .135
10  (6/17/21 Email and Amendment to Purchase Agreement)
    Plaintiff's Exhibit Number 8 . . . . . . . . . . . . . . .136
11  (3/1/22 Email and Second Amendment to Purchase
    Agreement)
12  Plaintiff's Exhibit Number 9 . . . . . . . . . . . . . . .137
    (Second Amendment to Purchase Agreement)
13
    Plaintiff's Exhibit Number 10 . . . . . . . . . . . . . .173
14  (First Bank Information)
    Plaintiff's Exhibit Number 11 . . . . . . . . . . . . . .193
15  (Ikon Weapons Presentation)
    Plaintiff's Exhibit Number 12 . . . . . . . . . . . . . .208
16  (Email Correspondences)
17
            STIPULATIONS
18
        It is stipulated and agreed that this
19  deposition is being taken pursuant to the South
    Carolina Rules of Civil Procedure.
20
        It is further stipulated and agreed that the
21  formalities of taking a videotaped deposition are
    hereby waived.
22
23      It is stipulated by and between counsel and the
24  witness that the reading and signing of the following
25  deposition be, and the same are, hereby waived.

---

**Page 4**

1   VIDEOGRAPHER:  We are on the record at 9:45.
2       Today's date is August the 25th, 2022.  This is
3       the beginning of Media 1 in the deposition of
4       30(b)(6) Suliban Esteban Deaza, witness for
5       Ikon Weapons, LLC, in the matter of Palmetto
6       State Armory, LLC, versus Ikon Weapons, LLC,
7       and Suliban Esteban Deaza filed in the Court of
8       Common Pleas, 11th Judicial Circuit, State of
9       South Carolina, County of Lexington, Case
10      Number 2022-CP-32-02241.
11          The deposition's being held at Willoughby
12      and Hoefer, P.A., 930 Richland Street,
13      Columbia, South Carolina 29202.
14          My name is Brad Graham, and I'm the
15      videographer.  The court reporter is Cortney --
16      Cortney Glover.
17          Counsel, please state your appearance
18      including who you represent beginning with the
19      plaintiff's counsel, and then will the court
20      reporter please swear in the witness.
21  MR. D'ANTONI:  My name is Andrew D'Antoni, and I'm
22      with the law firm of Willoughby and Hoefer, and
23      we represent Palmetto State Armory.
24  MR. WILLOUGHBY:  And my name is Mitchell Willoughby,
25      also with the law firm of Willoughby and

---

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 5

1    Hoefer, and we represent the plaintiff in this
2    case, Palmetto State Armory.
3  MR. HOPEWELL: I'm Michael S. Hopewell, an attorney
4    with Abbott, McKissick & Hopewell. We
5    represent the defendants.
6  COURT REPORTER: Please raise your right hand to be
7    sworn in.
8  SULIBAN ESTEBAN DEAZA, having been duly sworn,
9    deposes and testifies as follows:
10 COURT REPORTER: Thank you.
11 MR. D'ANTONI: Before we begin, just for the -- the
12    record, I'd like to point out that Mr. Hopewell
13    handed us a large number of documents that are
14    relevant to this case, and we haven't had time
15    to -- to thoroughly review those documents.
16    We've just gone through just a cursory review,
17    quick inventory.
18        Yeah, that said, we're gonna still move
19    forward with today's deposition and get through
20    the things that we have prepared to go through
21    today. However, we may -- you know, at the
22    adjournment of this deposition today, we may
23    need to continue it, keep it over thereafter
24    after we've had sufficient time to thoroughly
25    go through the documents that Ikon Weapons has

Page 6

1    provided us.
2  MR. HOPEWELL: We understand that and agree.
3  MR. D'ANTONI: Okay.
4  MR. DEAZA - EXAMINATION BY MR. D'ANTONI:
5  Q:  And Mr. Deaza, you understand that we're here
6    for a Rule 30(b)(6) of Ikon Weapons, LLC;
7    correct?
8  A:  Yes.
9  Q:  Okay. And you've been designated by Ikon
10    Weapons, LLC, to testify on its behalf in this
11    deposition; right?
12 A:  Yes.
13 Q:  And your position with Ikon Weapons, LLC,
14    you're the -- the founder and CEO; is that
15    correct?
16 A:  Correct.
17 Q:  Okay. Are you -- you're also the managing
18    member of the LLC?
19 A:  Yes.
20 Q:  Okay. And you're the majority owner?
21 A:  Yes.
22 Q:  Okay. And if you could state your full name
23    for the record too, sir?
24 A:  My name is Suliban Deaza, Suliban Esteban
25    Deaza.

Page 7

1  Q:  Okay. And you're familiar with this case?
2  A:  Yes.
3  Q:  Okay. What I have is the summons and complaint
4    in this case. I'd like to put it in as our
5    Plaintiff Exhibit 1.
6  (Plaintiff's Exhibit Number 1 was marked for
7  identification purposes.)
8  MR. D'ANTONI: And let the record reflect that I'm
9    handing a copy to Mr. Hopewell as well and
10    placed a copy in front of Mr. Deaza.
11 Q:  Okay. And have you had a chance to review the
12    complaint in this case?
13 A:  Yes.
14 Q:  Okay. So you're familiar with all the
15    allegations; right?
16 A:  Correct.
17 Q:  Okay. You were served with this complaint on
18    July 6, 2022; is that correct?
19 A:  Correct.
20 Q:  Okay. You were also served simultaneously with
21    this complaint, Plaintiff's First Request for
22    Production; is that true? Discovery request?
23 A:  Correct.
24 Q:  Okay. Were you also served with this
25    complaint, Plaintiff's First Set of

Page 8

1    Interrogatories?
2  A:  Correct.
3  Q:  Okay. And also served with this complaint on
4    you on July 6th was the Plaintiff's subpoena to
5    First Bank; is that true?
6  A:  Correct.
7  Q:  Okay. And these were all given to you in a
8    single packet by a process server; right?
9  A:  No.
10 Q:  Two packets?
11 A:  Correct.
12 Q:  Okay. One was served on you individually?
13 A:  (No audible response.)
14 Q:  One was -- one packet was served on you
15    individually and the other on Ikon Weapons,
16    LLC?
17 A:  You mean -- can you rephrase that?
18 Q:  Sure.
19 A:  They both given to me? Is that what you're
20    saying?
21 Q:  Yeah. So that there are two packets served on
22    you, one would be on you individually, you're
23    named individually ---
24 A:  Correct.
25 Q:  --- in this action?

2 (Pages 5 to 8)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 9

1  A:  Correct.
2  Q:  And then one on the corporate entity, Ikon
3      Weapons, LLC?
4  A:  Correct.
5  Q:  Okay.  And did you provide all those materials
6      to your attorney?
7  A:  Correct.
8  Q:  So the summons and the complaint, you provided
9      that?
10 A:  Correct.
11 Q:  What about the request for production?
12 A:  Correct.
13 Q:  And the interrogatories?
14 A:  Correct.
15 Q:  And the copy of the subpoena?
16 A:  Correct.
17 Q:  Okay.  All right.  So now we got that
18     preliminary matter out of the way, what I want
19     to do now is just go over just some of the
20     ground rules of a deposition before we get into
21     the substance of the matter.  I know your
22     lawyer may have talked to you about this, but
23     I'm required to tell you a few things, okay?
24         First have you had your deposition taken
25     before?

Page 10

1  A:  No.
2  Q:  Okay.  While I'll let you know that a
3      deposition is a question-and-answer session
4      under oath, you are under oath the same as if
5      you were in court; do you understand that?
6  A:  Yes.
7  Q:  Okay.  And Ms. Glover who is sitting across
8      from me, she's a court reporter.  She's gonna
9      be recording every word we say today.  So it's
10     necessary that we don't talk over each other;
11     okay?
12 A:  Okay.
13 Q:  So kind of along those lines, if you just let
14     me finish my questions before you begin your
15     answer and I'll -- I'll do the same with you as
16     well, okay?
17 A:  Okay.
18 Q:  If you do not understand a question or want me
19     to repeat it, please direct that to me rather
20     than to Mr. Hopewell.  I'll work to rephrase
21     that question to get it into a framework that
22     you can understand; is that fair?
23 A:  Yes.
24 Q:  Okay.  And just know you can't confer with your
25     counsel, Mr. Hopewell, regarding a question or

Page 11

1      how to answer the question, okay?
2  A:  Okay.
3  Q:  Your counsel may, from time to time, object to
4      the form of my questions.  If that should
5      occur, please know that you still have an
6      obligation to answer the question
7      notwithstanding the objection, okay?
8  A:  Okay.
9  Q:  During the course of today, if you need to take
10     a break, just let me know and we'll take a
11     break.  There'll probably be several throughout
12     the day --
13 MR. D'ANTONI:  And that's true for anyone else here.
14     If you need to take a break, please let me
15     know.
16 Q:  I'm gonna aim to take about a five- to
17     ten-minute break about every hour or so.  But
18     if it gets beyond an hour --
19 MR. D'ANTONI:  Mr. Hopewell, if you could just
20     signal me, we'll take a -- take a break.
21 Q:  Just know that during the breaks we take, under
22     our -- under our rules, you're not allowed to
23     talk to your counsel about this deposition,
24     okay?
25 A:  Okay.

Page 12

1  Q:  You can talk to him about football, golf,
2      anything you want, just not about the
3      deposition; is that fair?
4  A:  Yes.
5  Q:  All right.  When I ask you a question that
6      calls for a yes-or-no answer, I'd like the --
7      for you to first answer that yes or no.  And if
8      you want to give me an explanation after that,
9      you can, okay?
10 A:  Okay.
11 Q:  Also just I've written down a lot of the
12     questions that I want to ask for you today.
13     But from time to time, I may kind of veer off
14     my script here.  I'll come back to it as
15     needed.  But if I ask you a question that I've
16     asked you before, it's just me trying to cover
17     everything.  I'm not trying to trip you up or
18     anything like that, okay?
19 A:  Okay.
20 Q:  All right.  Let the record reflect I'm placing
21     in front of you what is our Notice of Rule
22     30(b)(6) deposition of Ikon Weapons.  I'm
23     handing a copy to Mr. Hopewell.
24 MR. D'ANTONI:  If you'll mark that as Exhibit 2?
25     Okay.

3 (Pages 9 to 12)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 13

1  (Plaintiff's Exhibit Number 2 was marked for
2  identification purposes.)
3  Q:  Do you recognize this document?
4  A:  (No audible response.)
5  Q:  Is this your first time seeing the document,
6      Mr. Deaza?
7  A:  No, it's not the first time.  I just want to
8      make sure it's the same.
9  Q:  Okay.  Well, I'll represent to you that this is
10     our -- our Rule 30(b)(6) deposition notice that
11     we served on you through your counsel.  And did
12     you -- did you review this prior to coming here
13     today?
14 A:  Not this copy.
15 Q:  Not that particular copy?
16 A:  Correct.
17 Q:  But an identical copy of it?
18 A:  I need to verify that.
19 Q:  Okay.  And I'll represent to you that that is
20     an identical copy of the 30(b)(6) notice that
21     we served on your counsel, Mr. Hopewell.
22     So you reviewed a copy of the 30(b)(6)
23     deposition notice that we served on
24     Mr. Hopewell?
25 A:  I reviewed the copy that was originally ---

Page 14

1  Q:  All right.
2  A:  --- given to me.
3  Q:  Okay.  Are you prepared to testify about the
4      list of matters on which examination is sought
5      that begins on page 5?
6  A:  Page 5 of this document?
7  Q:  Yes.  Of the deposition notice here in front of
8      you.
9  A:  Page 5, yes.
10 Q:  Okay.  Page 6 and 7 also continue with the --
11     the list of topics.
12 A:  Okay.
13 Q:  Are you prepared to testify about all those?
14 A:  I need to read it.
15 Q:  Is this your first time reading it?
16 A:  This document, yes.  This copy, yes.
17 Q:  Okay.  Again, I'll represent to you that that's
18     a duplicate copy of what was served on your
19     attorney, Mr. Hopewell?
20 A:  Okay.  May I read it?
21 A:  Sure.
22 A:  Page 6 and 7; correct.
23 Q:  Okay.  Is there anything in there that you're
24     not prepared to testify about?
25 A:  No.

Page 15

1  Q:  Okay.  All right.  You can go to page 8.  This
2      is a list of items ---
3  A:  Uh-huh.
4  Q:  --- to bring to the deposition.  Did you bring
5      all these items that were requested with you?
6  A:  To -- to the best of my knowledge, yes.
7  Q:  To your knowledge?  Okay.  So we have -- and
8      I'm just gonna kind of go through some of
9      these.  I just want to make sure that -- you
10     know, to the best of my knowledge, you know,
11     what we have.
12     Do we have complete copies of all
13     contracts or agreements or invoices between
14     Ikon and IZOP-K?
15 A:  Yes.
16 Q:  Okay.  And do we have complete copies of all
17     contracts or agreement or invoices between
18     Ikon-K and N.B I.N.A.T.  That's I -- spelled I-
19     N-A-T D-O-O.
20 A:  Yeah.  As far as I know, yes.
21 Q:  Okay.  And do we have complete copies of
22     contracts, agreements, or invoices between Ikon
23     and A.C. Unity D.O.O.?
24 A:  As far as I know, yes.
25 Q:  And complete copies of contracts or agreements

Page 16

1  or invoices between Ikon and ***M. M. Transport
2  D.O.O.?
3  A:  As far as I know, yes.
4  Q:  And complete copies of all contracts or
5      agreements or invoices between Ikon and
6      Michael's Machines?
7  A:  As far as I know, yes.
8  Q:  Okay.  And do we have the complete copies of
9      all contracts or agreements or -- or invoices
10     between Ikon and Automatics & Machinery
11     Company, Incorporated?
12 A:  As far as I know, yes.
13 Q:  Okay.  And do we have all -- do we have copies
14     of all the contracts or agreements or invoices
15     between Ikon and ZhengZhou Harvest?  And I'm
16     gonna spell that for the court reporter.
17 MR. D'ANTONI:  It's Z-H-E-N-G-Z-H-O-U Harvest.
18 A:  No.
19 Q:  We don't have all the contracts for that?
20 A:  Huh-uh, no, sir.
21 Q:  Okay.  Do you have those in your possession?
22 A:  No.  Couldn't -- I couldn't locate them.
23 Q:  Okay.  Do we have complete copies of all
24     contracts or agreements or invoices between
25     Ikon and Li Yao Yuan Company, Ltd.?  And I'm

4 (Pages 13 to 16)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 17

1     gonna spell that for the court reporter.
2   MR. D'ANTONI: L-I, space, Y-A-O, space, Y-U-A-N,
3     Company Ltd.?
4   A:   Yes.
5   Q:   And turning back to subparagraph G, the
6     ZhengZhou Harvest, did you have contracts or
7     agreements with them?
8   A:   Yes.
9   Q:   Okay.  You just can't locate them?
10   A:   I can't locate it; correct.
11   Q:   Okay.  Okay.  Do we have the complete copies of
12     all contracts or agreements or invoices between
13     Ikon and Really Fine International Trading?
14   A:   Yes.
15   Q:   Okay.  Do we have complete copies of all
16     contracts or agreements or invoices between
17     Ikon and Genesis Machine Company, LLC?
18   A:   Yes.
19   Q:   Do we have complete copies of all contracts or
20     agreements or invoices between Ikon and Entrust
21     Manufacturing Technologies?
22   A:   As far as I know, yes.
23   Q:   Okay.  Do we have complete copies of all
24     contracts or agreements or invoices between
25     Ikon and 3DC Projects, LLC?

Page 18

1   A:   No.
2   Q:   Where are those located?
3   A:   I can't -- I couldn't locate them.
4   Q:   Are there actual contracts between Ikon and 3DC
5     Projects, LLC?
6   A:   No.
7   Q:   There are not?
8   A:   No.
9   Q:   There are no written contracts?
10   A:   No.
11   Q:   No invoices?
12   A:   Yes.
13   Q:   There are invoices?
14   A:   Yes.
15   Q:   And do we -- we -- we do not have those?
16   A:   No.
17   Q:   Okay.  Are they at your office or you cannot
18     locate them?
19   A:   They are in my office, yes.
20   Q:   Okay.  Is that something you can provide
21     through your attorney who can provide it to us?
22   A:   Yes.
23   Q:   Okay.
24   MR. HOPEWELL: Andrew, excuse me.
25   MR. D'ANTONI: Yes?

Page 19

1   MR. HOPEWELL: Which one is that?
2   MR. D'ANTONI: This is ---
3   MR. HOPEWELL: Is that ---
4   MR. D'ANTONI: --- 2(l).
5   MR. HOPEWELL: Okay.  That's (l).
6   MR. D'ANTONI: That's (l).  It's 3DC Projects, LLC.
7   MR. HOPEWELL: 3DC.  Okay.  Thank you.
8   Q:   The next materials we asked for were all
9     documents and communications.  And the
10     communications would be everything from
11     ***email(s) to text message to letters to
12     memoranda, any type of correspondence, okay? --
13     that are received from or exchanged or between,
14     directly or indirectly, coming through you or,
15     you know, coming through some other third
16     party, Ikon and the following persons or
17     entities.  Do we have all those materials
18     between Ikon and IZOP-K, D.O.O.?
19   A:   No.
20   Q:   Okay.  What are we missing?
21   A:   Emails.
22   Q:   Okay.  Where are those emails located?
23   A:   They should be on my email.
24   Q:   On your email.  Okay.  Is that something you
25     can provide to Mr. Hopewell?

Page 20

1   A:   Yes.
2   Q:   Okay.  Do we have all documents and
3     communications sent to or received from or
4     exchanged between Ikon and Mr. Klemen Molek?
5   A:   That would be the same company.
6   Q:   Okay.  So the emails that you're referencing
7     are emails from ---
8   A:   Klemen.
9   Q:   --- Mr. Molek?  From Klemen to Ikon and Ikon to
10     Klemen?
11   A:   Correct.
12   Q:   Okay.  And those are all -- those are all on
13     your computer and you can provide them to
14     Mr. Hopewell?
15   A:   Yes, correct.
16   Q:   Okay.  Do we have all the documents and
17     communications between Ikon and N.B. I.N.A.T.,
18     D.O.O.?
19   A:   No.
20   Q:   No?  What are we missing?
21   A:   The emails.
22   Q:   The emails?
23   A:   Uh-huh.
24   Q:   And where are those emails located?
25   A:   Same location.  The computer.

5 (Pages 17 to 20)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 21

1  Q:  On a computer?
2  A:  It should be on my email; yes.
3  Q:  Okay.
4  A:  Company email.
5  Q:  And you can provide those to Mr. Hopewell?
6  A:  Yes.
7  Q:  And what about all documents and communications
8      between Ikon -- and I'm gonna spell this for
9      the court reporter.
10 MR. D'ANTONI:  Mr. Zeljko, Z-E-L ---
11 A:  Zeljko.
12 Q:  Say that again?
13 A:  Zeljko.
14 Q:  Zeljko, yeah.
15 A:  Uh-huh.
16 Q:  Mr. Zeljko Blagojevic.
17 MR. D'ANTONI:  And that's B-L-A-G-O-J-E-V-I-C.
18 Q:  Do we have all your documents and
19     communications between Ikon and Mr. Blagojevic?
20 A:  He's N.B.A.T.
21 Q:  Okay.
22 A:  So it's the same.
23 Q:  Okay.  So the emails that you're talking
24     about ---
25 A:  Uh-huh.

Page 22

1  Q:  --- with N.B. I.N.A.T., those are from ---
2  A:  From that company.
3  Q:  --- Mr. Blagojevic?
4  A:  Uh-huh.
5  Q:  Okay.  Those are on your computer, and you can
6      provide them to Mr. Hopewell?
7  A:  Correct.
8  Q:  Okay.  What about the next individual here,
9      Mr. Milorad, M-I-L-O-R-A-D,
10 MR. D'ANTONI:  And that's spelled -- yeah --
11     K-R-I-V-O-K-A-P-I-C.
12 Q:  Any communications between Ikon and this
13     individual?
14 A:  I don't recall their name, to be honest.
15 Q:  Okay.  Is that something, if you did have the
16     communication, it would also be on your
17     computer?
18 A:  It should be; yes.
19 Q:  In your email?
20 A:  But I don't recall.
21 Q:  Is that something you can -- you could search
22     for on your computer?
23 A:  Yeah.  Most definitely.
24 Q:  Okay.  And if you search and you locate those,
25     that's something you can provide to

Page 23

1      Mr. Hopewell?
2  A:  Yes.
3  Q:  Okay.  What about all documents and
4      communications exchanged between Ikon and A.C.
5      Unity, D.O.O.?  Have you provided all those?
6  A:  No.
7  Q:  No?  What have you not provided?
8  A:  The emails.
9  Q:  Okay.  Where are those emails located?
10 A:  They are in the computer, in the company email.
11 Q:  Okay.
12 A:  Yeah.
13 Q:  On your same computer?
14 A:  Uh-huh.
15 Q:  And those are emails that -- that you can
16     provide to Mr. Hopewell?
17 A:  Yes.
18 Q:  Okay.  Have you provided us with all documents
19     and communications between Ikon and B.M.
20     Transport, D.O.O.?
21 A:  No.
22 Q:  What documents are we missing or communications
23     are we missing?
24 A:  I think the invoice that I provided came on an
25     email, so I didn't print the email.

Page 24

1  Q:  Okay.  And that email is also located on your
2      computer?
3  A:  Company email; yes.
4  Q:  And that -- that email is also something you
5      can provide to Mr. Hopewell?
6  A:  Yes.
7  Q:  Okay.  What about all documents and
8      communications sent to or received from or
9      exchanged between Ikon and Michael's Machines?
10     Do we have all those?
11 A:  No.
12 Q:  We don't?
13 A:  No.
14 Q:  What are we missing?
15 A:  I brought the -- I brought the invoice.  But,
16     again, I think the invoice came on a email.  So
17     I didn't print the email.
18 Q:  Okay.  That email -- and that's the only email?
19     That's the only communication between you and
20     Michael's Machines?
21 A:  No.  We do business together, so there should
22     be more emails.
23 Q:  Okay.
24 A:  Uh-huh.
25 Q:  And you can gather those emails ---

6 (Pages 21 to 24)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 25

1  A:  Yes.
2  Q:  --- and you can provide them to Mr. Hopewell?
3  A:  Yes.
4  Q:  Okay.  What about all documents and
5      communications between Ikon and Mr. Michael
6      Otte or Mike Otte?
7  A:  It's the same.  He's the owner of Michael's
8      Machines.
9  Q:  Okay.  So he's the person at Michael's Machines
10     who you were corresponding?
11 A:  Correct.
12 Q:  When I say you, I mean Ikon you were ---
13 A:  Uh-huh.
14 Q:  --- corresponding with?
15 A:  Correct.
16 Q:  Okay.  And those -- those emails that
17     correspondence, that's all on your computer;
18     right?
19 A:  It should be; yes.
20 Q:  And that's -- you can gather that and provide
21     it to Mr. Hopewell?
22 A:  Yes.
23 Q:  Okay.  Any other communications with Mr. Otte
24     or Michael's Machines, you know, non-email?
25     Any letters, text messages?

Page 26

1  A:  Text messages, yes.
2  Q:  Okay.
3  A:  Probably.
4  Q:  Are those text messages on your phone?
5  A:  Yes.
6  Q:  Can you provide -- is that something you can
7      provide to -- to Mr. Hopewell?
8  A:  Yes.
9  Q:  And just backing up a little bit, do you have
10     any text messages with Mr. Molek?
11 A:  Yes.
12 Q:  Did you provide those today?
13 A:  No.
14 Q:  Is that something that you can pull from your
15     phone and provide to Mr. Hopewell?
16 A:  Yes.
17 Q:  Okay.  Any text messages with Mr. Blagojevic
18     from N.B. I.N.A.T.?
19 A:  No.
20 Q:  Any other communication with him other than
21     email?
22 A:  No.  I don't recall.
23 Q:  Okay.  Do you have any communications between
24     Ikon and Mr. Lawrence B. Holt?
25 A:  Yes.  I'm sorry.  Can you repeat the question?

Page 27

1  Q:  Yeah.  Communications, you know, relating to,
2      you know, what's going on with this case ---
3  A:  Yes.
4  Q:  --- you know, between Ikon and Mr. Lawrence B.
5      Holt, Jr.?
6  A:  Yes.
7  Q:  Okay.  What are the -- what type of
8      communications are those, and where are they
9      located?
10 A:  Can you be more specific?
11 Q:  Sure let me ask this:  Did you provide any of
12     those communications?  Did you bring those with
13     you today?
14 A:  No.
15 Q:  Okay.  Are those communications in the form of
16     email?
17 A:  Yes.
18 Q:  Where are those emails located?
19 A:  At the company email.
20 Q:  In the company computer?
21 A:  No.  In the email.
22 Q:  On the -- oh, okay, the email?  And those are
23     emails that you can gather?
24 A:  Yes.
25 Q:  And you can provide those to Mr. Hopewell?

Page 28

1  A:  Yes.
2  Q:  Okay.  Any text messages with Mr. Holt?
3  A:  Yes.
4  Q:  Are those text messages that you can gather and
5      also provide to Mr. Hopewell?
6  A:  They do have information about communications
7      with my lawyer.
8  Q:  Non-privileged?  Yeah.  Well, your attorney can
9      review those communications and make a
10     determination as to whether they're ---
11 A:  Yes.
12 Q:  --- privileged or not.
13 A:  Yes.
14 Q:  Do you have any emails or communications that
15     would -- before I get to that -- (m)(xi) here.
16     What's the full name of your brother who was
17     helping you on this transaction?
18 A:  Ali Andres Deaza.
19 Q:  And do you have communications, documents with
20     him relating to this transaction?  Emails and
21     the like?
22 A:  Emails.
23 Q:  Okay.  Are you those emails also on the company
24     computer?
25 A:  In the email.

7 (Pages 25 to 28)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 29

1  Q:  Or in your email, yeah.
2  A:  Yes.
3  Q:  And those are emails that you can gather?
4  A:  Yes.
5  Q:  And you can provide them to Mr. Hopewell?
6  A:  Yes.
7  Q:  Okay.  Any text messages with Ali?
8  A:  No.
9  Q:  Okay.  And just to be clear, on the -- the
10      emails when you say they're -- they're, you
11      know, that you have them, what is the email
12      address you're -- you're speaking to, in
13      reference to?
14  A:  Suliban@ikonweapons.com.
15  Q:  Suliban@ikon ---
16  A:  --- weapons.com.
17  Q:  Okay.  Is there any other email address you
18      use -- you have used to communicate with any of
19      these persons?
20  A:  No.
21  Q:  Okay.  Okay.  What about -- have you provided
22      all documents and communications sent to or
23      received from or exchanged between Ikon and the
24      Montenegrin, Serbian, Slovenian, or United
25      States Government officials or agencies

Page 30

1      relating to this matter?
2  A:  No.
3  Q:  Okay.  What have you not provided?
4  A:  ATF -- some emails from the ATF.
5  Q:  Do you have any emails or communications with
6      the Montenegrin government officials or
7      agencies or representatives ---
8  A:  No.
9  Q:  --- of those agencies?
10      No?  Do you have any emails, documents, or
11      communications exchanged between Ikon and the
12      Serbian government, it's officials, agencies,
13      or representatives?
14  A:  No.
15  Q:  Do you have any documents, communications,
16      emails exchanged between Ikon and the Slovenian
17      government, officials, agencies ---
18  A:  No.
19  Q:  --- or those representatives?
20      So the only materials you have that are
21      responsive to this request are certain
22      documents and communications between Ikon and
23      the United States Government, namely the ATF;
24      is that true?
25  A:  It's -- it's what I can recall at this time.

Page 31

1  Q:  Okay.  Could there be other US Government,
2      agencies, officials, or representatives that
3      you were -- been in contact with, exchanged
4      communications with relating to this case?
5  A:  It could be; yes.
6  Q:  Okay.  Is that something you can search for?
7  A:  Yes.
8  Q:  Okay.  And if you gather that, you can provide
9      that to Mr. Hopewell; correct?
10  A:  Right.
11  Q:  Okay.  We did see that, you know, in the -- the
12      documents that you provided us at the beginning
13      of this deposition, that there were copies us
14      of both your US passport and your Columbian
15      passport; is that correct?
16  A:  Correct.
17  Q:  Were those complete copies of -- of all the
18      pages in ---?
19  A:  Correct.
20  Q:  --- your passports?
21      Do you have the originals here with you
22      today?
23  A:  No.
24  Q:  Is the original something -- where are the
25      originals?

Page 32

1  A:  In a safe.
2  Q:  In a safe?  Is that something that -- that you
3      can gather that we can inspect visually?
4  A:  Yes.
5  Q:  Okay.  And I will just represent to you the
6      reason why I'm asking you that is some of the
7      copies are -- are difficult to see, the quality
8      of the copy.  So it's difficult to determine,
9      you know, some of the -- the entry stamps,
10      what -- what they're saying, okay?
11  A:  Uh-huh.
12  Q:  And we have all other documents that you had in
13      your possession that were sufficient to
14      concern -- or excuse me -- sufficient to
15      confirm your overseas travel in connection with
16      these agreements in this case?
17  A:  Can you rephrase the question?
18  Q:  Yeah.  So what we were -- what we were asking
19      for in this request was, you know, any hotel
20      receipts, rental car receipts, bank records,
21      foreign ATM withdrawals, anything showing that
22      you had traveled overseas, you know, in
23      connection with these agreements in this case?
24  A:  There was a lot of them.
25  Q:  Sure.

8 (Pages 29 to 32)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 33

1  A:   They -- as far as I can remember, yes.  And --
2       but I'm not 100 sure.
3  Q:   Okay.
4  A:   I -- I don't know.  There's a lot of receipts.
5  Q:   Uh-huh.
6  A:   So I may miss some.
7  Q:   Yeah.  Is -- is that something you can still,
8       you know, search for and try to gather anything
9       you haven't provided?
10 A:   Correct.
11 Q:   And you can provide those to Mr. Hopewell?
12 A:   Yes.
13 Q:   Okay.  And going back to the subparagraph (m)
14      under Documents and Communications, we talked
15      about text messages being exchanged.  What cell
16      phone number are those -- were those -- you
17      know, what cell phone number do you have where
18      those text messages are stored?
19 A:   (843)251-6488.
20 Q:   That's your personal cell phone?
21 A:   Correct.
22 Q:   Does anybody else use that cell phone other
23      than you?
24 A:   No.
25 Q:   You use that for Ikon business as well?

Page 34

1  A:   Correct.
2  Q:   Does Ikon pay the monthly bill for that cell
3       phone?
4  A:   Yes.
5  Q:   Okay.  Do you have the -- the cell phone
6       numbers for Mr. Klemen Molek?
7  A:   I do.
8  Q:   Is that something you have on you right now?
9  A:   Yes.
10 Q:   Could you provide that to us right now, please?
11 A:   Sure.
12 Q:   Okay.
13 A:   386 ---
14 Q:   386.
15 A:   --- 41 ---
16 Q:   41.
17 A:   --- 794 ---
18 Q:   794.
19 A:   --- 895.
20 Q:   895.  So just to be sure that I got it,
21      386-41-794-895; is that correct?
22 A:   Yes.
23 Q:   Do you have an email address for him as well?
24 A:   Yes.
25 Q:   What is that email address?

