UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | |
|---|---|
| IN RE:<br><br>IKON WEAPONS, LLC,<br><br>　　　　　　　Debtor. | CASE NO. 22-10507<br>CHAPTER 11 |
| PALMETTO STATE ARMORY, LLC,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>IKON WEAPONS, LLC,<br><br>　　　　　Defendant. | ADV. PROC. NO.: 22-02021 |

## PALMETTO STATE ARMORY, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS CLAIM FOR DECLARATORY JUDGMENT AND MOTION FOR PRELIMINARY INJUNCTION

Palmetto State Armory, LLC ("Plaintiff"), by and through counsel, and pursuant to Rules 7007 and 9013 of the Federal Rules of Bankruptcy Procedure and Rules 7007-1 and 9013-1 of the local Rules of Practice and Procedure of the United States Bankruptcy Court for the Middle District of North Carolina, hereby submits this Memorandum of Law in support of its motion for injunctive relief and claim for declaratory judgment asserted in its Complaint filed on September 21, 2022, against Ikon Weapons, LLC ("Debtor") and respectfully shows the Court as follows:

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

1.    Plaintiff adopts and incorporates herein by reference all facts and allegations, including footnotes, stated in its Complaint,[1] as well as all exhibits attached thereto.[2]

2.    June 16, 2021: Plaintiff and Debtor entered into the Original Agreement whereby Debtor agreed to sell, and Plaintiff agreed to purchase, 8,000 Yugoslavian AK-47 firearms kits from Debtor for a purchase price of $3,760,000.00. This transaction was referred to as the Montenegrin Agreement. *See* Compl. Ex. A (the "Common Pleas Complaint") ¶ 6 & Ex. A thereto; Compl. Ex. B (the "Common Pleas Answer") ¶ 6.[3] The firearms were represented to be new, old stock.  Plaintiff agreed to entrust 50% of this amount to Debtor to secure Debtor's delivery of the firearms kits.

3.    June 17, 2021: The parties amended the Original Agreement to provide that Plaintiff would, as a condition precedent to Plaintiff receiving the firearms kits, entrust 100% of the purchase price with Debtor rather than the 50% initially agreed to in the Original Agreement. Common Pleas Compl. ¶ 7 & Ex. B thereto; Common Pleas Answer ¶ 7. In exchange for this material alteration to the Original Agreement, Deaza pledged to transfer to Plaintiff 100% of the

---

[1] All defined terms in the Complaint that appear herein, have the same meanings set forth in the Complaint.

[2] Plaintiff hereby reserves the right to submit further declarations or affidavits regarding this Memorandum of Law and/or its Complaint in accordance with Rules 803(6), 902(11), and 902(12) of the Federal Rules of Evidence as made applicable to this case pursuant to Rule 9017 of the Federal Rules of Bankruptcy Procedure. Plaintiff also respectfully requests the right of providing the live testimony of witnesses at the hearing now scheduled for October 20, 2022.

[3] Exhibit A to the Complaint filed in this proceeding is a Complaint that Plaintiff filed in the Court of Common Pleas in Lexington County, South Carolina against the Debtor and its principal, Mr. Suliban Deaza, prior to the initiation of this proceeding (referred to throughout as the "Common Pleas Complaint"). Exhibit B to the Complaint filed in this proceeding is those Defendants' Amended Answer to the Common Pleas Complaint (referred to throughout as the "Common Pleas Answer"), wherein the Debtor made admissions which are relevant to these proceedings. Plaintiff requests that the Court take judicial notice of these documents as they are matters of public record.

stock in Debtor, "if for any reason the Buyer does not receive the products FOB Charleston, SC on or before November 30th, 2021, or receive a full refund of all monies paid by the same date." Common Pleas Compl. Ex. B at 1.

4.    June 17, 2021:  Plaintiff deposited 50% of the purchase price with Debtor in the amount of $1,880,000.00 (the "First Entrusted Amount"). Compl. Ex. C, First Bank Records, at 3.

5.    August 20, 2021:  After Deaza provided photographs of products he represented to be "his eyes on" the firearms that he was prepared to acquire once Plaintiff delivered the remainder of the purchase price, Plaintiff deposited the remaining 50% of the purchase price with Debtor in the amount of $1,880,000.00 (the "Second Entrusted Amount"). Compl. Ex. C at 11. Accordingly, as of this date, Plaintiff had entrusted the full purchase price of $3,760,000.00 with Debtor for the firearms kids under the Montenegrin Agreement.

6.    August 31, 2021:  Ikon through Deaza represented that it could acquire additional firearms kits in the country of Serbia. Based upon these representations, Plaintiff entered into a second transaction with Debtor whereby Plaintiff agreed to purchase from Debtor an additional number of firearms kits (the "Second Agreement" or "Serbia Agreement"). Common Pleas Compl. ¶ 8 & Ex. C thereto; Common Pleas Answer ¶ 8. Under the terms of the Second Agreement, Plaintiff agreed to pay Debtor $3,722,520.00 for these additional firearms kits and further agreed to advance 20% of the purchase price ($744,504.00) in order to secure the Debtor's performance of the Second Agreement. *Id.*

7.    September 1, 2021:  Plaintiff entrusted $744,504.00 with Debtor by depositing such amount into Debtor's bank account in accordance with the terms of the Second Agreement. Compl. Ex. C at 15.

8.    November 6, 2021:  After continued delays by Debtor in delivering the contracted-

3

for firearms kits, Debtor requested and Plaintiff agreed, based upon representations made by Deaza of imminent performance, to amend the Original Agreement to extend the delivery date to March 1, 2022. Common Pleas Compl. ¶ 9 & Ex. D thereto; Common Pleas Answer ¶ 9.[4]

9.    February 28, 2022:  Due to further delays by Debtor and based upon the request of and representations made by Deaza, Plaintiff agreed to extend the delivery date one final time to June 1, 2022, and to pay the cost of freight (which was not included in the Original Agreement). Common Pleas Compl. ¶ 9 & Ex. E thereto; Common Pleas Answer ¶ 9. In exchange for Plaintiff's agreement to this final delivery deadline, Deaza agreed in writing to personally guarantee the timely performance of both the Original Agreement and the Second Agreement and to be personally liable to Plaintiff in the event of any default for whatever deficiency Plaintiff should experience. *Id.*

10.    June 1, 2022:  Debtor defaulted under the agreements by failing to deliver the firearms kits by this final deadline.

11.    June 2, 2022:  Plaintiff sent a notice of default to Debtor and Deaza and demanded that the default be cured by July 2, 2022, either by delivering the products as agreed or by returning the full amount of all deposits entrusted by Plaintiff. *See* Common Pleas Compl. Ex. E.

12.    July 2, 2022:  Debtor and Deaza failed to cure their default.

**Common Pleas Action**

13.    July 6, 2022: Plaintiff initiated its South Carolina Common Pleas Action against Debtor and Deaza claiming, among other things, breach of contract, fraud, unjust enrichment,

---

[4] This document contains a scrivener's error denoting the date for delivery as March 1, 2023. In fact, all parties understood and agreed that the new delivery date for the firearms kits under this amendment was March 1, 2022, not March 1, 2023. This understanding is plainly demonstrated both in email communications between the parties and by the final amendment entered into between the parties on February 28, 2022, which extended the delivery date "for a period not exceeding ninety (90) days through June 1, 2022." *See* Common Pleas Compl. Ex. E.

conversion, and for an accounting.

14.     August 24, 2022:  Debtor and Deaza filed an Amended Answer in which they admitted that the agreements between the parties, as amended, are valid and binding and that Plaintiff paid the full amount of the deposits called for in those agreements. Common Pleas Answer ¶¶ 46, 64. Debtor and Deaza further admitted that they have neither (1) performed the agreements nor (2) returned the funds that Plaintiff entrusted. *Id.* ¶¶ 41 & 42, 48, 54.

15.     August 25, 2022: Plaintiff began a deposition of Debtor in which Deaza testified on Debtor's behalf.  During the deposition, Deaza made statements indicating that Debtor did not intend to deliver to Plaintiff the firearms that were purchased with Plaintiff's entrusted funds. *See* Compl. Ex. E, Rule 30(b)(6) Deposition of Debtor, at 57-59. Deaza further asserted that Debtor is now the rightful owner of the firearms that it acquired for Plaintiff and with Plaintiff's funds, and that Debtor is free to dispose of the firearms as it sees fit and keep the money. *See id.*

16.     August 31, 2022:  Plaintiff filed a Motion for Preliminary Injunction ("MPI") requesting that Debtor and Deaza be enjoined from selling, transferring, disposing of, or encumbering certain assets which rightfully belong to Plaintiff, including, but not limited to, the funds that Plaintiff entrusted with Debtor and any firearms which were purchased with Plaintiff's entrusted funds.

17.     September 2, 2022:  The Court's scheduled status conference on Plaintiff's MPI was to begin at 10 a.m.  However, at 8:48 a.m. that morning, Debtor filed its Voluntary Petition in this case, and then at 9:36 a.m. filed a Motion to Extend the Automatic Stay to Deaza.

### Lead Bankruptcy Case

18.     September 6, 2022:  Debtor filed its first day motions requesting, among other relief, that it be permitted to use cash collateral to continue operating its business.

19.    September 8, 2022:  The Court held a hearing in this case.  In addition to other matters at that hearing, Debtor's counsel represented that there were containers of parts, firearms kits, and other items worth approximately $800,000.00 to $900,000.00 which were either en route to the Port of Charleston or had recently arrived there (the "Container Contents").  However, it appears from shipping records and invoices that the Debtor may have paid $1.5 million or more for these goods using Plaintiff's Funds. The parties agreed that Plaintiff has the right to inspect the Container Contents.

### Adversary Proceeding

20.    September 21, 2022:  Plaintiff initiated this Adversary Proceeding and filed its Complaint and a Motion for Temporary Restraining Order, or in the alternative, Motion for Preliminary Injunction (the "Motion").

21.    September 22, 2022:  This Court heard and, as evidenced by the Docket Text Entry on even date, granted in part Plaintiff's Motion and temporarily enjoined Debtor from selling the Container Contents without court approval. With the consent of the parties and the approval of the Court, this Order has been extended through October 20, 2022.

