**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| IKON WEAPONS, LLC | ) | |
| | ) | Case No. 22-10507 |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| ———————————————— | ) | |
| | ) | |
| PALMETTO STATE ARMORY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | ADV. PRO. NO 22-02021 |
| | ) | |
| v | ) | |
| | ) | |
| IKON WEAPONS, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ———————————————— | ) | |

**DEFENDANT'S *BRIEF* IN RESPONSE TO PLAINTIFF'S MOTION**
**FOR TEMPORARY RESTRANING ORDER OR, IN THE ALTERNATIVE,**
**FOR A PRELIMINARY INJUNCTION**

Defendant, and debtor in possession, Ikon Weapons, LLC, ("Debtor") hereby responds to

*Palmetto State Armory, LLC's Motion for Temporary Restraining Order or, in the Alternative, for*

*a Preliminary Injunction* filed in this adversary proceeding on September 21, 2022 [AP No. 2][1]

(the "Motion").  In opposition to the Motion, the Debtor respectfully files this brief pursuant to

Local Rule 7007-1 and shows unto the Court as follows:

### SUMMARY OF THE ARGUMENT

Plaintiff, Palmetto State Armory, LLC, (PSA) cannot establish the requisite elements

necessary for the extraordinary injunctive relief it seeks via this adversary proceeding and the

---

[1] References to the Adversary Proceeding docket are abbreviated with "AP No._____" while references to the base case are abbreviated with "Doc. No._____".

present motion for three (3) distinct reasons.

First, PSA holds no colorable claim to the property that it seeks (the "Subject Property")[2] and therefore it cannot show a likelihood that it will prevail upon the merits of its adversary case. The Subject Property does not comprise any of the surplus firearms kits sold to PSA under either of the two contracts PSA currently asserts with the Debtor.  Nor is the Subject Property PSA's collateral under any contract or security agreement with PSA.  Moreover, the contracts between PSA and the Debtor do not "earmark" any particular funds for the purchase of the Subject Property (or, for that matter, any property).    Furthermore, PSA has engaged in no tracing analysis to establish any direct tie to PSA funds that would support a constructive trust theory.

Second, PSA is not irreparably harmed  absent the requested relief.  In truth, PSA will not suffer *any* greater harm than any other similarly situated unsecured creditor.  PSA's claim in this case is an unsecured one.  It is based upon the Debtor's failure to perform pursuant to two sales contracts.  The claim is compensable (like any other allowed claim), but is not entitled to recovery against any particular collateral.  However, despite this, via its present motion, PSA attempts to vault itself ahead of other unsecured creditors (and even one properly perfected secured creditor, the United States Small Business Administration), by having this Court, in-effect, recategorize its claim as one secured by the Subject Property.  While, no doubt, PSA, would welcome such an outcome, there is simply no basis in fact or law for this relief.  Ultimately,  PSA's fate here will be no different than any other unsecured creditor in this case, or any bankruptcy case.

Finally, the relief requested by PSA is not equitable to the Debtor and/or the other creditors

---

[2] The "Subject Property" as used herein refers to those items of the **Debtor's inventory** that until recently were contained in three (3) shipping containers delivered to the Port of Charleston, South Carolina.  Pursuant to an Order entered in the Debtor's base bankruptcy case on October 3, 2022  (Case No 22-10507, Doc. No. 83) the Subject Property was transferred to the Debtor's facility in Albemarle, North Carolina.  As permitted by the Court, PSA subsequently completed an inventory of the Subject Property and confirmed that it is comprised of a variety of firearms parts and accessories that substantially coincide with the items listed on the packing lists provided by the Debtor.

in this case.  By enjoining the sale of the Subject Property and/or commandeering it for its own use, PSA robs the Debtor's estate of valuable inventory, for some of which the Debtor already has willing buyers.  Such an injunction would limit the Debtor's ability to pursue a successful reorganization and to repay its creditors—including PSA.   Thus, by freezing the Debtor's inventory, PSA, in a sense, cuts off its nose to spite its face.  It hinders the Debtor from paying PSA through any plan of reorganization, which is, and has been, the Debtor's stated goal.  For all of these reasons, the Debtor respectfully asserts that PSA's Motion must be denied.