Page 35

1  A:   I can't recall.  It's weird.
2  Q:   Do you have that on your -- your -- your --
3       your email with your company ---
4  A:   Yes.
5  Q:   --- the suliban@ikonweapons?
6  A:   Yes.
7  Q:   Is that's something you can get?
8  A:   Yes.
9  Q:   Okay.  And that's something you can provide to
10      Mr. Hopewell?
11 A:   Yes.
12 Q:   Okay.  Would that email address -- do you have
13      your -- your email suliban@ikonweapons.com
14      synched to your cell phone?
15 A:   Yes.
16 Q:   Is that something you could look up right now
17      to get Mr. Klemen's email address?
18 A:   Yes.
19 Q:   Okay.  You can go ahead and get that.
20 A:   Kle --
21 Q:   Uh-huh.
22 A:   --- men@izop.si.
23 MR. HOPEWELL:  Is that a B or a V?
24 MR. DEAZA:  P as in Paul.
25 MR. HOPEWELL:  I -- I'm sorry.

Page 36

1  MR. DEAZA:  Izop.si.
2  MR. HOPEWELL:  Izop.  Okay.
3  MR. DEAZA:  Uh-huh.
4  MR. HOPEWELL:  I'm sorry.
5  Q:   And just so -- so that I'm clear, that's
6       klemen@izop.si?
7  A:   I-S.
8  Q:   I-S?
9  A:   Hold on.  Let me double-check.  S-I.
10 Q:   S-I.  And do you --
11         (Off-the-record discussion.)
12 Q:   And what country is Mr. Molek located in?
13 A:   Slovenia.
14 Q:   And what about Mr. Blagojevic?  Do you have his
15      cell phone number?
16 A:   Who?
17 Q:   This is the individual from N.B. I.N.A.T.,
18      Mr. Blagojevic.
19 A:   No.
20 Q:   So no cell number for -- for him?
21 A:   No.
22 Q:   Do you have an email address for him?
23 A:   Yes.
24 Q:   Is that something you can pull off your phone
25      right now?

9 (Pages 33 to 36)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 37

1   A:  I think so. Nbinat@gmail.com.
2   Q:  Okay. You don't have a cell phone number for
3       Mr. Blagojevic. Do you have a business phone
4       number for him?
5   A:  Yes.
6   Q:  What's his business phone number?
7   A:  381-34-368-042.
8   Q:  Do you also have a business phone number for
9       Mr. Molek?
10  A:  I already answered that question.
11  Q:  In addition to his cell phone. You gave me his
12      cell phone number. I just want to make sure
13      this ---
14  A:  Oh.
15  Q:  He got a cell phone number. Does he also have
16      business number?
17  A:  I'm not recalling.
18  Q:  Okay. So that's -- that's the only number that
19      you use to contact Mr. Molek?
20  A:  Correct.
21  Q:  Okay. Do you have a telephone number for
22      Mr. Michael Otte?
23  A:  From who?
24  Q:  Mr. Michael Otte from Michael's Machines. Can
25      you tell us ---

Page 38

1   A:  Otte? Okay.
2   Q:  Yeah. Otte. Is that how you it, Otte?
3   A:  Yeah. That's ...
4           618 ---
5   Q:  618.
6   A:  --- 570 ---
7   Q:  570.
8   A:  --- 8641.
9   Q:  8641. Is that a cell phone?
10  A:  I'm not sure.
11  Q:  Not sure? Is that the only number you use to
12      contact him?
13  A:  Correct.
14  Q:  Do you have an email for Mr. Otte, email
15      address?
16  A:  Yes.
17  Q:  Do you have an email address? Can you ---
18  A:  Yes.
19  Q:  --- provide that, please?
20  A:  Oh, okay. Hk ---
21  Q:  Hk.
22  A:  --- mp5 ---
23  Q:  Mp5.
24  A:  --- @empowering.com, E-M-P-O-W-E-R-I-N-G.com.
25  Q:  Do you have a cell phone number for Mr. Holt?

Page 39

1   A:  Yes.
2   Q:  What is that number?
3   A:  843 ---
4   Q:  843.
5   A:  --- 995 ---
6   Q:  995.
7   A:  --- 4749.
8   Q:  Is that the only number you use to contact
9       Mr. Holt?
10  A:  No.
11  Q:  Is there another number he has?
12  A:  Yes.
13  Q:  What is it?
14  A:  (843)903-3805.
15  Q:  Is that a home number or a business number?
16  A:  I don't know.
17  Q:  Don't know? Do you have an email address for
18      Mr. Holt ---
19  A:  Yes.
20  Q:  --- that you can provide?
21  A:  Yes. Sand, S-A-N-D, lholt, H-O-L-T,
22      @cscoast.net.
23  Q:  Any other email address that you use to
24      communicate with Mr. Holt?
25  A:  No.

Page 40

1   Q:  Does your brother Ali have a cell phone number
2       that you use to contract him?
3   A:  What -- what's the question again?
4   Q:  Does your brother Ali have a cell phone number
5       that you use to contact him?
6   A:  Yes.
7   Q:  What's that cell phone number?
8   A:  381 ---
9   Q:  381.
10  A:  --- 62 ---
11  Q:  62.
12  A:  --- 19 ---
13  Q:  19.
14  A:  --- 28 ---
15  Q:  28.
16  A:  --- 184.
17  Q:  184. Okay. So I just want to be sure I got
18      it. 381-62-19-28-184?
19  A:  Uh-huh.
20  Q:  Do you have an email address that you use to
21      communicate with Ali?
22  A:  Yes.
23  Q:  What is that email address?
24  A:  Ali@ikonweapons.com.
25  Q:  Is there any other email address that you use

                                    10 (Pages 37 to 40)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

---

Page 41

1    to communicate with Ali?
2  A:  No.
3  Q:  Okay. Let's turn to page 10 of the deposition
4       notice. We asked for tax records for Suliban
5       E. Deaza, tax years 2019, 2020. Have you
6       provided those?
7  A:  Yes.
8  Q:  Okay.
9  MR. D'ANTONI:  I think -- Mr. Hopewell, did you say
10       2021 is still pending? Yeah.
11  Q:  Okay. Do we have complete copies of the tax
12       returns filed by Ikon Weapons, LLC, for 2019
13       and 2020?
14  A:  Yes.
15  Q:  Okay. Do we have all photographs or pictures
16       that were taken by Ikon or anyone acting on --
17       on Ikon's behalf or received by Ikon in
18       connection with these agreements?
19  A:  No.
20  Q:  What photographs and pictures are we missing?
21  A:  There's a lot of pictures and a lot of
22       photographs.
23  Q:  And where are these located?
24  A:  I'm not sure exactly.
25  Q:  How do you know they exist?

---

Page 42

1  A:  They at different places, is what I meant.
2       They could be on the email.
3  Q:  Okay. So you have some photographs that are,
4       you know, part of the email attachments ---
5  A:  Correct.
6  Q:  --- that you received ---
7  A:  So I don't know the exact location of all the
8       pictures.
9  Q:  Are they all -- are they all within your --
10       your email account or on your computer --
11       stored on your computer system?
12  A:  Some of them on the email.
13  Q:  Uh-huh.
14  A:  Some of the them on the computer.
15  Q:  Okay. Are these things that you can search for
16       and you can gather?
17  A:  Yes.
18  Q:  Okay. And you can provide those to
19       Mr. Hopewell?
20  A:  Yes.
21  Q:  Okay. Are these pictures that you took
22       personally?
23  A:  Some of them; yes.
24  Q:  And who else took the -- the pictures that
25       you're aware of?

---

Page 43

1  A:  My brother.
2  Q:  Okay. Anybody else?
3  A:  Brokers.
4  Q:  Which brokers?
5  A:  IZOP.
6  Q:  Any other brokers?
7  A:  That's as far as I know.
8  Q:  Okay. And do we have a complete copy of -- of
9       Ikon's shareholder agreement, articles of
10       incorporation, and corporate minutes for years
11       2020, 2021, and what you have to date through
12       2022?
13  A:  Yes. We don't have corporate minutes.
14  Q:  Okay. But we got your articles of
15       incorporation?
16  A:  Yes.
17  Q:  We have any shareholder agreements?
18  A:  We don't have any.
19  Q:  Don't have any? Okay.
20  A:  Huh-uh.
21  Q:  Do we have documents sufficient to show Ikon's
22       current inventory of firearms? And that would
23       include, you know, an inventory of the quality
24       and type of firearms that Ikon currently has?
25  A:  No.

---

Page 44

1  Q:  Do you have documents like that?
2  A:  Yes.
3  Q:  Is that something -- where are those documents
4       located?
5  A:  The office.
6  Q:  The office? And those are documents that you
7       can gather?
8  A:  Yes.
9  Q:  And you can provide those to Mr. Hopewell?
10  A:  Yes.
11  Q:  Okay. Does Ikon keep an income operating
12       statement? You do, like, a trailing 12-month
13       operating statement that goes over your -- your
14       income and your expenses?
15  A:  No, we don't.
16  Q:  Do you have an accountant who keeps the books
17       for you?
18  A:  We have an accountant.
19  Q:  Okay. Who is the accountant for -- for Ikon?
20  A:  His name is Bob.
21  Q:  Can you -- say that name again, please?
22  A:  Bob.
23  Q:  Bob?
24  A:  Yes.
25  Q:  What's his last name?

---

11 (Pages 41 to 44)

Page 45

1   A:   I can't recall.  It's ---
2   Q:   What's the name of his business?
3   A:   It starts with his last name.
4   Q:   How long have you used Bob as your accountant?
5   A:   Since I opened the company.
6   Q:   How many years is that?
7   A:   Since 2017.
8   Q:   You don't know Bob's last name?
9   A:   I -- I can't recall right now.
10  Q:   Okay.
11  A:   It's ...
12  Q:   Where is he located?
13  A:   North Carolina.
14  Q:   Okay.  City?  What city is located in?
15  A:   I'm not sure.
16  Q:   Do you have a phone number for him?
17  A:   Yes.
18  Q:   What's his phone number?
19  A:   336 ---
20  Q:   336.
21  A:   --- 247 ---
22  Q:   247.
23  A:   --- 13 ---
24  Q:   13.
25  A:   --- 24.

Page 46

1   Q:   24.  Do you have an email address for Bob?
2   A:   Yes; I think so.
3   Q:   Do you have that on your phone?
4   A:   Yes.
5   Q:   Can you provide it, please?
6   A:   Yes.  It's not pulling up.
7   Q:   Is that something that you can search for and
8        then you can provide it to Mr. Hopewell?
9   A:   Yes.
10  Q:   Okay.  Turning to the last item on the
11       deposition notice here.  Do we have the
12       complete copy of the slide show presentation
13       that Ikon delivered to PSA -- when I say PSA,
14       that's Palmetto State Armory -- corporate
15       officers on or about March 14th, 2022?
16  A:   Yes.
17  Q:   And those are the exact same slides that you
18       briefed them on that day?
19  A:   Yes.
20  Q:   Okay.  Before this deposition started this
21       morning, how did you prepare?
22  A:   What do you mean?  Can you ---
23  Q:   How did you prepare yourself to be able to
24       testify at this deposition?  Did you review any
25       materials?  Did you speak with your attorney?

Page 47

1   A:   For the first question, no.  For the second
2        question, yes.
3   Q:   So you didn't review any materials before the
4        start of this deposition?
5   A:   Can you be specific?
6   Q:   Yeah.  Are there -- are there any -- any
7        documents that you -- you took a look at maybe
8        to refresh your recollection just in order to
9        prepare to be able to testify fully and
10       completely here?
11  A:   I -- I gave the documents that I brought in to
12       my attorney.
13  Q:   Okay.  But there were no specific documents
14       that you took a look at before this deposition?
15       Is that what you're telling me?  In other words
16       that -- that you used, that you -- you used
17       studied, you looked it specifically to prepare
18       to testify here today?
19  A:   I -- this morning I gave the documents that I
20       brought in to my attorney.
21  Q:   Other than those documents, is there any other
22       documents that you looked at in order to
23       prepare to testify in this deposition?
24  A:   No.
25  Q:   Okay.  Did you speak -- other than speaking

Page 48

1        with your attorney, did you meet or speak with
2        anyone else to prepare for this deposition?
3   A:   No.
4   Q:   Okay.  What I'd like to do --
5            (Off-the-record discussion.)
6   Q:   Other than your lawyer, did you speak with
7        anyone else to let them know that you were gon'
8        be going to be giving a deposition today?
9   A:   My wife.
10  Q:   Your wife?  Anyone else other than your wife?
11  A:   My dad.
12  Q:   Your dad?  And anyone else other than your dad?
13  A:   My mom.
14  Q:   Anyone else other than your mom?
15  A:   No.
16  Q:   Okay.  So just wife, dad, mom, and your
17       attorney?  Those are the only people you've
18       spoken to about this deposition?
19  A:   This morning; yes.
20  Q:   This morning?  Anyone else you've spoken to
21       about this deposition?
22  A:   When?
23  Q:   At any time.
24  A:   Multiple people.
25  Q:   Who?

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 49

1  A:  My -- when I was gathering the documents ---
2  Q:  Uh-huh.
3  A:  --- they asked me what the documents were for,
4      some of the employees.  I told them I was
5      having a deposition and I needed the documents.
6  Q:  Okay.  Which employees did you speak with?
7  A:  Angelica.
8  Q:  And these are employees of Ikon, just to be
9      clear?
10 A:  Correct.
11 Q:  And what is Angelica's last name?
12 A:  Cecchini [ph].
13 Q:  How do I spell that?
14 A:  I don't know.
15 Q:  Pronounce it again?
16 A:  Cecchini, C-E-C-C-I -- yeah.
17 Q:  Cecchini [ph]?
18 A:  Uh-huh.
19 Q:  Okay.  Any other employees that you spoke with
20     about this deposition?
21 A:  Tyler Litum [ph].
22 Q:  Okay.  Say that last name again?
23 A:  Like Litum.  I don't know how to spell it.  I'm
24     sorry.  English is not my first language.
25 Q:  That's fine.  And just going back to Angelica

Page 50

1      Cecchini [ph], what's her position with Ikon?
2  A:  She's our purchasing and compliance manager.
3  Q:  And what is Tyler's position with Ikon?
4  A:  He's our VP over production.
5  Q:  Any other employees you spoke with about this
6      deposition?
7  A:  No.
8  Q:  Anyone else other than employees of Ikon that
9      you spoke with about this deposition, other
10     than your wife, dad, mom, and counsel?
11 A:  No.
12 Q:  Did you speak to Mr.--
13         (Off-the-record discussion.)
14 Q:  Did you speak to Mr. Larry Holt at all about
15     this deposition?
16 A:  No.  Not today.
17 Q:  But you spoke to -- with him about it before
18     today?
19 A:  When I got served, he knew I have to do a
20     deposition.  But that was about it.
21 Q:  Okay.  What did you discuss with Mr. Holt about
22     this deposition or about this case?
23 A:  That I was just got served and I have to go to
24     do a deposition.
25 Q:  Did he have any questions?

Page 51

1  A:  No.
2  Q:  So that was the extent of your conversation?
3      You just told him ---
4  A:  Yeah.
5  Q:  --- you got served and then that was it?
6  A:  I -- that's it.  I told him I -- I have to do
7      a deposition.
8  Q:  Uh-huh.
9  A:  And he say okay.
10 Q:  Have you talked to him about this case at all,
11     not just the deposition?
12 A:  He was familiar with the case.
13 Q:  What have you told him about the case?
14 A:  Oh, he knows.  He read the complaint, the first
15     letters from you guys.
16 Q:  So you sent him the complaint, sent him the
17     letters?
18 A:  Yeah.  He's -- he's -- he's aware of the case.
19 Q:  Have you talked to Mr. Michael Otte at all
20     about this case?
21 A:  No.
22 Q:  Have you talked to Mr. Michael Otte at all
23     about this deposition?
24 A:  I mentioned it to him.  He called me yesterday
25     and I told him I can't talk to him because I

Page 52

1      have a deposition.  And that was about it.
2  Q:  Why did he call you yesterday?
3  A:  Because he got served some papers.
4  Q:  What did Mr. Otte tell you that he got served
5      with?
6  A:  I can't recall specifically.  He just told me
7      he got a bunch of crap in the mail.
8  Q:  But he didn't describe what it was?
9  A:  No.  He just call to say what's going on.
10 Q:  Uh-huh.  What did you tell him what was going
11     on?
12 A:  I said I can't tell you nothing.  That's what
13     I told him.  I say I have a disposition [sic]
14     tomorrow ---
15 Q:  Uh-huh.
16 A:  --- and I can't tell you anything.  That was
17     the length of our conversation.
18 Q:  No other conversations with Mr. Otte about this
19     case since it's been filed?
20 A:  Not that I can recall at this moment.
21 Q:  Could there have been conversations?
22 A:  Not that I can recall at this moment.
23 Q:  Okay.  Have you had any conversations with
24     Mr. Klemen Molek about this case ---
25 A:  Yes.

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 53

1  Q:   --- anything related to it?
2        When did that conversation occur?
3  A:   Let me rephrase that.  Not about the case,
4        about the project himself.
5  Q:   Well, we'll talk about the agreements and
6        the ---
7  A:   Correct.
8  Q:   --- the project later.
9        But as far as this case, the actual
10       litigation, have you spoken to him about it at
11       all?
12 A:   No, huh-uh.
13 Q:   Okay.  Have you spoken to him about this
14       deposition at all?
15 A:   No.
16 Q:   Okay.  When was the last time you spoke with
17       Mr. Molek?
18 A:   Yesterday.
19 Q:   What did you talk to him about yesterday?
20 A:   We were talking about -- about the contract.
21 Q:   What was the substance of that conversation?
22 A:   It was about update, the second update on the
23       contract.
24 Q:   And what was the update?
25 A:   The update is that everything keeps moving

Page 54

1        forward.
2  Q:   What -- what -- what does that mean, everything
3        keeps moving forward?
4  A:   That's -- that's what we talk about, the whole
5        contract.  Everything we keep do what we need
6        to be doing.  We were waiting for some
7        documents from Serbia.  And he say ---
8  Q:   What document are you waiting for from Serbia?
9  A:   Export.  Export documents.
10 Q:   Did you exchange any emails or documents
11       yesterday with Mr. Molek?
12 A:   No.
13 Q:   Okay.  So just the phone call?
14 A:   Correct.
15 Q:   And you said as far as -- well, just, you know,
16       again, to -- just give me, you know, as -- as
17       detailed as you can, an explanation as to
18       Mr. Molek's update.  What precisely did he tell
19       you?
20 A:   Can you be more specific?
21 Q:   Yeah.  I'm -- I'm -- I'm interested in the --
22       the exact substance of the conversation.
23 A:   I ---
24 Q:   You said everything was moving forward.
25 A:   Uh-huh.

Page 55

1  Q:   But I don't know what that means, everything
2        moving forward.  What -- what -- what does that
3        mean exactly?
4  A:   We -- we -- we have a short conversation.  It
5        was really short.  He was busy.  And we talk
6        about is everything going well, and he said,
7        yep, everything looks good.  We should be able
8        to export soon.  And that was about it.
9  Q:   What does -- what does soon mean?  What -- what
10       does that mean?
11 A:   Soon ---
12 Q:   Is that one week, one month, one year?
13 A:   I would good guessing.  I would be guessing.
14       I would be totally guessing.
15 Q:   Did he describe anything yesterday as far as
16       what the hold-up is?
17 A:   No.
18 Q:   Did you ask any questions of him as to what was
19       holding it up?
20 A:   No.
21 Q:   Why not?
22 A:   Because I don't have to.  I didn't have to.
23 Q:   What did he say would be shipped soon?
24       What's -- what's -- what is about to happen
25       soon?

Page 56

1  A:   The guns in Serbia.
2  Q:   Which guns?
3  A:   The AKs.
4  Q:   How many?
5  A:   2,000.
6  Q:   Did he say anything about -- I'm gonna talk
7        about this a little more later -- but did he
8        say anything about the Montenegrin deal?
9  A:   No.
10 Q:   So for the -- the 2,000 that he said were going
11       to be shipped soon, these are the -- are these
12       M70 kits?  Is that what these are?
13 A:   Correct.
14 Q:   And who are these weapons for?
15 A:   Who are these weapons -- what do you mean?
16 Q:   The -- the firearms that are being shipped.
17       Where -- where are they going, and who are they
18       gonna be ultimately delivered to?
19 A:   The MUs are with Ikon Weapons.
20 Q:   Okay.  And what's Ikon Weapons going to do with
21       those weapons upon receipt -- or excuse me --
22       those firearms upon receipt?
23 A:   Explain the question?  Storage them?
24 Q:   So when the -- these 2,000 weapons, which
25       you've told me Mr. Klemen said he's going to

14 (Pages 53 to 56)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 57

1   export soon; correct?
2   A:  Correct.
3   Q:  All right.  And you said the end user is Ikon;
4       correct?
5   A:  Correct.
6   Q:  Okay.  When Ikon receives these weapons, you'll
7       be receiving them in the United States; is that
8       correct?
9   A:  Yes.
10  Q:  Okay.  Which port?
11  A:  We don't know that yet.
12  Q:  Don't know that yet?
13  A:  Huh-uh.
14  Q:  Okay.  When you do receive them in the United
15      States, what is Ikon Weapons going to do with
16      these firearms?
17  A:  Oh, we don't know yet.
18  Q:  Who do they -- do these -- do these firearms
19      belong to Ikon Weapons?
20  A:  These firearms were paid by Ikon Weapons.
21  Q:  Okay.  Are these -- these particular weapons
22      that you're speaking about, are they part of
23      the Serbian agreement between PSA and Ikon
24      Weapons?
25  A:  No.

Page 58

1   Q:  Okay.  So this is a separate order of AK-47s
2       that you have coming from IZOP-K that has
3       nothing to do with Palmetto State Armory?
4   A:  No.
5   Q:  No, it has nothing to do with Palmetto State
6       Armory?
7   A:  No to first question you asked.
8   Q:  Well, let me rephrase it a better way.  Are
9       these weapons that you just referenced in any
10      way related to the agreements that give rise to
11      this case?
12  A:  Yes.
13  Q:  Okay.  Which agreement do these weapons relate
14      to?
15  A:  So that would be the Contract Number 2.
16  Q:  Okay.  And just for kind of a standard naming,
17      you got -- when I say you and PSA, Ikon and PSA
18      have referred to that Contract Number 2 as the
19      Serbian agreement between themselves in their
20      communications?
21  A:  Zastava.
22  Q:  It was a Zastava agreement?
23  A:  Yeah, a Zastava agreement.
24  Q:  Okay.  The second contract?
25  A:  Yeah.

Page 59

1   Q:  Okay.  So those are -- am I to understand that
2       those 2,000 weapons -- or excuse me -- those
3       2,000 firearms, once you receive them, you'll
4       be delivering them to PSA per the agreement?
5   A:  No.  They don't want them.
6   Q:  They don't want the weapons?
7   A:  Correct.
8   Q:  Why do you say that they do not want the
9       firearms under the agreement?
10  A:  Because they were specific in a letter sent by
11      your firm ---
12  Q:  Uh-huh.
13  A:  --- saying that if you guys don't receive the
14      firearms by a certain date ---
15  Q:  Uh-huh.
16  A:  --- you just want the money.
17  Q:  Okay.
18  A:  Can we take a break?
19  Q:  Sure.  Yeah.
20  MR. D'ANTONI:  It's -- let's see.  What time is it?
21      Okay.  It's 10:49 right now.  So, yeah, we've
22      been going, I think, just over an hour.  So
23      let's take a ten-minute break.  Let's reconvene
24      at 11:00 o'clock.
25  VIDEOGRAPHER:  We're off the record at 10:50.

Page 60

1       (A break was taken from 10:50 a.m. until
2   11:00 a.m.)
3   VIDEOGRAPHER:  We're on the record at 11:00 o'clock.
4   A:  I would like to ask you a question on the
5       record.  I may not recollect having all the
6       invoices, all of them and all the contracts.
7       But with the best of my knowledge, I -- I
8       include it.  I don't remember which of this I
9       didn't -- I didn't answer with the best of my
10      knowledge.  So I just want to make sure for the
11      record with the best of my knowledge, each of
12      this we provided what you asked.
13  Q:  Okay.  So just to be clear ---
14  A:  Yeah.
15  Q:  --- what you're saying is as we went
16      through ---
17  A:  Uh-huh.
18  Q:  --- the specific documents and materials that
19      are requested here ---
20  A:  Correct.
21  Q:  --- that you just want to make it clear for the
22      record that you're answering to the best of
23      your knowledge and ability?
24  A:  Correct, correct, correct.
25  Q:  Okay.

15 (Pages 57 to 60)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 61

1  A:  For each of them; yes.  'Cause I may slip one
2      or two as you were asking me questions about
3      each one.  One -- one or two I say yes, but I
4      didn't say with the best of my knowledge.  So
5      I just want to make sure that it's within the
6      record that with the best of my knowledge I
7      answered all those questions.
8  Q:  Okay.  Understood.  Okay.  So we -- when we
9      left off, we were talking about your
10     conversation with Mr. Molek ---
11 A:  Uh-huh.
12 Q:  --- yesterday.  What I'd like to ask you now
13     is:  Have you had any conversations since this
14     case was filed with Mr. Blagojevic from N.B.
15     I.N.A.T.?
16 A:  No.
17 Q:  Okay.  And we talked about your conversation
18     with Mr. Otte relating to the filing -- or
19     excuse me -- relating to the service of certain
20     documents on him?
21 A:  Uh-huh.
22 Q:  Did you -- have you had any other conversation
23     with Mr. Otte since this case was filed?
24 A:  Since the case was filed, yes.
25 Q:  And when did that conversation occur?

Page 62

1  A:  That was another phone call.
2  Q:  Do you remember about the date when that
3      happened?
4  A:  No, I can't recall the date.
5  Q:  What did you speak with -- or what was the
6      substance of your conversation with Mr. Otte?
7  A:  You guys request something from him again.
8  Q:  Uh-huh.
9  A:  And he called me and say the same words that he
10     say the second time.
11 Q:  Did you discuss anything else?
12 A:  Huh-uh, no.
13 Q:  And have you spoken with your brother Ali about
14     this case since it was filed?
15 A:  Since it was filed, yes.
16 Q:  How many times have you spoken to Ali about
17     this case since it was filed?
18 A:  I can't recall the number of times.
19 Q:  More than five times?
20 A:  Yes.
21 Q:  Okay.  And are you communicating with him via
22     email or cell phone or both?
23 A:  Phone call.
24 Q:  When was the last time you spoke with Ali about
25     this case ---

Page 63

1  A:  Yesterday.
2  Q:  --- before this deposition?
3  A:  Sorry to interrupt you.
4  Q:  Go ahead.
5  A:  Finish the question.  I didn't hear that last
6      part.
7  Q:  When was the last time you spoke with Ali about
8      this case or this deposition?
9  A:  Yesterday.
10 Q:  And what did you discuss with Ali?
11 A:  I just told him that I have a deposition and
12     that's it.  We talked about family stuff.
13 Q:  And in your prior conversations with Ali, what
14     have you -- what was the substance of your
15     conversation about about this case?
16 A:  About this case specifically, I can't recall
17     the details.  We talk on a daily basis almost
18     'cause he's my brother.
19 Q:  Uh-huh.  Is -- is he living in Columbia?
20 A:  Correct.
21 Q:  Is that where he is right now?
22 A:  Correct.
23 MR. HOPEWELL:  Andrew, I hate to interrupt.
24 MR. D'ANTONI:  Yes, sir.
25 MR. HOPEWELL:  Could you, so the record's clear, are

Page 64

1      we talking about Columbia like we are or
2      Columbia, South America?
3  MR. D'ANTONI:  That's a -- that's a good point,
4      Mike.
5  Q:  We are talking about Columbia the -- the
6      country in South America?
7  A:  Yes.
8  Q:  Okay.  What I'd like to do here is pivot a
9      little bit.  And want to ask a bit about your
10     background.  How old are you?
11 A:  I'm 43 right now.
12 Q:  Okay.  And what's your date of birth?
13 A:  September 5th, 1978.
14 Q:  Where do you currently live?
15 A:  6010 Farm Oak Lane.
16 Q:  And that -- is that in Mint Hill,
17     North Carolina, yes?
18 A:  Mint Hill, North Carolina, yes.
19 Q:  Do you own or do you rent that home?
20 A:  We own the home.
21 Q:  When you say we, who is we?
22 A:  My wife and I.
23 Q:  Okay.  What's your wife's name?
24 A:  Ashley Deaza.
25 Q:  And how long have you been married to

16 (Pages 61 to 64)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 65

1    Mrs. Deaza?
2  A:  For the record, approximately five years.
3  Q:  That's a tough question, I know.
4  A:  Yeah.
5  Q:  And what is Mrs. Deaza's occupation?
6  A:  She's a home -- a stay-at-home mom.
7  Q:  Okay.  Did she have a profession or an
8       occupation before becoming a stay-at-home mom?
9  A:  Yes.
10 Q:  What did she do?
11 A:  She was a real estate agent, and she was the
12      director of the Florence-Darlington Tech
13      business incubator.
14 Q:  State that second job again?  The director of
15      what?
16 A:  The SiMT, the Florence Southern Institute of
17      Manufacturing in Florence.  It's called the
18      Florence-Darlington Institute, something like
19      that.
20 Q:  Okay.  How long have you lived at the -- the
21      Mint Hill address that you just provided me?
22 A:  Almost a year.
23 Q:  Where did you live before that?
24 A:  In an apartment.
25 Q:  Where is that located?

Page 66

1  A:  It's located in Concord.  I don't recall the
2       address.  But it's in Concord, North Carolina.
3  Q:  And what dates were you at that apartment?
4  A:  We move in ---
5  Q:  And we is, again, that's you and Mrs. Deaza,
6       Mrs. Ashley ---
7  A:  My wife.
8  Q:  --- Deaza?
9  A:  Correct.
10 Q:  Okay.
11 A:  We move in -- I don't recall the exact date,
12      but it was around August of twenty -- 2021.  I
13      don't recall.  I -- I -- I don't recall.
14 Q:  Just, you know, I understand that you may not
15      be able to give a precise date ---
16 A:  Yeah.
17 Q:  --- but just a ballpark estimation as to when
18      you were in that apartment?
19 A:  We rented.  We have the lease.  It was a
20      six-month lease, and then it got extended.
21 Q:  Okay.
22 A:  And I -- I don't recall.  It was right before
23      the kids started school in North Carolina.
24 Q:  Okay.
25 A:  So -- but that's why I'm saying it's August

Page 67

1       because the kids start school in August.  So
2       that's why my recollection of the -- of the
3       date.
4  Q:  Where did you live before the Concord
5       apartment?
6  A:  We were -- well, me in North Carolina at 234
7       Liberty Hill Church.
8  Q:  Say that address again?
9  A:  234 Liberty Hill Church.
10 Q:  Liberty Hill Church?
11 A:  Correct.  I move in there on February 4th.
12 Q:  Of what year?
13 A:  2020.
14 Q:  And how long did you live at that residence?
15 A:  Until my wife moved from Florence to
16      North Carolina.  And then I move in with them.
17 Q:  Where did you live before the 234 Liberty Hill
18      Church Road in ---
19 A:  In Florence.
20 Q:  Where did you live in Florence?
21 A:  It's 501 -- I'm sorry -- 405 Spike Court.
22      Spike Court, Florence, South Carolina.
23 Q:  And how long did you live at the spike Court
24      address?
25 A:  Me, I move in probably like -- more like two

Page 68

1       years.  Two, three years.  I don't recollect
2       right.
3  Q:  And where did you live before the spike Court
4       address?
5  A:  In North Myrtle Beach.
6  Q:  And where in Myrtle Beach did you live?
7  A:  North Myrtle Beach.  The address was -- I'm
8       having a hard time remembering all these
9       addresses.  It was by -- it was by the Swing
10      Bridge in North Myrtle Beach.  What's the name
11      of that place?  I owning a condo in there so I
12      just don't -- can't recall the address for some
13      reason.
14 Q:  To be clear just for the record, are you saying
15      North Myrtle Beach or Myrtle Beach?
16 A:  No.  North Myrtle Beach.
17 Q:  North Myrtle Beach?
18 A:  Yeah.
19 Q:  The city of North Myrtle Beach?
20 A:  The address had the North Myrtle Beach.  I'm
21      confused with some of the addresses 'cause I
22      move a lot during that short period of time.
23      So I guess it's what it is.
24 Q:  Okay.  Is the North Myrtle Beach address, is
25      that a condo that you own?