### ARGUMENT

**Plaintiff is entitled to the entry of a declaratory judgment on its first claim for relief based on the equitable doctrines of constructive trust, resulting trust, equitable title, and earmarking.**

In its Complaint, Plaintiff contends that (1) it is the owner of the Container Contents; (2) it is the owner of the funds in the bank accounts of the Debtor; and (3) it is the owner of all property (real or personal) acquired by Debtor from the funds entrusted by Plaintiff to the Debtor.  Debtor was placed on notice of Plaintiff's ownership claim over such assets and property well before Debtor filed its voluntary petition, as evidenced by the Common Pleas Complaint filed by Plaintiff

against Debtor and Deaza on July 6, 2022.   Further evidencing Debtor's prior knowledge of Plaintiff's ownership claim to the assets and property, Debtor filed a Motion to Extend Automatic Stay to Deaza personally in the Lead Case on September 2, 2022, the same day it filed its petition, and attached as an exhibit thereto a copy of the filed Common Pleas Complaint. Soon thereafter, Plaintiff once again established its prior and ongoing challenge to Debtor's claim of ownership of the foregoing assets and property by filing its Complaint in this proceeding.   Accordingly, by the time Debtor filed its Schedules listing said assets and property as Debtor's own, Debtor was fully aware that ownership and other interests in those assets and property are and have been in dispute by Plaintiff.

Based on the foregoing, Debtor's mere inclusion of these assets and property in its Schedules is not dispositive as to Debtor's ownership of said assets and property, nor is it dispositive as to said assets and property being property of the estate; rather, Plaintiff contends that Debtor did not own such assets and property prior to—nor at the time of—Debtor's filing of its bankruptcy petition, and, as such, said assets and property are expressly excluded from the estate. *See Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718 (4th Cir. 1998) (property to which debtor holds only legal title and not an equitable interest at the commencement of the bankruptcy case is expressly excluded from the estate).

Because the Debtor's Schedules are not dispositive, especially with respect to Debtor's claim of assets and property which has been repeatedly challenged and disputed by Plaintiff, the Court must determine the interests, if any, that Debtor or the estate may have in the disputed assets and property. *See Lanik v. Smith (In re Cox Motor Express of Greensboro, Inc.)*, 2017 WL 1207517 (M.D.N.C. Bankr. Jan. 27, 2017); *see also Spokane Law Enforcement Fed. Credit Union v. Barker (In re Barker)*, 839 F.3d 1189 (9th Cir. 2016) (in the context of determining eligibility under a

specific chapter, debtor's schedules are the mere starting point; because if schedules were considered dispositive, then eligibility could be created by improper or incomplete scheduling of creditors).

When analyzing a debtor's interest in real and personal property listed in its bankruptcy schedules, the Supreme Court of the United States has held that the bankruptcy court must look to and apply state law to decide the issue:

> Property Interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy" . . . The justifications for application of state law are not limited to ownership interests."

*Butner v. United States*, 440 U.S. 48, 55 (1979) (citing *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609 (1961)).

More recently, the Fourth Circuit Court of Appeals applied the holding in *Butner* to conclude that the "consideration of what constitutes an 'equitable interest' subject to an exclusion from the bankruptcy estate is a question of state law." *Old Republic*, 155 F.3d at 722; *see also Lee v. Anasti (In re Lee)*, 461 Fed. Appx. 227 (4th Cir. 2012) (any bankruptcy estate's interest in certain property or causes of action claimed by debtor is not greater than the debtor's interest in same).

Pursuant to the foregoing applicable and controlling authority, this Court should apply North Carolina state law to determine ownership of the subject assets and property. In the following discussion of the applicable North Carolina law regarding constructive trusts, resulting trusts, equitable title, and earmarking, as applied to the facts of this case, Plaintiff establishes that

it owns the subject assets and property listed by Debtor, and said assets and property are not property of the estate.

### a.  Judicially Created Constructive Trusts and Resulting Trusts

As a general matter, "[t]rusts created by operation of law are classified into *resulting trusts* and *constructive trusts*." *Carcano v. JBSS, LLC*, 684 S.E.2d 41, 49 (N.C. Ct. App. 2009) (emphasis added). Each is discussed below.

### i.  Constructive Trust

The North Carolina Court of Appeals defines a constructive trust as, "a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty, or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust. . . [ ] It is an obligation or relationship imposed irrespective of the intent with which such party acquired the property." *Cury v. Mitchell*, 688 S.E.2d 825, 827 (N.C. Ct. App. 2010) (quoting *Roper v. Edwards*, 373 S.E.2d 423, 424–25 (N.C. 1988)); *Guy v. Guy*, 411 S.E.2d 403, 406 (N.C. Ct. App. 1991) (constructive trust was imposed in the context of a land transfer when the transfer was based on an oral agreement prior to the land conveyance and a promise from grantee which misled the grantor because grantee never had any intention of fulfilling said promise); *Old Line Life Ins. Co. of Am. v Bollinger*, 589 S.E.2d 411, 413 (N.C. Ct. App. 2003) (constructive trust arises when one obtains legal title to property in violation of a duty he owes to another).

Debtor's receipt, deposit, and use of Plaintiff's entrusted funds without performing its contractual obligations to Plaintiff—which is undisputedly what occurred in this case—constitutes unjust enrichment of Debtor, a necessary element for the imposition of a constructive trust. Debtor

and Deaza have admitted in filed pleadings and under oath that Debtor failed to deliver any of the promised firearms kits to Plaintiff and failed to return any of Plaintiff's funds. Additionally, Debtor misused and misappropriated Plaintiff's funds, which were entrusted to Debtor for a specific purpose under the terms of the Original Agreement and Second Agreement, to purchase other property for Debtor's own benefit, or for the benefit of Deaza.[5] This other property, including but not limited to the Container Contents, was acquired by Debtor through its improper use of Plaintiff's funds. *See* McCallum Dec. at ¶¶ 21-44 (examining bank account records and deposition testimony and showing that Plaintiff's entrusted funds were used to purchase, among other things, inventory for Ikon). Because the established unjust enrichment persists, and Debtor has already fraudulently used Plaintiff's funds to obtain property under these circumstances, it is inequitable for Debtor to retain said property.

In addition to Debtor's unjust enrichment, Debtor's actions and/or inactions satisfy the other necessary element of a constructive trust, *i.e.*, fraud, breach of duty, or inequitable conduct.[6]

---

[5] Attached hereto as Exhibit A is the Declaration of Jamim McCallum ("McCallum Dec."). Mr. McCallum, a former certified public accountant and current firearms industry executive, traces Deaza's use of funds entrusted by Plaintiff to Debtor for the exclusive purpose of acquiring, demilitarizing, and delivering promised firearms under the agreements. Based on an examination of relevant bank records, as well as Deaza's deposition testimony, Mr. McCallum demonstrates that Plaintiff's entrusted funds were misappropriated to enrich Deaza personally and expand the business operations of his company, Debtor. McCallum Dec. ¶ 51. Mr. McCallum shows convincingly that Plaintiff is the victim of a complex fraud. *Id.*

[6] For example, when questioned on the veracity of a presentation Deaza made to Plaintiff on March 11, 2022 concerning the status of the firearms under the agreements, Deaza admitted to making multiple, deliberate misrepresentations:

Q. You represent in this slide that the total kits cut to date is 1,930 units, those being kits under the Montenegrin agreement. This representation was false; correct?
A. Correct.
Q. And you knew it was -- you knew it was false at the time you made this representation; isn't that true?
A. Correct.
Q. And the stop work order November 15 you put in is false; correct?
A. Correct.
Q. And you knew that was false at the time you made this representation to Palmetto State Armory; correct?

North Carolina law does not require proof of the elements of actual fraud to impose a constructive trust. The North Carolina Court of Appeals has found that "neither actual fraud nor distinct breach of duty are required. Indeed, 'inequitable conduct short of actual fraud will give rise to a constructive trust where the holder of legal title would be unjustly enriched through retention of the property.'" *Hughes v. Craddock*, 701 S.E.2d 404 (N.C. Ct. App. 2010) (unpublished) (citing *Roper*, 373 S.E.2d at 425). Furthermore, inequitable conduct alone gives rise to a constructive trust as, "[f]raud need not be shown if legal title has been obtained in violation of some duty owed to the one equitably entitled." *Cury*, 688 S.E.2d at 828 (quoting *Roper*, 373 S.E.2d at 425). The facts and evidence presented in the instant case satisfy the required element of inequitable conduct by Debtor.

Accordingly, Debtor's unjust enrichment coupled with its inequitable conduct[7] in obtaining other property with Plaintiff's funds warrants the immediate imposition of a constructive trust on the funds in Debtor's bank accounts, the contracted-for weapons to the extent such come into the possession, custody, or control of Plaintiff, the Container Contents, and any and all other property purchased by Debtor with Plaintiff's funds. In addition, in order to carry out the intent and purpose

---

A. Correct.

Deaza Dep., Oct. 4, 2022, 275:1-16; *see also* Deaza Dep. Ex. 30. These misrepresentations were communicated by Deaza to Plaintiff to create the illusion of progress (i.e., that some firearms had been demilitarized) and legitimate delay (i.e., a stop work order from the Montenegrin government preventing further demilitarization of the purchased firearms). The reality, however, is that Debtor and its overseas broker, IZOP-K D.O.O., failed to acquire the promised firearms. Moreover, there now is grave doubt that the firearms to which Deaza represented that he had "eyes on" ever existed. McCallum Dec. ¶ 45.

[7] Mr. McCallum notes with concern that Deaza was perfectly capable of acquiring and shipping firearms parts, including AK parts, as well as other firearms related products to stock the inventory of his own business, Debtor, using funds entrusted to it by Plaintiff, but incapable of acquiring and shipping the promised firearms parts kits under the agreements with Plaintiff. This is one of many troubling facts concerning the inequitable and dishonest conduct on the part of Deaza and Debtor. McCallum Dec. ¶ 41 n. 4.

of the constructive trust, Plaintiff should be allowed by the Court to utilize tracing to identify any additional property acquired with Plaintiff's funds for inclusion in the constructive trust.

### ii. Resulting Trust

The doctrine of resulting trust differs slightly from that of a constructive trust in that a resulting trust is created by, or arises out of, either an express or implied agreement, such as the underlying agreements between Plaintiff and Debtor in this case. "A resulting trust arises 'when a person becomes invested with the title to real property under circumstances which in equity obligates him to hold the title and to exercise his ownership for the benefit of another.'" *Meekins v. Box*, 567 S.E.2d 422, 425 (N.C. Ct. App. 2002) (quoting *Mims v. Mims*, 286 S.E.2d 779, 783 (N.C. 1982)). In *Meekins*, the Court granted a resulting trust under circumstances surrounding a land sale agreement in which one person paid for the purchase of the land, but the land title was taken in the name of another; thus, a resulting trust was created in favor of the one who furnished the purchase price. *Meekins*, 567 S.E.2d at 425. Although resulting trusts frequently arise in the context of real property transfers, the equitable doctrine is not limited to real property transactions. Resulting trusts can be imposed in the context of real and personal property, "based upon the doctrine that valuable consideration rather than legal title determines the equitable title resulting from a transaction." *Guy*, 411 S.E.2d at 405.