## FACTS & ALLEGATIONS

Formed on December 15, 2020, the Debtor is a North Carolina limited liability company that operates as a firearms manufacturer, purchaser, and importer.   On September 2, 2022, the Debtor filed for protection under Subchapter V of the Bankruptcy Code (the "Petition Date").  The Debtor continues in possession of its properties and the management of its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### The Debtor and Palmetto State Armory, LLC

Movant, PSA, is a firearms and accessories retailer who, upon information and belief is headquartered in Columbia, South Carolina. *See* Complaint ¶ 1 [AP. No. 1].  PSA is a duly scheduled unsecured creditor in the Debtor's bankruptcy case with a claim arising from two contracts PSA entered into with the Debtor.  *See* Schedule E/F [Doc. No. 67, p. 27 of 45].  Said contracts include:

      a.   a contract entered on or about June 16, 2021 under which the Debtor agreed to sell and PSA agreed to purchase 8,000 **surplus** Yugoslavian AK-47 kits for the price of $3,760,000.00 ("Contract 1"). A true and accurate copy of Contract 1 and its amendments is attached hereto as Exhibit A; and

b. an agreement was entered into on of about August 31, 2021 under which the Debtor agreed to sell and PSA agreed to purchase 297 handguns/pistols, 1,500 sniper rifles and 5,000 **surplus** AK-47 for the price of $3,722,520.00 ("Contract 2"). A true and accurate copy of the invoice evidencing Contract 2 is attached hereto as <u>Exhibit B.</u>

*Contract 1*

Under the terms of Contract 1, PSA on June 17, 2021, initially provided a deposit of 50% of the purchase price. This amount was deposited in the Debtor's general operating bank account with First Bank along with other funds of the Debtor. Subsequently on August 20, 2021, pursuant to an amendment to Contract 1, PSA paid the other 50% of the purchase price. This amount was likewise deposited in the Debtor's operating account with First Bank account and comingled with the funds therein   After three separate amendments to Contract 1 under which the parties agreed to alter the payment schedule, delivery date, and other materials terms, communications between the Debtor and PSA broke down when the Debtor was unable to deliver the product from the country of Montenegro.   At that time, the Debtor had done all that it could to try to fulfill the terms of Contract 1.   It had paid the amounts to the necessary to acquire the kits to the brokers and third parties involved in the transaction. The Debtor has disclosed in its *Schedules* those deposits and possible claims against said third parties.

*Contract 2*

Contract 2 is memorialized by only an invoice/purchase order. Under its terms, on or about September 1, 2021  PSA provided a 20% deposit of the total purchase price. This was deposited in the Debtor's bank account with First Bank. The product sold under Contract 2, again surplus firearms, was scheduled to come from Serbia but with no confirmed delivery date. Like with Contract 1, the Debtor has had difficulty being able to secure and deliver the products  to

fulfill PSA's orders under Contract 2.  The Debtor is regularly seeking information from its broker, IZOP-K, on the status of the surplus product under Contract 2, so that it can timely make a decision on whether to assume or reject this possible executory contract.

***State Court Litigation***

Notwithstanding the Debtor's good faith efforts to preform under the Contracts and various amendments, on July 6, 2022 PSA proceeded to file that certain action entitled *Palmetto State Armory, LLC v. IKON Weapons, LLC and Suliban Deaza*, Lexington County, Case No. 2022-CP-32- (the "Action").   The Action alleges claims against both the Debtor and Mr. Deaza based upon the Contract and the subsequent amendments.   PSA seeks claims of (i) Breach of Contract, (ii) Fraud in the Inducement, (iii) Breach of Contract accompanied by fraudulent act, (iv) Unfair Trade Practices, (v) Unjust Enrichment, (vi) Conversion, (vii) Negligent Misrepresentation, (viii) Equitable Accounting, and (ix) Attachment.  The Debtor and Mr. Deaza dispute the allegations and claims brought by PSA in the Action.  The Claims asserted by PSA are consistent with a suit by any ordinary **unsecured** trade creditor.

PSA immediately began discovery in the Action as to the Debtor's operations and the activity of Mr. Deaza through the issuance of certain subpoenas (the "Subpoenas").   Through the Subpoenas, PSA gained information from First Bank as it relates to account statements, cancelled checks, and transaction history of both First Bank and Mr. Deaza.  The Subpoenas also sought information from Verizon Wireless as it relates to the Debtor and Mr. Deaza concerning billing information but also call records and text messages.  PSA also initiated a Rule 30(b)(6) deposition in the Action for the Debtor in which it had an opportunity to questions Mr. Deaza regarding the Debtor and other topics.  The Deposition notice sought testimony on a substantial list of topics for which Mr. Deaza—the Debtor's sole manager and license holder was the  30(b)(6) designee.