17 (Pages 65 to 68)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

|  | Page 69 |
|---|---|
| 1 | A: Yes. |
| 2 | Q: Do you currently lease that out to other |
| 3 | people? |
| 4 | A: No. I sold it. |
| 5 | Q: You sold it? |
| 6 | A: Uh-huh. |
| 7 | Q: When did you sell that condo? |
| 8 | A: I can't recall. |
| 9 | Q: Okay. Do you own any other property in |
| 10 | Myrtle Beach? |
| 11 | A: Yes. |
| 12 | Q: What property do you own in Myrtle Beach? |
| 13 | A: A condo. |
| 14 | Q: Condo? This is a different condo? |
| 15 | A: Correct. |
| 16 | Q: And do you currently lease that condo to other |
| 17 | people? |
| 18 | A: Correct. |
| 19 | Q: And you told me you had -- you talked about |
| 20 | your brother Ali. Do you have any other |
| 21 | brothers? |
| 22 | A: Yes. |
| 23 | Q: Who are your other brothers? |
| 24 | A: Juan Gabriel [ph] Deaza. |
| 25 | Q: Can you spell that for the court reporter? |

|  | Page 70 |
|---|---|
| 1 | A: Yes. |
| 2 | Q: Okay. |
| 3 | A: Juan, J-U-A-N, Grabiel, G-R-A-B-I-E-L, and |
| 4 | Deaza, D-E-A-Z-A. |
| 5 | Q: Do you have any other brothers? |
| 6 | A: No. |
| 7 | Q: Do you have any sisters? |
| 8 | A: No. |
| 9 | Q: What's that the name of your mother? |
| 10 | A: Liliana. |
| 11 | Q: What's her full name? |
| 12 | A: Liliana Celis. |
| 13 | Q: And can you spell that for the court reporter? |
| 14 | A: Yes. Liliana, L-I-L-I-A-N-A, and Celis, |
| 15 | C-E-L-I-S. |
| 16 | Q: And what is your father's name? |
| 17 | A: Alirio. |
| 18 | Q: And can you please spell that for the court |
| 19 | reporter? |
| 20 | A: A-L-I-R-I-O. |
| 21 | Q: And that's his full name? |
| 22 | A: Alirio Deaza. |
| 23 | Q: Okay. And your mother and father, are they |
| 24 | still alive? |
| 25 | A: Yes. |

|  | Page 71 |
|---|---|
| 1 | Q: Where do they live? |
| 2 | A: Right now they're living with me. |
| 3 | Q: Okay. Your brother Juan, does he live with |
| 4 | you? |
| 5 | A: No. |
| 6 | Q: Where does he live? |
| 7 | A: In Columbia. |
| 8 | Q: Okay. Where in Columbia? |
| 9 | A: He lives in Bogota. |
| 10 | Q: Okay. Turning back to Mrs. Ashley Deaza, is |
| 11 | she a naturalized US citizen, or was she born |
| 12 | in the United States? |
| 13 | A: She's born in the US. |
| 14 | Q: Does Mrs. Deaza hold citizenship in any country |
| 15 | other than the United States? |
| 16 | A: No. |
| 17 | Q: Have you been divorced? |
| 18 | A: Yes. |
| 19 | Q: What's the name of your ex-wife? |
| 20 | A: Beth. |
| 21 | Q: What's her full name? |
| 22 | A: Beth Calish Deaza. |
| 23 | Q: And the middle name -- Beth and say the middle |
| 24 | name again? |
| 25 | A: Calish, C-A-L-I-S-H. |

|  | Page 72 |
|---|---|
| 1 | Q: Okay. And when did you get divorced from |
| 2 | Mrs. Beth Calish Deaza? |
| 3 | A: I don't remember. I can't recall the date. |
| 4 | Q: Do you recall the year? |
| 5 | A: Not at this time. |
| 6 | Q: Do you have any children? |
| 7 | A: Yes. |
| 8 | Q: How many? |
| 9 | A: Three. |
| 10 | Q: What are their ages? |
| 11 | A: 14, 4, and 2. |
| 12 | Q: And are these children with Beth or Ashley? |
| 13 | A: My -- I'm sorry. I say 14. 13, 4 and 2. My |
| 14 | 13-year-old is with my first wife. |
| 15 | Q: Uh-huh. |
| 16 | A: And my four-year-old and my two-year-old is by |
| 17 | my second wife. |
| 18 | Q: Okay. Where are you from originally? |
| 19 | A: Bogota, Columbia. |
| 20 | Q: Are you still a citizen of Columbia? |
| 21 | A: Yes. |
| 22 | Q: Do you hold a Columbian passport? |
| 23 | A: Yes. |
| 24 | Q: Do you maintain a home in Columbia? |
| 25 | A: No. |

18 (Pages 69 to 72)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 73

1  Q:   When did you move to the United States?
2  A:   In 2003.
3  Q:   Spanish and English, are those the only
4        languages you speak?
5  A:   Yes.
6  Q:   So you gave us your cell phone number of
7        (843)251-6488.  Do you have any other cell
8        phone?
9  A:   No.
10 Q:   Does anyone else use that cell phone?
11 A:   No.
12 Q:   Have you -- do you keep your cell phone with
13       you on business trips?
14 A:   Not all the time.
15 Q:   Do you carry your cell phone with you when you
16       go overseas on business trips?
17 A:   I don't understand the question.
18 Q:   So just for the overseas trips you've taken,
19       specifically some of your trips to -- to Europe
20       in connection with these agreements, did you
21       bring your cell phone with you?
22 A:   I brought the -- the phone with me to overseas,
23       yes.
24 Q:   Okay.  And we may have already discussed this.
25       Again, I'm not trying to trip you up.

Page 74

1  A:   Uh-huh.
2  Q:   Does anyone other than you use the
3        suliban@ikonweapons.com email account?
4  A:   No.
5  Q:   Is it password protected?
6  A:   Yes.
7  Q:   Do you have any knowledge of any unauthorized
8        use of that email account?
9  A:   No.
10 Q:   So it's fair to say that all the emails that
11       are coming from suliban@ikonweapons.com were
12       written and sent by you?
13 A:   Correct.
14 Q:   Okay.  Has Ikon or any of its corporate
15       officers, including you, ever been accused or
16       convicted of a crime and something more than
17       just a routine traffic citation?
18 A:   No.
19 Q:   And that's whether in the United States or any
20       other country?
21 A:   No.
22 Q:   Has Ikon or any of its corporate officer --
23       that would include you -- ever been named,
24       whether as a plaintiff or a defendant, in a
25       civil suit not including this lawsuit?

Page 75

1  A:   No.
2  Q:   Okay.  And that's for any -- any country,
3        whether the United States or any other country
4        in terms of the civil suit.
5  A:   Rephrase the question?
6  Q:   Sure.  Yeah.  In terms of any past civil suits
7        against Ikon ---
8  A:   Uh-huh.
9  Q:   --- its corporate officers, including yourself,
10       you know, I asked whether you'd been named as
11       a plaintiff or a defendant in a civil suit, and
12       you answered no; correct?
13 A:   Yes.
14 Q:   Okay.  Is that -- and when I -- is that a civil
15       suit in either the United States or any other
16       country?
17 A:   I don't understand.
18 Q:   In other words, has Ikon or any of its
19       corporate officers, include yourself, been
20       named as a party in a civil suit outside of the
21       United States?
22 A:   No.
23 Q:   Okay.  Have you ever given testimony at a
24       trial?
25 A:   No.

Page 76

1  Q:   And you said this is your first time ever being
2        deposed; is that correct?
3  A:   Yes, first time.
4  Q:   I want to talk about your past education and
5        training.  Where did you go to high school?
6  A:   In Bogota.
7  Q:   What was that name of the high school?
8  A:   Jose Max Leon.  Colegio Jose Max Leon.
9  Q:   Can you spell that for the court reporter?
10 A:   Colegio, it's like a school in English.  And
11       Jose, J-O-S-E, Max, M-A-X, Leon, L-E-O-N.
12 Q:   And what year did you graduate?
13 A:   1994.
14 Q:   Did you go the college?
15 A:   Yes.
16 Q:   Where did you go to college?
17 A:   It's -- I'm just gonna say it in English.
18 Q:   Sure.
19 A:   Columbian School of Engineering.
20 Q:   Did you go to graduate school?
21 A:   No.
22 Q:   What degree did you get from the Columbia
23       School of Engineering ---
24 A:   Bachelor's, civil engineering.
25 Q:   Do you hold any licenses or certifications?

19 (Pages 73 to 76)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 77

1  A:　Yes.
2  Q:　What licenses or certifications do you hold?
3  A:　I'm a professional licensed engineer in the
4　　　state of South Carolina, and I have license.
5　　　And I have a license also, a professional civil
6　　　engineer in the state of North Carolina.
7  Q:　Any other licenses or certifications that you
8　　　hold?
9  A:　I'm also a licensed engineer in Columbia, of
10　　　course.
11  Q:　What year did you graduate from college?
12  A:　2003.
13  Q:　Do you have any prior military experience?
14  A:　No.
15  Q:　Do you have any formal education or training
16　　　specifically related to firearms?
17  A:　Can you be specific?
18  Q:　You know, do you -- are you in terms of
19　　　firearms, do you have any certificates, any
20　　　degrees?  Have you gone to any, you know,
21　　　courses, you know, technical colleges, anything
22　　　that pertains to firearms, armory,
23　　　manufacturing, things like that?
24  A:　Yes.
25  Q:　And what are those?

Page 78

1  A:　I took a class for gunsmithing.
2  Q:　Okay.  And where was that class taken?
3  A:　It was in the -- I don't recall the exact name
4　　　of the institution.  But I -- I -- I took the
5　　　class.  I took the course.
6  Q:　And when did that occur?
7  A:　That occurred -- around 2017, if I'm correct.
8　　　Maybe -- maybe not recall the exact year but
9　　　around 2017.
10  Q:　And where did you take this course?
11  A:　It was an online class.
12  Q:　Do you recall who put on the online class?
13  A:　No, I don't recall the name.
14  Q:　Okay.  Do you have any other formal -- formal
15　　　education or training related to firearms?
16  A:　I took a class on ARs, training.  Informal,
17　　　nothing formal.
18  Q:　Tell me about that class.
19  A:　I have an acquaintance that run these classes
20　　　where they teach you positioning, shooting, a
21　　　little bit of taking down, cleaning.  It's more
22　　　like a day event.  And then you just run
23　　　through courses and do things ---
24  Q:　Okay.  And when did that occur?
25  A:　That occurred around 2017 as well, around that

Page 79

1　　　time.
2  Q:　And where was that located?
3  A:　He came to Florence, so the class was somewhere
4　　　around Florence.  Can't -- it was on a property
5　　　of one of his friends.
6  Q:　And when you say he, who is he?
7  A:　Frank Reed.
8  Q:　Frank Reed?
9  A:　Yes.  R-E-E-D.
10  Q:　So we got the -- the gunsmithing class, the
11　　　class on AR training.  Is there any other
12　　　education or training that you've had
13　　　specifically related to firearms?
14  A:　No.
15  Q:　When did you start learning -- when did you
16　　　start teaching yourself about firearms and the
17　　　firearms industry?
18  A:　2015.
19  Q:　And what prompted you to, you know, to -- to
20　　　educate yourself about firearms and the
21　　　firearms industry?
22  A:　I met an individual.
23  Q:　Who did you meet?
24  A:　Josh Fiorini.  And Mark McNamara -- John
25　　　McNamara.  My bad.

Page 80

1  Q:　And how did you happen to meet them?
2  A:　I can't recall the specifics of how we met.
3  Q:　Uh-huh.
4  A:　But we end up talking about guns.
5  Q:　And were you familiar with firearms at the time
6　　　that you met them?
7  A:　No.
8  Q:　Okay.  And what was the -- the -- the substance
9　　　of your conversation with them about -- about
10　　　firearms?
11  A:　I just went there to shoot.
12  Q:　When where to shoot?
13  A:　A .308 gun.
14  Q:　So you were at a firearms range?
15  A:　No.  We were on the back of PTR Industries.
16  Q:　Okay.  And how did you get to the back of PTR
17　　　Industries?
18  A:　We -- we agreed to meet there.  And there was
19　　　some other people, and then they wanted me to
20　　　shoot for the first time.
21  Q:　And when you say you -- you agreed to meet
22　　　there, I -- there must have been some
23　　　relationship between you and Josh Fiorini and
24　　　John McNamara ----
25  A:　Uh-huh.

20 (Pages 77 to 80)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 81

1  Q:   --- before that.  Can you tell me how that
2       relationship began?
3  A:   Like I answered before, I don't recall how we
4       got to know each other.
5  Q:   Uh-huh.  So you just met them at the back of
6       PTR Industries?
7  A:   There was -- no.  They -- we met before that.
8  Q:   Uh-huh.
9  A:   And then after that, we -- when I say I never
10      shoot a gun, they took me to the back to shoot
11      a gun.
12 Q:   Okay.  But you don't remember why you met them
13      in the first place?
14 A:   Yeah.  I went to visit the company, as far as
15      I remember.
16 Q:   Why did you go to visit the company?
17 A:   There was a friend of mine that worked there.
18 Q:   Who was your friend who worked there?
19 A:   Steve Clark.
20 Q:   And why were you going to meet Steve Clark
21      there?
22 A:   He invited me.
23 Q:   Why did he invite you?
24 A:   I can't recall.
25 Q:   Okay.

Page 82

1  A:   He was one of my students.
2  Q:   Okay.  We'll come back to -- to PTR, but what
3       I'd like do now is -- is pivot and talk about
4       your employment history.
5  A:   Uh-huh.
6  Q:   You're presently employed by Ikon Weapons, LLC;
7       correct?
8  A:   Correct.
9  Q:   Are you employed by any other business or
10      company?
11 A:   Yes.
12 Q:   Who?
13 A:   3DC Projects.
14 Q:   And what is your position with 3DC Projects?
15 A:   I'm the engineer.
16 Q:   I'm sorry.  Say it again?
17 A:   A engineer.  Engineering.
18 Q:   And where is 3DC Projects located?
19 A:   At my house.
20 Q:   And is that an LLC?
21 A:   Yes.
22 Q:   Are you the managing member?
23 A:   Correct.
24 Q:   Are there any other members?
25 A:   No.

Page 83

1  Q:   Are you the sole owner?
2  A:   Yes.
3  Q:   I'm turning back to Ikon.  We already asked
4       that you're the managing member; correct?
5  A:   Correct.
6  Q:   And what is your ownership interest in Ikon?
7  A:   90 percent.
8  Q:   And who holds the other 10 percent?
9  A:   Law Enforcement Concepts.
10 Q:   And is Law Enforcement Concepts, is that
11      Mr. Larry Holt's business?
12 A:   Yes.
13 Q:   Is he the owner of that business, to your
14      knowledge?
15 A:   I don't know.
16 Q:   Okay.  In terms of Ikon, do you exercise
17      conclusive managerial control over the
18      business?
19 A:   Explain that?
20 Q:   In other words, if there are business decisions
21      to be made, you don't have to consult with
22      anyone to make that business decision?
23 A:   No.
24 Q:   You don't?  You -- so you don't have exclusive
25      control over ---

Page 84

1  A:   Correct.
2  Q:   Who do you have to consult with to make
3       business decisions?
4  A:   Larry.
5  Q:   Okay.  Can you describe the managerial
6       authority that Larry exercises in -- in Ikon
7       Weapons, LLC?
8  A:   Explain that?
9  Q:   In other words, if a decision is to be made ---
10 A:   Uh-huh.
11 Q:   --- how do you make that decision?  How do you
12      and Larry arrive at the decision together,
13      especially in the event there's a disagreement?
14 A:   If it's -- it's never been a disagreement.
15 Q:   Uh-huh.  So the decisions that are made by Ikon
16      are jointly made by you and Larry?
17 A:   Yes.
18 Q:   Let me ask, if there was a disagreement about
19      a business decision between you and Larry,
20      would you have the authority to move forward
21      with the business decision even if Larry
22      objected?
23 A:   It's never been a disagreement.
24 Q:   If there was?
25 A:   In the bylaws they say that everything over

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 85

```
 1      $20,000 I have to get a consent from him.
 2  Q:  Okay.  So -- so every business decision that
 3      involves a transaction over $20,000, you have
 4      to get the consent of Mr. Holt?
 5  A:  Yeah.
 6  Q:  Okay.
 7  A:  Most of the time.
 8  Q:  And if you don't get that consent, you can't
 9      move forward with that business decision?
10  A:  I will be guessing.  We never have a
11      disagreement.
12  Q:  Did you consult with Mr. Holt before you
13      entered into the purchase agreement with
14      Palmetto State Armory?
15  A:  Explain that?
16  Q:  The purchase agreement, also known as the
17      Montenegrin agreement, that gives rise -- one
18      of the agreements that gives rise to this case,
19      did you have to consult with Mr. Holt before
20      you executed that agreement on behalf of Ikon?
21  A:  The agreement with PSA was an invoice.  So I
22      sent an invoice to PSA.  That's the agreement.
23      They wrote the agreement.  There was --
24  Q:  There ---
25  A:  --- an invoice.  We -- from my standpoint,
```

Page 86

```
 1      decision on the managerial is I sent an invoice
 2      to PSA.
 3  Q:  Okay.  So just -- just to be clear ---
 4  A:  Yes.
 5  Q:  --- there are two agreements -- right? --
 6      with -- with PSA; correct?
 7  A:  There are multiple agreements with PSA.
 8  Q:  There is the purchase agreement for 8,000 M70s
 9      that was signed, I believe, June 16th, 2021;
10      correct?
11  A:  Correct.
12  Q:  Okay.  Did you have to consult with Mr. Holt
13      before you executed that agreement?
14  A:  I did not consult him on that.
15  Q:  Why not?
16  A:  I didn't saw a reason why.
17  Q:  You told me a moment ago that you couldn't make
18      a business decision on a transaction that
19      involved more than $20,000 without the consent
20      of Mr. Holt.  This transaction with Palmetto
21      Statement Armory on the purchase agreement was
22      $3,760,000, and you're telling me you didn't
23      have to consult with Mr. Holt to enter that
24      agreement?
25  A:  I say I have to consult with him when I spend
```

Page 87

```
 1      $20,000 or more.  I did not spend any money.
 2  Q:  Okay.  So just to be clear, I'm trying to just
 3      clarify on Mr. Holt's managerial ---
 4  A:  Yes.
 5  Q:  --- authority.
 6  A:  Correct.
 7  Q:  So you only have to consult with Mr. Holt if
 8      you spend ---
 9  A:  Correct.
10  Q:  --- more than $20,000?
11  A:  Correct.
12  Q:  You don't have to consult with Mr. Hold on any
13      agreement that Ikon Weapons may enter into?
14  A:  When I sell, I don't have to consult.
15  Q:  So on any agreement where you are selling
16      product ---
17  A:  Correct.
18  Q:  --- there's no consultation with Mr. Holt?
19  A:  No.  It's an invoice that we generate ---
20  Q:  Uh-huh.
21  A:  --- from the company to the customer.
22  Q:  But on agreement where you are purchasing
23      something, if there's a cost to -- to Ikon, you
24      have to consult with Mr. Holt?
25  A:  Correct.
```

Page 88

```
 1  Q:  Okay.  Did you have to consult -- let me -- let
 2      me take that back.
 3      The purchase agreement for the 8,000 AKs,
 4      did you have those 8,000 AKs in some type of
 5      storage unit with Ikon?  Was that part of
 6      Ikon's inventory?
 7  A:  No.
 8  Q:  So you had to purchase that from a third party,
 9      correct ---
10  A:  Yes.
11  Q:  --- the 8,000 AKs?
12      Did you have to consult with Mr. Holt to
13      purchase the 8,000 AKs from a third party?
14  A:  I have to, yes.
15  Q:  Okay.
16  A:  But I didn't do it.
17  Q:  Why did you not do it?
18  A:  Because at that time it was an invoice that we
19      got from a supplier.  So the invoice came in
20      from Mike Machines saying on the 8,000 AKs, and
21      then I sent an invoice to PSA for 8,000 AKs,
22      and then that was the transaction.  There was
23      nothing to consult.  I was not spending any
24      money.
25  Q:  Okay.  So as far as the June 16th, 2021,
```

1230 Richland Street | Columbia, SC 29201
(803) 252-3445 | (800) 822-0896

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

| Page 89 |
| --- |

1    purchase agreement ---
2  A:  Yes.
3  Q:  --- Mr. Holt was that consulted at all?
4  A:  Explain? I don't understand the question.
5  Q:  In other words, you didn't approach Mr. Holt
6       and talk to him about the agreement, whether it
7       was a good agreement to enter into, whether it
8       was the right business choice for -- for P --
9       for -- excuse me -- for Ikon?
10 A:  I consult him and I hold him we sold this to
11      PSA and we're buying it from here.  So Mike
12      Machine sent me an invoice ---
13 Q:  Uh-huh.
14 A:  --- for 8,000 guns.  I contacting PSA, and I
15      say here's a invoice for 8,000 guns.  And that
16      was it.
17 Q:  So you told Mr. Holt about this after the fact?
18 A:  I told him when we were doing it.  This is
19      we're selling to PAS 8,000 guns.
20 Q:  Okay.  And what did he say about the
21      transaction?
22 A:  He said okay.
23 Q:  Okay.  Okay.  Turning back to your employment
24      with Ikon, what is your current salary?
25 A:  $1,000 a week.

| Page 90 |
| --- |

1  Q:  And are those -- is that the paycheck that's
2       get issued to you weekly?
3  A:  Yes.
4  Q:  How was your salary and compensation
5       determined?
6  A:  Explain that.
7  Q:  In other words, you're setting a salary for
8       yourself.  Who's -- who's making that decision?
9       Are you making the decision as to how much ---
10 A:  Correct.
11 Q:  --- to pay yourself?
12 A:  Correct.
13 Q:  Does Larry Holt get to weigh in on how much
14      you -- you pay yourself?
15 A:  I consult to him; yes.
16 Q:  Do you have to get his approval for your
17      salary?
18 A:  No.
19 Q:  Are you paid any bonuses by Ikon Weapons?
20 A:  No.
21 Q:  Do you have a pension with Ikon Weapons?
22 A:  No.
23 Q:  An IRA?
24 A:  No.
25 Q:  Health care?

| Page 91 |
| --- |

1  A:  Nope.
2  Q:  Do you have a company car through Ikon Weapons?
3  A:  I have a credit card.
4  Q:  Excuse me.  A company car through Ikon Weapons?
5  A:  A car that like I drive?
6  Q:  Yeah, vehicle.
7  A:  Oh, okay.  I'm sorry.  My English.
8  Q:  Yeah.
9  A:  No.
10 Q:  Do you receive any other benefits from Ikon
11      Weapons other than the $1,000 a week that
12      you're receiving as -- currently receives as
13      salary?
14 A:  So at the end of each year we get a form.
15 Q:  Uh-huh.
16 A:  It's a dividends form for taxes purposes.
17 Q:  Okay.  Turning back -- turning to some of your
18      historical income.  How much compensation did
19      you earn from Ikon in 2018?
20 A:  I can't recall.
21 Q:  Do you have a ballpark figure?
22 A:  No.
23 Q:  What about 2019?
24 A:  I can't recall.
25 Q:  What about 2020?

| Page 92 |
| --- |

1  A:  I can't recall.  I know we filed losses.
2  Q:  Filed losses in 2020?
3  A:  Yes.
4  Q:  So did you take home any compensation in 2020
5       from Ikon?
6  A:  I can't recall.
7  Q:  How much income did you make -- or excuse me --
8       how much compensation did you make from Ikon in
9       2021?
10 A:  I -- I was still in the process of figuring
11      that out.
12 Q:  You don't know how much Ikon paid you in 2021?
13 A:  No.
14 Q:  You talked about these dividend forms.  How
15      many -- how many -- how much in terms of the
16      dividends did you take in 2021 from Ikon?
17 A:  We're in the process of figuring that out.
18 Q:  So at -- at this time, you don't know how much
19      Ikon paid you in 2021?
20 A:  Correct.
21 Q:  How much do you expect to earn this year in
22      2022?
23 A:  I would be guessing.
24 Q:  What's your best guess?
25 A:  I don't like to guess.

23 (Pages 89 to 92)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 93

```
 1   Q:   Okay.  Just going through your work history
 2        prior to Ikon, can you name all the public or
 3        private employers you have worked with from the
 4        time you arrived in the United States till
 5        today?
 6   A:   I mean, I try with the best of my recollection.
 7        I worked at the Kid Adventure Park owned by
 8        Burroughs & Chapin.  These -- they were people
 9        that provide the work and travel visa that I
10        came here with.
11   Q:   And to interrupt you just for one second.  You
12        came to the United States in 2003; correct?
13   A:   Correct.
14   Q:   Okay.  What's the first job you had when you
15        came to the United States?
16   A:   That's it.
17   Q:   Okay.  And can you tell me that again?
18   A:   So it was called the Kid Adventure Park or
19        something like that.  I -- you got to remember,
20        I don't speak English fluent at that time.  Not
21        I do now but yes.
22   Q:   So Kid Adventure park.  And you said ---
23   A:   Kid Adventure Park.  I was a ride operator.
24   Q:   And how long were you a ride operator at the
25        Kid Adventure Park?
```

Page 94

```
 1   A:   A few months.
 2   Q:   And that's in 2003?
 3   A:   2003, correct.
 4   Q:   And what did you do after that?
 5   A:   Simultaneously I was working at Krispy Kreme.
 6   Q:   And what were you doing for Krispy Kreme?
 7   A:   I was a cook.
 8   Q:   And how long were you employed with Krispy
 9        Kreme?
10   A:   A few months as well.
11   Q:   Do you recall your income as a ride operator
12        from Kid Adventure Park?
13   A:   I think it was close to minimum wage.
14   Q:   Okay.
15   A:   At that time.
16   Q:   What was your pay or salary while you were a
17        cook at Krispy Kreme?
18   A:   I think around 8 bucks an hour, if I recall
19        correctly.
20   Q:   And you said you were only at Krispy Kreme for
21        about five months?
22   A:   Yes.  The specific dates I can't recall.
23   Q:   Sure.  And what did you do after Krispy Kreme?
24   A:   After Krispy Kreme I went to work for a land
25        surveying company.
```

Page 95

```
 1   Q:   And what was the name of that land surveying
 2        company?
 3   A:   Culler, C-U-L-L-E-R, Land Surveying in
 4        Surfside.
 5   Q:   And what did you do for Culler Land Surveying?
 6   A:   I started as a CAD operator.  C-A-D, computer
 7        and design operator.
 8   Q:   And what does a CAD operator do?
 9   A:   We draft blueprints, surveys.
10   Q:   And what was your salary while you were with
11        land -- culler -- or excuse me -- Culler Land
12        Surveying?
13   A:   I start at minimum wage.  And by the end, I was
14        around 8.
15   Q:   $8 an hour?
16   A:   Uh-huh.
17   Q:   And how long were you employed at Culler Land
18        Surveying?
19   A:   About a year.
20   Q:   And what did you do after that?
21   A:   I moved to a company called Nelson Hardwick &
22        Associates.
23   Q:   Nelson Hardwick & Associates?
24   A:   And Associates, yeah.
25   Q:   And what did you do for them?
```

Page 96

```
 1   A:   I was -- I started as a CAD operator.  And than
 2        I start getting my engineering licenses.
 3   Q:   What engineering licenses did you get?
 4   A:   I -- in that company I got the engineer in
 5        training license by the State of
 6        South Carolina.
 7   Q:   Any other licenses that you obtained while you
 8        were with them?
 9   A:   No.
10   Q:   And how long were you with Nelson Hardwick &
11        Associates?
12   A:   About four years.
13   Q:   So through 2004 to about 2008?
14   A:   I can't recall the dates but, yeah, around that
15        time.
16   Q:   Okay.  Just let me get -- go back one step.
17        For Culler Land Surveying, why did you leave?
18   A:   They share offices with the Nelson Hardwick
19        Associates.
20   Q:   Uh-huh.
21   A:   So they were in the same building, and they
22        shared a kitchen.  And they knew my background
23        was engineering.  They just couldn't understand
24        me.  So I guess after a while, they -- I start
25        speaking ---
```

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 97

1  Q:  Uh-huh.
2  A:  --- and they brought me in.  So I just did a
3      lateral move.
4  Q:  Are they part of the same company?
5  A:  Nope.  Two different companies.
6  Q:  Why did they decide to bring you in?
7  A:  I mean, I don't know.  I would be guessing.
8  Q:  Okay.  And what did you do after Nelson
9      Hardwick & Associates?
10 A:  I received an offer from Ellen DeAmbrossi &
11     Todd [ph].
12 Q:  Sorry.  Say that -- say that again?
13 A:  Ellen -- Ellen -- I don't even know how to
14     spell it.
15 Q:  Ellen ---
16 A:  --- DeAmbrossi and Todd [ph].
17 Q:  Ellen DeAmbrossi?
18 A:  Ed, E-D, DeAmbrossi, I don't know how do you
19     spell it.
20 Q:  Uh-huh.
21 A:  And Todd or something like that, yeah.  ETD,
22     ETD of South Carolina is what they go by.
23 Q:  ETD of South Carolina?
24 A:  Correct.
25 Q:  And what did you do for ETD of South Carolina?

Page 98

1  A:  I became a project engineer.
2  Q:  And what were your responsibilities as a
3      project engineer?
4  A:  I oversee'd subdivision design.
5  Q:  What was your salary while you were with ETD of
6      South Carolina?
7  A:  I think the initial offering was 71,000.
8  Q:  And how long were you with ETD of
9      South Carolina?
10 A:  Close to a year.
11 Q:  Why did you leave?
12 A:  They shut down for business.
13 Q:  So they went out of business?
14 A:  Correct.  In 2008.
15 Q:  And then what did you do after you left ETD of
16     South Carolina?
17 A:  I started 3DC Projects, and I started working
18     contracting jobs.
19 Q:  What type of contracting jobs were you working
20     for 3DC Projects?
21 A:  Little engineering things, you know, here and
22     there.  I also started a part-time adjunct
23     professor.
24 Q:  And where were you a part-time adjunct
25     professor?