Accordingly, the imposition of a resulting trust is warranted here as to Plaintiff's Funds entrusted with Debtor and any *real or personal property* purchased by Debtor using Plaintiff's Funds. *See Fulp v. Fulp*, 140 S.E.2d 708 (N.C. 1965) (resulting trust is warranted in a situation in which legal title passed out of the same transaction in which consideration was advanced before or at the time said title passed, and not from consideration thereafter paid). Here, Debtor's acquisition of property obviously was made by using Plaintiff's funds advanced per the underlying

agreements—not from other consideration, as Debtor's accounts show it lacked funds to otherwise acquire the weapons. *See* Compl. Ex. C at 8 (showing that the balance in Debtor's First Bank account was approximately $43,000 prior to receiving Plaintiff's funds); *see also* McCallum Dec. at ¶¶ 13-150 (showing that Debtor was incurring annual losses with declining sales prior to its agreements with PSA, and further showing that Deaza and Debtor used funds entrusted by Plaintiff to purchase, among other things, goods and real estate for the personal benefit of Deaza and his company, Debtor). Furthermore, Debtor acquired property by misusing and dishonestly misappropriating Plaintiff's funds but never delivered the contracted-for firearms kits to Plaintiff. Debtor's possession of, and erroneous claim of title to, the firearms kits and other property acquired with Plaintiff's funds, combined with the underlying written contracts, constitute the exact circumstances that mandate a resulting trust over title to the weapons and other property acquired with Plaintiff's funds in favor of Plaintiff.

Based on the foregoing analyses of trusts created by operation of law, Plaintiff is entitled to the imposition of a constructive trust and resulting trust (collectively, "Equitable Trusts") both in favor of Plaintiff as beneficiary. Accordingly, as the sole beneficiary of the Equitable Trusts and pursuant to the provisions of 28 U.S.C. § 2201, Plaintiff is entitled to the entry of a declaratory judgment determining that: (a) Plaintiff is the owner of the goods or personal property in the containers; (b) Plaintiff is the owner of the funds in the bank accounts of the Debtor; and (c) Plaintiff is the owner of all property (real or personal) acquired by the Debtor from the funds entrusted by Plaintiff to the Debtor.

b.      **Equitable Title**

Pursuant to the Original Agreement, legal and equitable title to the firearms kits passed to Plaintiff on August 20, 2021, when Plaintiff completed payment to Debtor of the full purchase

price.  Pursuant to the Second Agreement, legal title, or at a minimum, equitable title, to those specific firearms kits passed to Plaintiff on September 1, 2021, when Plaintiff entrusted 20% of the second transaction to Debtor in the amount of $744,504.00.  Accordingly, Plaintiff now owns the firearms kits or parts purchased, or alternatively, and at the very least, Plaintiff has equitable title to the firearms kits, parts, and other property. *See Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171 (2d Cir. 2006). The underlying agreements, along with Plaintiff's full performance thereunder, evidence a completed conveyance to Plaintiff of all equitable interest in the property, leaving only the formality of a subsequent transfer to Plaintiff of the property or the actual title thereto.  *See In re Foreclosure of Deed of Trust Given by Taylor*, 298 S.E.2d 163 (N.C. Ct. App. 1982); *see also Matthews v. Fields*, 877 S.E.2d 14 (N.C. Ct. App. 2022) (while buyer is making payments, or has made all contract payments to seller, buyer holds equitable title to the property).

Therefore, all firearms kits or other property acquired from the proceeds remitted by Plaintiff to the Debtor to purchase the kits are property of Plaintiff as a matter of law and by virtue of its equitable title thereto.  As such, Debtor does not have a right to sell these firearms kits or other property; rather, Debtor should be required to deliver them to Plaintiff.

c.    **Earmarking Doctrine**

The Plaintiff's funds paid to Debtor were for a specific purpose and thus were earmarked or entrusted funds.  The U.S. District Court for the Western District of North Carolina in *Campbell v. Hanover*, 457 B.R. 452 (W.D.N.C. 2011) affirmed the decision of the Bankruptcy Court that the earmarking doctrine had been adopted by the Fourth Circuit. This case involved an action to recover on an alleged preferential transfer, but the findings and holding regarding the earmarking doctrine remain pertinent here.

Further, the earmarking doctrine has been applied in many contexts.  In *Boldt v. Alpha Beta*

*Co. (In re Price Chopper Supermarkets, Inc.)*, 40 B.R. 816 (Bankr. Cal. 1984), which was cited with approval by the Eleventh Circuit in *American Bank of Martin County v. Leasing Service Corp. (In re Air Condition, Inc. of Stuart)*, 845 F.2d 293, 297 (11th Cir. 1988), the earmarking doctrine applied to a post-petition transfer. The trustee in that case was unable to set aside a post-petition transfer of stock because the earmarking doctrine applied and the stock was not deemed to be property of the bankruptcy estate. *Id.*

Many other courts have applied the earmarking doctrine when facts demonstrate that the lender (Plaintiff is not a lender) would not have otherwise provided the funds to the debtor but for the agreement to use the funds for the designated purpose. *See, e.g., Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351 (5th Cir. 1986) (funds pledged by solvent indirect offshore subsidiary of debtor to re-pay debtor's loan never came into the general control of the debtor and were deemed to be earmarked funds); *Tolz v. Barnett Bank of S. Florida, N.A. (In re Safe-T-Brake of S. Fla., Inc.)*, 162 B.R. 359 (Bankr. S.D. Fla. 1993) (debtor did not have dispositive control over funds that a secured creditor wire-transferred to lien claimant pursuant to closing of loan and were deemed to be earmarked funds); *Hood v. Brownyard-Sharon Park Ctr., Inc. (In re Hood)*, 118 B.R. 417 (Bankr. D.S.C. 1990) (checks written by third-party, cashed by debtor, and provided to creditor as cashier's checks to satisfy antecedent debts of debtor and to prevent levy on inventory after judgment were deemed to be earmarked funds). Because Debtor acquired these firearms kits, parts, and other property using funds entrusted by Plaintiff to Debtor for the specific and exclusive purpose of purchasing firearms kits for the Plaintiff pursuant to the agreements, these firearms kits and parts are not property of the estate. Accordingly, the Debtor does not have any right to use this property.

    **d.**    **Tracing**

In addition to the foregoing legal analysis establishing Plaintiff's entitlement to a constructive trust, resulting trust, equitable title, and the earmarking doctrine, a critical component necessary for Plaintiff to identify with specificity the funds and property subject to all of its equitable claims is that Plaintiff be allowed by the Court to utilize tracing. While the Court must evaluate Plaintiff's equitable claims under North Carolina state law, the issue of tracing is exclusively a question of federal law. *Old Republic*, 155 F.3d at 723. Furthermore, tracing is not limited only to one specific account; rather, courts have held that tracing with respect to multiple accounts of a debtor and its inventory and property is permitted and often necessary if the facts so require, and such is the case here. *See Merchants Express Money Order Co. v. Supermarkets of Cheltenham, Inc. (In re Supermarkets of Cheltenham, Inc.)*, 1999 WL 260956 (Bankr. E.D. Penn. Apr. 28, 1999) (claimant was allowed to rely on and introduce into evidence its expert's report which traced almost $3,000,000 of proceeds into and across two accounts held by debtor; *see also First Nat'l Bank of Amarillo v. Martin (In re Martin)*, 25 B.R. 25 (Bankr. N.D. Tex. 1982) (court allowed bank claimant to trace and recover proceeds from debtor's sale of bank's collateral, which proceeds debtor had deposited into two separate accounts).

In *Old Republic*, the Fourth Circuit adopted and established the specific tracing method to be utilized in this jurisdiction, which is commonly referred to as the "lowest intermediate balance" rule, and the court defined it as follows:

> [This rule] is grounded in the fiction that, when faced with the need to withdraw funds from a commingled account, the trustee withdraws non-trust funds first, thus maintaining as much of the trust's funds as possible. Hence, pursuant to the lowest intermediate balance rule, if the amount on deposit in the commingled fund has at all times equaled or exceeded the amount of the [equitable] trust, the trust's funds will be returned in their full amount. Conversely, if the commingled fund has been depleted entirely, the trust is considered lost. Finally, if the commingled fund has been reduced below the level of the trust fund but not depleted, the claimant is entitled to the lowest intermediate balance in the account.

16

155 F.3d at 724; *see also Angell v. C.A. Perry & Son, Inc. (In re Tanglewood Farms, Inc. of Elizabeth City)*, 2013 WL 1405757 (Bankr. E.D.N.C. Apr. 4, 2013); *Massenburg v. Schlossber (In re Massenburg)*, 554 B.R. 769 (Bankr. D. Md. 2016); *United States v. $7,599,358.09*, 2011 WL 3611451 (D.N.J. Aug. 15, 2011) holding that where trust property is commingled with other property of debtor, the beneficiary/claimant must trace its own trust property though the debtor's various dealings with it).

Because Plaintiff has established claims and property interests in certain assets listed in Debtor's Schedules, this Court should authorize Plaintiff to trace the following: including but not limited to, Debtor's deposit of Plaintiff's funds into one or both of Debtor's bank accounts, any subsequent transfers by Debtor of Plaintiff's funds into and out of Debtor's two separate bank accounts, and Debtor's transfer of Plaintiff's funds out of one or both of Debtor's bank accounts into Debtor's inventory or other assets.

## CONCLUSION

Based on the equitable maxims of constructive trust, resulting trust, equitable title, and the earmarking doctrine, and pursuant to the provisions of 28 U.S.C. § 2201, Plaintiff has established that it is entitled to a preliminary injunction enjoining the use, disposition, encumbrance, distribution, movement, or sale of any of the property identified herein and entry of a declaratory judgment finding that: (a) Plaintiff is the owner of the goods or personal property in the containers; (b) Plaintiff is the owner of the funds in the bank accounts of the Debtor; and (c) Plaintiff is the owner of all property (real or personal) acquired by Debtor from the funds entrusted by Plaintiff to the Debtor.

**[SIGNATURE PAGE FOLLOWS]**

Respectfully submitted,

This the 16th day of October, 2022.

HUTCHENS LAW FIRM LLP


By: /s/ William Walt Pettit
    William Walt Pettit
    N.C. Bar No. 9407
    6230 Fairview Road, Suite 315
    Charlotte, N.C. 28210
    Telephone: (704) 362-9255
    Email: walt.pettit@hutchenslawfirm.com


WILLOUGHBY & HOEFER, P.A.