### *Initial Cash Collateral Hearing*

On September 6, 2022, the Debtor filed that certain *Emergency Motion of the Debtor for Authority to Use Cash Collateral* [Doc. No. 5] which the United States Bankruptcy Court for the Western District of North Carolina heard on September 8, 2022.  PSA, despite holding no security interest in any property of the debtor,  objected to the Debtor's Motion.  In the spirit of Subchapter V cases, the interest of facilitating an initial agreement and securing the Debtor's right to use cash collateral,   the Debtor negotiated with its senior secured creditor the Small Business Administration, the Subchapter V Trustee, the Bankruptcy Administrator on certain terms and conditions to be included in any Cash Collateral order.  While the Debtor disputed that PSA lacked any interest in Cash Collateral, PSA was included in the negotiations as well, and ultimately, it made the largest requests for concessions.  These included the following:

(i)     the Debtor would provide an inventory of the Subject Property,

(ii)    PSA would be able to inspect the Subject Property once it cleared United States Customs so that it confirm independently that the Subject Property was not the purchased surplus under Contract 1 or Contract 2,

(iii)   any proposed sale over $50,000.00 from a third party concerning any item arriving through the Port of Charleston, regardless of whether it is in the ordinary course of business of the Debtor, PSA, the SBA, the Bankruptcy Administrator and the Subchapter V Trustee would receive notice of such proposed sale,

(iv)    the notice shall include the amount of the proposed sale, the party purchasing the asset, and the items to be purchased,

(v)     the noticing parties would then have 48 hours to object to the proposed sale or make a counter-offer increasing the proposed purchase price, and

(vi)    the Debtor would sit for a Rule 2004 examination and produce certain documents.

Following the circulation of a proposed Cash Collateral Order which was reviewed, commented and agreed upon by the SBA, the Subchapter V Trustee and the Bankruptcy Administrator, it became apparent in the view of the Debtor that an agreed upon Order was not likely, and it submitted the Cash Collateral Order from the foregoing parties and the competing order of PSA.  The competing Orders were submitted on September 20, and one day later, this Adversary Proceeding was initiated.   In the interim, as was announced at the September 8, 2022 hearing, the Debtor conceded to sit for a two-day 2004 examination taken by PSA.  In short, PSA has had every opportunity to gain information about the Debtor, its principal and its operations.

***The Subject Property Furnished by AC Unity***

Separate and apart from its contracts and business dealings with PSA, in June 2022, the Debtor entered into an agreement with AC Unity (the "AC Unity Agreement"). AC Unity is a seller and exporter of firearms parts and accessories located in Goražde, in the Republic of Bosnia and Herzegovina. Under the AC Unity Agreement, AC Unity would ship to the Debtor (at the Debtor's expense) certain amounts of new firearms parts, magazines, and related accessories which the Debtor could then sell into the market.  Pursuant to the AC Unity Agreement, AC Unity shipped to the Debtor three (3) large containers  of product which arrived in the Port of Charleston, South Carolina on August 25, 2022.   A complete list of the items shipped by AC Unity can be found on the AC Unity Packing List (the "Packing List") which is attached hereto as <u>Exhibit C</u> and incorporated by reference as if fully set forth herein.

For budgeting purposes, the Debtor did not include any anticipated sales of the contents shipped by AC Unity in its preliminary budget attached to the Cash Collateral Motion due to the

unknown timing of when the contents would clear United States Customs.[3]  Nonetheless, it is the AC Unity products from these containers that are the subject of the present Motion (the "Subject Property").  The Subject Property shipped by AC Unity is <u>new issued inventory</u>, not surplus inventory, to which PSA contracted for under Contract 1 and Contract 2.  The Debtor provided the Packing List of the Subject Property to PSA on September 15, 2022 pursuant to the announcement made during the September 8 hearing but also to allow PSA to independently confirm that the contents of the containers were not associated with Contract 1 or Contract 2.

To date, the Debtor has not been allowed to sell (and therefore has not paid anything to AC Unity for the purchase of) any of the Subject Property.   On or about December 23, 2021 the Debtor did pay $231,899.20 for the shipping costs and taxes on the Subject Property that was needed to get the products here.  The Debtor did this using money it had acquired from other business deals.  These deals included a sale the Debtor completed on December 13 in the amount of $172,490 to another customer of the Debtor, HK Parts.

The Subject Property represents valuable inventory, a portion of which the Debtor currently can immediately sell to willing buyers.  As such, it is an important component of the Debtor's plan to reorganize and eventually pay all of its creditors—including PSA.