Page 99

1  A:  Horry-Georgetown Technical College.
2  Q:  What classes did you teach?
3  A:  Statics, extraining materials, surveying,
4      autoCAD, cost estimating, construction
5      management.  There is more -- yeah.  Almost all
6      the civil engineering curriculum at the school.
7  Q:  And how long were you -- let's see, you're
8      working for 3DC Projects; you're doing
9      adjunct -- adjunct instructor at
10     Horry-Georgetown Tech?
11 A:  Uh-huh.
12 Q:  --- how long were you doing that?
13 A:  I don't understand the question.
14 Q:  How long were you -- how long were these two
15     occupations your primary occupation until you
16     got to the next job?
17 A:  The next job was with Horry-Georgetown
18     Technical College.
19 Q:  Okay.  And was that a full-time ---
20 A:  Full-time position; yes.
21 Q:  Okay.  When did that happen?
22 A:  I can't recall.  I give you guys a copy of the
23     letter.
24 Q:  Do you recall how long you were a full-time
25     instructor at Horry-Georgetown Technical

Page 100

1      College?
2  A:  A few years.
3  Q:  And when did you leave?
4  A:  2015, somewhere around that time.
5  Q:  And while you were an instructor, what was your
6      salary?
7  A:  I got to be a department chair of the program.
8      I can't remember.  We -- we have different
9      contracts.
10 Q:  Uh-huh.  More than $100,000?
11 A:  Around that; yes.
12 Q:  Okay.  So 2015 you leave being a full-time
13     instructor at Harry-Georgetown?
14 A:  Correct.  Department chair.  At the time I'm
15     passing from full-time instruction to
16     department chair.  So I was a department chair
17     when I left that school.
18 Q:  Okay.  And what did you do after that?
19 A:  I joined PTR.
20 Q:  And what was your position with PTR Industries?
21 A:  Is a chief operating officer.
22 Q:  And what was your salary while you were with
23     PTR?
24 A:  I have $100,000 plus shares.
25 Q:  How much did you get in terms of -- of shares?

25  (Pages 97 to 100)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 101

1  A:  I can't remember.
2  Q:  You had an ownership stake in PTR Industries?
3  A:  What do you mean?
4  Q:  So I'm trying to understand, how many
5      shareholders were a part of PTR?
6  A:  At the time that I joined, there was three of
7      us.
8  Q:  Uh-huh.
9  A:  There was the CEO.
10 Q:  Uh-huh.
11 A:  There was the VP of sales.
12 Q:  Uh-huh.
13 A:  And there was me that was the COO.  And to my
14     understand -- to my knowledge, the CEO, the VP
15     of sales, and myself were the only ones that
16     were getting vested within the company.
17 Q:  Okay.  And did you have any idea what your
18     ownership interest was relative to the CEO and
19     the other individual?
20 A:  My contract said that I earn .5 of shares for
21     every year and another .5 for shares based on
22     performance per year as well.
23 Q:  And what was the name of the CEO again?
24 A:  Josh Fiorini.
25 Q:  And you described a third person as also being

Page 102

1      a shareholder?  What was that person's name?
2  A:  John McNamara.
3  Q:  Okay.  And what were your typical duties and
4      responsibilities as chief operating officer?
5  A:  Operations.
6  Q:  Can you describe what your roles and
7      responsibilities would be if you were
8      describing them in a resume?
9  A:  Oversee purchasing, oversee perishables,
10     overseeing manufacturing ---
11 Q:  Uh-huh.
12 A:  --- overseeing assembling, making sure that our
13     customers get the product on time, overseeing
14     the fabrication, overseeing all the
15     engineering.  So engineering was also part.
16     Overseeing engineering, shipping, programming.
17     The operations, everything that covers
18     operations.
19 Q:  And describe to me the -- the business of PTR
20     Industries.
21 VIDEOGRAPHER:  I need to reset.
22     This is the end of Media 1 in the
23     deposition of 30(b)(6) of Suliban -- excuse
24     me -- E. Deaza, witness for Ikon Weapons, LLC.
25     We're off the record at 11:52.

Page 103

1      (A break was taken from 11:52 a.m. until
2  12:37 p.m.)
3  VIDEOGRAPHER:  This is the beginning of Media 2 in
4      the deposition of 30(b)(6), Suliban Esteban
5      Deaza, witness for Ikon Weapons, LLC.  We're
6      back on the record at 12:37.
7  Q:  All right, Mr. Deaza.  When we left off, we
8      were talking about, you know, what is the
9      nature of the business of PTR Industries.  Can
10     you describe it to me?
11 A:  They are a gun manufacturer.
12 Q:  Okay.  What -- specifically what type of guns
13     do they manufacture?
14 A:  The PTR 91.
15 Q:  Is there any other products that they
16     manufacture?
17 A:  They do the -- a version of the MP5.
18 Q:  PTR 91, a version of the MP5, any other
19     firearms products?
20 A:  Not that I can recall.
21 Q:  Okay.  Do they provide any other services other
22     than firearms manufacturing?
23 A:  No.
24 Q:  And remind me again.  When did you start with
25     PTR Industries?

Page 104

1  A:  After I left the school.
2  Q:  And what year was that?
3  A:  I would say, if I recall correctly, 2015.
4  Q:  Okay.  And you were the chief operating
5      officer; right?
6  A:  Correct.  I may be wrong on the date of the
7      year.  I can't recall.
8  Q:  And how long were you in that position?
9  A:  The entire time from the beginning of the
10     employment until the end.
11 Q:  What year did you leave PTR Industries?
12 A:  It was around March of 2017.
13 Q:  So you were with PTR about two years?
14 A:  Again, I can't recall the start, so I can't
15     guess.
16 Q:  And what caused you to leave PTR Industries?
17 A:  There was a disagreement.
18 Q:  Disagreement.  Can you describe the -- the
19     nature of this disagreement?
20 A:  Yeah.  It was disagreement with the new CEO.
21 Q:  Who was the new CEO?
22 A:  Steve Farkas.
23 Q:  And what were you and Steve Farkas disagreeing
24     over?
25 A:  I can't recall.  It was multiple things.

26 (Pages 101 to 104)

CREEL COURT REPORTING, INC.

Deaza, Suliban – Vol. I

Page 105

1  Q:  Does any of one of those multiple things stand
2      out in your mind?
3  A:  No.
4  Q:  You mentioned that Josh Fiorini was the CEO?
5  A:  Correct.
6  Q:  So ---
7  A:  When I started it.
8  Q:  And you said that Steve Farkas, his company
9      purchased PTR Industries?
10 A:  No.
11 Q:  What happened to create the change in
12     leadership between Josh Fiorini and Steve
13     Farkas?
14 A:  Josh sold the company.
15 Q:  Who did Josh sell the company to?
16 A:  A group, Center Farms. I don't know
17     specifically.
18 Q:  Were you involved at all in that sale?
19 A:  I was at the beginning.
20 Q:  And why did Mr. Fiorini sell to Center Farms?
21 A:  I don't know.
22 Q:  Mr. Fiorini didn't consult his chief operating
23     officer about why he was selling the company?
24 A:  No.
25 Q:  Was the company -- company, being PTR

Page 106

1      industries -- experiencing any financial
2      hardship or distress at the time of the sale?
3  A:  We always since the beginning were struggling.
4      So I don't think that being a reason.
5  Q:  Was PTR Industries, during the time you were
6      there, turning a profit each year?
7  A:  I -- I'll be guessing. I never have full
8      access to all the books.
9  Q:  In the sale of PTR Industries, did you receive
10     any compensation as a result of that, any
11     payment?
12 A:  Yes.
13 Q:  How much?
14 A:  I can't recall.
15 Q:  How many shares of stock did you own?
16 A:  At that time, probably 1 percent. It was never
17     executed. They were never executed.
18 Q:  But you did receive a payment from ---
19 A:  A settlement. A settlement payment; yes.
20 Q:  Let me ask, was it more than $10,000?
21 A:  Yes.
22 Q:  Was it more than $50,000?
23 A:  Yes.
24 Q:  Was it more than $100,000?
25 A:  No.

Page 107

1  Q:  Okay. Okay. So you leave PTR Industries based
2      on a agreement that you have with Mr. Farkas.
3      What do you do next?
4  A:  I -- I decided go to Europe.
5  Q:  Uh-huh. And what was the purpose of your going
6      to Europe?
7  A:  I always wanted to backpack Europe.
8  Q:  And how long did you backpack Europe?
9  A:  Weeks.
10 Q:  And was it purely recreational?
11 A:  Yes.
12 Q:  So there was no business being done?
13 A:  It was propositions of businesses, but it was
14     purely recreational.
15 Q:  What propositions of businesses were made
16     during your trip to Europe?
17 A:  I have friends there, and they have a bunch of
18     surplus.
19 Q:  Who are your friends?
20 A:  I can't recall their names. They have like
21     weird names.
22 Q:  Where were your friends located?
23 A:  In Czech Republic.
24 Q:  How did you become friends?
25 A:  Through PTR and the events. I kept a card. I

Page 108

1      can't remember how I came across that card. It
2      was definitely at the time that we were in Shot
3      Show. We have a lot of people from different
4      backgrounds come in and you talk to a lot
5      people. Yeah.
6  Q:  And what type of -- when you talk about, you
7      know, surplus, what type of surplus are you
8      talking about?
9  A:  Full auto guns, full auto guns, parts,
10     bayonets, slings, components, magazines,
11     pistols, rockets, tanks, Apaches, you name it.
12 Q:  Apache helicopters?
13 A:  Yeah. I got offered a helicopter. It was not
14     an Apache. It was a -- I forgot the name. But
15     I got offered that. I got offered a lot of
16     stuff. I was just going out with friends and
17     they were like, oh, we got this; we got that;
18     we got this. And I was like, okay. Totally
19     recreational.
20 Q:  Where were -- where was this surplus located?
21 A:  Different parts of Europe.
22 Q:  For example, where?
23 A:  Czech Republic.
24 Q:  Where else?
25 A:  Romania, Poland, Bosnia, Serbia, Montenegro,

27 (Pages 105 to 108)

CREEL COURT REPORTING, INC.

Deaza, Suliban – Vol. I

Page 109

1    Bulgaria, Germany.  That's all what I can
2    recall right now.
3  Q:  Did you pursue any of these propositions?
4  A:  No.
5  Q:  Okay.
6  A:  Not at the time.
7  Q:  You pursued some later?
8  A:  Yes.
9  Q:  Which ones did you pursue?
10  A:  There was a Galil deal that I pursued.
11  Q:  Tell me about the Galil deal.
12  A:  This contact in Czech Republic has a bunch of
13    Galils, and he wanted to move them to the
14    States.  And so when I came here and I already
15    putting the company together and everything, I
16    gave -- I have a lunch meeting with another
17    friend of mine and -- and he end up buying
18    them.
19  Q:  Who was your friend who ended up buying them?
20  A:  Patrick Henry.
21  Q:  How much did you make off this deal?
22  A:  Nothing.
23  Q:  You did it free of charge?
24  A:  No.  He cut me off.
25  Q:  Who cut you off?

Page 110

1  A:  Patrick.
2  Q:  He cut you out of the deal?
3  A:  Yeah, pretty much.
4  Q:  So as -- as I understand it, what your
5    testimony here is, is that you didn't get any
6    money from Patrick Henry on this deal; is
7    that -- that correct?
8  A:  Correct.
9  Q:  So you didn't take any money out of the deal at
10    all?
11  A:  Correct.
12  Q:  Did you lose money?
13  A:  No.
14  Q:  Okay.  Did you receive any firearms or firearms
15    parts from this deal?
16  A:  No.
17  Q:  Did you receive any machinery such as CNC
18    machinery?
19  A:  No.  Not from that deal.
20  Q:  Not from this deal?  Did you do any other deals
21    with Patrick Henry?
22  A:  Yes; multiple.
23  Q:  Okay.  Why did you continue to do deals with
24    him after he cut you out of the first deal?
25  A:  That's a good question.

Page 111

1  Q:  What other deals did you do with ---
2  A:  I ---
3  Q:  --- Henry?  Excuse me.  Continue to answer,
4    please.
5  A:  I guess we were friends.  And he -- he
6    apologized and I say it's okay.  It's business.
7  Q:  Okay.  What other deals did you do with Patrick
8    Henry?
9  A:  I purchased a couple machines from him.
10  Q:  What machines did you purchase from him?
11  A:  I purchased a sandblaster.  I purchased a safe.
12    I purchased a desk, to cover a lease of his
13    company.
14  Q:  When did you purchase these items?
15  A:  2017.
16  Q:  Did Mr. Patrick Henry ever allege at any point
17    that you took machinery or other products from
18    him and failed to pay for them?
19  A:  Explain that?
20  Q:  In other words, did you have any transaction or
21    agreement with Mr. Patrick Henry where he
22    provided you, you know, with -- with products
23    or goods under that transaction and you did not
24    pay him?
25  A:  No.

Page 112

1  Q:  Okay.  So there was no allegations from Patrick
2    Henry that Ikon had ever failed to pay Patrick
3    Henry for any agreements they entered into?
4  A:  No.
5  Q:  Okay.  Was there any agreement with Mr. Henry
6    where you were forced to return whatever
7    product you receive from Mr. Henry, any
8    machinery or he was forced to repossess any
9    machinery that he had provided to you under an
10    agreement?
11  A:  No.
12  Q:  Okay.  How long were you in Europe backpacking?
13  A:  I already answered that question.
14  Q:  Was it three weeks?
15  A:  I already answered the question.
16  Q:  Can you answer it again, please?
17  A:  I say it's a few -- several weeks.
18  Q:  Okay.
19  A:  I can't recall exactly.
20  Q:  Less than a month?
21  A:  I already answered that question.
22  Q:  Okay.  What I'd like do now, I'd like to shift
23    gears.  And I'd like to talk about the
24    agreements that are the subject of this
25    litigation.

28  (Pages 109 to 112)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 113

1  A:   Uh-huh.
2  Q:   And this is front and back.  And so what I'm
3       handing to you -- and we can mark this.  Would
4       this be Exhibit 3?  Here's a copy for the court
5       reporter.
6  MR. HOPEWELL:  A copy for you, Mr. Hopewell.
7  Q:   The court reporter will mark it for the
8       attorney.
9  (Plaintiff's Exhibit Number 3 was marked for
10 identification purposes.)
11 MR. D'ANTONI:  And that's been marked as what?
12 COURT REPORTER:  3.
13 Q:   Exhibit 3.  Do you recognize this document,
14      Mr. -- Mr. Deaza?
15 A:   No.
16 Q:   Turn to the other side.
17 A:   Yeah.
18 Q:   Is that an email from you to Mr. Ben Fortin?
19 A:   Correct.
20 Q:   And that email is dated June 15th, 2021?
21 A:   Yes.
22 Q:   And is that your signature block on the email?
23 A:   Yes.
24 Q:   Okay.  And on the back is -- is an invoice.
25      Did you send that invoice to Mr. Fortin on that

Page 114

1       date and time?
2  A:   It is a draft.
3  Q:   Is it marked as a draft anywhere on the face of
4       it?
5  A:   It -- it was the preliminary invoice before
6       sending the final invoice.
7  Q:   And just tell me, how -- how did this email
8       come about?  Why did you decide to send this to
9       Ben?  What events led up to you sending this
10      email?
11 A:   Ben has contacted me that PSA was looking
12      heavily to get AK guns into the country and
13      they were tapping various sources.  And they
14      wanted -- he say 20 to 25,000.
15 Q:   And did you represent in those communications
16      with Ben that you could get him some of those
17      AK?
18 A:   I say I can talk to my contacts.
19 Q:   And who were your conducts?
20 A:   At that point it was Mike Machines.
21 Q:   He was your only contact?
22 A:   At the time, yes.
23 Q:   Did you have contact with any other broker with
24      regard to these weapons listed on this invoice?
25 A:   Probably but I can't recall specifically.

Page 115

1  Q:   Did you have contact with IZOP-K?
2  A:   At that time, no.
3  Q:   So to the best of your recollection, is Mike's
4       Machines the only broker that you're working
5       with at the date and time of this email to
6       secure the weapons on this invoice?
7  A:   He was the only one that reply with an answer
8       and a price; yes.
9  Q:   So when Mr. Fortin, you know, at -- you know,
10      told you that PSA was looking for AKs, you
11      turned around and contacted Mr. Mike Otte?
12 A:   Correct.
13 Q:   And what did Mike Otte tell you?
14 A:   He said he was gonna put it through his
15      sources.
16 Q:   Did Mike Otte own 8,000 AKs at the time, to
17      your knowledge?
18 A:   I can't answer that.
19 Q:   Okay.  Did Mike Otte tell you that he owned
20      8,000 AKs ---
21 A:   No.
22 Q:   --- at that time?
23      And when you were communicating with
24      Mr. Fortin, did you tell him that you could get
25      8,000 AKs for Palmetto State Armory?

Page 116

1  A:   I don't recall my exact words.  I told him I
2       would put it through my contacts and I'd see.
3       He asked for 20 to 25,000.
4  Q:   When you sent this invoice to Mr. Fortin, this
5       invoice ---
6  A:   Right.
7  Q:   --- that you sent June 15th, 2021, did you have
8       8,000 AKs that you could provide to Palmetto
9       State Armory?
10 A:   The company, no.
11 Q:   Ikon did not?
12 A:   No.
13 Q:   Did Ikon have an agreement in place that it
14      secured those 8,000 AKs at the time it sent
15      this invoice?
16 A:   Yes.
17 Q:   Who was that agreement with?
18 A:   That was a verbal agreement that we found the
19      guns.
20 Q:   Verbal agreement with who?
21 A:   With Mike Machines.
22 Q:   So you sent this invoice showing 8,000 AKs ---
23 A:   Uh-huh.
24 Q:   --- $4 million based on a verbal conversation
25      or verbal agreement you had with Mr. Otte?

29 (Pages 113 to 116)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

---

Page 117

1  A:   That's how we do business; yes.
2  Q:   One moment.
3  MR. D'ANTONI: Okay. Handing our next exhibit, we
4      can mark that Exhibit 4. I'm handing a copy to
5      Mr. Hopewell.
6  (Plaintiff's Exhibit Number 4 was marked for
7  identification purposes.)
8  Q:   Mr. Deaza, do you know what this is?
9  A:   Yes.
10 Q:   What is it?
11 A:   A second draft -- a third draft.
12 Q:   Okay. So ---
13 A:   Or second draft, whatever that was.
14 Q:   What is the date and time of this email?
15 A:   So one was sent -- the first one was sent on
16     Tuesday at 10:28 in the morning, and the next
17     one was sent at 4:44 p.m.
18 Q:   Okay. And who is -- see in the -- in the email
19     chain here?
20 A:   Yes.
21 Q:   Who is Sonia Saavedra?
22 A:   She used to work for us.
23 Q:   How long did she work for you?
24 A:   I can't recall. A few months.
25 Q:   When did she leave?

---

Page 118

1  A:   I can't recall. She got into a car accident
2      and she couldn't continue.
3  Q:   If she was only with you a few months, is it
4      safe to say that she left shortly after
5      sending -- forwarding this email?
6  A:   I would be guessing.
7  Q:   Who's the email VP Finance,
8      finance@ikonweapons.com? Who is that?
9  A:   That is -- that was her email; yes.
10 Q:   That's her email address?
11 A:   Uh-huh.
12 Q:   And she's forwarding this invoice to you, and
13     you're sending it to Mr. Fortin; correct?
14 A:   Correct. For -- with corrections. And at that
15     time, I have a second lead on more AKs.
16 Q:   Okay. We'll take one thing at a time. So the
17     first correction I see is the price. It goes
18     from 500 to 470. Why the change?
19 A:   'Cause Jamin said it was too expensive.
20 Q:   So Mr. McCallum said that 500 per AK was too
21     expensive?
22 A:   Let me rephrase that. Ben contacted me and
23     said that Jamin say that that was too much
24     money, that he can make a better deal.
25 Q:   Okay. So how did you -- how did you come down

---

Page 119

1      to -- to 470? Did you have to go back to Mike
2      Otte?
3  A:   No.
4  Q:   So the 500 you have in this first invoice ---
5  A:   Uh-huh.
6  Q:   --- that's not the price Mike Otte quoted to
7      you?
8  A:   No.
9  Q:   Okay. What's the price Mike Otte quoted to
10     you?
11 A:   300.
12 Q:   Okay. And then you've added another item here,
13     the AK Polish kits. Tell me about why you
14     added this to the invoice.
15 A:   Can you be more specific?
16 Q:   How did it come about?
17 A:   Again, can you be ----
18 Q:   Where -- where did you get these Polish kits?
19     Do these Polish kits belong to you? Is this
20     coming from Mr. Otte? Where is it coming from?
21 A:   Well, there's so many questions. Can you
22     just ...
23 Q:   Did Mr. Otte tell you about the AK Polish kits?
24 A:   No.
25 Q:   Okay. Where are the AK Polish kits coming

---

Page 120

1      from?
2  A:   Another source.
3  Q:   Who's your source?
4  A:   HK -- Adam Weaver.
5  Q:   And where is Adam Weaver employed?
6  A:   Hkparts.net.
7  Q:   Do you have any communication or document with
8      Adam Weaver reflecting or relating to these AK
9      Polish kits?
10 A:   We have a couple phone conversations so no
11     documents that I can recall. Maybe an email or
12     so but I can't recall.
13 Q:   Do you have contact information for Adam
14     Weaver?
15 A:   Yes.
16 Q:   Do you have it in your phone?
17 A:   My phone just died when I was talking with my
18     wife.
19 Q:   It's just lost battery power?
20 A:   Yes.
21 Q:   What kind of phone do you have?
22 A:   iPhone.
23 Q:   We'll get you a charger.
24 A:   Okay.
25 Q:   Do you have Adam Weaver's contact information

---

30 (Pages 117 to 120)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 121

1    in your cell phone?
2    A:  Yes.
3    Q:  Do you have his email in your cell phone?
4    A:  Probably.
5    Q:  So did you reach out to Adam Weaver in search
6        of additional AKs?
7    A:  Yes.
8    Q:  And you were doing that in response to your
9        conversations with Mr. Fortin?
10   A:  Correct.
11   Q:  Where were these AK Polish kits located, to
12       your knowledge?
13   A:  I don't know.
14   Q:  Adam Weaver didn't tell you?
15   A:  No.
16   Q:  He didn't tell you where they were coming from?
17   A:  They did -- he said where they were coming
18       from.  He didn't tell me where they were.
19   Q:  Where did he say they were coming from?
20   A:  He say another broker has them.
21   Q:  Who's the other broker?
22   A:  Stacey Praniance [ph].
23   Q:  And what's the -- can you spell the name for
24       Stacey?
25   A:  I don't know.

Page 122

1    Q:  You -- can you just repeat it?
2    A:  Praniance.  I don't know how to spell it.
3    Q:  Praniance?
4    A:  Yeah.  He goes by that.  I never met the guy.
5        Don't know ---
6    Q:  Stacey Praniance.  And that's a -- that's a
7        male?
8    A:  Uh-huh.
9    Q:  And where is Stacey Praniance from?
10   A:  I don't know.
11   Q:  Do you know where Stacey Praniance is employed?
12   A:  Nope.
13   Q:  But that's what Adam told you?
14   A:  Correct.
15   Q:  Do you have any agreement with Adam with regard
16       to these Polish kits?
17   A:  A verbal agreement; yes.
18   Q:  So you were gonna do a $450,000 transaction for
19       1,000 Polish kits based on a verbal agreement
20       with Adam?
21   A:  Yes.
22   MR. D'ANTONI:  Let's go ahead and mark his as
23   Exhibit 5.  I'm handing a copy to Mr. Hopewell.
24   (Plaintiff's Exhibit Number 5 was marked for
25   identification purposes.)

Page 123

1    Q:  Mr. Deaza, do you recognize Exhibit 5 that's
2        been placed in front of you?
3    A:  Yes.
4    Q:  What is it?
5    A:  It's two invoices.
6    Q:  Okay.  And these invoices are from Ikon
7        Weapons; correct?
8    A:  They're drafts; yes.
9    Q:  Okay.  Is "draft" written anywhere on the
10       invoice?
11   A:  No.
12   Q:  And just, Mr. Deaza, will you go ahead and plug
13       it in your ---
14   A:  It's in my car.
15   Q:  It's in your car?
16   A:  Uh-huh.
17   MR. WILLOUGHBY:  Let's take break and he can go get
18   it.
19   MR. D'ANTONI:  We'll take a ten-minute break.
20   VIDEOGRAPHER:  We're off the record at 1:04.
21       (A break was taken from 1:04 p.m. until 1:14 p.m.)
22   VIDEOGRAPHER:  We are back on the record at 1:14.
23   Q:  Mr. Deaza, we've placed in front of you what's
24       been marked as Exhibit 5.  Do you recognize
25       this document?

Page 124

1    A:  Yes.
2    Q:  What is it?
3    A:  It's a draft invoice.
4    Q:  Was this email sent by you to Mr. Fortin?
5    A:  Correct.
6    Q:  Is "draft" written anywhere on the invoice?
7    A:  No.
8    Q:  Okay.  And just to -- to be clear, I'm looking
9        at the invoice that's Number 158?
10   A:  Correct.
11   Q:  These weapons here -- excuse me -- these
12       firearms here, you said that you're getting
13       these from Michael's Machines?
14   A:  Correct.
15   Q:  You sent this email on June 16th.  At this
16       point, do you have a written agreement with
17       Michael's Machines?
18   A:  I can't recall.  He sent me an invoice.  I
19       can't recall.  I sent you guys a copy of that.
20   Q:  So Michael's Machines sent you an invoice ---
21   A:  Same thing; yep.
22   Q:  And he was your broker responsible for
23       acquiring these weapons?
24   A:  He was a contact; yes.
25   Q:  To your knowledge, did Michael's Machines own

31 (Pages 121 to 124)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 125

1    these weapons?
2  A:  I don't know.
3  Q:  Do you know where Mr. Otte or Michael's
4    Machines, where they were getting these weapons
5    from?
6  A:  No.
7  Q:  What did Michael's Machines tell you about
8    these weapons?
9  A:  Can you be specific?
10 Q:  They didn't tell you where they were coming
11    from ---
12 A:  Correct.
13 Q:  --- is that true?
14    Did they tell you who they -- who they
15    were getting them from?
16 A:  No.
17 Q:  So Michael's Machines, all you know is that
18    they told you they could provide you with the
19    weapons here that are listed here in this
20    invoice?
21 A:  Correct.  On his invoice; correct.
22 Q:  And did you represent to Palmetto State Armory
23    that you could provide these 8,000 AK-47s to
24    them?
25 A:  I told Ben that we have found 8,000.  And I

Page 126

1    provide to send him an email -- an invoice.
2  Q:  Why did you decide to send him an invoice?
3  A:  Because he wanted to know how much.
4  Q:  Did you tell Mr. Fortin that you could get
5    these weapons?
6  A:  We didn't discuss that at that time.
7  Q:  Did you tell me Mr. Fortin that you were not
8    sure you could get these weapons?
9  A:  We didn't discuss that at that time.
10 Q:  So you had held out an invoice for the purchase
11    of 8,000 AK-47s to Mr. Ben Fortin -- Mr. Ben
12    Fortin; right?
13 A:  Yes.
14 Q:  But you didn't know at the time whether you
15    could actually get these weapons?
16 A:  I knew I could get them.
17 Q:  How did you know you could get the weapons?
18 A:  I got the confirmation from Mike.
19 Q:  And did you represent to PSA that you could get
20    these weapons and deliver them to them?
21 A:  I sent him an email with an invoice, and I was
22    specific of what I put on the invoice of what
23    I can and can't do.
24 Q:  In your own words, what is this invoice saying
25    that Ikon Weapons can do?