By: Mitchell Willoughby S.C. Bar No. 6161
    Andrew D'Antoni S.C. Bar No. 100919
    930 Richland Street
    Columbia, SC 29201
    Telephone: (803) 252-3300
    Email: mwilloughby@willoughbyhoefer.com

*Attorneys for Palmetto State Armory, LLC*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | |
|---|---|
| IN RE:<br><br>IKON WEAPONS, LLC,<br><br>              Debtor. | CASE NO.: 22-10507<br>CHAPTER 11 |
| PALMETTO STATE ARMORY, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>IKON WEAPONS, LLC,<br><br>Defendant. | ADV. PROC. NO.: 22-02021 |

## DECLARATION OF JAMIN MCCALLUM

I, Jamin McCallum, hereby declare as follows:

1.     My name is Jamin McCallum, I am over the age of 21, and I am competent to make this Declaration.

2.     I have personal knowledge of the matters contained in this Declaration through first-hand experience and/or my review of the documents and materials produced and deposition testimony rendered by the Debtor, Ikon Weapons, LLC ("Ikon"), in the above-captioned matter.

3.     I am the founder of Palmetto State Armory, LLC ("SA") and an owner and the current Chief Executive Officer of JJE Capital Holding, LLC ("JJE Capital"). JJE Capital owns PSA, among other companies.

4.     I have been a certified public accountant for approximately 14 years. From about 2003 to 2007, I worked for McGregor & Company, LLP, a public accounting firm. From about 2007 to 2008, I worked for Kirkland, Thomas, Watson & Dyches LLC, also a public accounting

1

firm. I also served as an adjunct professor at the University of South Carolina Moore School of Business, Department of Accounting from about 2008 to 2009. I also have 24 years of honorable service as both an enlisted soldier and commissioned officer with the United States Army and South Carolina Army National Guard. Prior to my retirement on August 1, 2022, my last duty position was as a senior auditor for the Finance Internal Review Division of the South Carolina Army National Guard.

5.     This Declaration traces the use of entrusted funds deposited by PSA into Ikon's bank account with First Bank (bearing Account No. XXXXXX7790) (the "Ikon First Bank Account") for the exclusive purpose of purchasing certain firearms under certain agreements between Ikon and PSA. That said, the background provided in this Declaration is not meant to be exhaustive, but rather is limited to those facts relevant to tracing the use of PSA's entrusted funds deposited into the Ikon First Bank Account.

6.     Ikon and PSA entered into a Purchase Agreement, dated June 16, 2021, as amended, for the purchase of 8,000 AK M-70 firearms represented to be in "brand new" condition and originating from the Montenegrin Ministry of Defense at a total purchase price of $3,760,000.00 (the "Montenegrin Agreement"). Deaza Dep. Ex. 14, PSA2004_0787 – 0796. Importantly, the Montenegrin Agreement provides that Ikon shall refund PSA its entire deposit in the event of a default, such as Ikon not delivering the promised goods by the agreed-upon delivery date. *Id.* at PSA2004_0789.

7.     On June 17, 2021, PSA deposited $1,880,000.00 (representing one half of the total purchase price) in entrusted funds to the Ikon First Bank Account for the exclusive purpose of purchasing, demilitarizing, and delivering the firearms under the Montenegrin Agreement. Deaza Dep. Ex. 5 at IKON2004 003559.

2

8.      On August 20, 2021, after being assured by Mr. Suliban Deaza ("Mr. Deaza") of the existence of the firearms under the Montenegro Agreement and legitimacy of the transaction, while purportedly in Montenegro with "eyes-on" the promised firearms, PSA deposited another $1,880,000.00 (representing the second half and complete purchase price) in entrusted funds to the Ikon First Bank Account, again, for the exclusive purpose of purchasing, demilitarizing, and delivering the firearms under the Montenegrin Contract. Deaza Dep. Ex. 5 at IKON2004 003565.

9.      On August 30, 2021, Mr. Deaza sent Mr. Benjamin Fortin, then-Quality Manager for PSA ("Mr. Fortin"), an email offering for purchase to PSA certain other firearms. Deaza Dep. Ex. 28, PSA2004_0802-0803. These firearms were represented to originate from suppliers in Serbia. From the list and quantity of firearms provided by Mr. Deaza, PSA agreed to purchase 5,000 AK M70 kits, 1,500 M76 semi-automatic rifles with accessors, and 297 Z-10 auto-pistols. Deaza Dep. Ex. 29, PSA2004_0797-0798.

10.     On August 31, 2021, Mr. Deaza emailed Mr. Fortin an invoice with a total purchase price of $3,722,520.00 and requiring 20% down payment to secure the promised firearms and bind the transaction (the "Serbian Agreement"). Deaza Dep. Ex. 29 at PSA2004_0798. As agreed, on September 1, 2021, PSA wire transferred $744,504.00 in entrusted funds to the Ikon First Bank Account for the exclusive purpose of purchasing, demilitarizing, and delivering the firearms under the Serbian Agreement. Deaza Dep. Ex. 5 at IKON2004 003568.

11.     After agreeing to extend two prior delivery deadlines that were not met, the parties finally agreed that the promised goods under both the Montenegro and Serbian Agreements would be delivered not later than June 1, 2022. Deaza Dep. Ex. 14, PSA2004_0795. As of the date of this Declaration, however, not a single firearm or firearm parts kits have been delivered to PSA.

3

12.    In order to trace the use of PSA's entrusted funds, I have reviewed the following documents and materials:

- Tax Year 2018 federal and state tax returns for Ikon;

- Tax Year 2019 federal and state tax returns for Ikon;

- Tax Year 2020 federal and state tax returns for Ikon;

- Ikon's bank account statements with First Bank (Account No. -7790) from October 2020 through August 2022;

- Ikon's bank account statements with Bank of America (Account No. -0750) from January 2021 through August 2022;

- 3DC Projects, LLC bank account statements with Bank of America (Account No. 0729) from January 2021 through August 2022;

- Ikon's Official Form 202, dated September 23, 2022, and filed in this proceeding.

- Deposition Testimony Transcript of Suliban E. Deaza, October 3 and 4, 2022, in the above-captioned matter; and

- Deposition Testimony Transcript of Suliban E. Deaza, August 25, 2022 in Civil Action No. 2022-CP-32-02241, pending before the Lexington County Court of Common Pleas.

13.    For tax year 2018 Ikon reported "ordinary business income" in the amount of $13,079.00. IKON2004 000018. Ordinary business income or "OBI" is the net income to a company measured by the total amount of gross receipts from sales of goods reduced by the cost of goods sold and further reduced by the company's operating expenses. That said, ordinary business income provides a good snapshot into whether a company is "making money" or not.

14.    Tax year 2018 reveals a very small OBI for Ikon. This OBI represents $158,261.00 in gross sales, reduced by $92,459 in cost of goods sold, resulting in a gross profit of just $65,802.00. IKON2004 000018. This gross profit is further reduced by repairs and maintenance ($170.00), rent ($11,566.00), depreciation ($10,628.00), and other deductions ($30,359.00). *Id.*

4

The "other deductions" consist of general business expenses (i.e., insurance, supplies, telephone, etc.). IKON2004 000029. Further, Ikon reports its "total assets" at just $123,553.00. *Id.*

15.     For tax year 2019, Ikon reported OBI as a loss in the amount of -$93,399.00. Total gross sales modestly declined to $153,218.00. IKON2004 000096. Cost of goods sold amounted to $127,601.00, leaving a gross profit of just $25,617.00. *Id.* Gross profit is reduced by rent ($10,481.00), taxes and licenses ($1,891.00), depreciation ($14,676.00), and other deductions ($91,968.00). *Id.* Further, Ikon reports its "total assets" at just $60,057.00. *Id*

16.     For tax year 2020, Ikon reported another OBI loss. This time in the amount of -$13,284.00. IKON2004 000196. Gross sales declined just over 14% to $131,478.00. *Id.* Cost of goods sold amounted to $83,576.00 for a gross profit of $47,902.00. IKON2004 000196. Gross profit is reduced by repairs and maintenance ($669.00), rent ($1,136.00), taxes and licenses ($2,357.00), interest ($1,292.00), depreciation ($20,832.00), and other deductions ($34,900.00). *Id.* Further, Ikon reports its "total assets" at just $115,827.00. *Id.*

17.     That said, based on my background in accounting and experience within the firearms industry, it is clear Ikon is a company with limited assets, depleting resources, and declining sales prior to entering the Montenegrin and Serbian Agreements with PSA.

18.     Examining relevant bank account statements for Ikon reveals that PSA's entrusted funds were used primarily to enrich Mr. Deaza personally and to grow his company, Ikon. Beginning with the June 2021 Ikon First Bank Account statement, Ikon had a beginning balance of $89,263.95. Deaza Dep. Ex. 5 at IKON2004 003558.

19.     On June 17, 2021, PSA entrusted Ikon with and deposited into the Ikon First Bank Account $1,880,000.00 strictly for the purpose of acquiring, demilitarizing, and delivering promised firearms under the Montenegrin Agreement. *Id.* at IKON2004 003559.

5

20.     On June 18, 2021, Ikon purports to pay a business named "Michael's Machines" $1,212,500.00, as a one-half down payment for the promised firearms under the Montenegrin Agreement. *Id.* at IKON2004 003561.[1] However, even accepting this is true, Ikon rapidly misappropriated a large share of the entrusted funds for the personal benefit of Mr. Deaza and his company, Ikon, totally ignoring their refund obligations under the agreements.

21.     The following select debits from the Ikon First Bank Account highlight the misappropriation of PSA's entrusted funds by Mr. Deaza within a mere 14 days after PSA's first deposit:

- o  June 16, 2021: $40,659.14 cash withdrawal for the purchase of a new car titled in the name of Ashley Deaza, the wife of Mr. Deaza. Deaza Dep., Oct. 3, 2022, 159:5-14.

- o  June 21, 2021: $6,319.70 debited to pay down a personal credit card in the name of Suliban Deaza. *Id.* at 168:4-8.

- o  June 22, 2021: $150,000.00 debited to "Automatics & Machinery" for business machinery to improve Ikon's business. *Id.* at 168:9-21.

- o  June 22, 2021: $16,240.52 cash withdrawal to pay down or off mortgage on real estate owned by Mr. Deaza. *Id.* at 169:6-15, 170:1-12.

- o  June 22, 2021: $34,663.09 cash withdrawal to pay off outstanding loan amount from First Bank to Ikon. *Id.* at 170:13-25, 171:1-11.

- o  June 23, 2021: $37,000.00 transferred to Ikon's bank account with Bank of America. *Id.* at 174:14-17.