### PSA's Present Motion

The present Motion, filed under Rule 65 of the Federal Rules of Civil Procedure, as made applicable by Rule 7065 of the Federal Rules of Bankruptcy Procedure, has not been served on the Debtor nor has a bond been set as required under Rule 65(c).  The Motion is devoid of any tracing analysis by an independent expert.   It is largely full of incorrect, self-serving and conclusory

---

[3]  The preliminary cash collateral budget includes a line item entitled "AC Unity" with an average of $4,000 gross revenue every other week.  This does not include the Subject Property but rather 2,000 magazines that the Debtor had acquired pre-petition from AC Unity.

assertions that PSA is entitled to the Subject Property because they have not received their product under Contracts 1 and 2.   This argument is specious, and worse, it appears to be motivated not merely by PSA's frustration over the delay in Contracts 1 and 2, but also by PSA's desire to squelch competition and attempt to eliminate a competitor.   Paragraph 4 of PSA's Motion is clear on this point, wherein PSA states that "[i]f the Debtor is permitted to sell these firearms products to third parties, it will have the effect [of] not only depriving PSA's of the products that it paid for and now rightfully owns, but will have the *additional effect of absorbing market share from PSA and depriving it of sales that it would have made*." See Motion, ¶ 4.  The implication here is clear. PSA's intention is not only to thwart the Debtor's reorganization efforts by chilling the chapter 11 process but also to prevent free market sales that would compete with PSA.  This motivation is foreign to the lawful ends of the Bankruptcy Code, and preliminary injunctions are not properly used for this purpose.

Via this Adversary Proceeding, PSA seeks to: 1) enjoin the Debtor from selling the Subject Property in the ordinary course of its business; and 2) ultimately be awarded the Subject Property (as well as all other assets of the Debtor including its bank accounts) based upon several erroneous theories.  See PSA's *Motion* at *Complaint*  at ¶ 20.[Doc. No. 1].   As best the Debtor can discern at present, PSA seeks this relief based upon two flawed conclusions. These include the following:

a.  The Subject Property is (or at least in part includes) the surplus weapons kits that PSA contracted with the Debtor for under Contract 1 and Contract 2, and

b.  The Subject Property was purchased with funds that belonged to PSA and which were "earmarked" for the purchase of PSA firearms kits under Contracts 1 and 2.

The Debtor respectfully submits that both of these conclusions are incorrect.  While PSA has an unsecured claim arising from the Debtor's purported breach of contracts, PSA has no colorable

claim to the Subject Property shipped to the Debtor under a separate contract with AC Unity. Therefore, PSA's present Motion should be DENIED.

## STANDARD OF REVIEW

Preliminary injunctions are "extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*, Nos. 20-30080, 20-03004, 2021 Bankr. LEXIS 2194, at *95-96 (Bankr. W.D.N.C. Aug. 10, 2021). To obtain a preliminary injunction, the Movant is required to make "a clear showing [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Id*. The substantive standards for granting a request for a temporary restraining order and entering a preliminary injunction are the same. *S.C. Progressive Network Educ. Fund v. Andino*, 493 F. Supp. 3d 460, 465 (D.S.C. 2020)(citing *Virginia v. Kelly*, 29 F.3d 145, 147 (4th Cir. 1994).

"The burden is on the party seeking injunctive relief to show it is entitled to the relief, not the burden of the other party to show the movant is not entitled." *Id*. (internal citations omitted). "All four requirements must be satisfied. Thus, even a strong showing of likely success on the merits cannot compensate for failure to show likely injury. *Id*. And, irreparable injury alone is insufficient to support equitable relief. In other words, "a temporary restraining order or a preliminary injunction shall be granted only if the moving party clearly establishes entitlement." *Id*. (citing *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)).

A court's decision granting or denying injunctive relief is reviewed under an abuse of discretion standard. *Id*. However, the Fourth Circuit has stated that "[b]ecause preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power, [a court]

should be particularly exacting in its use of the abuse of discretion standard when it reviews an order granting [injunctive relief]." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (citations omitted) (internal quotation marks omitted) (alteration marks omitted).

## LAW & ARGUMENT

### I.    *Plaintiff is Not Likely to Succeed Upon the Merits*

#### A.  The Subject Property is Distinctly Different from any Product Promised to Plaintiff Under Contract 1 or Contract 2

For the reasons provided herein, PSA is not likely to succeed on the merits its present adversary proceeding claiming an interest in the Subject Property.  The Debtor acknowledges that PSA has a colorable claim for breach of contract that would entitle it to money damages, but that is not the relief PSA seeks in this present case.  PSA's sole causes of action here are for declaratory judgment and preliminary injunction.  In essence both seek a court order that declares that PSA is the rightful owner of property of the Debtor's bankruptcy estate.  These claims are meritless on the facts presented, and cannot sustain the injunctive relief PSA seeks.