Page 127

1  A:  This is not the invoice that they agreed to.
2  Q:  What invoice did they agree to?
3  A:  My bad.  It -- it is the invoice.  I'm talking
4    about when you put them all together.  Yeah.
5    This seems to be the invoice that they agreed
6    to.  There was multiple invoices as they were
7    changing the prices, and they wanted to take
8    the Polish guns out.  At the beginning they
9    want it all in one.  Then they want it out, two
10    separate deals.  And so I was doing the drafts
11    of the invoices as they were changing their
12    mind.
13 Q:  Uh-huh.
14 A:  So first they wanted 20 to 25.  I told them I
15    found 8.  Then they want saying, hey, put
16    everything in one invoice.  Tell us how much it
17    is.  Then I provided to do that.  Then after I
18    have confirmation of the 1,000 and the 8,000,
19    then they say no.  Jamin want you to split
20    them.  And then I split them.  And then we
21    proceed -- they proceed to approve the invoice
22    after it was sent to them.
23 Q:  Okay.
24 A:  Read the terms and conditions.  So in the
25    invoice I show the date; I show the quantity;

Page 128

1    I show the product description; I show the
2    price per unit that they have to pay.  And I
3    also put the banking information if they would
4    like to wire the money.  I ask him to send me
5    a times extension form so it's written on the
6    invoice that if not, I would have to charge him
7    taxes.  They say they do have it.  So I say,
8    well, provide us a copy of that so I won't
9    charge you taxes.  I also says that the
10    shipping is not included in the total.  So it's
11    an agreement.
12 Q:  Okay.  And under this agreement Ikon was going
13    to provide 8,000 AK-47s to Palmetto State
14    Armory for $3,760,000; correct?
15 A:  It was in the invoice that Ikon Weapons will
16    sell them $3.7 million, 60,000; yes.
17 Q:  Okay.  And the second invoice, the Polish kits?
18 A:  Yes.
19 Q:  And you said this was coming from Adam Weaver;
20    correct?
21 A:  Correct.
22 Q:  And you said that you had no written agreement
23    with Adam Weaver for these weapons; correct?
24 A:  Correct.
25 Q:  And what was the name of his broker again?  I'm

32 (Pages 125 to 128)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 129

```
 1    sorry.
 2 A:  Stacey Printers [ph], or something like that.
 3 Q:  And did you ever represent to PSA that these AK
 4    Polish kits were located in the United States?
 5 A:  Explain "represent"?
 6 Q:  Did you ever tell them, communicate to them,
 7    you know, hey, these Polish kits that you're
 8    purchasing are located in Myrtle Beach or
 9    Florence ---
10 A:  No.
11 Q:  --- or somewhere else in the United States?
12 A:  No.
13 Q:  Okay.  What did you tell them about these
14    Polish kits?
15 A:  Can you be more specific?  'Cause we talk a lot
16    about this in different occasions.
17 Q:  Yeah.  How did -- how, you know, how did you
18    communicate this deal to Palmetto State Armory?
19    You just don't get them ---
20 A:  At the beginning?
21 Q:  Yes, at the beginning.
22 A:  Okay.  So at the beginning they were asking for
23    guns, 20 to 25,000 AKs.
24 Q:  Uh-huh.
25 A:  And I say, okay.  Let me ask around.  Adam came
```

Page 130

```
 1    back and he say, hey, I found 1,000.  And then
 2    I communicated to Ben, hey, there is 1,000.
 3    They're Polish.  And that's the price.  And
 4    that was the communication I have with him.
 5 Q:  Did Adam say where he found them?
 6 A:  He say he has a broker, and I already answer
 7    that.
 8 MR. D'ANTONI:  Okay.  We can go ahead mark this as
 9    Exhibit 6.  I'm handing a copy to Mr. Hopewell.
10 (Plaintiff's Exhibit Number 6 was marked for
11 identification purposes.)
12 Q:  So we placed in front of you what's been marked
13    as Exhibit 6.  Do you recognize this document?
14 A:  Yes.
15 Q:  What is it?
16 A:  It's the first purchase agreement.
17 Q:  Okay.  And what is being purchased under this
18    agreement?
19 A:  5,500 Yugoslavian AK M70s kits of parts
20    underfold, 2,500 Yugoslavian AKs M70 kits of
21    parts fixed stock.
22 Q:  And what is the price for these products?
23 A:  3.7 million, 60,000.
24 Q:  Okay.  And are these the same products that are
25    referenced in the invoice that we have marked
```

Page 131

```
 1    as Exhibit 5?  The invoice -- and I'll be more
 2    specific -- Invoice Number 158?
 3 A:  Correct.
 4 Q:  Okay.  At this time, did Ikon Weapons own the
 5    8,000 -- total of 8,000 AK-47 kits?
 6 A:  No.
 7 Q:  At this time, had Ikon secured the 8,000 AK-47
 8    kits?
 9 A:  Huh-uh, no.
10 Q:  What was the status of these AK 47 kits at the
11    time you executed this -- at the time you -- of
12    this agreement?
13 A:  Explain that?
14 Q:  Where were they located?  Who was the broker
15    you were getting them, and why did you think
16    that you could enter into a purchase agreement,
17    you know, for these kits at this time?
18 A:  That's four questions in that statement.
19 Q:  Sure.  In this purchase agreement, did you sell
20    8,000 AK-47 kits to Palmetto Statement Armory?
21 A:  Yes.
22 Q:  How could you sell them?
23 A:  I was about to sell.  They were not sold yet.
24    They didn't give me the money yet.  I was
25    agreeing to the terms.
```

Page 132

```
 1 Q:  And each of these pages here has an initial at
 2    the bottom right-hand corner.  Are those
 3    your -- is that your initials?
 4 A:  Yes.
 5 Q:  And the signature on the back, is that your
 6    signature?
 7 A:  Yes.
 8 Q:  Mr. Deaza, tell me -- tell me how this
 9    agreement came about.  Did you draft the
10    agreement?  When did you -- when did you
11    receive this agreement?
12 A:  There's three questions in that.  Can you be
13    specific, please?
14 Q:  Yeah.  Can you just walk me through how this
15    agreement came about?
16 A:  I was contacted by Ben, and Ben say that the
17    lawyers needed to send me a purchase agreement
18    and that there was nothing wrong with it and
19    that John, the guy who wrote this, will be
20    giving me a call.
21 Q:  And did he give you a call?
22 A:  Yes.  I did spoke with him on the phone.
23 Q:  And what did you discuss?
24 A:  You can you be specific?
25 Q:  When you got the call from -- from John, is
```

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 133

1    that John Pencelli?
2  A:   Yes, correct.
3  Q:   Okay.  What did you say to him on the phone?
4  A:   I say hello.
5  Q:   Did you discuss anything else?
6  A:   Yes.
7  Q:   What did you discuss?
8  A:   Be specific.
9  Q:   Did you discuss this contract?
10 A:   Yes.
11 Q:   What did you discuss about this contract?
12 A:   He was saying that he's gonna give me some --
13       he's gonna send me a contract.  And he say that
14       it's just a formality, and he say to look it
15       over.
16 Q:   Did you look it over?
17 A:   I did.
18 Q:   Did you agree to the terms?
19 A:   I did.
20 Q:   Was there anything you didn't understand in the
21       contract?
22 A:   No.
23 Q:   You understood that the delivery destination
24       was FOB USA Charleston, South Carolina?
25 A:   At that time, yes.

Page 134

1  Q:   You agreed to deliver the products FOB USA
2       Charleston, South Carolina, under this
3       agreement?
4  A:   At the time, yes.
5  Q:   Did you understand that under this purchase
6       agreement the responsibility of PSA was to pay
7       the purchase price for these products?
8  A:   Can you be specific about that?
9  Q:   Under this purchase agreement, in order to
10       secure delivery ---
11 A:   Uh-huh.
12 Q:   --- all PSA had to do was pay $3,760,000;
13       correct?
14 A:   That's not true.
15 Q:   What else did they have to do under this
16       agreement in order to get delivery of the
17       products?
18 A:   What it says in the agreement is that they have
19       to pay half of the amount.
20 Q:   Okay.
21 A:   That's what it says in the agreement.  You
22       wrote it.  Your company did.
23 Q:   If they paid you 3,760,000, was Ikon required
24       to deliver the products FOB Charleston?
25 A:   Correct.  On that delivery date; yes.

Page 135

1  MR. D'ANTONI:  Introduce the next exhibit here.
2       This is going to be Exhibit 7.  I'm handing a
3       copy to Mr. Hopewell.
4  (Plaintiff's Exhibit Number 7 was marked for
5  identification purposes.)
6  Q:   Do you recognize this document, Mr. Deaza?
7  A:   Yes.
8  Q:   What is it?
9  A:   It is the amendment to the purchase agreement.
10 Q:   What did the amendment do to the purchase
11       agreement?
12 A:   Overcedes.
13 Q:   I don't understand that response, overcedes?
14 A:   My English -- supercedes.
15 Q:   Ah, supersedes.  Okay.  What -- what term is
16       the amendment changing?
17 A:   It is setting a delivery date.
18 Q:   And what's the delivery date under this
19       amendment?
20 A:   November 30th, 2021.
21 Q:   And what else does this amendment do?
22 A:   The -- it has a security provision.
23 Q:   What's the security provision?
24 A:   That if they -- if the products are not
25       received FOB Charleston, South Carolina, on or

Page 136

1       before November 30th or receive a full refund
2       of all monies paid by the same day, then the
3       officers and directors of Ikon Weapons will
4       deliver the buyer all documents reasonable and
5       necessary to transfer full, unencumbered
6       ownership Ikon Weapons to the buyer.
7  Q:   Okay.  And were the products under the purchase
8       agreement delivered by November 30th, 2021?
9  A:   No.
10 Q:   Is that your initial at the bottom right-hand
11       corner?
12 A:   Yes, sir.
13 Q:   Is that your signature on the back?
14 A:   Yes.
15 MR. D'ANTONI:  Okay.  This next exhibit will be ---
16 COURT REPORTER:  8.
17 MR. D'ANTONI:  This will be Exhibit 8.  I'm handing
18       a copy to Mr. Hopewell.
19 (Plaintiff's Exhibit Number 8 was marked for
20 identification purposes.)
21 Q:   Mr. Deaza, I'm placing in front of you what's
22       been marked as Exhibit 8.  Do you recognize
23       this document?
24 A:   Yes.
25 Q:   Okay.  What is it?

34 (Pages 133 to 136)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 137

1 A:  It's a second amendment to the purchase
2     agreement.
3 Q:  Okay.  I want to go ahead and introduce another
4     exhibit here.  This will be Exhibit 9.  I'm
5     handing a copy to Mr. Hopewell.
6 (Plaintiff's Exhibit Number 9 was marked for
7 identification purposes.)
8 Q:  Okay.  We've placed in front of you what's been
9     marked as Exhibit 9.  Do you recognize this
10    document?
11 A:  Let me read it.  Yes.
12 Q:  What is it?
13 A:  It is another second amendment to the purchase
14    agreement.
15 Q:  Okay.  Let's start with 9 'cause I think that
16    came first in time.  And this agreement extends
17    the delivery date to what?
18 A:  March 1st, 2023.
19 Q:  Did you understand at that time that it was
20    2023, or was the understanding of the parties
21    2022?
22 A:  What's the question?
23 Q:  The question is, is that when you executed this
24    agreement ---
25 A:  Uh-huh.

Page 138

1 Q:  --- did you understand that the delivery date
2     would be 2023?  Or is that a typo and the
3     actual understanding of the parties was 2022?
4 A:  When I read the agreement and I sign it, it
5     says March 1st, 2023.
6 Q:  And that's how you understood -- or that's what
7     you thought the extension of time was given, to
8     2023?
9 A:  That's what I sign when I saw the agreement.
10 Q:  What led you to execute this amendment?
11 A:  Explain that?
12 Q:  Isn't it true that you contacted Palmetto State
13    Armory and request additional time to be able
14    to comply with the delivery date per the
15    agreement?
16 A:  Yes.
17 Q:  Okay.  And what communications did you have
18    with Palmetto State Armory about extending the
19    delivery date?
20 A:  Can you be more specific?  There were multiple.
21 Q:  When did you initially contact Palmetto State
22    Armory about extending a delivery date?
23 A:  I can't recall the specific date.  The first
24    one, I can't recall it.
25 Q:  About when?

Page 139

1 A:  I can't recall.
2 Q:  Why were you asking for an extension on the
3     delivery -- for the delivery date?
4 A:  Because the guns won't be on time.
5 Q:  And when was PSA expecting the products to be
6     delivered, based on -- let me take that back.
7       At the time you executed this purchase
8     agreement, had PSA fully performed by making
9     both deposits $3.76 million?
10 A:  You're talking about what agreement ---
11 Q:  The purchase agreement.
12 A:  --- the second agreement?  The purchase
13    agreement?
14 Q:  Uh-huh.
15 A:  The first one.  What's the question again?
16 Q:  Had they fully performed?  Had they fully paid
17    for the weapons under the purchase agreement?
18 A:  But what time?
19 Q:  I'm asking a question.
20 A:  Yeah.  I -- I'm sorry.  I'm not understanding.
21    I'm trying to understand what you're saying.
22    I have a hard time ---
23 Q:  Did Palmetto State Armory pay the full purchase
24    price for the products under the purchase
25    agreement at the time you entered into the

Page 140

1     second amendment?
2 A:  By November 6; yes.
3 Q:  By November 6 you're saying that they had made
4     full payment under the purchase agreement?
5 A:  November 6 they completed paying the money,
6     yes, the payment full what -- at the time that
7     I signed that.
8 Q:  Take a look at Exhibit 8, the second amendment
9     to the purchase agreement.  Is this another
10    extension for a delivery date?
11 A:  Correct.
12 Q:  And that's date to?
13 A:  What date?
14 Q:  The extension for delivery.
15 A:  The date that's signed -- oh, the delivery date
16    shall be extended for a period not exceeding 90
17    days throughout [sic] June 1st, 2022.
18 Q:  And did you deliver the weapons under the
19    purchase agreement by the extension date?
20 A:  No.
21 Q:  Did you make a personal guaranty under this
22    second amendment to the purchase amendment?
23 A:  No.
24 Q:  You did not make a personal guaranty under this
25    second amendment to the purchase agreement?

1230 Richland Street | Columbia, SC 29201
(803) 252-3445 | (800) 822-0896

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 141

1  A:  No. I made a personal performance guaranty.
2  Q:  Okay. Can you read the last paragraph of this
3      second amendment to the purchase agreement for
4      me?
5  A:   This second amendment so executed by Suliban
6      Esteban Deaza in his individual capacity will
7      serve as a personal performance guaranty in
8      favor of the buyer in the amount of the
9      transaction in chief, that being $3.7 million,
10     60,000, with an asterisk, and his prior as of
11     yet unfulfilled transaction with Zastava Arms
12     in the amount of $744,504, with an asterisk, to
13     the extent that either of the entire
14     transactions are contemplated are not
15     completed. Suliban Esteban Deaza will be
16     liable to the buyer for whatever deficiency the
17     buyer experiences, including all associated
18     fees of collection specifically but not limited
19     to attorneys fees.
20  Q:  And what is your understanding --
21        (Off-the-record discussion.)
22  Q:  So Ikon Weapons failed to deliver the firearms
23     under the purchase agreement by June 1st, 2022;
24     right?
25  A:   Correct.

Page 142

1  Q:  Okay. So you would agree with me that because
2      of that, you're personally liable now on the
3      purchase agreement?
4  A:  No.
5  Q:  Why not?
6  A:  'Cause they breached the contract before the
7      June 1st deadline.
8  Q:  How did PSA breach the contract?
9  A:  Because the contact is giving me until June 1st
10     to bring the guns, and your firm sent me a
11     letter saying that I have 30 days to either
12     give them the product or the money back.
13  Q:  When was that letter sent to you?
14  A:  I can't recall specifically. Around April.
15  Q:  Did you give the money back?
16  A:  No.
17  Q:  So you didn't five the -- a refund to Palmetto
18     State Armory; true?
19  A:  They breached the contract.
20  Q:  You didn't provide the goods by June 1st, 2022;
21     is that right?
22  A:  They pulled out in April.
23  Q:  How did they pull out of the -- of the
24     contract?
25  A:  I already answered that question.

Page 143

1  Q:  Answer it again.
2  A:  I got a letter in April saying that they didn't
3      want to continue with the deal. Either I give
4      them the guns within 30 days or the money back.
5      And that was not part of the agreement.
6  MR. D'ANTONI: Okay. Let's take a ten-minute break,
7      and then we'll reconvene.
8  VIDEOGRAPHER: Okay. We're off the record at 1:50.
9      (A break was taken from 1:50 p.m. until 2:09 p.m.)
10  VIDEOGRAPHER: Back on the record at 2:09.
11  Q:  Okay. Mr. Deaza, I want to turn back real
12     quick to the -- the first amendment to the
13     purchase agreement that's dated June 17th,
14     2021.
15  MR. HOPEWELL: Give us an Exhibit Number ---
16  MR. D'ANTONI: Yeah.
17  MR. HOPEWELL: --- so we can make sure.
18  MR. DEAZA: I don't have anything for 17.
19  MR. D'ANTONI: One -- one moment. That should be
20     Exhibit 7.
21  MR. HOPEWELL: Thank you.
22  Q:  Okay. You see at the top there it says the --
23     the amendment to the purchase agreement entered
24     into this 17th day of June 2021?
25  A:  Yes.

Page 144

1  Q:  Okay. Can you tell me why the parties entered
2      into this purchase agreement?
3  A:  Can you be more specific?
4  Q:  Well, you entered into the purchase agreement
5      on June 16th, and then you entered into this
6      amendment the following day. What led you --
7      or what led the parties to the purchase
8      agreement to want to amend the purchase
9      agreement through this first amendment?
10  A:  The amendment to the purchase agreement was
11     draft by -- by this law firm, if I'm not
12     mistakenly. So by you guys, by the lawyer of
13     PSA.
14  Q:  So the lawyer of PSA provided -- just provided
15     it to you without prompting?
16  A:  They provided this and they say look it over
17     and sign it if you agree.
18  Q:  Did they provide any explanation as to why they
19     were providing you with an amendment to the
20     purchase agreement?
21  A:  I mean, the explanation is within the
22     agreement.
23  Q:  Did you have any conversation with Palmetto
24     State Armory about entering into this
25     amendment?

36 (Pages 141 to 144)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 145

1  A:  Be specific about it.
2  Q:  Did you even -- did you talk about the
3      amendment before you signed it with Palmetto
4      State Armory?
5  A:  The -- if it was a phone call?
6  Q:  Phone call, yes.
7  A:  Yeah, there was a phone call.
8  Q:  Okay. Who was the phone call with?
9  A:  I can't recall. Probably either Ben or John.
10     One of the two called me.
11 Q:  Okay.
12 A:  Yes.
13 Q:  What did you discuss in the phone call?
14 A:  We discussed the agreement, that they're going
15     to write an agreement.
16 Q:  Uh-huh.
17 A:  PSA will write an agreement called amendment to
18     the purchase agreement, that they will -- that
19     they will have to read it and they have to, if
20     I agree, sign it.
21 Q:  Did they explain to you why they were amending
22     the agreement?
23 A:  It's explained in the agreement.
24 Q:  Did they explain it to you in the phone call?
25 A:  No.

Page 146

1  Q:  What did you understand the amendment was
2      doing?
3  A:  The amendment supersedes the first agreement.
4      So it's an amendment. It's an addition.
5      That's what I understand.
6  Q:  In what way was it changing the purchase
7      agreement?
8  A:  In the date and the date of the -- of the --
9      the date that I have to bring the kits into
10     the -- into the FOB Charleston.
11 Q:  So it was changing the purchase agreement by
12     adding a deadline; is that true?
13 A:  It was providing a deadline; correct.
14 Q:  Okay. Did it do anything else, make any other
15     changes to the agreement?
16 A:  It's in the agreement. It's in there. Further
17     it is agree understood that all directors,
18     officers, and employees -- so it's adding to
19     the agreement. It's adding.
20 Q:  Can you -- can you explain to me in your own
21     words what you believe -- you have a security
22     in favor of the buyer, 100 percent stock in
23     Ikon Weapons, LLC -- what that is doing?
24 A:  I can tell you by reading it. I understand it
25     perfectly. I can ---

Page 147

1  Q:  Okay. What is your understanding?
2  A:  --- read it. It says in here. As security for
3      the transaction set forth in the purchase
4      agreement, the seller hereby pledge as security
5      in favor of the buyer of 100 percent of the
6      stock in Ikon Weapons, LLC. It is clearly
7      understood by the parties that, if for any
8      reason, the buyer does not receive the products
9      FOB Charleston, South Carolina, on or before
10     November 30th, 2021, or receive a full refund
11     of all monies paid by the same day, then the
12     officers and directors of Ikon Weapons will
13     deliver the buyer all the documents reasonable
14     and necessary to the transfer full and
15     unencumbered -- I apologize -- ownership of
16     Ikon, LLC, to the buyer.
17 Q:  So that means that if you fail to perform under
18     this agreement, you agree to transfer the
19     ownership of Ikon Weapons, LLC, to Palmetto
20     State Armory?
21 A:  I already told you what I -- I -- what I
22     understood.
23 Q:  And you agreed to this; right?
24 A:  I sign it.
25 Q:  Yeah. Okay. Let's go to Exhibit 9. This has

Page 148

1      a document titled Second Amendment to the
2      Purchase Agreement. What led the parties to
3      execute this second amendment to the purchase
4      agreement?
5  A:  Again, they contacted me, and they send me
6      another email with this. And they say just
7      look it over and read it.
8  Q:  So there was nothing going on in the background
9      about Ikon Weapons not being able to satisfy
10     the deadline of the first amendment?
11 A:  That's not what I say.
12 Q:  Was -- was Ikon able to -- or did you enter
13     this second amendment because you were not
14     going to meet the deadline in the first
15     amendment?
16 A:  I do not understand the question. There was --
17     you started asking one question and you
18     switched to the second question. What's the
19     question?
20 Q:  Did you enter into the second amendment ---
21 A:  The one ---
22 Q:  --- because you were not going to meet the
23     deadline in the first amendment?
24 A:  I apologize for cutting you off. You are
25     talking about -- there is two second

37 (Pages 145 to 148)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 149

1  amendments. Can you be specific? It's Exhibit
2  Number 9?
3  Q:  I'm talking about Exhibit Number 9.
4  A:  Okay. Can you repeat the question?
5  Q:  Yes. Did you enter into this second amendment,
6  Exhibit 9 ---
7  A:  Uh-huh.
8  Q:  --- because you were not going to meet the
9  deadline on the first amendment?
10  A:  I entered this second agreement because they
11  wanted more -- put it -- security that the
12  parts will be coming as they request them.
13  Q:  What do you mean that they wanted more
14  security? What does what mean?
15  A:  They always send me different agreements and
16  they will say sign this. Now we want you to
17  sign this, and sign this, and sign this. And
18  it was all documents from lawyers saying sign
19  this, sign this, sign this because we want to
20  make sure you're gonna bring the guns. So you
21  got to sign this.
22  Q:  At any time did you tell PSA that you would not
23  be able to deliver the weapons by November
24  30th, 2021?
25  A:  Yes.

Page 150

1  Q:  Okay. And are those conversations what led to
2  the second amendment here, Exhibit 9?
3  A:  Exhibit 9, I can't recall exactly if there was
4  a conversation that led to this.
5  Q:  When you informed Palmetto State Armory that
6  you couldn't meet the November 30th, 2021,
7  deadline, what did you tell them? What was
8  your excuse?
9  A:  I met in person with Jamin at his office with
10  Ben, and I expressed to him that I was not able
11  to get the guns before the deadline.
12  Personally at his office -- at Ben's office,
13  PSA's location.
14  Q:  And what excuse did you give for not being able
15  to meet the deadline?
16  A:  I didn't give him an excuse. I told him that
17  we were having issues trying to clear the guns.
18  Q:  Okay. Explain to me what issues you were
19  having.
20  A:  At that time, the Montenegrins wanted a end
21  user, like a government -- government, to sign
22  as an end user. That's what they wanted.
23  Q:  And how did you know that to be true?
24  A:  They -- the broker communicated that to me.
25  Q:  Who's the broker?

Page 151

1  A:  IZOP-K.
2  Q:  Now, you mentioned earlier that -- that
3  Michael's Machines was the -- the broker on
4  this transaction; correct?
5  A:  Correct.
6  Q:  Now you're saying that IZOP-K is the broker on
7  this transaction; right?
8  A:  Correct.
9  Q:  How did that change happen?
10  A:  It happened through the process. Michael sent
11  me an invoice when we fulfill -- when we start
12  doing the transaction. And his invoice says
13  that half of the money was nonrefundable. And
14  I got on the phone with him, and I decided to
15  go directly with the broker because Michael, at
16  that time, didn't want to be part of it. He
17  wanted out. He -- he didn't want to be a part
18  of it.
19  Q:  Why ---
20  A:  So I went directly with IZOP.
21  Q:  Why did Michael want out of it?
22  A:  No. He wanted half. No -- no refunds and no
23  deadline.
24  Q:  Why did he want out of the deal?
25  A:  No. He wanted no refunds, no deadlines.

Page 152

1  That's how he wanted out. He wanted no
2  refunds, no deadlines. I take the money; I
3  bring you the guns when I can.
4  Let me rephrase. My English. It's not
5  that he wanted out; he was not negotiating. He
6  was not budging on that. Half of the money, no
7  refund, no deadline.
8  Q:  Uh-huh. And how do you make the -- the switch
9  now from working with Michael's Machines to
10  moving on to IZOP-K?
11  A:  IZOP has been always the broker of the deal
12  through Michael and through me.
13  Q:  Now, you told me earlier that the only broker
14  working on the deal was Michael's Machines?
15  A:  At the beginning, yes.
16  Q:  Did you know of IZOP-K at the beginning?
17  A:  No.
18  Q:  How did you get to know IZOP-K?
19  A:  When PSA deposit the first half, we're supposed
20  to -- all of us, including PSA personnel -- to
21  fly to Ljubljana in Slovenia, meet the broker
22  personally, and go travel to see the guns or to
23  get a confirmation on the guns.
24  And so when I went there, PSA purchased my
25  ticket, my brother's ticket, and paid for a

38 (Pages 149 to 152)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

## Page 153

1   hotel -- it was part of the deal -- and pay all
2   of our expenses.  And we -- we jump on a pane
3   and we went there.  PSA never arrived.
4 Q:  How did you find out that IZOP-K was Michael
5      Machine's broker?
6 A:  Yeah.  Michael put me in touch with them to --
7      for all of us to meet there.  Michael was in
8      the United States.
9 Q:  When did Michael put you in touch with IZOP-K?
10 A:  When we traveled there.  He was my point of
11     contract getting there.
12 Q:  Michael was your point of contact to your ---
13 A:  No.  IZOP.
14 Q:  IZOP was your point of contact on your travel
15     to Slovenia?
16 A:  Correct.
17 Q:  And you said Michael's Machines put you in
18     touch with IZOP-K?
19 A:  Correct.
20 Q:  And when did he do that?
21 A:  From the beginning.  From the -- explain --
22     what is your question, I guess, specifically?
23 Q:  You told me that at the beginning of this
24     deal ---
25 A:  Yes.

## Page 154

1 Q:  --- that the broker was Michael's Machines ---
2 A:  Correct.
3 Q:  --- and you didn't know about IZOP-K?
4 A:  Correct.
5 Q:  Okay.  So when did Michael's Machines tell you
6      about IZOP-K?
7 A:  When we were on transit there.
8 Q:  So Michael's Machines first told you about
9      IZOP-K when you were traveling to Slovenia?
10 A:  Correct.  He say there is a guy; he's gonna
11     meet us; and that's your point of contact.
12 Q:  And when -- when did this occur?
13 A:  It's in one of the emails.  PSA purchased the
14     tickets for the planes around August, sometime
15     around August.  It's a bunch of dates.
16 Q:  Would that be 2021?
17 A:  PSA has the records.  I can't remember.
18 Q:  You don't remember what year it was in?
19 A:  Yeah.  Last year.
20 Q:  So it was August 2021?
21 A:  I don't remember the date.
22 Q:  You don't remember the month?
23 A:  August 2021.
24 Q:  Okay.  And who did Michael's Machines put you
25     in touch with at IZOP-K?

## Page 155

1 A:  Klemen.
2 Q:  Was this the very first time you had ever met
3      Klemen?
4 A:  Correct.
5 Q:  Had you had any dealings with Klemen before
6      August 2021?
7 A:  I already answered that question.
8 Q:  I'm asking it again.  Have you had any dealings
9      or agreements with Klemen ---
10 A:  No.
11 Q:  --- prior to August 2021?
12 A:  No.  And I didn't say '21.  I said August.
13     You're -- you're ---
14 Q:  You don't know what year?
15 A:  You're adding -- you're saying August -- okay.
16     The year is 2021.
17 Q:  Correct.
18 A:  And the month is August, correct.  My
19     apologies.  I'm just trying to understand.
20 Q:  That's the first time you met Klemen?
21 A:  Correct.
22 Q:  That's the first time you ever had dealings
23     with IZOP-K?
24 A:  Correct.
25 Q:  Tell me about this trip to Slovenia.  Let's

## Page 156

1      start -- you know, your earliest recollection
2      when you arrived and walk me through day by day
3      of what you did.
4 A:  When I arrived, we arrived to the airport.  And
5      it was only me and my brother.  And we went to
6      the hotel.  And that was the next couple days.
7 Q:  What airport did you arrive in?
8 A:  At the Ljubljana Airport.
9 Q:  What hotel?
10 A:  The -- when I got into Europe or ---
11 Q:  What airplane did you arrive in Slovenia?
12 A:  Well, the Ljubljana Airport.
13 Q:  And what -- and that would be in the city of
14     Ljubljana?  Is that how you pronounce it?
15 A:  Yes.  That's the capital.
16 Q:  Okay.  And what hotel did you stay in?
17 A:  PSA put us at the -- I can't recall the name.
18     They did all the bookings.
19 Q:  Okay.  So you stayed at the hotel that PSA
20     booked for you?
21 A:  Correct.
22 Q:  Did you stay in any other hotel?
23 A:  After that, yes.
24 Q:  Okay.  Let's go back to walking through day by
25     day.  You arrive in Slovenia.  You go to the

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 157

1    hotel that the PSA has booked for you.  Then
2    what do you do?
3    A:   We waited.
4    Q:   What are you waiting on?
5    A:   PSA's people.
6    Q:   How long did you wait for PSA's people?
7    A:   We waited weeks -- like, days, days.
8    Q:   Okay.
9    A:   Not weeks but days.
10   Q:   Okay.  So after you waited days for PSA's
11   people, then what did you do?
12   A:   We have a meeting with the broker finally.
13   Q:   Do you remember about the date of that meeting?
14   A:   What -- what's the question?
15   Q:   Do you remember the date of the meeting?
16   A:   No.
17   Q:   And the broker is IZOP-K; correct?
18   A:   Correct.
19   Q:   And the individual representing IZOP-K at the
20   meeting was Klemen?
21   A:   Klemen, correct.
22   Q:   Was there anyone else from IZOP-K there?
23   A:   No.
24   Q:   What was the purpose of that meeting?
25   A:   To meet and greet.  To meet the broker.

Page 158

1    Q:   Was there any other purpose?
2    A:   To plan.
3    Q:   Okay.  Tell me what you discussed about your
4    planning?
5    A:   We planned on waiting for PSA people to move,
6    so we just planning the wait.
7    Q:   So you planned to wait for PSA to arrive?
8    A:   The plan was to, as soon as PSA arrive, for
9    us -- for all of us to travel.
10   Q:   Travel where?
11   A:   To Serbia and Montenegro possibly.
12   Q:   Why were you gonna travel to Montenegro?
13   A:   Because the guns were located there.
14   Q:   Which guns, under the -- the purchase
15   agreement?
16   A:   Correct.
17   Q:   And why were you gonna -- and why were you
18   gonna travel to Serbia?
19   A:   It's on the way.
20   Q:   Did you have business in Serbia?
21   A:   No.  It's on the way.  We were driving.
22   Q:   Did you actually go to Montenegro?
23   A:   We did.
24   Q:   Do you remember about when you arrived in
25   Montenegro?

Page 159

1    A:   I don't recollect completely, but I was there
2    around October.
3    Q:   October?
4    A:   Correct.
5    Q:   How long did you stay in Montenegro?
6    A:   Days.
7    Q:   Walk me through each day.  What did you do?
8    A:   It's extremely difficult.  We did different
9    things.  We wait and do different things like
10   go to the restaurant and eat, wait, a lot of
11   phone calls, communications.  I was working too
12   from there.
13   Q:   What was the purpose of your trip to
14   Montenegro?
15   A:   The trip to go to Montenegro was to meet with
16   Montenegrin officials.
17   Q:   And did you meet with Montenegrin officials?
18   A:   We did.
19   Q:   Who did you meet with?
20   A:   I don't recall their names.
21   Q:   Where did you meet with them?
22   A:   We meet in -- at cafes.
23   Q:   What did you discuss with these Montenegrin
24   officials?
25   A:   We discussed a plan to get the import -- the --

Page 160

1    I'm sorry -- the export papers.
2    Q:   Who's with you at these meetings?
3    A:   My brother all the time.
4    Q:   Was Klemen with you?
5    A:   Yes.
6    Q:   The whole time?
7    A:   Most of the time.
8    Q:   Anybody else?
9    A:   No.
10   Q:   PSA actually paid to send you on this trip to
11   Slovenia; correct?
12   A:   They paid the tickets; yeah.
13   Q:   They paid for the hotel?
14   A:   They did.  The first booking.
15   Q:   And was the purpose of that trip so you could
16   get eyes on and confirm the AK-47s that are
17   being purchased under the purchase agreement?
18   A:   The purpose of the trip was to have PSA to have
19   eyes on the guns, yes.
20   Q:   Were you gonna put eyes on the guns for PSA?
21   A:   No.  The purpose was that they come with us to
22   see the guns.
23   Q:   Did you go see the guns yourself?
24   A:   Yes.
25   Q:   You actually saw the 8,000 AK-47s that were

40 (Pages 157 to 160)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 161

1      purchased under the purchase agreement?
2   A:   We -- we saw them, yes.
3   Q:   So you physically saw them?
4   A:   We saw them, yes.
5   Q:   Who took you to them?
6   A:   Klemen.
7   Q:   Where are they located?
8   A:   They are located in Isquit [ph], a town near
9        the capitol.  I -- I don't know.  They just
10       drove me around.
11  Q:   Who had custody of the firearms at that time?
12  A:   The entire time the custody is being under the
13       MOD, which is the government.
14  Q:   How did you know that these were the firearms
15       that you purchased?
16  A:   I didn't know.
17  Q:   Did you have title to the weapons at that time?
18  A:   At that time we have an invoice.
19  Q:   Were you also to begin the process of demilling
20       and cutting the weapons while you were staying
21       in Slovenia or Montenegro?
22  A:   No.
23  Q:   So when you were in Montenegro in August and
24       September, you said throughout October; is that
25       correct?