- o  June 28, 2021: $50,000.00 cash withdrawals for transfer to 3DC Projects, LLC, a single member LLC owned and operated by Mr. Deaza. *Id.* at 171:19-25, 172:1-5.

- o  June 30, 2021: $45,033.00 debited to "Entrust Manufacturing Technologies" for business machinery to improve Ikon's business. *Id.* at 172:17-25, 173:1-16.

---

[1] Mr. Deaza testified that "Michael's Machines" was the original "broker" for the purchase of the promised firearms that are the subject of the Montenegrin Agreement. Deaza Dep., Oct. 3, 2022, 160:10-12.

22.     The total amount of entrusted funds expended from this sample alone is $379,915.31.  For comparative purposes, this amount is more than 2.5 times Ikon's gross sales receipts for the entire preceding tax year. *See* Paragraph 16 of this Declaration. None of these purchases or payments would have been possible but for the infusion of $1,880,000.00 in PSA entrusted funds into the Ikon First Bank Account.

23.     Indeed, if we reduce the total credits and deposited into the Ikon First Bank Account for June 2021 ($1,892,555.41) by the PSA deposit ($1,880,000.00), then this reveals that only $12,555.41 was deposited into the account less PSA's entrusted funds. If we reduce the total debits for June 2021 ($1,674,769.50) by the debit to Michael's Machines ($1,212,500.00), then total debits amount to $461,269.50.

24.     Accordingly, in the absence of PSA's entrusted funds and Ikon's purported payment to its "broker," Michael's Machines, on the Montenegrin Agreement, Ikon would have posted a **negative** $360,450.14 account balance at the conclusion of June 2021, which is easily calculated as follows:

> [$89,253.95 (beginning balance) + $12,555.41 (total credits less PSA's entrusted funds)] -
> [$462,269.50  (total debits less the debit to Michael's Machines)] = ($360,450.14).

25.     In other words, *all* the purchases and payments listed in Paragraph 21 above were paid for with and can be traced directly to PSA's entrusted funds deposited on June 17, 2021. However, PSA did not authorize Mr. Deaza to use the entrusted funds to enrich himself or to improve his company's business operations.

26.     The Ikon First Bank Account statement for July 2021 shows a beginning balance of $307,049.86. Deaza Dep. Ex. 4 at IKON2004 003046. However, we know from the calculation in Paragraph 24 above that Ikon's beginning balance less PSA's entrusted funds is actually negative $360,450.14.

7

27.     In July 2021, total credits to the Ikon First Bank Account amount to $119,120.98. *Id.* It is important to note, however, that Mr. Deaza testified that $100,000.00 of this amount are "loans" from Mr. Michael M. Otte and Mr. Lawrence B. Holt, Jr. Deaza Dep., Oct. 3, 2022, 175:10-12, 176:4-10. In other words, in large part, the July 2021 credit count does not reflect actual business sales or gross receipts. Total debits for July 2021 amount to $156,161.31. Deaza Dep. Ex. 4 at IKON2004 003046.

28.     Accordingly, in the absence of PSA's entrusted funds, the total account balance would have been **negative** $397,490.48 at the end of July 2021. This is calculated by reducing total credits for July 2021 ($119,120.98) by total debits ($156,161.32) and adding this figure to negative $360,450.14 from the preceding month. Much like its prior tax year losses, Ikon is generally operating at a loss month-to-month in 2021.

29.     In August 2021, total credits to the Ikon First Bank Account amounted to $1,885,414.85. Deaza Dep. Ex. 5 at IKON2004 003564. PSA entrusted Ikon with $1,880,000.00 on August 20, 2021 (the second half of the purchase price under the Montenegrin Agreement), meaning that total credits less PSA's deposit of the entrusted funds amounts to just $5,414.85. *Id.* at IKON2004 003565,

30.     Total debits for August 2021 are $266,033.33. *Id.* at IKON2004 003564. Mr. Deaza claims that a $201,000.00 debit on August 24, 2021 to Li Yaoyuan Co. LTD (an apparent Chinese national company) is a "partial commission" on the Serbian Contract. Deaza Dep., Oct. 3, 2022, 181:16-12.

31.     Even assuming what Mr. Deaza claims is true, this would put the Ikon First Bank Account balance less PSA's deposit of the entrusted funds at **negative** $457,108.96 at the end of August 2021. This is calculated as follows:

8

[-$397,490.48 (beginning balance less PSA June 17, 2021 deposit) + $5,414.85 (total credits less the PSA August 20, 2021 deposit)] - [$65,033.33 (total debits less the debit to Li Yaoyuan Co. LTD)] = ($457,108.96).

32.     That said, absent PSA's deposits of entrusted funds on June 17, 2021 and August 20, 2021, Ikon could not have incurred the expenses it incurred for August 2021. All these expenses were funded by PSA's entrusted funds.

33.     In September 2021, total credits to the Ikon First Bank Account amount to $1,960,080.16. Deaza Dep. Ex. 5 at IKON2004 003568. On September 27, 2021, Michael's Machines refunded $1,212,500.00 that was purportedly for the purchase of the promised firearms that are the subject of the Montenegrin Agreement. *Id.* at IKON2004 003569; *see also* Deaza Dep., Oct. 3, 2022, 216:18-22. Earlier, on September 1, 2021, PSA entrusted $744,504.00 to Ikon for the exclusive purpose of acquiring, demilitarizing, and delivering firearms purchased under the Serbian Agreement. Deaza Dep. Ex. 5 at IKON2004 003568.

34.     Accordingly, total credits less PSA's deposit of entrusted funds for the month of September 2021 into the Ikon First Bank Account amount to just $3,076.16. This is calculated by reducing total credits ($1,960,080.16) by the Michael's Machines refund ($1,212,500.00) and the PSA's entrusted funds deposited under the Serbian Agreement ($744,504.00).

35.     Total debits for the month of September 2021 amount to $3,516,439.93. *Id.* at IKON2004 003568. Mr. Deaza claims that $103,000.00 paid to Li Yaoyuan Co. LTD on September 2, 2021 is another commission payment for the Serbian Agreement. Deaza Dep., Oct. 3, 2022, 22:1-6. Mr. Deaza claims that $312,532.00 debited to IZOP-K, D.O.O. ("IZOP-K")[2] on

---

[2] Mr. Deaza claims that IZOP-K is the broker on both the Montenegrin and Serbian Agreements. Deaza Dep., Oct. 4, 2022, 57:24-25, 58:1-3, 201:13-15. IZOP-K holds itself as "defense industry" company. IZOP-K is located at Hrašče 23, 5272 Podnanos, Slovenija. *See* IZOP-K company website available at https://www.izop-k.com/ (last accessed Oct. 16, 2022).

September 2, 2021 is partial payment for firearms under the Serbian Agreement. Deaza Dep. Ex. 5 at IKON2004 003569. Mr. Deaza claims that $128,000.00 debited to "Really Fine International Trading" (another apparent Chinese national company) on September 28, 2021 is a "commission" on the Montenegrin Contract. Deaza Dep. Ex. 5 at IKON2004 003570. Finally, Mr. Deaza claims a debit in the amount of $1,862,000.00 to IZOP-K on September 29, 2021 is payment in full to the "broker" for the promised firearms under the Montenegrin Agreement. *Id.*

36.    Even assuming everything Mr. Deaza says is true, total debits for September 2021, less those debits purportedly made in connection with the Montenegrin and Serbian Agreements amount to $1,110,907.93. This is almost 8.5 times the gross sales receipts of Ikon in the entire preceding tax year. *See* Paragraph 16 of this Declaration. That said, the Ikon First Bank Account balance at the end of September 2021 would be **negative** $1,564,940.73 absent the PSA's deposit of the entrusted funds. This means PSA's entrusted funds can be directly traced and were used to fund the following transactions (among all others) in September 2021:

o   September 2, 2021: $20,000.00 transferred to Ikon's bank account with Bank of America. Deaza Dep. Ex. 4 at IKON2004 003103.

o   September 8, 2021: $363,816.60 debited to A.C. Unity for firearms and firearms related inventory for the benefit of Ikon. *Id.* at IKON2004 003101; *see also* Deaza Dep., Oct. 3, 2022, 235:1-9.

o   September 13, 2021: $357,496.89 debited to Knipp Law Office, PLLC for the purchase of Mr. Deaza's and Mrs. Deaza's personal residence at 6010 Farm Oak Lane, Mint Hill ,NC 28227. Deaza Dep. Ex. 5 at IKON2004 003570; *see also* Deaza Dep., Oct. 4, 2022, 30:18-15, 31:1-16.

o   September 15, 2021: $133,952.00 to Zhengh Zhou Harvest as partial payment for a rubber recycling machine for the benefit of Ikon. Deaza Dep. Ex. 5 at IKON2004 003570; *see also* Deaza Dep., Oct. 4, 2022, 41:2-25.

o   September 15, 2021: $10,000.00 cash withdrawal to RPM Associates, LLC as escrow payment for a new Ikon manufacturing facility at 202 NC 24/27 Albermarle, NC 28001. Deaza Dep. Ex. 5 at IKON2004 003570; *see also* Deaza Dep., Oct. 4, 2022, 52:12-18.

o   September 23, 2021: $9,000 cash withdrawal for the purchase of a trailer for the benefit of Ikon. Deaza Dep. Ex. 5 at IKON2004 003570; *see also* Deaza Dep., Oct. 4, 2022, 54:1-21.

o   September 27, 2021: $4,228.24 to pay down a personal credit card. Deaza Dep. Ex. 5 at IKON2004 003570; *see also* Deaza Dep., Oct. 4, 2022, 55:6-15.

o   September 30, 2021: $188,317.47 debited to Shepard Law, PLLC as payment in full for the new Ikon manufacturing facility at 202 NC 24/27 Albermarle, NC 28001. Deaza Dep. Ex. 5 at IKON2004 003570; *see also* Deaza Dep., Oct. 4, 2022, 73:18-25, 74:1-5.

37.     This sampling of debits for personal benefit of Mr. Deaza and his company, Ikon, in September 2021 amounts to $1,086,811.20. None of these purchases or payments would have been possible but for the $4,504,504.00 entrusted by PSA to Ikon for the exclusive purpose of acquiring, demilitarizing, and delivering firearms under the Montenegrin and Serbian Agreements.

38.     Accordingly, for September 2021, total credits to the Ikon First Bank Account less the deposit of PSA's entrusted funds amounts to merely $3,076.16. Total debits from the Ikon First Bank Account less all debits claimed by Mr. Deaza to be related to the Montenegrin or Serbian Agreements amounts to $1,110,907.00. This puts the Ikon First Bank Account balance at a **negative** $1,564,940.73 balance at the end of September 2021 when we remove the infusion of PSA's deposits of entrusted funds.