The Subject Property simply is not the firearms kits for which PSA contracted.  There is no dispute that PSA contracted with the Debtor for surplus firearms product, whereas, the Subject Property is new or "nonsurplus."  Specifically, PSA sought for the Debtor to import 8,000 surplus Yugoslavian AK-47 kits under Contract 1 and 297 handguns/pistols, 1,500 sniper rifles and 5,000 surplus AK-47 kits under Contract 2.  These items are not part of the Subject Property, and PSA cannot lay claim to them via any theory advanced in its lawsuit.

At this point, this should be apparent even to PSA.  At the conclusion of the cash collateral hearing held on September 8, 2022, the Debtor, as part of what it understood to be a resolution concerning PSA's objection to the cash collateral as an unsecured creditor, offered PSA the opportunity to inspect the Subject Property once it cleared United States Customs.  PSA confirmed

the same at the September 8, 2022 hearing by stating "[a]s far as these three containers, we would also ask that we be provided a list of what is in those containers and have the right to inspect them if we want, we may not want to, but we would ask that we preserve that right."  Upon the Subject Property clearing United States Customs, confirming the packing list and the contents therein, the Debtor coordinated with its transportation broker, Bantam International, the Subject Property to a transportation shipping yard, Nilson Worldwide, located at 2017 Pittsburgh Ave., Charleston SC 29405.  On September 15, 2022, the Debtor provided this information to PSA as two of the containers had arrived.  On September 16, 2022, the Debtor notified that the third container would likely arrive the following Monday but that PSA could begin its inspection if it elected to do so. Upon information and belief, PSA arrived for its "inspection" on the afternoon of Tuesday September 20 and then began a full-on inspection and inventory the morning of Wednesday September 21.

As the Debtor, along with other interested parties, was rightfully concerned about administrative expense costs, among other justifiable reasons, with the Subject Property "parked" parking at the transportation yard, a dispute arose as to the scope of the inspection and what also turned out to be a desired inventory.  PSA demanded that the Subject Property to be "parked" at the transportation yard so that its inspection, and now detailed inventory, could be completed.  The Debtor, along with the Subchapter V trustee, the United States Bankruptcy Administrator for the Western District of North Carolina as well as the various third parties sought that the Subject Property be delivered to its final destination.  Following the Honorable Judge Whitley's ruling during the telephonic hearing held on September 22, 2022, the Subject Property was ordered to be shipped to Debtor's facility, its final destination, pursuant to the *Waybill*.  Thereafter, PSA completed its inspection and inventory.  Following the Debtor's multiple inquiries on the inventory

and inspection results, on October 1, 2022, PSA stated via e-mail "I would note that the packing lists and purchase orders were mostly accurate, and the deviations were minor" confirming that the Subject Property was consistent with the packing lists furnished by the Debtor.  In sum, even PSA at this point seems to have to concede that the Subject Property, simply, are not the guns they are looking for.

### B.  None of Plaintiff's Funds were Used by the Debtor to Purchase any Product in Subject Containers or Pay for Their Shipping or Taxes

PSA's alternative theory is that, even if the Subject Property are not the product under Contract 1 or Contract 2, PSA  is still entitled to the Subject Property because (PSA believes) the property was acquired with funds PSA paid to the Debtor *for the guns*.  Yet this approach fairs no better.

The Debtor has maintained from the outset that <u>no monies</u>, PSA's or otherwise, have been expended to purchase the Subject Property.  It has been shipped to the Debtor by AC Unity to be sold in the U.S..  Not until the Subject Property is sold, will the Debtor have to remit any payment[4] to AC Unity for the Subject Property it shipped.  The only expense the Debtor has paid in connection with the Subject Property is the shipping costs and associated taxes.

This was all explained to PSA via testimony at the 2004 Examination given by the Debtor's insider, Mr. Deaza.  While the deposits provided by PSA pursuant to Contract 1 and Contract 2 were deposited into the Debtor's operating account with other receipts, none were used to purchase the property shipped to the Debtor by AC Unity.  With regard to the related taxes and shipping costs that the Debtor has paid, the  Debtor's operating accounts had balances sufficient to support the payment from sources other than the PSA deposits.  Specifically, the Debtor received in its First Bank account ending in 7790 an  amount of $172,490.00 from a customer,  HK Parts,

---

[4] The Debtor plans on submitting a Procedures Motion to cover this exact situation and the handling of repayment on the AC Unity product.

Inc. on December 13, 2021.   Said deposit was to purchase certain magazines which the Debtor
was to receive from AC Unity.