Page 162

1   A:   Correct.
2   Q:   Did you do any demilling and cutting during
3        that time ---
4   A:   No.
5   Q:   --- the Montenegrin weapons?
6   A:   No.
7   Q:   Why not?
8   A:   Because we were not allowed on the base.  We
9        submitted the passport and we did everything,
10       and we were just told to wait for the green
11       light.
12  Q:   You weren't allowed on the base?
13  A:   We were not allowed on -- it's on a government
14       compound.
15  Q:   How did you get in to see them?
16  A:   We got allowed one time.
17  Q:   When you were allowed to see them that one
18       time, do you remember about when that occurred?
19       Was that in August 2021?
20  A:   No.
21  Q:   Just so we're getting the dates, I can
22       represent to you that base on the records that
23       we have, you departed the United States on
24       August 17th; you arrived on August 18th.  So
25       you would it have been August 19th that you

Page 163

1        actually saw the weapons?
2   A:   I don't recall.
3   Q:   Was it one or two days after you arrived?
4   A:   No.  It was days later.
5   Q:   More than a week, seven days?
6   A:   I can't recall.
7   Q:   Did you ever represent to -- or did you ever
8        communicate to Palmetto State Armory that you
9        were cutting and demilling any weapons in
10       Montenegro?
11  A:   I communicated to Ben the process that we were
12       doing internally.
13  Q:   What -- what is that process?
14  A:   That Ben was my point of contact.  And at that
15       time when we arrived, we didn't have the money
16       from Palmetto State.  They didn't pay.
17  Q:   When did they make their first payment to you?
18  A:   In July.
19  Q:   How much did they pay?
20  A:   1.8 eighty.
21  Q:   So you had the first deposit; true?
22  A:   I have the half; yes.
23  Q:   Okay.  And you needed the second half to begin
24       demilling the weapons?
25  A:   I needed the full amount; yes.

Page 164

1   Q:   Okay.  Did they pay you that full amount?
2   A:   Eventually did; yes.
3   Q:   When did they pay you the full amount?
4   A:   If I remember correctly, two months later or --
5        yeah, about two months later.
6   Q:   Okay.
7   A:   A month later.  My bad.
8   Q:   A month is the best to your recollection?
9   A:   Several weeks for sure.
10  Q:   Was this a month -- was this a month after
11       the -- when you say a month later, a month
12       later from what?
13  A:   Several weeks from the first deposit.
14  Q:   Okay.  And when --
15  A:   So it was not -- it was not the next day like
16       you ---
17  Q:   Okay.
18  A:   It was not the next day.
19  Q:   Okay.
20  A:   It -- it -- it was several weeks after the
21       first half ----
22  Q:   And ---
23  A:   --- that -- I'm sorry.  I'm not done.  So
24       several week after the first payment ---
25  Q:   Uh-huh.

1230 Richland Street | Columbia, SC 29201
(803)  252-3445  |  (800)  822-0896

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

---

Page 165

1 A:  ---- they gave me half of the amount.  We sign
2      the agreement and then nothing happened.
3 Q:  Uh-huh.
4 A:  We were waiting.  Then they purchased the plane
5      tickets.  Then we never leave.  They change
6      them.  Then we left.  And then they never got
7      there.  So it was several weeks later.  Then
8      they deposit the other half.
9 Q:  Okay.  So do you remember about the time when
10     they deposited the other half?
11 A:  I remember seeing the wire.  I can't recall the
12     date.
13 Q:  Okay.
14 A:  I gave you guys a copy of that.
15 Q:  Was it when you were over in Slovenia?
16 A:  I already answered the question.
17 A:  Answer it again.
18 A:  What was the question again?
19 Q:  When you received the second wire, were you
20     over in Slovenia at the time?
21 A:  Correct.
22 Q:  Okay.  And were you over in Slovenia -- let me
23     rephrase that.
24        In order to get the second wire, did you
25     have to show Palmetto State Armory proof of

---

Page 166

1      the -- firearms?
2 A:  I sent an email to Ben.  And in that email I
3      say, you guys are gonna come or not?  We're
4      waiting.  And I say I need to know if you're
5      gonna give me the money in full; true or not?
6 Q:  Uh-huh.
7 A:  And that's what I told him.  That's what I
8      communicated to them.  Are you guys coming?
9      Ben told me the password.  We don't have the
10     password yet.  And then the other kid, Logan,
11     was supposed to go there.  Jamin told him he
12     cannot go.  And then the password never came.
13     So I told him, okay, I'm here.  We got the
14     broker.  We're waiting.
15 Q:  And you're waiting on PSA to arrive?
16 A:  Either I'm waiting on PSA to arrive or to say
17     give us the money back or whatever it is that
18     they wanted to say at that point.
19 Q:  Did they give you the second payment, the
20     second installment?
21 A:  They did.  He -- Ben went and talked to Jamin,
22     and Jamin agreed to send the other half;
23     correct.
24 Q:  Okay.  And then at that point you had the full
25     purchase price; correct?

---

Page 167

1 A:  Correct.
2 Q:  And at that point did you own the weapons?  Did
3      you pay that to IZOP-K?
4 A:  At that time I already paid Michael the
5      deposit.  And that's when we start arguing with
6      Michael about the nonrefundable.  He put it on
7      his invoice, nonrefundable.
8 Q:  Did you demand the money back from Michael?
9 A:  Yes.
10 Q:  Did you get the money back?
11 A:  Yes.
12 Q:  What did you do with the money then?
13 A:  I -- I send the wire immediately to IZOP
14     directly.
15 Q:  At that point, did you begin cutting and
16     demilling the weapons?
17 A:  No.
18 Q:  Did you satisfy the full purchase price with
19     IZOP-K for the purchase of those weapons?
20 A:  Yes.
21 Q:  So Ikon owns the 6,000 AKs?
22 A:  8,000.
23 Q:  Excuse me.  8,000.  You're right.
24 A:  Yes.
25 Q:  But you didn't cut any of those; true?

---

Page 168

1 A:  No.
2 Q:  And you said that's because the Montenegrin
3      government won't let you have access to them?
4 A:  At that time, the broker was the one
5      controlling the communication.  We didn't speak
6      the language, so whatever he was informed to
7      ask is what we we're trying to do.  We're
8      trying to get to the guns.
9 Q:  Did you send any pictures of the firearms in
10     Montenegro to Palmetto State Armory while you
11     were over there at this time?
12 A:  I forward the pictures that the broker gave me.
13     I requested ----
14 Q:  You didn't take those pictures yourself?
15 A:  I did not.
16 Q:  Have you taken any pictures of the firearms is
17     Montenegro yourself?
18 A:  No.
19 Q:  Has Ali taken pictures himself?
20 A:  No.
21 Q:  I may have already asked this question, but
22     have you physically ever seen the Montenegrin
23     AK-47s that were purchased under the purchase
24     agreement?
25 A:  Yes.  Let me rephrase that because I remember

---

1230 Richland Street | Columbia, SC 29201
(803) 252-3445 | (800) 822-0896

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 169

1    what I answered before.  I saw those guns.  I'm
2    not sure if they were the same one that we're
3    asking about.  But I did see the guns, if it
4    makes sense.
5  Q:   What exactly -- just describe to me what you
6        saw.
7  A:   Correct.  So we got into a car, and we agree to
8        go in to go see the guns.  We're supposed to
9        have a full day.  It was supposed to be a week.
10       It's supposed to be a month that we were
11       staying there.
12 Q:   Uh-huh.
13 A:   So we relocated and were about to go.  Then one
14       time we're allowed to get in; and we walked
15       through it; we saw the guns; and then they push
16       us out.
17 Q:   So were -- were the -- when you say we saw the
18       guns, how were they situated?  Were they in ---
19 A:   Just boxes.
20 Q:   Okay.  Did you ---
21 A:   And they just opened some boxes.
22 Q:   I want to turn back to Michael's Machines.  Why
23       didn't Michael's Machines get out of this
24       agreement?
25 A:   Because I push him to give me the money back.

Page 170

1  Q:   Why did you want the money back from Michael's
2        machines?
3  A:   From my view, when he put the no -- half
4        nonrefundable, I knew I was liable for the
5        money.  So my invoice doesn't say
6        nonrefundable.
7  Q:   Uh-huh.
8  A:   So he say nonrefundable.  I didn't want that
9        much liability.
10 Q:   Okay.  But just to be clear, you didn't --
11       after you saw them that first time, you never
12       saw them physically again; right?
13 A:   Correct.
14 Q:   So you never began cutting or demilling these
15       weapons; right?
16 A:   Correct.
17 Q:   Does Ikon still own these weapons?
18 A:   Correct.
19 Q:   And they're being stored at this MOD facility?
20 A:   We have an agreement with the broker.  We have
21       a contract.  We have an invoice that was being
22       paid in full for the full amount of the 8,000
23       AKs.  We pay the commissions.
24 Q:   Uh-huh.
25 A:   We started the export paper through IZOP.  We

Page 171

1    started the import papers through Ikon.
2  Q:   Uh-huh.
3  A:   We have all ATA permits ready to go.  And he
4        has most of the transactions on his end of the
5        export papers.
6  Q:   Uh-huh.
7  A:   He's the broker of the deal.  He's the only one
8        that can get the guns out.
9  Q:   Ikon can't get the guns out?
10 A:   No US company can get the guns out of there.
11 Q:   So you're saying only IZOP can get the guns
12       out?
13 A:   No.  I'm saying only companies that are from
14       there can get them out.
15 Q:   What -- what documents do you have, can you
16       identify for me to suggest that Ikon has title
17       to these 8,000 weapons?
18 A:   Yes.  So we have an invoice.
19 Q:   Uh-huh.
20 A:   And ---
21 Q:   The invoice is with IZOP-K?
22 A:   Correct.  So IZOP sent us an invoice.  We
23       purchase that -- we paid that invoice.  Then I
24       requested an agreement, and they did an
25       agreement and we sign it.  And -- and it's --

Page 172

1    it's the same thing I got here.
2  Q:   When did you sign the agreement with IZOP-K?
3  A:   I can't recall.
4  Q:   Was it sometime in August when you were there?
5  A:   I -- I can't recall.  We -- I can't recall.
6  Q:   Well, you didn't know about IZOP-K when you
7        were first working with Michael's Machines;
8        right ---
9  A:   That's right.
10 Q:   --- in June?
11       So it had to be after June -- correct? --
12       2021?  After June 2021?
13 A:   After June, yes.
14 Q:   Okay.  And you said that Michael Otte linked
15       you up with Klemen and you met him for the
16       first time in August of 2021 when you arrived
17       in Slovenia; right?
18 A:   Correct.
19 Q:   So the agreement between Ikon and between IZOP
20       has to be sometime after August 2021; right?
21 A:   Correct.
22 Q:   Okay.  Okay.  I'm gonna introduce our next
23       exhibit here.  Bear with me.  It's a lot of
24       paper.
25 MR. D'ANTONI:  And this will be 10?  Yeah.  This

43 (Pages 169 to 172)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 173

1    will be Exhibit 10.
2  (Plaintiff's Exhibit Number 10 was marked for
3    identification purposes.)
4  MR. HOPEWELL: I'm passing a copy there to
5    Mr. Hopewell.
6  Q:   And, Mr. Deaza, this is a -- this is a lot of
7    paper.  And what I'll represent to you is that
8    we subpoenaed First Bank for the bank records
9    of Ikon.
10 A:   Yes.
11 Q:   And this is the production we got from First
12    Bank.  It's unaltered.  It's precisely what we
13    received.
14 A:   Okay.
15 Q:   So what I'd like to do now is if you could
16    turn -- and you're gonna see at the bottom
17    right-hand corner there are Bates numbers
18    there, PSA underscore, and you'll see a number.
19    And if you go to PSA underscore 0463?
20 MR. HOPEWELL: 046?
21 MR. D'ANTONI: 0463.
22 MR. HOPEWELL: 0463.
23 A:   Uh-huh.
24 Q:   All right.  Okay.  So this is the bank account
25    for Ikon Weapons, LLC, with First Bank.  And

Page 174

1    the last four of the account, the account
2    number is 7790; is that -- that correct?
3  A:   Yes.
4  Q:   Okay.  And if you look at the credits to the
5    Ikon bank account on 6/17, you see $1,880,000
6    come in from Palmetto State Armory; is that
7    correct?
8  A:   Correct.
9  Q:   Okay.  And if you go to PSA underscore 0465,
10    let's look at some of the debits from the
11    account.  The first one at 6/16 is for
12    $40,659.14.
13 A:   Uh-huh.
14 Q:   Do you remember what that debit is for?
15 A:   I can't recall.
16 Q:   So go to PSA_0470.
17 A:   047 ...
18 Q:   And you'll see copies of the face of checking
19    withdrawals.  Are you there, 0470?
20 A:   0470.  Okay.
21 Q:   And you can see on the left-hand side the third
22    item down.  The -- you took a checking
23    withdrawal for $40,659.14; is that correct?
24 A:   That's correct.
25 Q:   All right.  Why did you withdraw that much

Page 175

1    money from the account?
2  A:   I can't recall.
3  Q:   Okay.  Let's turn back to PSA --
4    (Off-the-record discussion.)
5  Q:   Let's just turn back to 047, that -- that
6    checking withdrawal.  You said you can't
7    recall.  Could that have been -- you know, is
8    that paying some type of debt, or was that
9    paying yourself from Ikon?
10 A:   I already answered the question.
11 Q:   So you have no recollection whatsoever as to
12    why you took $40,659.14 out of your account?
13 A:   Already answered the question.
14 Q:   I asked it again.
15 A:   I can't recall.
16 Q:   Okay.  And on -- if you go back to PSA
17    underscore 0465?
18 A:   Uh-huh.
19 Q:   It shows $1,212,500 go to Michael's Machines;
20    is that right?
21 A:   Yes.
22 Q:   And what you claim is that's to purchase the
23    weapons under this -- under the purchase
24    agreement; true?
25 A:   Explain -- what's the question?

Page 176

1  Q:   that debit, the money that Ikon sent to
2    Michael's Machines is for the purchase ---
3  A:   Uh-huh.
4  Q:   --- of the weapons under the purchase
5    agreement?
6  A:   For what?
7  Q:   The purchase agreement that you entered into,
8    that Ikon Weapons entered into with PSA for the
9    purchase of 8,000 AKs?
10 A:   Uh-huh.
11 Q:   Is that debit for the purchase of those
12    weapons?
13 A:   That's an invoice we got from Michael, and I
14    paid that invoice.
15 Q:   What was the invoice for?
16 A:   You got a copy of it.
17 Q:   I'm asking you the question.
18 A:   It's -- it's -- I -- I can't recall exactly,
19    but I think it says half of the money for the
20    guns.  But, again, I can't recall.  I don't
21    have the invoice in front of me.  You guys have
22    a copy of it.
23 Q:   Okay.  Let's move further down to 6/21.
24    There's a debit of $6,319.70 on a Citi card?
25 A:   Uh-huh.

44 (Pages 173 to 176)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

| Page 177 |
| --- |

1  Q:  Is that a credit card in -- in the name of Ikon
2      Weapons, LLC?
3  A:  No.
4  Q:  Is that a credit card in the name of Suliban
5      Deaza?
6  A:  Yes.
7  Q:  That's your personal credit card?
8  A:  Yes.
9  Q:  The next is for a debit of $150,000 to
10     Automatics & Machinery.  What is that debit
11     for?
12 A:  I gave you guys a copy of the invoice.  It's on
13     the invoice.
14 Q:  Please explain ---
15 A:  It's -- its ---
16 Q:  ---- what it's for.
17 A:  It's an invoice for equipment.
18 Q:  What type of equipment?
19 A:  Some machinery.
20 Q:  What type ---
21 A:  Machines.
22 Q:  What type of machinery or machines?
23 A:  Machines.
24 Q:  What type of machines?
25 A:  CNC machines.

| Page 178 |
| --- |

1  Q:  And what do CNC machines do?
2  A:  CNC.
3  Q:  What's that?
4  A:  Demil.
5  Q:  Demil?
6  A:  Milling.
7  Q:  Okay.  Is this for Ikon Weapons ---
8  A:  Correct.
9  Q:  --- for its business?
10     This is for the -- the business of Ikon
11     Weapons?
12 A:  Correct.
13 Q:  If we move over to 0466, there are two
14     additional debits, one for $16,240.53 and one
15     for 34,663.09?
16 A:  Uh-huh.
17 Q:  Do you recall what those debits were for?
18 A:  No.
19 Q:  Okay.  Can you turn to page 470?  If you look
20     on the right-hand side, the first item.  It
21     says checking withdrawal $16,240.53 with your
22     signature; is that correct?
23 A:  That's correct.
24 Q:  Okay.  So you withdrawed that amount of catch
25     out of the Ikon checking account; right?

| Page 179 |
| --- |

1  A:  Yes.
2  Q:  What did you withdraw that cash for?
3  A:  I can't recall.
4  Q:  Okay.  Let's move down a little further.  It
5      says -- there's a checking invoice -- excuse
6      me -- checking withdraw 6/22 34,663.09.  Is
7      says on the top left, loan pay-off.  What loan
8      is that?
9  A:  I didn't wrote that.
10 Q:  Is that your signature?
11 A:  My signature, yes.  I just don't wrote that.
12     I don't know what that is.  I can't recall.
13 Q:  So you don't know why you withdrew 34,663.09
14     from the account?
15 A:  I cannot recall.
16 Q:  Okay.  Let's go back to 0466.  Let's go down a
17     little further to June 28th.  There's two
18     checking withdrawals in the amount of $25,000
19     each.  Do you remember why you withdraw $50,000
20     between the two of those withdrawals?
21 A:  I can't recall.
22 Q:  Let's go to June 30th.  There is a debit of
23     $45,000 -- $45,033 ----
24 A:  Uh-huh.
25 Q:  --- for Entrust Manufacturing Technologies.

| Page 180 |
| --- |

1      What was that for?
2  MR. HOPEWELL:  Do you have this same page?  I'm
3      sorry.
4  MR. D'ANTONI:  Oh, this is 0466.
5  MR. HOPEWELL:  Same page.  Okay.
6  MR. D'ANTONI:  Yes, sir.
7  Q:  If you go down to 6/30, do you see it, $45,033?
8  A:  Uh-huh, yes.
9  Q:  And what was that for?
10 A:  It's an invoice.
11 Q:  An invoice from who?
12 A:  Entrust.
13 Q:  From what?
14 A:  I can't recall.  I ---
15 Q:  Could it be for machinery?
16 A:  I give you guys a copy of it.  You should have
17     it.  I just can't recall.  There -- we got many
18     invoices from them.
19 Q:  Is it for the benefit of Ikon Weapons?
20 A:  Correct.
21 Q:  Okay.  Go ahead and turn to PSA_472.
22 A:  Okay.
23 Q:  Top left there's a check from Ikon Weapons to
24     the order of 3DC Projects, LLC, in the amount
25     $50,000; is that right?

45 (Pages 177 to 180)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 181

1  A:  Correct.
2  Q:  Is that your signature?
3  A:  Yes.
4  Q:  3DC Projects, LLC, is your company; correct?
5  A:  Correct.
6  Q:  When I say yours, that means Suliban Deaza?
7  A:  Correct.
8  Q:  You're the sole owner of that company?
9  A:  Correct.
10 Q:  Okay.  Why are you paying 3DC Projects $50,000?
11 A:  It says in there.
12 Q:  Explain it to me.
13 A:  Ikon 3 construction.
14 Q:  What does that mean?
15 A:  Construction done on Ikon 3.
16 Q:  What's Ikon 3?
17 A:  Ikon 3 is our building where we are now.
18 Q:  Okay.  So this is for constructing improvements
19     to Ikon's property.  And this is in
20     Mount Gilead, North Carolina?
21 A:  That's for consulting and construction and yes.
22 Q:  This is for consulting?
23 A:  Correct.  Blueprints, whatever needs to be
24     done.
25 Q:  So who was the consultant?

Page 182

1  A:  3DC Projects.
2  Q:  Did you actually do the consulting, you being
3     Suliban Deaza?
4  A:  Correct.
5  Q:  So you paid yourself $50,000 for doing
6     consulting work for Ikon Weapons?
7  A:  No.
8  Q:  Then what did you pay yourself for?
9  A:  I paid the company.  So Ikon paid 3DC Projects.
10 Q:  3DC Projects pay you a salary?
11 A:  I take withdrawals from 3DC Projects; correct.
12 Q:  Did Mr. Holt authorize that transfer of
13     payment?
14 A:  I can't recall.
15 Q:  That's above $20,000; right?
16 A:  Correct.
17 Q:  And you told me earlier that Mr. Holt had to
18     authorize any expenses over $20,000; right?
19 A:  That's correct.
20 Q:  And you can't recall whether or not he
21     authorized that expense?
22 A:  Yes.  I can't recall.
23 Q:  Okay.  Let's turn to PSA_474.  Let me know when
24     you're there.
25 A:  I'm here.  Okay.

Page 183

1  Q:  On July 7th it's showing a credit of $50,000
2     from Mr. Michael M. Otte.  Why is he putting
3     $50,000 into Ikon's bank account?
4  A:  It was a loan.
5  Q:  A loan?
6  A:  Yes.
7  Q:  What was the loan for?
8  A:  It was just a loan.
9  Q:  Why did you take the loan?
10 A:  We needed the 50 grand, I think.
11 Q:  What did you need the 50 grand for?
12 A:  I can't recall.
13 Q:  Michael Otte here is the same Michael Otte who
14     runs Michael's Machines?
15 A:  Yes.
16 Q:  Michael's Machines is the same Michael's
17     Machines you just last month sent over
18     $1.2 million to?
19 A:  That's not true.
20 Q:  You didn't send him ---
21 A:  Oh, you're talking about last month ---
22 Q:  That's right.
23 A:  Like ---
24 Q:  Last month in the bank records here ---
25 A:  --- like now being ---

Page 184

1  Q:  --- as we're working from the bank records.
2  A:  Oh, okay.  You were not clear on that.
3  Q:  So this is the same Michael's Machines at 0465;
4     correct?
5  A:  That's correct, yes.
6  Q:  That's Michael Otte business?
7  A:  Yes.
8  Q:  Okay.  And the next day Mr. Lawrence B. Holt,
9     Jr., puts $50,000 into the account of Ikon.
10    What is that?
11 A:  A loan.
12 Q:  What's the loan for?
13 A:  Something that Michael -- I needed 50 grand,
14     and they both -- they both gave me the money.
15 Q:  Before you -- you -- you -- before your
16     agreements with PSA, did you do business with
17     Mr. Michael Otte?
18 A:  Yes.
19 Q:  What kind of business did you do with him?
20 A:  Be specific.  What do you mean?
21 Q:  What kind of business?  Did you enter any
22     agreements, any transactions?  Did you purchase
23     weapons from him?  Did he purchase weapons from
24     you?
25 A:  That's so many questions.  Can you just do one

46 (Pages 181 to 184)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 185

1    at a time?
2    Q:   Can you explain the nature of your
3         relationship?
4    A:   We did business.
5    Q:   Yes.  But what kind of business?
6    A:   Different business.  Purchasing.
7    Q:   Purchasing what?
8    A:   Items.
9    Q:   What items?
10   A:   Mail items, different -- I can't recall exactly
11        what items, but we did business together.
12   Q:   Did you purchase firearms from Mr. Otte?
13   A:   I did.
14   Q:   Did Mr. Otte purchase firearms from Ikon
15        Weapons?
16   A:   No.
17   Q:   Did Mr. Otte purchase anything from Ikon
18        Weapons?
19   A:   Yes.
20   Q:   What did he purchase from Ikon Weapons?
21   A:   It's in invoices.  I can't recall.
22   Q:   How long have you known Mr. Otte?
23   A:   Since my time at PTR.
24   Q:   How did you meet Mr. Otte?
25   A:   I can't recall.

Page 186

1    Q:   How did you come to meet him from your time at
2         PTR?
3    A:   I can't recall.
4    Q:   Turning to Dr. Holt you said that -- or excuse
5         me -- Mr. Lawrence B. Holt.  You said that this
6         was also a loan?
7    A:   At what page are we?
8    Q:   We're still at 474.
9    A:   Oh, okay.  What did you say?
10   Q:   You said the -- the $50,000 put into the
11        account by Lawrence B. Holt, Jr., was a loan;
12        right?
13   A:   Yes, correct.  That's correct.
14   Q:   Okay.  What exactly was the loan for?
15   A:   I can't recall.
16   Q:   Okay.  Let's turn over to 47 -- PSA_476.
17   A:   Uh-huh.
18   Q:   On 7/12 there is 50,000 that goes out ---
19   A:   Correct.
20   Q:   --- to Mr. Michael Otte?
21   A:   Uh-huh.
22   Q:   Why did Ikon send $50,000 to Michael Otte on
23        July 12th?
24   A:   I asked for 50 from both of them.  They both
25        sent it to me.  So I returned the 50 to Michael

Page 187

1    and I told him thank you.
2    VIDEOGRAPHER: Excuse me.  Reset.
3         This is the end of Media Number 2 in the
4         deposition of Suliban Esteban Deaza, witness
5         for Ikon Weapons.  We're off the record at
6         3:03.
7    (A break was taken from 3:03 p.m. until 3:17 p.m.)
8    VIDEOGRAPHER:  This is the beginning of Media 3 in
9         the deposition of 30(b)(6) Suliban Esteban
10        Deaza, witness for Ikon Weapons, LLC.  We're
11        back on the record at 3:17.
12   Q:   Okay.  Mr. Deaza, we're still working our way
13        through these bank records.  Could you turn to
14        PSA_480?
15   A:   Okay.
16   Q:   All right.  Do you recall what the purpose of
17        the checking withdrawal on July 12th, 2021 --
18        that's the third item down on the left-hand
19        side for $5,000 -- why you made that
20        withdrawal?
21   A:   I can't recall.
22   Q:   That's your signature; right?
23   A:   That's my signature, yes.
24   Q:   And on the right-hand side if we go to the next
25        to the last item, do you see that check to 3DC

Page 188

1         Projects?
2    A:   Yes.
3    Q:   And that's in the amount of $10,000; is that
4         correct?
5    A:   Correct.
6    Q:   That that's your signature; right?
7    A:   Yes.
8    Q:   Is that another check to pay you for
9         consulting?
10   A:   No.  It's a check to pay 3DC Projects.  From
11        Ikon to 3DC Projects.
12   Q:   Okay.  And you own 3DC Projects; right?
13   A:   That's correct.
14   Q:   And you're the sole member of that LLC; right?
15   A:   That's correct.
16   Q:   Okay.  Let's go to PSA_0483.
17   A:   Okay.
18   Q:   Do you see on August 20th Palmetto State Armory
19        wired $1,880,000 into the Ikon account?
20   A:   Yes.
21   Q:   And what was the purpose of that payment?
22   A:   That was the second half of Contract 1.
23   Q:   Were you over in Slovenia when that payments
24        was made?
25   A:   Yes.

47 (Pages 185 to 188)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 189

1  Q:   And what communications did you have with
2       Palmetto State Armory to induce Palmetto State
3       Armory to make that payment?
4  A:   There was an email I sent to Ben.  And the
5       email, I can't recall exactly the words.  But
6       it was like, hey, you guys coming?  I'm here.
7       What we gonna do about this?
8  Q:   So they paid you an additional $1,880,000 based
9       on an email that you sent, are you coming?
10 A:   Yes.
11 Q:   Is it true that you contacted Mr. Fortin and
12      provided him pictures of the 8,000 AKs under
13      the purchase agreement?
14 A:   I can't recall.  I did that multiple times.
15 Q:   Did you provide Mr. Fortin with pictures of
16      the -- of some or all of the 8,000 AKs under
17      the purchase agreement at or near August 20th?
18 A:   I can't recall exactly the date.
19 Q:   Were you sending those pictures to Mr. Fortin
20      to verify the existence of the 8,000 AKs?
21 A:   I sent him a lot of pictures from the beginning
22      from when we started looking at this, pictures
23      that the broker were sending me.  I don't
24      recall specifically what you're asking me.
25 Q:   Did you ever send him pictures for the purpose

Page 190

1       of verifying the existence of the 8,000 AK-47s?
2  A:   From the beginning of the deal I sent him
3       pictures verifying that the deal that I got
4       from the broker.
5  Q:   When was the first time you sent him pictures?
6  A:   When I first -- I can't recall specifically the
7       date but when we first start talking about the
8       guns.  PSA didn't even pay yet and ----
9  Q:   Did you ---
10 A:   --- I start sending him pictures of the guns
11      and showing him the product.
12 Q:   Did you provide him pictures of the firearms
13      before -- excuse me.  Yes.  Did you provide him
14      pictures of the firearms before this deposit
15      was made?
16 A:   I did provide pictures of the firearms along
17      way before, even before we got into an
18      agreement of those guns.  So we start talking
19      about the guns.  They wanted to see them.  And
20      I forward the pictures from the brokers that
21      said this is the product.  So, yes, I did.
22 Q:   So you arrived in Slovenia, by our records, on
23      the 18th.  Payment was made two days later.
24      I'm just working through my thoughts here.  How
25      early did you provide Mr. Fortin with pictures

Page 191

1       of the firearms under this purchase agreement?
2  A:   How early -- explain that.
3  Q:   Yeah, sure.  Was it before your trip to
4       Slovenia?
5  A:   Yes.
6  Q:   Was it before you executed the June twenty --
7       16th -- 2021, purchase agreement?
8  A:   I can't recall.  I can't recall because it was
9       an exchange in emails for the invoices, and
10      there was a back and forth.  I may provide
11      pictures during that time, but I can't recall.
12 Q:   Did you ever communicate to Mr. Fortin that you
13      could not start demilling or cutting the
14      firearms until you received the second payment?
15 A:   I communicated with Mr. Fortin even from the
16      beginning that the guns needed to pay in full
17      before we can do anything about them.  And that
18      was communicated to me by Michael, which was
19      later reinforced by IZOP.
20 Q:   Did you communicate with PSA on August 20th
21      that you had -- you had seen the firearms and
22      that you needed a second payment in order to
23      begin cutting and demilling?
24 A:   I don't recall specifics.  But, again, like I
25      say, from the beginning I expressed to PSA that

Page 192

1       they have to pay in full in order for us to get
2       access to the guns.
3  Q:   And they paid in full; correct?
4  A:   On August 20th they completed the payment; yes.
5  Q:   And did you have access to the guns at that
6       time?
7  A:   Explain.  That day?
8  Q:   You -- you testified that you needed payment in
9       full to have access to the guns.  And what I'm
10      asking is that after full payment was made on
11      August 20th, did you have access to the guns?
12 A:   Eventually, yes.
13 Q:   When?
14 A:   I already answered that question.
15 Q:   Answer it again.  When did you have access to
16      the guns?
17 A:   We -- when we were in Montenegro.  We -- we got
18      taken and drove to this location where I was
19      presented with what seemed to be the guns one
20      time.
21 Q:   Why do you say they seemed to be the -- the
22      guns?
23 A:   Because they all look the same.
24 Q:   Did you ever represent to Palmetto State Armory
25      that you were in Montenegro cutting and

1230 Richland Street | Columbia, SC 29201
(803) 252-3445 | (800) 822-0896

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 193

1 demilling the firearms?
2 A:  I can't recall the specific of the emails.
3 There were a bunch of emails back and forth.
4 At that time, my communications were through
5 Ben as well and through email.  And the back
6 and forth was also between Jamin and Ben.
7 'Cause Jamin wanted to have some results or
8 wanted to have some answers from the beginning
9 of the deal.
10 Q:  Were you, Suliban Deaza, ever in Montenegro
11 demilling or cutting the weapons?
12 A:  No.
13 Q:  Was Ali ever in Montenegro demilling and
14 cutting the weapons?
15 A:  No.
16 Q:  One moment.
17 MR. D'ANTONI:  Okay.  I'd like to introduce another
18 exhibit here.
19 COURT REPORTER:  11.
20 MR. D'ANTONI:  This would be Exhibit Number 11.
21 Would you hand that to the court reporter
22 to be appropriately marked?  I'm gonna hand a
23 copy to Mr. Hopewell.
24 (Plaintiff's Exhibit Number 11 was marked for
25 identification purposes.)