39.     I have attached as Attachment A hereto a spreadsheet that analyzes the total credit and debit counts in the Ikon First Bank Account from June 2021 through August 2022 when controlled for the PSA's deposits of funds entrusted to Ikon, as well as all debits purportedly made by Ikon in connection with Montenegrin and Serbian Agreements. What this spreadsheet shows is that PSA's deposits of entrusted funds were misappropriated by Mr. Deaza for his personal gain and the benefit of his company, Ikon, and that Ikon is a business operating at a loss month-to-month absent the cash infusions from the deposits of these entrusted funds.

40.     Examining the credit counts in the Ikon First Bank Account for December 2021, April 2022, and June 2022 helps to bring into greater focus precisely how Mr. Deaza's misappropriation of PSA's entrusted deposits went to grow Ikon's business operations.  Total credits into the Ikon First Bank Account for December 2021 amount to $237,113.62 (after reducing for a return wire from December 21, 2021). Deaza Dep. Ex. 4 at IKON2004 003198, 003200. This figure exceeds gross sales receipts for all of tax year 2020.

41.     However, $172,490.00 deposited into the account by "HK Parts Inc." on December 13, 2021 was for the purchase of certain products supplied by A.C. Unity, D.O.O. ("A.C. Unity").[3] Deaza Dep. Ex. 4 at IKON2004 003200; *see also* Deaza Dep., Oct. 4, 2022, 80:11-13. However, Ikon misappropriated PSA's entrusted funds to purchase inventory for Ikon from A.C. Unity that was, in turn, sold to HK Parts Inc. in this transaction. *See* Paragraph 36 of this Declaration (highlighting a debit to A.C. Unity in the amount of $363,816.60 on September 8, 2021 that was paid with PSA's entrusted funds).

42.     In April 2021, there are credits in the amount of $146,847.01, also a large figure relative to Ikon's prior gross annual sales receipts. Deaza Dep. Ex. 4 at IKON2004 004163. However, hereto, the majority of these credits ($98,806.00) are attributable to the purchase of flare guns by Kosher Surplus, LLC from Ikon that were supplied by A.C. Unity. Deaza Dep., Oct. 4, 2022, 94:24-25, 95:1-9. This sale by Ikon, however, like the sale to HK Parts Inc., was only made possible through Mr. Deaza's misappropriation of PSA's entrusted funds to stock Ikon's own inventory with A.C. Unity products.

---

[3] A.C. Unity holds itself out as "a company, fully licensed to manufacture and trade military weapons and ammunitions of all types and is based in the industrial zone of Goražde." A.C. Unity is located at Industrijska zona Vitkovići bb, 73000 Goražde, Bosnia and Herzegovina. *See* A.C. Unity, D.O.O. company website available at https://ac-unity.com/ (last accessed Oct. 16, 2022).

43.    In June 2022, there are credits in the amount of $280,200.19, but $100,000.00 is deposited by Black Rain Ordinance ("Black Rain") for the acquisition of AK-47 parts. Deaza Dep. Ex. 4 at IKON2004 004183. This credit is a down payment by Black Rain on a $786,380.00 transaction for various AK parts memorialized in Ikon Invoice No. 344. Deaza Dep. Ex. 44. These AK parts, sold by Ikon to Black Rain, originate from inventory Ikon purchased from A.C. Unity.[4] Deaza Dep., Oct. 4, 2022, 105:7-12. Thus, Ikon's business with Black Rain is only made possible by PSA's entrusted funds, which were misused by Ikon to purchase certain A.C. Unity products, and which, in turn, were sold to Black Rain. *Id.*

44.    Focusing on Ikon's payments to A.C. Unity with PSA's entrusted funds, I identified two wire transfers from the Ikon First Bank Account to A.C. Unity in the amount of $363,816.60 and $231,899.20 on September 8, 2021 and December 22, 2021, respectively. Deaza Dep. Ex. 4 at IKON2004 003101, 003203. Mr. Deaza testified that his "partnership" with A.C. Unity involves paying a "lump sum" to A.C. Unity, Deaza Dep., Oct. 4, 2022, 81:2-5, 24-25, 82:1, and that A.C. Unity goods delivered to Ikon were paid for, apparently whether in whole or part, from this "lump sum" payment. Deaza Dep., Oct. 4, 2022, 83:4-21. That said, the "partnership" between Ikon and A.C. Unity was only made possible by the misappropriation of PSA's entrusted funds for the benefit of Ikon.

45.    Several of Ikon's business transactions with IZOP-K are also worth highlighting. Ikon purchased 14,000 gas masks from IZOP-K for $8,988.00 and these products were delivered to Ikon on or about April 25, 2022. Deaza Dep. Ex. 6; Deaza Dep., Oct. 3, 2022, 32:4-23.  Ikon

---

[4] As a tangential matter, I find it very troubling that Ikon is fully capable of acquiring and shipping AK parts from A.C. Unity for its own inventory and benefit, and in furtherance of its partnership with Black Rain to develop an AK-47 that will directly compete with PSA, but wholly unable to deliver AK parts kits and other firearms under the Montenegrin or Serbian Agreements to PSA. *See* Deaza Dep., Oct. 4, 2022, 103:21-25 (explaining Ikon's business relations with Black Rain).

also purchased 10 Akila Chassis sniper rifles from IZOP-K for $25,300.00 and these products were likewise delivered to Ikon on or about March 21, 2022. Deaza Dep. Ex. 3; Deaza Dep. Ex. IKON2004 003965, 003966; Deaza Dep. Oct. 3, 2022, 18:11-23. However, there is no evidence whatsoever of payment from Ikon to IZOP-K for the acquisition of these products other than payments Ikon made to IZOP-K that Mr. Deaza claims are for the purpose of acquiring promised firearms under the Montenegrin and Serbian Agreements. This means that Ikon drew upon PSA's entrusted funds that it sent to IZOP-K (purportedly for the purpose of acquiring firearms under the Montenegrin and Serbian Agreements) to purchase products for Ikon's own inventory.[5]

46.     IZOP-K also invoiced Ikon $14,450,000.00 for a large quantity of ammunition originating from the Russian Federation. Deaza Dep. Ex. 9. Email communications between IZOP-K and Ikon, dated May 24, 2022, indicate that containers have been filled with the purchased ammunition and that shipment is forthcoming. Deaza Dep. Ex. 9. However, Mr. Deaza's memory seemed to fail him concerning the precise details of this transaction and he claimed there was no written agreement concerning this multi-million dollar transaction other than the invoice. Deaza Dep. 35:3-25, 36:1-25, 37:1-12. Based on my approximately 14 years in the firearms industry, I believe it highly improbable that a transaction for ammunition for this amount of money would not be accompanied by a written agreement, and further find that a transaction of this size could not be funded, whether in whole or part, without significant upfront capital from the participants, capital that Ikon did not possess prior to the deposit of PSA's entrusted funds.

---

[5] Mr. Deaza testified that Ikon paid for the Akila Chassis sniper rifles and that payment was made from the Ikon First Bank Account, however, Mr. Deaza was unable to show from the bank records where payment went to IZOP-K other than payments in connection with the Montenegrin and Serbian Agreements. Deaza Dep., Oct. 3, 2022, 17:3-6, 15-16, 24-25, 18:1-4, 25:17-25, 26:1-7. After being unable to show funds wired to IZOP-K for the purchased sniper rifles in the bank account records, Mr. Deaza's recollection became less certain concerning where funds came from for the purchase of the gas masks from IZOP-K. Deaza Dep., Oct. 3, 2022, 33:9-12.

47.     Finally, it appears that if an agreement ever existed between Ikon and IZOP-K for the purchase of AK M70s from the Montenegrin Ministry of Defense (and that is far from certain), that agreement was later cancelled by IZOP-K and funds committed for the purchase under IZOP-K Proforma Invoice No. 131 – 2021 were redirected to alternative suppliers for the AK M70 firearms. Deaza Dep. Ex. 11 at IKON2004 003946; Deaza Dep. Ex. 21. As background, Proforma Invoice No. 131 – 2021, dated September 25, 2021, invoices Ikon $1,862,000.00 for 8,000 AK-47. Deaza Dep. Ex. 22. Mr. Deaza testified that this invoice is for the purchase of the promised firearms under the Montenegrin Agreement.  Deaza Dep., Oct. 3, 2022, 130:8-14.

48.     However, an email from Mr. Deaza to Mr. Klemen Molek, Chief Executive Officer, IZOP-K, dated July 1, 2022, recites that IZOP-K has paid $596,365.14 for 2,000 AK kits from N.B. I.N.A.T., D.O.O. ("NB INAT") and $257,963.79 to DORI Group, D.O.O. ("DORI") for 1,940 AK kits, and requests a refund under Proforma Invoice No. 131 – 2021 for $1,017,671.07, which is the difference between the invoiced amount ($1,862,000.00) and the total amounts paid by IZOP-K to third-party suppliers ($854,328.93) for AK-47 firearms. Deaza Dep. Ex. 21.

49.     Replying to Mr. Deaza, Mr. Molek explains that IZOP-K is under contract to purchase 4,000 AK-47 from NB INAT for 1,142,880 EU and also under contract to purchase 1,940 AK-47 from DORI for 494,700 EU, which collectively amounts to 1,536,580 EU. *Id.* Mr. Molek then states that based on the exchange rate at the time this equals $1,605,726.10. *Id.*  Therefore, Mr. Molek only agrees that IZOP-K will refund to Ikon $266,274.00 under Proforma Invoice No. 131 – 2021, which is the difference between the invoice amount ($1,872,000.00) and the total amount for which IZOP-K is under contract ($1,605,726.10) with the aforesaid third party suppliers. *Id.* Thereafter, on August 25, 2022, IZOP-K deposited $266,239.50 into Ikon's bank

account with Bank of America, Account No. XXXX XXXX 0750. Deaza Dep. Ex. 45 at IKON2004 003578.

50.      Mr. Deaza testified that Proforma Invoice No. 131 – 2021 is for the purchase of the promised firearms under the Montenegrin Agreement. Deaza Dep., Oct. 3, 2022, 99:7-12. Mr. Deaza testified that the $266,239.50 deposited into the Ikon bank account with Bank of America is a partial refund on this invoice. Deaza Dep., Oct. 4, 2022, 188:15-17. Accordingly, these are PSA entrusted funds refunded to Ikon from IZOP-K for the purported purchase of firearms under the Montenegrin Agreement, and thus, should be immediately transferred by Ikon back to PSA.