IKON WEAPONS LLC

Page     2 of 8

| Statement Period:  December 01, 2021 Thru December 31, 2021 | | Account Number:     *****07790 |

**MISCELLANEOUS CREDITS**

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 12/08 | 668.72 | SIGNATURE PAY/CC DEPOSIT<br>025742704040721 IKON WEAPONS |
| 12/09 | 38.94 | SIGNATURE PAY/CC DEPOSIT<br>025742704040721 IKON WEAPONS |
| 12/13 | 304.00 | SIGNATURE PAY/CC DEPOSIT<br>025742704040721 IKON WEAPONS |
| 12/13 | 1,073.09 | SIGNATURE PAY/CC DEPOSIT<br>025742704040721 IKON WEAPONS |
| 12/13 | 172,490.00 | ORIG:HK PARTS INC.<br>TRN:P202112130117171 |

Prior to the deposit of HK Parts, Inc. the Debtor's balance in the First Bank account ending in 7790
was $114,040.34.

IKON WEAPONS LLC

Statement Period:  December 01, 2021 Thru  December 31, 2021                    Account Number:        *****07790

**ELECTRONIC TRANSACTION SUMMARY**

| Date | Deposits | Withdrawals | Location |
|------|----------|-------------|----------|
| 12/22 |  | 80.44 | POS PUR PILOT #1068 SUMMERVILLE SC 437619 *****1059 12/22 13:38 |

**DAILY BALANCE SUMMARY**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 12/01 | 125,744.08 | 12/13 | 287,836.24 | 12/23 | 79,626.26 |
| 12/02 | 121,466.31 | 12/14 | 56,805.86 | 12/24 | 81,501.33 |
| 12/03 | 116,800.49 | 12/15 | 53,783.95 | 12/27 | 82,096.54 |
| 12/06 | 118,440.22 | 12/16 | 54,126.37 | 12/28 | 80,794.50 |
| 12/07 | 118,990.73 | 12/17 | 55,323.22 | 12/29 | 81,097.15 |
| 12/08 | 120,000.85 | 12/20 | 81,844.34 | 12/30 | 78,556.10 |
| 12/09 | 120,033.40 | 12/21 | 307,700.22 | 12/31 | 78,907.75 |
| 12/10 | 114,040.94 | 12/22 | 78,479.71 | | |

The magazines sought by HK Parts, Inc. from the Debtor have nothing to do with PSA.  To grant the extraordinary relief that PSA seeks would not only harm the Debtor, the estate, and other similarly situated creditors to that of PSA, but also HK Parts, Inc. who now would be unable to receive its purchase from the Debtor.  Via its present motion, PSA in essence is trying to establish itself ahead of creditors like HK Parts, Inc. by asserting that it somehow should be secured in property of the estate that has been promised to other creditors.  This is an approach that undermines the basic tenets of the bankruptcy system, and one that this Court should not countenance.

Finally, even if PSA had a valid, properly perfected security interest in any of the  funds of the Debtor, once comingled, PSA would have to fairly trace its funds the same way any other secured creditor would.  This, to date, it has not done.  When proceeds are comingled with other property, a tracing analysis is required and among those acceptable methods is the "lowest intermediate balance

rule." *See* Commentary to N.C.G.S § 25-9-315 ("Under subsection (a)(1)(B), which derives from former section 9-306(2), a security interest attaches to any identifiable "proceeds," as defined in section 9-102. See also section 9-203(f). Subsection (b) is new. It indicates when proceeds commingled with other property are identifiable proceeds and permits the use of whatever methods of tracing other law permits with respect to the type of property involved.   Among the "equitable principles" whose use other law may permit is the "lowest intermediate balance rule.") (*citing* Restatement (2d), Trusts section 202).   This is consistent with the well-established Fourth Circuit precedent that requires a lowest intermediate balance test when resolving commingled property. *See In re Dameron*, 155 F.3d 718, 724 (4th Cir. 1998) ("Hence, pursuant to the lowest intermediate balance rule, if the amount on deposit in the commingled fund has at all times equaled or exceeded the amount of the trust, the trust's funds will be returned in their full amount. Conversely, if the commingled fund has been depleted entirely, the trust is considered lost.  Finally, if the commingled fund has been reduced "below the level of the trust fund but not depleted, the claimant is entitled to the lowest intermediate balance in the account." In no case is the trust permitted to be replenished by deposits made subsequent to the lowest intermediate balance.") (*internal citations omitted*).[5]

 PSA has filed to carry its burden on this point alone as it failed to complete a lowest intermediate balance rule or any such analysis proving its constructive trust / equitable lien theories.