Page 194

1 Q:  Mr. Deaza, we placed in front of you what's
2 marked as Exhibit 11.  Do you recognize this?
3 A:  Yes.
4 Q:  Okay.
5 A:  Can I move this out?
6 Q:  Yeah.  Just leave the bank records over there
7 for the time being.  Let's focus on Exhibit
8 Number 11.  Go to PSA_0286.  It says Montenegro
9 Contract Digital File.  It has several pictures
10 on the face of it.  Do you see that slide?
11 A:  Hold on one second.  PSA what?
12 Q:  0286.
13 A:  Correct.
14 Q:  Did you take these pictures?
15 A:  No.
16 Q:  Where did these pictures come from?
17 A:  From the broker.
18 Q:  When did you receive these pictures?
19 A:  I can't recall.
20 Q:  Did you ask for the broker to send you these
21 pictures?
22 A:  I did ask multiple times the broker to send me
23 multiple pictures; yes.
24 Q:  And did the broker represent to you that these
25 were the 8,000 AKs purchased under the purchase

Page 195

1 agreement?
2 A:  Correct.
3 Q:  And did you represent to Palmetto State Armory
4 that these were the firearms purchased under
5 the purchase agreement?
6 A:  I presented to PSA with the same evidence that
7 I got presented from the broker to PSA.  And I
8 stated this is the guns that are in Montenegro.
9 Q:  Okay.  This is your presentation to Palmetto
10 State Armory; correct?
11 A:  Correct.
12 Q:  What does it say across the -- the top of those
13 pictures?
14 A:  Where?  Like across the ---- the title?
15 Q:  That's right.  What's the title?
16 A:  Montenegro Contract Digital File.
17 Q:  The Montenegro contract is the purchase
18 agreement; correct?  The June 16th, 2021,
19 purchase agreement, that's the Montenegro
20 contract?
21 A:  Yes.
22 Q:  Yeah.  I just want to make sure we're all ---
23 A:  Yes.
24 Q:  --- speaking the language.
25 A:  Yes, yes, yes.

Page 196

1 Q:  So you're representing here that these are
2 the -- the pictures of the Montenegro weapons;
3 true?
4 A:  No.  I'm saying this is the pictures that I got
5 from the broker, which it shows the gun that I
6 purchased from the broker.
7 Q:  Did you explain that here in the slide,
8 anywhere in the slide?
9 A:  No.  I'm just showing the pictures.
10 Q:  Okay.  Let's go to the -- the next slide.  This
11 is a --
12 (Off-the-record discussion.)
13 Q:  At 287, do you recognize these picture?
14 A:  Yes.
15 Q:  Did you take these pictures?
16 A:  Yes.
17 Q:  When did you take these pictures?
18 A:  I can't recall the date.
19 Q:  In August?
20 A:  I can't recall exactly.
21 Q:  Could these be as late at October?
22 A:  I would be guessing.
23 Q:  So you don't know when you took these pictures?
24 A:  I cannot recall when I took the pictures.
25 Q:  Where are these pictures from?  Where were they

1230 Richland Street | Columbia, SC 29201
(803) 252-3445 | (800) 822-0896

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 197

1    taken?
2  A:  They were taken in Serbia.
3  Q:  Where in Serbia?
4  A:  In a MOD.
5  Q:  This is a Ministry of Defense facility?
6  A:  Ones -- yes.  The other ones are taken on a
7       private facility.
8  Q:  Which one is taken at the MOD facility, and
9       which ones are taken at the private facility?
10  A:  The one showing the sniper is at the MOD in
11      Serbia.  The other are in a private facility.
12  Q:  Where is the MOD facility located in Serbia?
13  A:  It's where Zastava is located.  We didn't go.
14      I have no recollection of the address.
15  Q:  And have you purchased these weapons?
16  A:  Correct.
17  Q:  So Ikon owns these weapons?
18  A:  Correct.
19  Q:  Do you have a storage invoice for these weapons
20      that are currently being just stored in the MOD
21      facility in ---
22  A:  What do you mean a storage invoice?
23  Q:  So you said that the picture on the left, this
24      is the M76 sniper rifle?
25  A:  Correct.

Page 198

1  Q:  That that's being stored by Zastava; correct?
2  A:  Correct.
3  Q:  Are they storing those weapons free of charge?
4  A:  They belong to contractors.  So the way that
5       works is they do, like, auctions and then
6       contractors buy them.
7  Q:  So the weapons don't belong to you?
8  A:  The weapons belong to us.  We bought them from
9       another person.  But I'm not paying a storage,
10      is to answer your question.  I'm not paying
11      storage.
12  Q:  Is Zastava free to sell those M76s?
13  A:  No.
14  Q:  So they're storing them there on behalf of Ikon
15      free of charge?
16  A:  They're storaging in there waiting for the
17      documents to get them out.
18  Q:  And while they're waiting on the documents to
19      get them out, they're not charging you for
20      storage?
21  A:  No.
22  Q:  Who's your point of contact at Zastava that is
23      custodying the M76s?
24  A:  IZOP.
25  Q:  So Mr. -- Mr. Klemen?

Page 199

1  A:  Uh-huh.
2  Q:  Mr. Klemen?
3  A:  Klemen.
4  Q:  Mr. Klemen is your point of contact for these
5       weapons?
6  A:  Correct.
7  Q:  So does IZOP own the weapons, or does Ikon own
8       the weapons?
9  A:  Did you just say Ikon owns the weapons or Ikon
10      owns the weapons?
11  Q:  IZOP -- yeah, I know it's similar.
12  A:  Okay.
13  Q:  Does IZOP-K own the weapons, or does Ikon -- or
14      excuse me -- Ikon Weapons, LLC, own the
15      weapons?
16  A:  Ikon, LLC, owns the weapons.
17  Q:  And what documents do you have to verify that?
18  A:  I submitted to you guys a purchase agreement,
19      an invoice, and I guess that's it.
20  Q:  Do you have any point of the contact at Zastava
21      itself?
22  A:  No.
23  Q:  The two pictures of the weapons on the right
24      are in a private, you said?
25  A:  Correct.

Page 200

1  Q:  What's the name of the private facility?
2  A:  NBAT -- N.B. I.N.A.T.
3  Q:  Okay.  And where is that located?
4  A:  It's located in a town in Serbia.  I can't --
5       I won't even -- gonna try to pronounce it.  It
6       would be wrong.
7  Q:  And you own the weapons that are currently
8       located ---
9  A:  Yes.
10  Q:  --- with N.B. I.N.A.T.?
11  A:  Ikon owns those weapons as well.
12  Q:  And what documentation do you have to evidence
13      that ownership?
14  A:  I submitted to you guys the purchase order and
15      also submitted the contract and the invoice.
16  Q:  And are those with IZOP-K?
17  A:  Correct.
18  Q:  And those were among the documents you
19      submitted this morning?
20  A:  Yes.
21  Q:  Let's go to the -- next slide.  This is
22      PSA_0288.
23  A:  Uh-huh.
24  Q:  Are you there?
25      You tell -- or you represented to Palmetto

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 201

```
1      State Armory that 1,940 of the AKs under the
2   Montenegrin deal had been cut.  Was that true?
3   A:   No.
4   Q:   So what you represented here was false;
5   correct?
6   A:   Correct.
7   Q:   And you knew it to be false; correct?
8   A:   Correct.
9   Q:   And tell me what you're trying to communicate
10   to -- to PSA with this slide.  What's the
11   message you're trying to send?
12   A:   I put it pretty simple.  I told them that the
13   Montenegrin Project was a no-go.  I ---
14   Q:   I'm sorry.  What do you mean, a no-go?
15   A:   That the guns were stuck.
16   Q:   What does that mean, the guns are stuck?
17   A:   That we were having a hard time getting expo
18   papers.
19   Q:   Okay.  Continue.  I'm sorry.
20   A:   And so I put it in there that they did pay
21   $3.7 million and 60,000.  It was paid in full.
22   And I also told them about the ones that were
23   cut in the container.  And I told them that
24   that was 1,940 and that we owned those.  And
25   then I talk about the Serbia project and I told
```

Page 202

```
1   them that there was an opportunity to bring
2   5,000 Zastava -- the M70s, the 1500, and the
3   C10s, 297 pistols.
4      And I also told them that they only pay
5   20 percent of that contract, and that it will
6   be easier and faster to bring the guns from the
7   Serbia project because the Serbians were more
8   open the export than the Montenegrins and we
9   have in our private locations as well as in
10   Zastava.  And then that if they -- if they
11   agree to that, then I will bring these guns to
12   the States and -- and then we just keep an
13   option in Montenegro to eventually get those
14   guns later.
15   Q:   In the bottom right-hand corner, you say
16   129,816 difference in favor of PSA.  What does
17   that mean?
18   A:   If you get the first contract, which is
19   3.76 ---
20   Q:   Uh-huh.
21   A:   --- right?  And you -- and you add the guns
22   that we currently have secure, which is the
23   1,940, the 5,000 AKs, the 1500 snipers, and the
24   297 C10s, then the difference will be of
25   129,886.
```

Page 203

```
1   Q:   You just said a moment ---
2   A:   We just extract those.
3   Q:   You just said a moment ago that the 1,940 ---
4   A:   Yes.
5   Q:   --- that were purported to be cut, that that
6   was false and you knew that to be false at the
7   time ---
8   A:   No, I -- I didn't say that.  I say that we did
9   not cut them.  We owned them.
10   Q:   So you owned -- so they're not cut?
11   A:   They're not cut, but they are in our -- in our
12   possession, if you want to put it that way.
13   Q:   How were they in your possession?
14   A:   We -- we -- we have them.
15   Q:   Where are they?
16   A:   In Serbia.
17   Q:   Where in Serbia?
18   A:   In the Zastava MOD.
19   Q:   So you moved those 1,940 from Montenegro to
20   Serbia?
21   A:   Correct.  I -- I didn't.  No.  False.  I did
22   not.  Me, I didn't.
23   Q:   Who did?
24   A:   The broker.
25   Q:   How was the broker able to move 1,940 from
```

Page 204

```
1   Montenegro to Serbia?
2   A:   He used another broker, Dory [ph] Group.  I
3   send you guys to documents of the contract with
4   Dory Group.
5   Q:   Why couldn't he just move all of the weapons?
6   A:   It's -- the government won't allow at this
7   point.
8   Q:   How do you know that the government won't
9   allow?
10   A:   It's just what I was told by hem.
11   Q:   Who's him?
12   A:   Klemen.  He still has the option in Montenegro.
13   Q:   Did Klemen provide you with any documentation
14   backing up his representations that the other
15   weapons couldn't be moved?
16   A:   No.
17   Q:   Did you ask for any?
18   A:   No.
19   Q:   Why not?
20   A:   I -- I don't know.
21   Q:   Have you asked Klemen or IZOP-K for a refund?
22   A:   Yes.
23   Q:   When did you ask them for a refund?
24   A:   Multiple times.
25   Q:   When was the first time?
```

51 (Pages 201 to 204)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 205

1   A:   I can't recall.  When Jamin first start wanting
2        the money back.
3   Q:   Okay.  How did you communicate it to him?
4   A:   I just tell him, like, hey, I may need the
5        money back.
6   Q:   Did you communicate by email?
7   A:   There was some emails; yes.
8   Q:   And what did you say in the emails?
9   A:   I can't recall the exact wording, but it's just
10       like, hey, I may need the money back.
11  Q:   And how did Klemen respond to that?
12  A:   He was agreeing.
13  Q:   And he can provide the money back?
14  A:   Yeah.
15  Q:   Can he provide the money today?
16  A:   I will have to ask him.  That's not -- I -- I
17       don't -- I can't assume something.
18  Q:   What do you think?  Do you think he can provide
19       it back?
20  A:   What I think?
21  Q:   Yes.
22  A:   Yes.
23  Q:   And what leads you to -- to be that optimistic
24       to think that he can do that?
25  A:   We have good communication, and he's been

Page 206

1        following through with the other contracts.
2   Q:   What other contracts?
3   A:   The Serbian contract.
4   Q:   If -- if Klemen can get the money back, why
5        don't you just get the money back to help avoid
6        at least, you know, part of this lawsuit on the
7        Montenegrin deal?
8   A:   Explain the question?
9   Q:   So you've explained that you're confident ---
10  A:   Uh-huh.
11  Q:   --- that Klemen can get the money back on the
12       Montenegro deal; correct?
13  A:   Correct.
14  Q:   Okay.  This litigation involves two
15       agreements ---
16  A:   Correct.
17  Q:   --- one is the Montenegrin deal; one is the
18       Serbian deal; right?
19  A:   Correct.
20  Q:   The Montenegrin deal involves $3,760,000?
21  A:   Correct.
22  Q:   The Serbian deal involves $744,500; right?
23  A:   Correct.
24  Q:   If you're confident that Klemen can refund the
25       $3,760,000, why don't you just ask him for a

Page 207

1        complete refund, you know, to avoid at least
2        part of this litigation?
3   A:   When I first start talking to Klemen about a
4        refund, I came to Jamin and I ask him if he
5        wanted the money back and he say, no.  Bring me
6        the guns.  So I told Klemen it's okay.  We can
7        continue working on it.
8            The second time that I offer the money
9        back was during the phone call, which Jamin was
10       live on the table and Julian, the other owner
11       of PT -- PSA, and Ben.  And I told him
12       Montenegro's a no-go.  But if you guys want, we
13       can get the money back.  We can go try to get
14       the guns from Serbia.  And they agreed to it.
15       And how I know they agree?  Because we continue
16       working on the Serbian deal.
17  Q:   Uh-huh.
18  A:   The Montenegro was done.  I asked Klemen
19       multiple times for the money back.  I went to
20       Jamin every time, and he say, no.  I want the
21       guns.  I want the guns.
22           And he say in his office, and he said in
23       front of Ben.  He gave me a fist bump and he
24       said, I don't want the money back.  Bring me
25       the guns November 30th of 2021.

Page 208

1   Q:   And is that because you told Mr. McCallum that
2        the firearms were in Charleston?
3   A:   No.  I never say that.
4   Q:   You never said that?
5   A:   Correct.
6   Q:   Okay.  One moment.
7   A:   Uh-huh.
8   MR. D'ANTONI:  I'm introducing another exhibit here.
9        This will be ---
10  COURT REPORTER:  12.
11  MR. D'ANTONI:  This will be Exhibit 12.  Handing a
12       copy to Mr. Hopewell.
13  (Plaintiff's Exhibit Number 12 was marked for
14  identification purposes.)
15  Q:   Can you -- what's been placed in front of you
16       has been marked as Exhibit 12.  Can you tell me
17       what this is?
18  A:   It's emails.
19  Q:   Okay.  Are these emails between you and
20       Mr. McCallum.
21  A:   Correct.
22  Q:   Okay.  Let's go back to the -- the start of the
23       email thread, and it starts -- the first email
24       starts at PSA_177.
25  A:   PSA 177?

52 (Pages 205 to 208)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 209

1  Q:  That's right. It's an email from you to Ben
2      Fortin. It's dated December 7th, 2021, at
3      12:27 p.m. Do you see that?
4  A:  Yes.
5  Q:  Okay. Can you read that email for me?
6  A:  Ben, I apologize for these delays. As you
7      know, I'm currently out of the country. I
8      understand the urgency of your call and totally
9      understand the frustration. I will get these
10     kits free and clear any time soon, as I was
11     told by Jamin at your office. Know that we
12     move into the holidays, and I'm doing by best.
13     Please find the extension signed agreement
14     verbally at your office. Please also know that
15     after our meeting in person, I turning down a
16     purchase order from one of your competitors to
17     get full rights on the kits.
18 Q:  If I go to the next page, it continues.
19     There's another paragraph. You go to 178.
20 A:  At this point I cannot give you the -- the
21     container information because I have all the
22     customers' products. We sign an DNA, and we
23     have contracts over the merchandise as well.
24     I apologize for that. As I expressed to you
25     and Jamin, I'm doing everything in my power to

Page 210

1      get those kits as soon as possible.
2          Please know that I didn't have control
3      over some of the issues. We're pushing
4      through, but I can guarantee you we will get
5      through and I will not disappoint you or Jamin.
6      My intention is to continue our relationship.
7          I know you guys are not interested in
8      company, but I do know the consequences of this
9      deal can take me and my company out of
10     business. I promise you I won't let that
11     happen.
12 Q:  Okay. Let's talk about some of the
13     representations you made in this email. So go
14     back to 177.
15 A:  Yeah.
16 Q:  You see, I'm currently out of the country?
17     Where were you?
18 A:  I can't recall.
19 Q:  You don't recall being out of the country in
20     December 7, 2021?
21 A:  In December we went out. We travel to
22     Columbia. So I -- I can't recall what day it
23     was specifically.
24 Q:  Okay. But you believe you were in Columbia?
25 A:  I -- I don't -- I can't recall.

Page 211

1  Q:  Okay. And you went to Jamin and met him as his
2      office? I'm looking at the -- the second
3      sentence. It says, I will get you the kits
4      free and clear ---
5  A:  Correct.
6  Q:  --- any time soon, as I was told by Jamin at
7      your office?
8  A:  Correct.
9  Q:  Okay. So when did that meeting at
10     Mr. McCallum's office occur?
11 A:  So it was sometime before the deadline of
12     November 30th. I been in communications with
13     Ben, and he was extremely frustrated, and he
14     was extremely fragile. And we were talking
15     over the phone. He made a mistake. At one
16     point, I couldn't answer his phone call, and he
17     proceed to tell Jamin -- Jamin stormed into his
18     office -- and, again, this is just his words
19     that I was communicated. Jamin had stormed
20     into his office and -- and started cussing at
21     him, telling him that he will go to jail and he
22     will fire him if he doesn't get the F'ing guns
23     in here. And he call me frantic, and I told
24     him it's okay. I'm working on them. We'll get
25     them.

Page 212

1          Ben, on his own, by all means, went ahead
2      and told Jamin the next day or day after that
3      of that first altercation that I have guns on
4      a container. Ben was the one that told Jamin
5      that I cut guns and they were coming in the
6      container. Ben then called me immediately and
7      apologized and then say, I'm sorry, man. I
8      don't want to lose my job. He -- he really
9      cuss at me. He's treating me really bad.
10     And -- and I said, don't worry. It's gonna be
11     okay. I'm gonna bring the guns.
12         So when I'm referring about all this, I
13     never denied; I never accepted. Ben was the
14     one. I never -- it never came out of my mouth
15     that I told him I have 1,000 guns in a
16     container. The first interaction of that was
17     coming from Ben at his office with Ben. And
18     Ben called me later and let me know that he was
19     the one pushing him into -- into -- into that.
20     And that happened right before the meeting in
21     PSA.
22 Q:  Okay. I want to go over to 178 right now.
23 A:  Yes.
24 Q:  Beginning of the paragraph.
25 A:  Correct.

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 213

1  Q:   Why do you say, at this point, I can't give you
2       the container information because I have other
3       customer products and we signed NDA ---
4  A:   Correct.
5  Q:   --- and have contract over that merchandise as
6       well.
7  A:   Correct. So at that point what I was trying to
8       do is I was trying to protect Ben. Ben told
9       that I have these guns coming in a container.
10      Ben asked me for help. He didn't want to be
11      fired, and he was fearing for his job. And
12      this was a constant -- it was a constant
13      recurring call from him when Jamin used to come
14      in here to his office -- so he used to go to
15      his office and tell him and treat him really
16      bad and cuss at him telling him that he will be
17      fired, that he -- all these things that Ben was
18      communicating to me.
19            What I tried to do in there is I tried to
20      help Ben to not take the complete heat. At
21      that time, Jamin, I spoke directly with him.
22      And he asked me about the containers, and I
23      told him nothing is coming, and I told him that
24      to his face. And I told him the guns are not
25      coming. I can give you your money back, or we

Page 214

1       can move forward. And at that time is when he
2       said, let's move forward.
3             This happened at his office. And I went
4       through him. I went to his office. And I told
5       him -- I flew. Because I told him, I don't
6       want to lose my company. I don't want you to
7       take my company. I come in here to tell you
8       that the Montenegro deal is over. It's not
9       happening. And I told him not any time soon.
10      That's what triggered all these amendments
11      after that. At that meeting Jamin told me,
12      bring me the guns and proceed to fist-pump me
13      right in front of the Ben at the same exact
14      time during that meeting.
15  Q:  Okay. So as I understand it, you're saying at
16      this point, I can't cannot give you the
17      container information. You're saying that
18      because you want to protect Ben?
19  A:  Jamin keeps pushing of the container
20      information, the mistake that Ben did. Ben
21      told him that I have guns in a container. I
22      didn't. Ben did. And then Ben -- of course,
23      Jamin had started telling Ben, give me the
24      contact information. I got contacts at the
25      customs. I got people that can come in here

Page 215

1       and help us. And he start pushing Ben to
2       tell -- to -- for me to tell him information
3       about that container.
4  Q:   Did you ever tell Mr. McCallum that you had
5       firearms in a container at the Port of
6       Charleston?
7  A:   Again, I go over what I say to him. I never
8       deny it; I never agreed to it. I -- I was
9       vague about it. If you read all my emails, I'm
10      completely vague. He's asking for information,
11      which I did not started the trip. Was Ben the
12      one that say that I have guns in a container.
13      Jamin start pushing him for information on the
14      container. Jamin came to me. I never
15      allegedly told him what guns were -- where they
16      were, what the container was. What I was
17      trying to do is I was trying to buy time and
18      not get Ben fired for a mistake he made.
19  Q:  So you were being deliberately vague with
20      Mr. McCallum to protect Ben?
21  A:  I told Jamin that the guns -- independently of
22      the guns of the container, the guns in
23      Montenegro were not coming. And I was
24      extremely clear with him at his office. After
25      that, if you look at the agreements, he start

Page 216

1       giving me all this notice and agreements, and
2       he want me to sign everything. I told him that
3       day that if I wanted the money back, I will
4       give him and request the money back. I told
5       him that.
6             And I told him too that Montenegro was a
7       done deal. I told him I can't get the guns
8       out. At that time there is no container.
9       There is no nothing. I came clean to him and
10      I told him nothing is coming by November the
11      30th.
12  Q:  Uh-huh.
13  A:  Nothing was coming by November the 30th. A
14      week prior my deadline, I came clean with him
15      and I had told him no guns are coming. What do
16      you want me to do?
17  Q:  Uh-huh.
18  A:  And he said, you still have your broker here?
19      I said yes. Do they still have the guns? I
20      said yes. Okay. Bring me the guns. And he
21      proceed to fist-pump me and sent me out to
22      bring the guns. But was in that office.
23  Q:  Uh-huh.
24  A:  I left that day, and I went to keep working on
25      this deal. I went to continue working on

54 (Pages 213 to 216)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 217

1    trying to get this Montenegro guns in here.  At
2    that time, he continued pressuring Ben ---
3    Q:   Uh-huh.
4    A:   --- on the container information.  And that's
5         when I told him, I cannot give you any
6         container information.  I cannot tell you
7         nothing of this.  You're chasing a phantom.  I
8         didn't say that.  But I -- in realty I already
9         told him I'm doing my best.  Later on in these
10        emails I tell him, hey, you give me the chance
11        to go get the guns.  Let me go get them.  Let
12        me go do my job.
13   Q:   Uh-huh.
14   A:   So at that time -- at that time when I met with
15        him in person, I came clean about of the
16        containers.  He asked me about the containers.
17        He personally asked me about the containers.
18        And I told him they're not coming.  There's
19        nothing coming.
20   Q:   Uh-huh.
21   A:   I told him that.  I told him --
22   MR. DEAZA:  And you can laugh, anything you want.  I
23        find it extremely disrespectful.
24   MR. D'ANTONI:  Hey.
25   MR. McCALLUM:  I'm gonna walk out here.

Page 218

1    MR. D'ANTONI:  Bye.
2    A:   But I've been absolutely honest.  I'm under
3         oath.  I understand it was a risk.  I went to
4         his office that same day before November the
5         30th.  I flew back exclusively to meet with
6         Jamin and tell him I cannot get the guns.  Do
7         you want the money back?  He say, no.  Give me
8         the guns.
9             And I also told him.  He say, when can you
10        give me the guns?  And I say, Christmas is
11        around the corner.  I can't go there in
12        December.  They take the entire month off.  The
13        Montenegrins celebrate holidays in -- in the
14        first and second week of January.  And I'm
15        gonna go see my family -- I was all over the
16        place in Columbia.
17            And then at that time I also told him the
18        Shot Show was coming, so I can't go fly back
19        in -- in January 'cause I'd been months
20        concentrating on this Montenegro deal and
21        nothing was coming.  And now my company was
22        going down.
23   Q:   Uh-huh.
24   A:   And I told him that.  I was honest with him
25        that day.  You can ask anybody.  I went there

Page 219

1    to complain to him and I say no guns are
2    coming.
3    Q:   Uh-huh.
4    A:   And he -- he didn't care.  He said, do you
5         still have the broker?  I said yes.  Do you
6         still own the guns?  I said yes.  He said,
7         okay.  Well, just bring me the guns.
8             And then we came back into this agreement.
9         That's where all these agreements start coming
10        back.  The November agreement I was not even
11        flying.  I was not traveling.  I was not doing
12        anything.  His lawyer was contacting me all the
13        time through Ben, you know, saying, hey, they
14        want you to sign this.  They want you to sign
15        that.  They start flipping the deadlines.  They
16        start moving me around.  Now it's this.  Sign
17        this.  Now it's this.  It's this.
18            And that's what you see in all those
19        documents.  And I was agreeing to everything
20        that he -- he say.  I signed every document you
21        guys put on my table, all of them.  I signed
22        them.  He wanted a date, and he just cares
23        about a date.  And when -- when they breached
24        the contract, I was given an update.  I was
25        given an update on what was going on with

Page 220

1    Serbia.  He didn't care that I switched the
2    deal.  He authorized me to do that.  He say
3    okay with Julian.  And he's on the emails,
4    okay.  Now we're gonna do the Serbia guns.
5        Again, I came back on that Zoom
6    presentation, and I told him no guns.  I can
7    only get 1,940 guns.  And I told him that.  I
8    can only get 1,940 guns.  And, yes, I use the
9    word "container" because of Ben.  But I have
10   the guns.  They exist.  That's 1,940 guns.
11       And we tried to get those guns in here.
12   I was giving him the updates.  I was going over
13   by the rule.  I was the one giving the updates.
14   I flew there.  I went in there.  I was trying
15   to do stuff.  And then in April, out of nowhere
16   they just saying, nope, we don't care about
17   anything else.  We just want our money back.
18   I say I already switched -- switched already
19   the broker to agree with me to put money in
20   another deals, holding the Montenegro open.  I
21   have the Montenegrin deal open with the broker.
22       And we pay for these all the guns thinking
23   that he was gonna stay to his word.  And he
24   didn't.  So I have -- the broker has done
25   nothing wrong.  The broker -- I told the broker

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 221

1    go to the left. He goes to the left. I tell
2    the broker go to the right. He moves to the
3    right. Hey, this is what we got to do now.
4    Okay.
5        But Montenegro guns, I came clean to him
6    in that meeting in November. And the -- the --
7    the container, those words he never -- I never
8    say, yes, I got guns cut in a container. No.
9    He went into Ben's office, and Ben told him,
10   oh, Suliban has some guns in a container. They
11   are coming, 1,000.
12 Q:  Palmetto State Armory paid you $3,760,000 for
13      these firearms, didn't they?
14 A:  I'm sorry. What?
15 Q:  Palmetto State Armory paid you $3,760,00 for
16      the firearms under the Montenegrin agreement?
17 A:  They paid $3,000,760 [sic] for Contract Number
18      1; correct?
19 Q:  You would agree with me that's a lot of money?
20 A:  I agree with you that's a lot of money.
21 Q:  So when you're going out and back and forth as
22      you were saying, what you were trying to do is
23      hold up your end of the bargain; right?
24 A:  We're still performing under that agreement up
25      to this day. I'm still performing. He wants

Page 222

1    out, he can be out. I will get the money.
2 Q:  Part of your performance was delivering on June
3      1st ---
4 A:  He didn't respect deadline. He did not respect
5      that deadline. That deadline got completely
6      violated. I never got to that deadline. I was
7      already on a 30-day notice before April. My
8      deadline was June. And originally for the
9      record it was June 2023.
10 Q:  That's how you understood it?
11 A:  No. That's what I signed.
12 Q:  That was how you understood it though; right?
13 A:  I signed with the letters and the dates that I
14      signed. I didn't invent anything. I signed
15      the documents that you guys created and the
16      deadlines.
17 Q:  Uh-huh.
18 A:  And the deadlines was moved back and forth.
19 Q:  If you can get the money back, when can you get
20      the money back?
21 A:  It's up to the broker, and it's up to -- we cut
22      some guns.
23 Q:  You told me a moment ago that you didn't cut or
24      demil any guns under the Montenegrin agreement.
25 A:  Correct.