51.      I have attached hereto as Attachment B is a PowerPoint presentation that summarizes my positions in this Declaration based upon my review of the documents, evidence, and deposition testimony, as well as my experience as a certified public accountant and executive in the firearms industry. In addition to the matters discussed herein, Slide No. 7 also shows that $253,500.500 of PSA's entrusted funds were paid from Ikon to 3DC Projects, LLC, a sole member LLC owned and operated by Mr. Deaza. Deaza Dep., Oct. 4, 2022, 262:6-8.

52.      Even a cursory review of the 3DC Project LLC Bank of America account statements for Account No. XXXX XXXX 0729 reveals that Mr. Deaza used this account to pay for a variety of purely personal expenses, such as paying down large credit card bills in his name, paying for his children's private education, and paying off a mortgage on personally owned real estate, among other things. *See e.g.,* Deaza Dep., Oct. 4, 2022, 262 – 265 (discussing paying various personal expenses from the 3DC Project, LLC corporate checking account).

53.      It is clear to me now (but was unknown to me at the time) based on my review of the documents, evidence, and deposition testimony in this proceeding, as well as my prior experience as a certified public accountant and firearms industry executive, that PSA is the victim

16

of a complex fraud. Mr. Deaza misappropriated $4,504,504.00 entrusted to Ikon for the exclusive purpose of purchasing, demilitarizing, and delivering firearms under the Montenegrin and Serbian Agreements, and instead, used those funds to enrich himself and to grow his company's business operations.

54.    The foregoing provides a clear picture that Ikon Weapons was a failing business before PSA entrusted its funds to it exclusively for the purposes of acquiring the aforementioned firearm kits, and it is a failing business today when you exclude PSA's entrusted funds. This Declaration shows conclusively, in my judgment, that all of the products acquired from A.C. Unity and other companies belong to PSA as they were acquired with PSA's entrusted funds which were and are being misappropriated. While this Declaration contains most of the key facts and evidence that I wish to call to the attention of the Court in support of PSA's adversary complaint and motion for preliminary injunction, I respectfully reserve the right to provide additional facts and evidence at any hearing or trial that may be held on the matters set for in the Complaint or in the motion for preliminary injunction.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.**

/s/ Jamin McCallum
Jamin McCallum

This 16th Day of October, 2022

# EXHIBIT A

ment A to Declaration of Jamin McCallum

**Total Credit/Debit Analysis (Ikon Weapons, LLC First Bank Account No. -7790)**

Starting Balance 10/01/2020: $10,176.20

| Month/Year | Total Credits/Deposits | Total Credits/Deposits by PSA and/or Refund of Prior Payment for PSA Firearms | Total Credits/Deposits LESS Deposit/Funds | Total Debits/Withdraws | Total Debits/Withdraws as Purported Payment for PSA Firearm Purchases | Total Debits/Withdraws LESS Purported Payments for PSA Firearm Purchases | Ending Balance | Ending Balance with PSA Deposits and Purported Payments for PSA Firearms Excluded | Pls. Dep. Ex. II CV-23-02241 (Record at 1001/C 07/31/2023) |
|---|---|---|---|---|---|---|---|---|---|
| | $23,036.60 | $0.00 | | $18,713.76 | $0.00 | | $14,499.04 | | PSA_0339 |
| | $28,485.96 | $0.00 | | $17,163.92 | $0.00 | | $25,816.08 | | PSA_0349 |
| | $12,067.00 | $0.00 | | $33,345.87 | $0.00 | | $5,537.21 | | PSA_0359 |
| | $254,175.00 | $0.00 | | $88,841.70 | $0.00 | | $200,870.51 | | PSA_0368 |
| | $2,500.00 | $0.00 | | $15,644.19 | $0.00 | | $187,726.32 | | PSA_0374 |
| | $0.00 | $0.00 | | $43,294.50 | $0.00 | | $144,431.82 | | PSA_0382 |
| | $90,777.61 | $0.00 | | $37,918.08 | $0.00 | | $197,291.35 | | PSA_0392 |
| | $1,513.13 | $0.00 | | $109,360.43 | $0.00 | | $89,263.95 | | PSA_0401 |
| | $1,592,555.41 | $1,880,000.00 | $12,555.41 | $1,674,769.50 | $1,212,500.00 | $462,269.50 | $307,049.86 | -$360,450.14 | PSA_0462 |
| | $119,110.98 | $0.00 | | $156,161.32 | $0.00 | | $270,009.52 | -$397,490.48 | PSA_0474 |
| | $1,885,414.85 | $1,880,000.00 | $5,414.85 | $266,033.33 | $201,000.00 | $65,033.33 | $1,889,391.04 | -$457,108.96 | PSA_482-047... |
| | $1,960,080.16 | $1,957,004.00 | $3,076.16 | $3,516,439.93 | $2,405,532.00 | $1,110,907.93 | $333,031.27 | -$1,564,940.73 | PSA_0489-0... |
| | $11,015.36 | $0.00 | | $160,973.33 | $0.00 | | $183,073.40 | -$1,714,898.60 | PSA_0497 |
| | $89,257.30 | $0.00 | | $146,571.68 | $0.00 | | $125,759.02 | -$1,772,212.98 | PSA_0506 |
| | $237,113.62 | $0.00 | | $383,364.89 | $0.00 | | $78,807.75 | -$1,819,664.25 | PSA_0513 |
| | $82,712.29 | $0.00 | | $88,888.89 | $0.00 | | $79,536.15 | -$1,818,435.65 | PSA_0525 |
| | $75,443.42 | $0.00 | | $136,491.69 | $0.00 | | $18,487.88 | -$1,879,484.12 | PSA_0534 |
| | $22,313.86 | $0.00 | | $28,883.79 | $0.00 | | $11,918.95 | -$1,886,163.05 | PSA_0544 |
| | $146,847.01 | $0.00 | | $142,133.02 | $0.00 | | $16,632.94 | -$1,881,139.06 | PSA_0560 |
| | $79,724.60 | $0.00 | | $74,841.10 | $0.00 | | $22,316.44 | -$1,875,655.56 | PSA_0572 |
| | $538,506.19 | $0.00 | | $155,563.47 | $0.00 | | $106,353.16 | -$1,791,018.84 | PSA_0583 |
| | $81,393.76 | $0.00 | | $99,945.81 | $0.00 | | $88,400.11 | -$1,809,571.89 | IKON2004 00... |
| | $62,236.02 | $0.00 | | $115,150.18 | $0.00 | | $35,985.95 | -$1,861,986.05 | IKON2004 00... |

# EXHIBIT B

Exhibit B to Declaration of Jamin McCallum

# TRACING THE DEBTOR'S USE OF ENTRUSTED FUNDS DELIVERED BY PALMETTO STATE ARMORY, LLC FOR THE EXCLUSIVE PURPOSE OF ACQUIRING THE PROMISED GOODS

## PALMETTO STATE ARMORY v. IKON WEAPONS, LLC (IN RE IKON WEAPONS, LLC)

ADV. PROC. NO.: 22-02021

# Outline

Ikon's financial condition prior to PSA's deposits.

How Ikon promised to use PSA's deposits.

How Ikon actually used PSA's deposits.

Summary of facts and evidence.



# Ikon Weapons, LLC was Losing Money

## Ikon Ordinary Business Income

2018 — $13,079.00

2019 — ($93,399.00)

2020 — ($13,284.00)

## IKON GROSS RECEIPTS

2018 — $158,261.00

2019 — $153,218.00

2020 — $131,478.00

2021 — $2,657,5__

ior to its transactions with PSA, Ikon is reporting **yearly losses** in ordinary business inc

r the two preceding tax years and **declining gross receipts**. The surge in gross receipts [

Y 2021 reflects the transfer of PSA's entrusted funds to Ikon.

# What Ikon Weapons, LLC and Mr. Deaza Promised …



Jun. 17, 2021: $1,880,000

Aug. 20, 2021: $1,880,000

Sep. 1, 2021: $744,500.00

$4,504,504.00

Sep. 2, 2021: $363,816.60*

Sep. 29, 2021: $1,862,000.00**

$2,174,532.00

*Purported payment on S…
Agreement.
**Purported payment on
Montenegrin Agreement.

## Promised Goods Delivered by Ikon to PSA to date: NONE.

> In the event of default … "Seller sh[all] _return the Buyer's Deposit_ in accordance with the Buyer's writt[en] instruction." Purchase Agreeme[nt] ¶6(c)

…se Agreement, Jun. 16, 2021 ("Montenegrin Agreement")

…ds:

- 5,500 AK M70 Kit of Parts – Underfold Stock
- 2,500 AK M70 Kit of Parts – Fixed Stock

…chase Price: $3,760,000.00 (100% of funds delivered)
…ended Delivery Date: June 1, 2022

…voice No. 173, Aug. 31, 2021 ("Serbian Agreement")

…ds:

- 5,000 Zastava M70
- 1,500 Zastava M76 Semi Auto (w/ accessories)
- 297 Zastava Z-10 Auto

…chase Price: $3,722,520.00 with 20% down ($744,500.00) to
…l transaction.
…ivery Date: June 1, 2022

# What Ikon Weapons, LLC and Mr. Deaza Have Actually Done ...



- These **8** transactions alone — **$379,915.31**. All transactions are for the **personal** benefit of Mr. Deaza or his company, Ikon.

- All transactions were made within **14 days** of the first deposit of the entrusted funds.

- This amount is more than **2.5 times** the sales reported by Ikon for tax year 2020.

- PSA did not authorize its entrusted funds be used to fund Mr. Deaza's lifestyle or business operations.

- Ikon had not (and still has not) sent a single firearm under the Monte Agreement at the time of this "buying spree."

- **All** of these payments and purchases were made with PSA's entrusted funds.

- This is **only** a sample of Mr. Deaza's spending and not a complete accounting.

**Jun. 16, 2021:**
$40,659.14 for new car for wife

**Jun. 21, 2021:**
$6,319.70 to pay down personal credit card

**Jun. 22, 2021:**
$150,000.00 for business machinery

**Jun. 22, 2021:**
$16,240.52 pay down mortgage on personal condo

**Jun. 22, 2021:**
$34,663.09 pay off outstanding loan from First Bank to Ikon

**Jun. 22, 2021:**
$50,000.00 cash withdrawal for transfer to 3DC Projects, LLC

**Jun. 23, 2021:**
$37,000.00 to Ikon BoA Account

**Jun. 30, 2021:**
$45,033.00 for business machinery

AUTOMATICS & MACHINERY



LOAN

**3DC Projects, LLC**

BANK

**ENTRUST**



IKON
WEAPONS

omised Goods
ivered by
n to PSA to
e: **NONE.**

# What Ikon Weapons, LLC and Mr. Deaza Have Actually Done ...

- These 8 transactions alone **$1,086,810.60**. All transactions are **personal** benefit of Mr. Deaza company, Ikon.