### C.  The Terms of the Contracts do Not Support a Finding of Earmarking

The doctrine of earmarking is a court-created doctrine that usually is employed in bankruptcy as an equitable defense to preference actions.  In that context, it is clearly established that three elements must be shown in order for the earmarking doctrine to apply:

---

[5] Again, for clarity, the Debtor would like to emphasize that PSA is NOT a secured creditor in this case.  It has no security agreement with the Debtor and holds no collateral.  The discussion above regarding Article 9 and tracing analysis of a secured creditor is provided merely to show that even assuming *arguendo* PSA's secured status, it still cannot meet the traditional standards for comingled collateral.

(1)     the existence of an *agreement* between the new lender and the

debtor that the new funds will be used to pay a specified antecedent

debt,

(2) performance of that agreement according to its terms, and

(3) the transaction viewed as a whole (including the transfer in of the

new funds and the transfer out to the old creditor) does not result in any

diminution of the estate.

*Sheehan v. Valley Nat'l Bank (In re Shreves)*, 272 B.R. 614, 624 (Bankr. N.D.W. Va. 2001)  See also; *Campbell v. Hanover Ins. Co.*, 457 B.R. 452, 457 (W.D.N.C. 2011)(citing *Virginia National Bank v. Woodson (In re Decker)*, (noting that  "[t]he *Decker* Court applied the earmarking doctrine because the debtor's sister *insisted* that the loan proceeds be used *solely to pay the bank* that was threatening her brother."(emphasis added).   The essential element of the earmarking doctrine therefore is "[t]he existence of an <u>agreement</u> between the new lender and the debtor that the new funds will be used to pay specified antecedent debt. *In re Hood*, 118 B.R. 417, 420 (Bankr. D.S.C. 1990)(emphasis added)(citing *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561 (8th Cir. 1988).

In the present case, PSA is not a new lender, and it is not facing any avoidance action by the Debtor or Trustee.   More importantly, and contrary to the assertions made by PSA in its Complaint and Motion, nothing contained within its contracts with the Debtor or the amendments thereto reflects any indication that PSA and the Debtor *agreed* that money paid to the Debtor was for the sole and exclusive purpose of purchasing PSA's firearms.   Nor do the contracts contain any term or obligation on the part of the Debtor to use some or any of PSA's funds for that specific purpose.[6]  In short, PSA has not (and cannot establish) the requisite element of the earmarking

---

[6] Contract 1 and 2 simply indicate product and purchase price.  They do not dictate what any particular funds may be

doctrine, and is therefore should not properly be awarded control or ownership over the Subject Property.

## II.        Plaintiff Will Not Suffer Irreparable Harm

To establish irreparable harm, the movant must make a "clear showing" that it will suffer harm that is "neither remote nor speculative, but actual and imminent."  Additionally, the harm must be irreparable, meaning that it "cannot be fully rectified by the final judgment after trial." *Mt. Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 216 (4th Cir. 2019).

"Generally, irreparable harm is suffered when an award of monetary damages would be inadequate."  *Int'l Fid. Ins. Co. v. Waterfront Grp. NC, LLC*, No. 3:11-cv-00116, 2011 U.S. Dist. LEXIS 116311, at *13 (W.D.N.C. Oct. 6, 2011).  "Purely monetary injuries are not normally considered irreparable because they can be remedied by a damages award later." See *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984). The same rule applies in the context of bankruptcy proceedings. *Freeman v. Ow*, No. 16-cv-04817-JST, 2016 U.S. Dist. LEXIS 159572, at *21-23 (N.D. Cal. Nov. 16, 2016)(citing Bankruptcy § 1285 ("Economic injury alone does not support a finding of irreparable harm because such injury can be remedied by a damage award.").  For that reason, courts have declined to stay bankruptcy proceedings pending appeal where "[t]he only harms put forth are economic in nature." *Id.* See also  *In re Irwin*, 338 B.R. 839, 853-54 (E.D. Cal. 2006) (holding that potential loss of monetary recovery caused by the sale of property pending appeal of the bankruptcy court's decision would not cause irreparable harm).

---

used for.  In any sale of goods there may exist some basic assumption that part of the sale price paid by the buyer will be seller's profit and another part  will be used by seller to acquire inventory, pay overhead, compensate employees or agents and/or generally be spent to allow seller to complete the transaction.  However, nothing in the case law cited indicates that these general background business principles are sufficient to invoke the doctrine of earmarking. Withal, if they were, virtually any creditor could suggest that the purchase price paid to a Debtor was "earmarked" for the acquisition of the goods under their particular contract and thereby argue that they are entitled to a security interest in anything that the Debtor may have acquired via buyer's money.