Page 223

1 Q:  Now you're saying you did?
2 A:  No. Serbian guns. After the meeting on
3      Germany ---
4 Q:  Uh-huh.
5 A:  --- that I communicated to them again that I
6      wanted to move to the Serbian, we cut guns in
7      Serbia.
8 Q:  Uh-huh.
9 A:  So we cut guns in Serbia.
10 Q:  I'm not talking about the Serbian firearms.
11      I'm talking about the Montenegrin firearms.
12      You said that you can get a refund for those,
13      and I'm asking how quickly can you get the
14      refund.
15 A:  I cannot get the refund after the last shuffle
16      that we did after the meeting that we have,
17      that which I was in Germany and there were on
18      the Zoom call. I, again, expressed to them
19      that if they will like to move the funds to try
20      to get guns in here and wait on the Montenegro,
21      and they both agreed. Jamin and Julian agreed
22      to that.
23 Q:  Uh-huh.
24 A:  I didn't do this on my own. They were guiding
25      me through it. I -- I did the presentation,

Page 224

1    and I say, hey, not coming. Only 1,940. We
2    can get these other ones. It would be a
3    positive balance to you guys. You want to do
4    that?
5        If you read the email after that, they
6    agree to that. And I said, I will give updates
7    on Serbia. And I start giving them updates on
8    Serbia. That's what I start doing.
9        And I have the -- you've seen the records.
10   Every -- hey, it was all about Serbia. PSA
11   paid 20 percent, 20 percent only as a whole
12   stock, meaning only as a whole. When I got the
13   authorization from them when I was in that
14   meeting, I went ahead and we start cutting guns
15   in Serbia in Zastava. They never paid for
16   those guns.
17 Q:  How many Montenegrin firearms have you
18      delivered to PSA?
19 A:  Zero.
20 Q:  How much have they paid you?
21 A:  3.76. Can't recall the number completely.
22 Q:  $3,760,000?
23 A:  Sounds about right.
24 Q:  Okay. Let's keep moving with these emails
25      here. Now, you said that you were talking

56 (Pages 221 to 224)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 225

1    about the containers just to protect Ben.  So
2    I want to go to PSA_176.  And let's look at
3    this email from Ben to you.  And that's in
4    response to the December 7th email we just
5    talked about momentarily.  And it says ---
6  MR. HOPEWELL:  What page are you on?
7  MR. D'ANTONI:  I am on PSA_176.  It's ---
8  MR. HOPEWELL:  Is it a different exhibit?  'Cause
9    these are in the 200s.
10  MR. D'ANTONI:  No.  These -- we're -- we're on
11    the -- the same exhibit.  I think it's Exhibit
12    12.
13  COURT REPORTER:  The last one was 12.
14  MR. D'ANTONI:  Yes.  This is Exhibit 12.  It's the
15    last document I handed to you.  It's a
16    collection of emails.
17  MR. HOPEWELL:  Okay.  I'm still looking at 11.  It's
18    176?
19  MR. D'ANTONI:  Yes, sir.
20  MR. HOPEWELL:  I'm sorry.
21  Q:    But just before I get to that email, Mr. Deaza,
22    looking at PSA_177.  You said, I turned down a
23    purchase order from one of your competitors to
24    give you full rights on the kits.  Who was the
25    competitor that you turned down?

Page 226

1  A:    When I came to meet with Jamin ---
2  Q:    Uh-huh.
3  A:    --- I was thinking of two people that can
4    purchase those guns.
5  Q:    But that -- that's not what you said.  You
6    said ---
7  A:    Correct.
8  Q:    --- I turned down a purchase order from one of
9    your competitors.  That it happened and then
10    you turned it down.  So I'm asking which
11    one ---
12  A:    No.  I -- I -- I -- probably I misspell that.
13    What I meant was after that I got the -- Jamin
14    that didn't wanted the money, then that's what
15    I meant, that I turned down.  Like, I shut it
16    off, that I was not looking to give him the
17    money.
18  Q:    Not looking to give the competitor the money?
19  A:    No.  Okay.  And this is a English problem for
20    sure.
21  Q:    Sure.
22  A:    What I meant was that at the time that I met
23    with Jamin ---
24  Q:    Uh-huh.
25  A:    --- and even up to today, those guns are

Page 227

1    extremely valuable.  And there is a lot of
2    people wait in the States that wants those
3    guns.  There is a lot of people, a lot of
4    competitors of PSA.  And that's what I meant,
5    that I'm not -- I'm not shopping around.  I'm
6    not doing anything.  I will stay loyal to PSA
7    to bring the guns to him.  That's what I meant.
8  Q:    So, again, you're -- you're saying I turned
9    down ---
10  A:    Correct.
11  Q:    --- a purchase order.  But you never received
12    a purchase order from a competitor; right?
13  A:    Correct.  That's a total mistake on my part, an
14    English mistake.
15  Q:    And you just told me a moment ago that, you
16    know, you -- there is no way that you can get
17    the Montenegrin weapons.  So why would you be
18    able to offer them to a competitor?
19  A:    When I say there's no way I can bring the guns
20    on their deadlines that they set for me.
21    That's why the second agreement was changed so
22    many times, because Jamin was trying to
23    pinpoint me to a date.
24  Q:    And it was changed by extending the deadline;
25    right?

Page 228

1  A:    Correct.  'Cause I told him no, that I don't
2    think it's possible.  I don't think we can do
3    it and he'll be okay.  What about this?
4    What about this?  What about this?  What about
5    this?  It was always -- the documents of the
6    extension came from him trying to pinpoint a
7    date.  The last date agreement was June 1st of
8    2022, the last one that we signed; correct?
9  Q:    Uh-huh.
10  A:    So that is the one that ultimately controls;
11    right?  Because there is many second agreements
12    that were signed during the time in which they
13    moved the line of the -- of the date that I
14    have to bring the guns.
15  Q:    Are you talking about the amendment with the
16    June 1st, 2022, deadline?
17  A:    I'm talking about the amendment that has
18    June 1st, 2023.  I'm talking about the
19    amendment that has June 1st, 2022.  I'm talking
20    about all the amendments that were signed after
21    my meeting with him in November, all these
22    amendments which is in the period of like few
23    weeks.  In between that he continued amending
24    the -- the -- the contracts.
25    And I'm -- at that time, I'm not even

1230 Richland Street | Columbia, SC 29201
(803) 252-3445 | (800) 822-0896

Page 229

1  going there 'cause he knows.  I expressed to
2  him that January I'll be at Shot Show.  And I
3  was not able to travel to Montenegro.  And I
4  expressed that at my meeting on November the
5  30th.  I told him December didn't work there.
6  We will be wasting our time just sitting in
7  there waiting for what?
8       And I had told him and I need January
9  because my company need it.  We have a booth at
10  the Shot Show.  So I couldn't be able go back
11  in there and -- and perform literally myself
12  going in there with my brother.  We -- and then
13  stay there because I have things that needed to
14  be done in here and because the government, it
15  wasn't shut down anyway.
16       So by end of January -- right? -- is when
17  I am about to travel there, and it's when he
18  start sending the second amendments and he
19  start revising them and he start going over
20  that.  After November 30th he's the one
21  changing the dates as we go.  And he did it all
22  the way to the end.  June 1st, 2022, was my
23  deadline to bring those guns.  That was my
24  deadline.  He violated that deadline.  He
25  breached the contract on that deadline.  He

Page 230

1  broke the contract in April.
2       He sent me a 30-day notice.  My money --
3  the guns or my money.  He knew I could not do
4  that.  He knew I can't do that.  So that was up
5  to him.  He breached the contract.  And the
6  excuse that he put on the email the reason why
7  they think they deserve the money, I present it
8  to you guys during the meeting last time I was
9  in here.
10       I never, by any means, told him that he
11  has to pay for demilling the kits, never.  And
12  they turn around and they say that is the
13  reason why we want out.  And I can't find
14  anywhere on those emails where I even
15  mentioning that he has to cut the guns or they
16  have -- PSA has to pay for demilling the guns.
17  Q:  One moment.
18  A:  May -- may I have some water, please?
19  MR. WILLOUGHBY:  Let's go off the record.  Go off
20       the record.
21  VIDEOGRAPHER:  We're off the record at 4:13.
22       (A break was taken from 4:13 p.m. until 4:22 p.m.)
23  VIDEOGRAPHER:  Back on the record at 4:22.
24  Q:  Okay, Mr. Deaza.  What I want to do is just
25       kind of give a -- for the benefit for the group

Page 231

1  here kind of the -- the -- the way ahead here.
2  What I want to do is I want to get through this
3  last exhibit.  I believe it's Exhibit 12 that
4  we put in front of -- front of you, this email
5  exchange.  We'll go through that.  And
6  depending on how long that is, that -- this
7  might be the last exhibit before we adjourn for
8  the day.  And we'll leave the -- the deposition
9  open and we'll settle on another day to resume
10  it with your -- with your counsel, okay?
11       So back to Exhibit 12.  As I understood
12  your -- your explanation about containers with
13  firearms being at the Port of Charleston, you
14  said you would neither confirm or deny that
15  with Palmetto State Armory because of you were
16  protecting Mr. Fortin; is that correct?
17  A:  I say I was trying to be elusive, not
18       confirming, not denying.
19  Q:  Okay.
20  A:  Correct.
21  Q:  Elusive, not confirming, not denying?
22  A:  Correct.
23  Q:  Okay.  Okay.  Let's go to PSA_0176, the bottom
24       email there.  And this is in response to the
25       December 7th, 2021, email that -- that we've

Page 232

1  talked about.
2  A:  Uh-huh.
3  Q:  And it's Mr. Fortin, and he's writing to
4  you ---
5  A:  Uh-huh.
6  Q:  --- and he says, you know, thank you for the
7  update.  I just want to touch base and see
8  where you -- you are at at this one.  Jamin and
9  PSA have extensive contacts at the Charleston
10  ports ---
11  A:  Uh-huh.
12  Q:  --- and they could help get the containers
13  pushed through.  They are willing to help with
14  that.  I'm not sure when exactly you'll be back
15  from your travels, but please let me know as
16  soon as you can.  We can jump on a call
17  sometime this week with Jamin and get it
18  resolved.
19       And Mr. Fortin, when he's talking about
20  having extensive contacts at the Port of
21  Charleston, he's referencing what you said in
22  the prior email ---
23  A:  Uh-huh.
24  Q:  --- where you remarked at this point, I can't
25  give you the container information because I

58 (Pages 229 to 232)

Page 233

1    have customer products and we signed NDA and
2    have contracts with the merchandise as well.
3    Is that true?
4  A:  No.
5  Q:  What is he referencing then when he tells you
6    that Jamin and PSA have extensive contacts in
7    the Charleston ports and they can help get the
8    containers pushed through?
9  A:  He called me before he sent this email.  And he
10   aid, I'm gonna send you an email about Jamin
11   keep pressing me for the container numbers.  So
12   I'm gonna send you an email, and just -- just
13   reply.  And he's referring as when he told
14   Jamin that I had guns in a container.  He's
15   referring to that.
16 Q:  So ---
17 A:  About in our original conversation.
18 Q:  So you ---
19 A:  At his office.  I'm sorry.
20 Q:  Please continue.
21 A:  I'm done.
22 Q:  So you and Mr. Fortin -- your testimony is that
23   you and Mr. Fortin are -- are speaking.  And,
24   you know, in order for you to, you know,
25   protect him, you're kind of keeping up with

Page 234

1    this fiction that the weapons or some of the
2    weapons are in containers at the Port of
3    Charleston; is that correct?
4  A:  No, no.  Not like that.
5  Q:  Okay.  So when you're speaking offline -- you
6    know, and I mean -- what I mean by offline,
7    we're speaking by telephone ---
8  A:  Telephone, correct.
9  Q:  --- to Mr. Fortin.
10 A:  Yes, yes.
11 Q:  You're saying that -- that Mr. Fortin
12   contracted you and he said, I want to put in an
13   email to you; I want to reference the
14   containers being at the Charleston ports?  And
15   you agreed to that?
16 A:  No.  Not that way.
17 Q:  How -- how did it happen then?
18 A:  He -- Jamin keeps pressuring going to his
19   office over and over again.  And then he calls
20   me and say, I -- I need -- I'm gonna send you
21   an email about the -- the containers.
22 Q:  And this is Ben saying he's gonna send you an
23   email ---
24 A:  Ben, correct.
25 Q:  --- about the containers?

Page 235

1  A:  He -- he -- he feels threatened by Jamin ---
2  Q:  Uh-huh.
3  A:  --- and Jamin keeps telling him that he is in
4    the middle.  Because I told Ben that I want to
5    deal directly with Jamin.  And he is bullying
6    him and putting his job in jeopardy multiple
7    times because this deal is not coming fast
8    enough.
9       So when he calls me, he's worried about
10   his job.  He doesn't want to lose the job.
11   Jamin told him that he's the reason why I start
12   doing business with them, and he uses a lot of
13   different languages -- this is what Ben tells
14   me.  And so that's what leads to these emails.
15 Q:  So, again, looking at the December 13th
16   email ---
17 A:  Uh-huh.
18 Q:  --- from Ben to you, if this was really about
19   protecting Ben from Jamin, why is Jamin not
20   included on this communication?  And I mean,
21   Jamin, Mr. McCallum -- Mr. Jamin McCallum.
22 A:  I don't understand the question.
23 Q:  So you've explained to me that you and Ben
24   spoke ---
25 A:  Yeah.

Page 236

1  Q:  --- by telephone and that Ben told you he
2    wanted to put information in the body of an
3    email that dealt with containers having
4    firearms being at the Port of Charleston;
5    right?
6  A:  I'm sorry.  I was zooming out.  I was reading.
7    What did you say?
8  Q:  So Ben Fortin contacted you?
9  A:  Correct.
10 Q:  And he said, Mr. Deaza, I want to be able to
11   talk about, in some way, weapons being in
12   containers at the Port of Charleston.  He -- he
13   said something of that effect to you; is that
14   correct?
15 A:  Not that way.
16 Q:  How did he -- how did he say it exactly?
17 A:  Before -- way before my meeting with Jamin when
18   he first say it when -- when Jamin is come to
19   his office one morning and told him, like, what
20   the hell -- I can't use exact words, and I
21   don't want to exaggerate.
22 Q:  Sure.
23 A:  He felt threatened by Jamin every time, and he
24   was completely, I would assume, fragile on one
25   of the occasions when Jamin walks into the

59 (Pages 233 to 236)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

---

Page 237

1   office.  Ben says, well, Suliban had them --
2   had 1,000 AKs in a container on the way here.
3   This was prior our meeting of November the
4   30th.  This was prior all this.
5   Q:   Okay.
6   A:   So there was multiple communications over the
7        phone and back and forth about containers and
8        what to say, what not to say, and -- and --
9        and -- with Ben because he was extremely
10       worried that Jamin will fire him on the spot if
11       he knew that was Jamin the one that says that
12       Suliban got the -- got the guns in the
13       containers.
14  Q:   Okay.  So --
15            (Off-the-record discussion.)
16  Q:   So just touching on -- on -- on what you've
17       said, your testimony is that it was Ben who
18       told Jamin thousands of firearms were on ---
19  A:   1,000.
20  Q:   --- containers -- 1,000.
21  A:   Uh-huh.
22  Q:   --- were on containers being shipped to the
23       Port of Charleston?
24  A:   In one container.
25  Q:   And then -- because that wasn't true; correct?

---

Page 238

1   A:   Correct.
2   Q:   Ben -- your testimony is Ben then went to you
3        and told you he wanted to send you an email
4        that referenced in some way the shipment of
5        those weapons to the Port of Charleston; is
6        that correct?
7   A:   No.  It didn't happen that way.  That's what
8        I'm trying to explain to you.  This was ---
9   Q:   Yeah.  I'm trying to work it out.  Trying to
10       work it out.
11  A:   Yeah.  This was multiple phone calls ---
12  Q:   Uh-huh.
13  A:   --- that we were having back and forth.  On one
14       of those phone calls, he apologized to me and
15       told me that he F'd up and then he told Jamin
16       that some containers were coming with some
17       guns.
18  Q:   So when he says in his December 13th ---
19  A:   Correct.
20  Q:   --- email to you ---
21  A:   Uh-huh.
22  Q:   --- Jamin and PSA had extensive contacts in the
23       Charleston ports and they could help get the
24       containers pushed through ---
25  A:   Uh-huh.

---

Page 239

1   Q:   --- what does he mean there?
2   A:   At that time, every time that -- and this is,
3        again, from Ben what I had communicated to
4        him -- every time that Ben would write an email
5        or call me is by orders or Jamin.  Jamin would
6        come through the office and say, did you call
7        Suliban?  Send an email to Suliban.  I want to
8        know what's going on.  Where the guns are?
9        What are you doing?  You're responsible.  You
10       were the one that -- the reason why we're doing
11       this business.  You're the one in the charge.
12       You need to get the guns from him.  And he was
13       just like that.
14            So it wasn't one email.  It wasn't one
15       phone call, is what I'm trying to explain.  It
16       was from the moment that he made that mistake,
17       it become -- it became like a -- like a
18       snowball effect, which Jamin was fixated on
19       having a number on the containers.  He was
20       fixated on getting a number.  In the meeting
21       when we met in November, he asked me that.  And
22       I told him there are not coming.  There's none.
23       At that point, meaning like, okay, I don't even
24       know if they're coming.  He asked me if these
25       guns were on the way or something he said.

---

Page 240

1    Right now the Montenegro deal is stopped, and
2    I can't do nothing about it.
3         We can do two things.  And, again, I
4    rephrase it to him.  We can -- you can get your
5    money back, or we can continue and I give you
6    the guns.  And I continued performing the guns.
7    I go back next year.  I will need you to give
8    me December.  I will need you to give me
9    January.  And that was my explanation to it.
10   I did not get in depth on the containers.  He
11   at the beginning was extremely upset with me,
12   which all reasons.  But then towards the end
13   when I gave him the options, he said, bring me
14   the guns.
15        We didn't talk more about containers.  Why
16   he did not let me leave that day that we met
17   with the container information?  He just wanted
18   the guns.  He wanted the guns.
19        And the emails that you're referring to
20   when he's sending these emails, that happened
21   over a period of time where Jamin used to come
22   to his office daily multiple times asking him
23   about where is his guns.  Where's the
24   container?  Have him send me the container.  So
25   Ben has no choice to call me first and say,

---

60  (Pages 237 to 240)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 241

1    hey, man, I'm gonna send you an email. Just
2    help me out, kind of thing. And I would be
3    like, okay. Not a problem. Right? Because in
4    realty, I was trying to get the guns anyway.
5  Q:   Uh-huh.
6  A:   See what I'm saying? But the container story
7    was originated at Ben's office when Ben told
8    Jamin that Suliban has some guns inside the
9    containers. I did not started that. So all
10    these emails that you're reading is a ball --
11    snowball effect on what just happened when he
12    first told lie.
13  Q:   Uh-huh. You said in your meeting -- and you
14    testified that in the November 7th meeting with
15    Mr. McCallum that you told him the -- the
16    Montenegrin firearms were not coming. So why
17    engage in this rouse about ---
18  A:   Uh-huh.
19  Q:   --- firearms being at the Port of Charleston?
20    Why not just tell Mr. McCallum, I already told
21    you. The firearms were not coming?
22  A:   That's what I did. When I say the guns
23    were not coming -- I just want to make sure
24    we're clear. They were not coming at the
25    original dateline, November 30th. That's why

Page 242

1    I flew a week before to communicate that to
2    him. If you read the first agreement --
3    right? -- the first amendment to the agreement,
4    I have until November 30th or I will lose the
5    company. And when I came back to US to meet
6    with Jamin is because I understand what I
7    signed. And I told Jamin I'm here. I don't
8    want to lose the company. I'm here, and this
9    is the situation. But I will not be able to
10    bring the guns by June -- by November 30th. So
11    when I say that I won't be able to complete the
12    transaction was by the -- by the day that we
13    set on that contract.
14  Q:   Uh-huh.
15  A:   I never -- I never -- I never say, like, they
16    will never come. I say by the date that we set
17    on that document that I signed -- right? --
18    that says November 30th.
19  Q:   Uh-huh.
20  A:   There are not coming. And I told him, I'm not
21    losing my company.
22  Q:   Uh-huh.
23  A:   We can get the money back, or we can get the
24    guns, but I need more time. So there was no
25    discussions or anything else.

Page 243

1  Q:   Uh-huh.
2  A:   He's aware of it. I asked him. I told him, I
3    don't want to lose the company. His answer
4    was, I don't care about your company. That was
5    his answer. I do. I flew directly. I have a
6    airplane ticket directly from Montenegro to his
7    office directly to tell him that by
8    November 30th they were not coming; I can't get
9    them; I -- government shut down; I can't get
10    them. I -- it was impossible at that time by
11    November 30th.
12    So when I'm referring to deadlines, I'm
13    referring to deadlines that we agree and set
14    and under the contract. I'm not saying
15    futuristic. I'm not saying no. By the
16    contract that I signed, I say I will bring the
17    guns by November 30th. I put my stock on the
18    line. That's what I signed. That's what we
19    write. When I came back, I told him one week
20    before the deadline.
21    'Cause my plan was, if he wanted the money
22    back, I was planning to call everybody I know
23    in the industry to see who wanted these guns.
24    Or at the same time, I already talked to the
25    broker and we were bouncing ideas on the

Page 244

1    phones. He did say it would take a while. So
2    I -- that's why I came, to communication that
3    to him, that either we can ask for the money
4    back -- right? -- but I was not planning to
5    lose the company at that point November the
6    30th.
7  Q:   But the truth here is that, you know, when we
8    go through your bank records, you already spent
9    a lot of the money that Palmetto State Armory
10    deposited into your bank account; right?
11  A:   The truth is that I used the funds that
12    Palmetto already gave me to purchase
13    100 percent of the product on the Montenegro
14    deal.
15  Q:   And you used a large portion of those funds for
16    Ikon's own benefit and your own; correct?
17  A:   That's -- that's wrong.
18  Q:   That's what? I didn't hear what you ---
19  A:   Yeah. Okay. So I'm gonna -- so what's your
20    question again?
21  Q:   My question is: That isn't it true that you
22    used a large amount of the deposits made by
23    Palmetto State Armory, the 3,760,000 for the
24    benefit of Ikon Weapons?
25  A:   As I'm operating budget, every invoice, every

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

---

Page 245

1  check with receipts, it goes to the bank
2  account that you have the records from.
3  Q:  Uh-huh.
4  A:  Every invoice, not only Palmetto State,
5  hkparts.net, Atlantic Farms, all the people I
6  do business with and they give me checks or
7  wires.  They all go to the same account.  It's
8  Ikon Weapons' operating account.  So the money
9  went there.  From there immediately after, as
10  the records show, I paid for what I sold.  I
11  pay 100 percent of the invoice to secure the
12  guns.
13  Q:  The money also went to a lot of cash
14  withdrawals for you; correct?  We went through
15  some of those in the bank account statements.
16  A:  It's -- It's not PSA's money.  It's inside a
17  pool of money where I'm operating regularly
18  from.
19  Q:  So did you feel free to use PSA's deposits as
20  you saw fit?
21  A:  That's not true.
22  Q:  Well, you were making, let's see, a purchase --
23  just over the ones we went over, you've spent
24  $150,000 five days after the purchase with
25  Automatics & Machinery; correct?

Page 246

1  A:  The company purchased some machines that we'd
2  been looking at out of the funds of the
3  operating account.
4  Q:  And those funds in the operating account were
5  boosted by the two very large deposits by
6  Palmetto State Armory; right?
7  A:  Those funds were boosted by many transactions
8  I got ---
9  Q:  So did you ---
10  A:  --- during -- during the -- during that
11  operating period.
12  Q:  So is it your testimony that over the course of
13  2021 after the deposits were made by Palmetto
14  State Armory that Ikon Weapons could have
15  afforded to incur all of the expenses it
16  incurred in terms of acquiring machinery, in
17  terms of making improvements to its footprint,
18  in terms of acquiring inventory, that it could
19  have done all those things absent the PSA
20  deposits?
21  A:  We -- we started doing those before PSA was
22  doing -- before the deal with PSA.  And to
23  answer the question, I will be guessing.  I
24  will be guessing.  Because you're asking me to
25  guess if I don't have the funds from PSA, we'll

Page 247

1  be able to do that?  Well we were selling.  Our
2  sales are increasing.
3  Q:  Well, you're not guessing.  You're the --
4  you're chief ---
5  A:  I would be guessing.
6  Q:  --- executive officer of the company.  You have
7  access to its financials.  Surely you would
8  know whether or not if you got -- if you didn't
9  get the two deposits from PSA whether you would
10  have had sufficient funds to cover all the
11  expenses you made in 2021?
12  A:  I don't understand the question.  What's the
13  specific question?
14  Q:  All right.  Just -- we're getting close to the
15  end here.  It's getting close to 5:00 o'clock,
16  and we've been doing this deposition for some
17  time now.  So just before we leave, I just want
18  to get a little bit of additional information
19  from you.
20       In terms of bank accounts, is -- is the --
21  is the bank account that -- that we have here
22  with First Bank 7790, is that the only bank
23  account for Ikon?
24  A:  No.
25  Q:  Is there another bank account?

Page 248

1  A:  Yes.
2  Q:  Where is it?
3  A:  Bank of America.
4  Q:  Do you have a personal bank account?
5  A:  No.
6  Q:  So do you debit all your personal expenses
7  through Ikon Weapons?
8  A:  No.
9  Q:  Without your own bank account, how do you --
10  how do you purchase things, buy things?  How do
11  you write checks?
12  A:  Personal?
13  Q:  Yeah.  I mean, do you have a bank account in
14  your own name, Suliban Deaza?
15  A:  No, I don't.
16  Q:  Do you have a joint account with your wife?
17  A:  No.
18  Q:  So the only bank accounts where you have access
19  to money is the Ikon Weapons bank account with
20  First Bank; right?
21  A:  Correct.
22  Q:  The second Ikon Weapons account with Bank of
23  America?
24  A:  Correct.
25  Q:  And does 3DC Projects, LLC, have a bank

62 (Pages 245 to 248)

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 249

1    account?
2  A:  Correct.
3  Q:  Okay.  Where does it bank?
4  A:  Bank of America.
5  Q:  Do you have account numbers for those Bank of
6       America accounts?
7  A:  Not at this time.
8  Q:  Okay.  That's something you could get though;
9       right?
10 A:  Yes.
11 Q:  Do you have any other bank accounts, whether in
12      your name or in the name of any corporate
13      entity that you have an ownership interest in,
14      that you haven't identified yet?
15 A:  The one I have with my parents, it's a senior
16      account.  I think you guys are already ---
17 Q:  Yes.
18 A:  --- subpoenaed that account.
19 Q:  That's account with First Bank; right?
20 A:  Yeah.
21 Q:  Where does your -- your salary, your checks
22      from Ikon or 3DC Projects, where do they get
23      deposited?
24 A:  They -- with Ikon ---
25 Q:  So mentioned that Ikon pays you 1,000 bucks ---

Page 250

1  A:  Correct.  Yeah, correct.
2  Q:  Okay.  Where do you deposit that money?
3  A:  That money goes to -- right now we're just
4       setting it up because we have a new system.  So
5       I'm just being added to the payroll.  So I
6       don't have an account yet set up on that.
7  Q:  So you're --
8            (Off-the-record discussion.)
9  Q:  You testified earlier today that you got about
10      $1,000 a week in 2021.  Where did that money
11      go?
12 A:  No.  I didn't say that.
13 Q:  So you didn't -- you didn't get paid a salary
14      in 2021 from Ikon?
15 A:  No.  My apology if I misunderstand -- that you
16      guys misunderstand; no.
17 Q:  So you made no money from Ikon in 2021?
18 A:  No.  I get paid dividends in K form, in the
19      form of a tax.
20 Q:  And where does that money go?  Where is it
21      deposited when it's -- the payment's made?
22 A:  I don't understand the question.  From what?
23 Q:  You said that you got paid by Ikon and I'm just
24      wondering ---
25 A:  No.  I say I got a K form.

Page 251

1  Q:  Uh-huh.  Do you get paid any salary from 3DC
2       Projects, LLC?
3  A:  No.  Not technically.
4  Q:  What do you mean, not technically?
5  A:  I do withdrawals from 3DC.
6  Q:  So you'll withdraw from the CD -- 3DC bank
7       account to ---
8  A:  Correct.
9  Q:  --- cover personal expenses and things?
10 A:  Yes.
11 Q:  Okay.  And will -- you'll -- you'll withdraw
12      from the Ikon Weapons, LLC, bank account when
13      you need to cover personal expenses?
14 A:  No.
15 Q:  You don't?
16 A:  No.
17 Q:  Okay.  You don't use the -- does -- does Ikon
18      Weapons have a credit card?
19 A:  Yes.
20 Q:  Okay.  Do you use the Ikon Weapons credit card
21      for personal expenses?
22 A:  No.
23 Q:  Okay.  So the only -- your testimony is that
24      the only account you use to cover your personal
25      expenses is the 3DC Projects, LLC?

Page 252

1  A:  It's a -- it's a single-owner LLC.
2  Q:  Uh-huh.
3  A:  So when I do my taxes, where you guys have a
4       copy of it, I get paid from there.
5  Q:  Where does your -- where does your wife bank?
6  A:  She -- I don't think she has one right now.
7  Q:  Your wife doesn't have a bank account?
8  A:  I can't recall.  We -- she was with SouthState
9       at one point.  And when we were living in
10      Florence and -- something happened.  I will
11      have to ask her.  I -- I honestly don't know.
12 Q:  You don't know whether your wife has a bank
13      account?
14 A:  No.
15 Q:  Is that something you can find out?
16 A:  Sure.
17 Q:  Is that something you can communicate to
18      Mr. Hopewell?
19 A:  Yes.
20 Q:  The Range Rover you came in with today, is that
21      a company car?
22 A:  No.
23 Q:  You own that personally?
24 A:  No.  I have a loan.
25 Q:  You have a loan for it?

1230 Richland Street | Columbia, SC 29201
(803) 252-3445 | (800) 822-0896

CREEL COURT REPORTING, INC.

Deaza, Suliban - Vol. I

Page 253

1   A:   Uh-huh.
2   Q:   You purchased it with an auto loan?
3   A:   Yes.
4   Q:   So it's not leased?
5   A:   No.
6   Q:   Okay.  When did you purchase it?
7   A:   Beginning of this year.  I can't recall.
8   Q:   And do you have a monthly payment on the car?
9   A:   Yes.
10  Q:   And where is the monthly payment made from?
11       What bank account?
12  A:   3DC Projects.
13  Q:   But it's not a 3DC Projects company car;
14       correct?
15  A:   Correct.
16  Q:   And you said you think you purchased it in
17       January of 2021?
18  A:   I am not sure.
19  Q:   How much did it cost?
20  A:   I did a trade-in.  I can't remember.
21  Q:   You don't know remember how much your car cost
22       that you purchased in January 2021?
23  A:   No.  Don't know the exact amount; correct.
24  Q:   You got a ballpark amount?
25  A:   Around 40 on that.

Page 254

1   Q:   You said it cost you about $40,000?
2   A:   Uh-huh.
3   Q:   Did you pay that auto loan off with the
4        $40,659.14 cash withdrawal you made from the
5        Ikon bank account on June 16th?
6   A:   No.
7   Q:   What was that cash withdrawal for?
8   A:   I already answered that.
9   Q:   You don't know; right?
10  A:   I don't remember; yes.
11  MR. D'ANTONI:  Okay.  At this time, we'd like to go
12       ahead and temporarily adjourn this deposition.
13       We'll leave it open to be continued at ---
14  MR. WILLOUGHBY:  Tuesday the 13th.
15  MR. D'ANTONI:  --- Tuesday the 13th, I think is what
16       we all ---
17  MR. WILLOUGHBY:  At 9:30 right here.
18  MR. D'ANTONI:  It will begin at 9:30 right here.
19  MR. DEAZA:  I appreciate it.
20  VIDEOGRAPHER:  The deposition of 30(b)(6) Suliban
21       Esteban Deaza, witness for Ikon Weapons, LLC,
22       is adjourned until a later date.  We're off the
23       record at 4:50.
24  (There being no further questions, the video
25  deposition temporarily adjourned at 4:50 p.m.)

64  (Pages 253 to 254)