- All transactions were made within 4[5] the second deposit of the entrusted fund.

- This amount is more than **8 times** [the] sales reported by Ikon for tax year 2020.

- PSA did not authorize its entrusted [fund] used to fund Mr. Deaza's lifestyle business operations.

- Ikon had not (and still has not) [made a] single firearm under the Mon[...] Agreement or Serbian Agreement [...] of this "spending spree."

- *All* of these payments and purchases made with PSA deposited funds.

- This is *only* a sample of Mr. Deaza's s[...] and not a complete accounting.



September 2, 2021:
$20,000.00 to Ikon's BoA Acct.



Sep. 8, 2021:
$363,816.60 to stock Ikon's inventory.



Sep. 13, 2021:
$357,496.89 to purchase personal home.



Sep. 15, 2021:
$133,952.00 partial payment for business machinery



Sep. 15, 2021:
$10,000.00 escrow to purchase new Ikon facility



September 23, 2021:
$9,000.00 cash withdrawal to purchase business equipment

  

September 27, 2021:
$4,228.24 to pay down personal credit card



September 30, 2021:
$188,317.47 to purchase new Ikon facility

**IKON WEAPONS**

[...]mised Goods
[...]ivered by
[...]n to PSA to
[...]e: **NONE.**

# What Ikon Weapons, LLC and Mr. Deaza Have Actually Done …

## I k o n WEAPONS    $253,500.50 ⟶ 3DC Projects, LLC

**3DC Projects, LLC**

| Invoice No. | Date: | Invoiced to: | Invoiced for: | Bates No.: |
|---|---|---|---|---|
| | | Invoices from 3DC Projects, LLC to Ikon Weapons, LLC | | |
| 206 | Jun. 30, 2021 | Ikon Weapons, LLC | IKON2 | IKON2004 000314 |
| 209 | Jul. 31, 2021 | Ikon Weapons, LLC | IKON2 | IKON2004 000326 |
| 2011 | Aug. 30, 2021 | Ikon Weapons, LLC | IKON2 | IKON2004 000335 |
| 212 | Sep. 30, 2021 | Ikon Weapons, LLC | IKON3 | IKON2004 000342 |
| 213 | Oct. 31, 2021 | Ikon Weapons, LLC | IKON3 | IKON2004 000355 |
| 214 | Nov. 30, 2021 | Ikon Weapons, LLC | IKON3 | IKON2004 000364 |
| 215 | Dec. 30, 2021 | Ikon Weapons, LLC | IKON3 | IKON2004 000373 |
| 216 | Jan. 31, 2022 | Ikon Weapons, LLC | IKON3 | IKON2004 000418 |
| 218 | Feb. 28, 2022 | Ikon Weapons, LLC | IKON3 | IKON2004 000434 |
| 221 | Apr. 30, 2022 | Ikon Weapons, LLC | IKON3 | IKON2004 000471 |
| 225 | May 30, 2022 | Ikon Weapons, LLC | IKON3 | IKON2004 000491 |
| 226 | Jun. 30, 2022 | Ikon Weapons, LLC | IKON3 | IKON2004 000506 |
| 227 | Jul. 30, 2022 | Ikon Weapons, LLC | IKON3 | IKON2004 000535 |
| 228 | Aug. 30, 2022 | Ikon Weapons, LLC | IKON3 | IKON2004 000555 |

...ised Goods Delivered by Ikon to PSA to date:

E.

- 3DC Projects, LLC is a single mem[ber] owned and operated by Mr. Deaza.
- Mr. Deaza used the corporate account numerous **personal** expenses, such ... down credit cards in his own name, ... his children's private education, pay... mortgage balance on an apartment ... him, etc.
- Mr. Deaza purports that the payme... Ikon to 3DC Projects, LLC are for ... services for improvements made a... facilities located at 234 Liberty Ch... Mount Gilead, NC 27306 and 202... Albermarle, NC 28001.
- PSA did not authorize its entrusted ... used to fund Mr. Deaza's lifestyl... business operations.
- **All** of these payments to 3DC Proj... were made with PSA's entrusted fund...
- This is **only** a sample of Mr. Deaza's ... and not a complete accounting.

# What Ikon Weapons, LLC and Mr. Deaza Have Actually Done ...

Proforma Invoice No. 112 – 2021, August 28, 2021
Akila Chassis (Sniper Rifles) / $25,300.00

Proforma Invoice No. 118 – 2021, September 9, 2021
Gas Masks / $8,988.00

Proforma Invoice No. 118 – 2021, September 9, 2021
Russian Ammo. / $14,450,000.00

Email from IZOP-K to Mr. Deaza, dated May 24, 2022, advises of "80 cont[...] load from Barnaul" and "12 containers load from Vympel-Amurski." The [...] ammunition is coming from the "Barnaul Cartridge Plan" in Barnaul, Russ[...] Vympel ammunition is coming from the "AMURSK CARTRIDGE PLAN[...] located in Amursk, Russia. IZOP-K advises "We would need to send contain[...] towards Columbia and than move them back to USA with IZOP documents[...]

- This is *only* a sample of Mr. Deaza's/Ikon's business with IZOP-K.
- Bank records show **NO** payments from Ikon to IZOP-K other than those purported firearms that are the subject of the Montenegrin and Serbian Agreements.
- Ikon's transactions with IZOP-K were made with PSA's entrusted funds.

## Promised Goods Delivered by Ikon to PSA to date: NO

...sages from Mr. Deaza
...g receipt of shipment
...sks and Akila Chassis
...fles from IZOP-K.

# What Ikon Weapons, LLC and Mr. Deaza Have Actually Done …

**IKON WEAPONS**

**$266,239.50**
August 25, 2022

→ **IZOP-K**

497,400 EU (contracted amt.)
Mar. 3, 2022

→ **DORI GROUP**
1,940 AK contracted
(partial payment)

1,142,880 EU (contracted amt.)
Mar. 9, 2022

→ **NB I.N.A.T.**
4,000 AK contracted
(partial payment)

o So-called "Montenegro Agreement" is purportedly cancelled on March 10, 2022.

o Funds under Proforma 131-2021 (8,000 AK M70) redirected to alternate suppliers (i.e., NB INAT and DORI Group).

o IZOP-K contracts with NB INAT for 4,000 AK-47 in the amount of 1,142,880 EU.

o IZOP-K contracts with DORI Group for 1,940 AK-47 in the amount of 497,400 EU.

o IZOP-K refunds Ikon the exchange rate difference of $266,239.50 between its contracts with NB INAT and DORI Group (1,536,580.00 EU) and the total under Pro Forma 131-2021 ($1,872,000.00)

## Promised Goods Delivered by Ikon to PSA to date: NONE.

# What Ikon Weapons, LLC and Mr. Deaza Have Actually Done …



A.C. Unity firearms and firearms-related goods delivered to Ikon.

September 2, 2021:
$363,816.60

December 22, 2021:
$231,899.20

**$595,715.80**

Proforma 046A-21
Proforma 047A-21
September 2, 2021
Total: 414,210.00 EU

Proforma 069-21
Proforma 063-21
Proforma 068-21
Proforma 064-21
November 16/19, 2021
Total: 1,326,107.36 EU

1,000 Flare Guns Sold
$96,801.00
April 5, 2022

Ikon Invoice No. 344
June 14, 2022
$886,380.00



No. 173A
, 2021
.00

## Promised Goods Delivered by Ikon to PSA to date: NONE.

# Summary of the Facts and Evidence

on was a business losing money and with declining sales in 2020.

A's entrusted funds were misappropriated and used to pay for Mr. Deaza's improved lifestyle (e.g... me, new car, paying off personal credit card debts, children's private education, etc.).

A's entrusted funds were misappropriated and used to grow Ikon's business operations... provements to current facility, purchase of a larger facility, purchase of business machinery, acquis... new inventory, etc.).

**SA ENTRUSTED IKON WITH $4,504,504.00 FOR THE EXCLUSIVE PURPOSE... CQUIRING THE PROMISED FIREARMS AND FAILING THAT THE ENTRUSTED F... ERE REQUIRED TO BE RETURNED.**

**OT A SINGLE PROMISED FIREARM OR FIREARMS KIT OR PARTS UNDER... ONTENEGRIN OR SERBIA AGREEMENTS HAVE BEEN DELIVERED TO PSA (... HOUGH IKON HAS MANAGED TO SHIP MULTIPLE CONTAINERS OF FIREARMS P... ND RELATED PRODUCTS TO FILL ITS OWN INVENTORY).**

**HE AGREEMENTS WITH PSA WERE A FRAUD. IKON AND MR. DEAZA SECURED... NTRUSTED FUNDS THROUGH DISHONESTY AND THEN, MISAPPROPRIATED P... NTRUSTED FUNDS TO BUY PERSONAL ASSETS AND BUSINESS ASSETS THAT H... OTHING TO DO WITH THE TRANSACTIONS WITH PSA AND NOW THEY SEEK TO H... HIS COURT ALLOW THEM TO PROFIT FROM THEIR FRAUD AND DECEIT.**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE:

IKON WEAPONS, LLC,

               Debtor.

CASE NO. 22-10507
CHAPTER 11

PALMETTO STATE ARMORY, LLC,

               Plaintiff,

vs.

IKON WEAPONS, LLC,

               Defendant.

ADV. PROC. NO.: 22-02021

## CERTIFICATE OF SERVICE

I, William Walt Pettit, as attorney of record for Palmetto State Armory, LLC, hereby certify that on the 16th day of October, 2022, I served a copy of Palmetto State Armory, LLC's Memorandum of Law in Support of Its Claim For Declaratory Judgment and Motion for Preliminary Injunction by either electronic notice in accordance with the local rules or by depositing the same, enclosed in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, said envelope being addressed as follows:

Ikon Weapons, LLC
234 Liberty Hill Church Rd
Mount Gilead, NC 27306

John C. Woodman, Esq.
Essex Richards
(by ECF service)

Ashley S. Rusher, Esq.
Subchapter V Trustee
(by ECF service)

William P. Miller, Esq.
U.S. Bankruptcy Administrator's Office
(by ECF service)

HUTCHENS LAW FIRM LLP
Attorneys for Palmetto State Armory, LLC

By: /s/ William Walt Pettit
     William Walt Pettit
     N.C. Bar No. 9407
     6230 Fairview Road, Suite 315
     Charlotte, N.C. 28210

Telephone: (704) 362-9255
Telecopier: (704) 362-9268
Email: walt.pettit@hutchenslawfirm.com