While Courts routinely recognize that a party's loss of its right to collateralization cannot be adequately remedied through monetary damages, this is so because such a party surety holds a "*bargained-for right to collateral security*." *Great Am. Ins. Co. v. Glob. Team Elec., LLC*, No. 3:20-cv-00218-RJC-DSC, 2020 U.S. Dist. LEXIS 72979, at \*15-16 (W.D.N.C. Apr. 24, 2020)(*emphasis added*).  Absent such an interest, the availability of money damages to a party is a sufficient remedy at law, and injunctive relief is improper. See *Time Warner Cable v. Condo Servs.*, 381 S.C. 275, 284, 672 S.E.2d 816, 820 (Ct. App. 2009).  "The inability of an unsecured creditor to satisfy his or her judgment *does not* result in irreparable harm warranting a preliminary injunction." *Steinberg v. Young*, 641 F. Supp. 2d 637, 642 (E.D. Mich. 2009)(*emphasis added*).  If it were otherwise, virtually any unsecured creditor in a bankruptcy case could, on the basis of purported irreparable harm, attempt to elevate its claims above others by demanding the court provide through injunction a *post-hoc* security interest in the Debtors property.  This would defeat one of the primary underlying principals of our bankruptcy scheme—the equal treatment of similarly situated creditors.

In the present case, PSA holds no bargained-for security interest in the Subject Property (and, for that matter, no properly perfected security interest in *any* of the Debtor's property).  Had PSA wanted to, it could have bargained for such protection at the outset, but, in this case, it did not.  As such, PSA sits in the Debtor's bankruptcy as a mere unsecured creditor—albeit a significant one—with a claim based upon a purported breach of the sales contracts it entered with the Debtor.  It faces no particular likelihood of  irreparable harm that would support the injunctive relief sought.  Its fate is that of any other unsecured creditor owed money in a bankruptcy case— one that rests upon the Debtor being able to engage in business that supports a  successful reorganization. This Court, therefore, should properly refuse PSA's request to elevate its claim to

a secured status and deny PSA's Motion.

### III. An Injunction Prohibiting the Sale of the Subject Property is Not Equitable and is Not in the Best Interest of the Debtor or its Other Creditors.

Finally, the Debtor has stated its goal for this bankruptcy case.  It intends to proffer a plan of reorganization that pays its creditors, including PSA, in full or as close to full as the projections permit.  Prohibiting the Debtor from selling the Subject Property, or further delay, would undoubtedly hinder the Debtor from accomplishing this.  PSA's current adversary proceeding and Motion only serve to impose additional costs upon the Debtor's operations and thereby impair the rights of the Debtor's clear senior secured creditor, the SBA, as well as AC Unity and HK Parts, Inc. neither of which PSA has included as a party in interest in this Adversary Proceeding.   In short, PSA is simply wasting Debtor resources by selfishly maintaining the present action in an attempt to grasp at more than it is entitled to receive and stepping in front of other legitimate creditors.  This result is not fair or equitable to the Debtor or any other party in interest.

### CONCLUSION

For the reasons stated above, the Debtor, Ikon Weapons, LLC, respectfully requests that the Court enter an order DENYING Plaintiff's Motion and providing the Debtor such other and/or further relief as the Court may deem justice requires.

This the 17th day of October, 2022

**ESSEX RICHARDS, P.A.**

_/s/ John C. Woodman_____
John C. Woodman (NC Bar No. 42365)
David R. DiMatteo (NC Bar No. 35254)
1701 South Boulevard
Charlotte, North Carolina 28203
Tel: (704) 377-4300
Fax:  (704) 372-1357
E-mail: jwoodman@essexrichards.com
*Counsel for the Debtor*

20

**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION**

| | | |
|---|---|---|
| IKON WEAPONS, LLC | ) | |
| | ) | Case No. 22-10507 |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| PALMETTO STATE ARMORY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | ADV. PRO. NO 22-03041 |
| | ) | |
| v | ) | |
| | ) | |
| IKON WEAPONS, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on the 17th day of October, 2022, I serviced a copy of the foregoing Response by either electronic notice in accordance with the local rules or by depositing the same, enclosed in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, said envelope being addressed as follows:

William P. Miller, Esq.  
U.S. Bankruptcy Administrator's Office  
(by ECF service)

Ashley S. Rusher, Esq.  
Subchapter V Trustee  
(by ECF service)

William Walt Petti  
Counsel for Plaintiff  
Palmetto State Armory, LLC  
(by ECF service)