**SO ORDERED.**

**SIGNED this 30th day of November, 2022.**

_____
BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

---

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| IKON WEAPONS, LLC, | ) | Chapter 11 |
| | ) | Case No. 22-10507 |
|     Debtor. | ) | |
| _____ | ) | |
| | ) | |
| PALMETTO STATE ARMORY, LLC, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 22-02021 |
| | ) | |
| IKON WEAPONS, LLC, | ) | |
| | ) | |
|     Defendant. | ) | |

**MEMORANDUM OPINION DENYING PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER OR, IN THE ALTERNATIVE, FOR A PRELIMINARY
INJUNCTION**

This adversary proceeding is before the court on the _Motion
for Temporary Restraining Order or, in the Alternative, for a
Preliminary Injunction_ ("Motion for Preliminary Injunction") filed
by Palmetto State Armory, LLC ("PSA" or "Plaintiff"). ECF No. 2.
In its motion, Plaintiff requests that the Court (1) enjoin Debtor

1

from selling certain "firearms products[1] and plac[e] those goods in the custody of the Court, or (2) consign[ ] those firearms products to [Plaintiff] so that [Plaintiff] may sell them at retail and retain its normal profit margin and return the remainder of the proceeds to the Court." Id. ¶ 5.[2]   In its Amended Complaint, Plaintiff asserts an ownership interest in virtually all of the Debtor's personal property and funds under the terms of its contract and on theories of constructive trust, resulting trust, equitable title, and the earmarking doctrine.   ECF No. 24, at 7-9.  Plaintiff asserts these same theories of ownership with respect to the Container Goods in the instant motion.  For the reasons set forth herein, the Court will deny Plaintiff's Motion for Preliminary Injunction.

## Procedural History

On September 2, 2022, Ikon Weapons, LLC ("Debtor" or

---

[1] The goods at issue in the motion will be referred to as the "Container Goods," more particularly described below.

[2] Plaintiff seeks a further preliminary relief in its Amended Complaint.   ECF No. 24.   In the complaint, Plaintiff contends that it is entitled to a preliminary injunction prohibiting Debtor from selling any property which Plaintiff claims a legal or equitable interest until a Court is able to conduct a trial to determine the ownership of such property.  Id. at 10.  The current motion solely seeks to enjoin transfer of the Container Goods.  To the extent that Plaintiff seeks further preliminary relief with respect to any particular property, Plaintiff should file an appropriate motion, giving appropriate notice of the specific property purportedly affected.  See James Luterbach Const. Co., Inc. v. Adamkus, 781 F.2d 599, 603 n.1 (7th Cir. 1986) (temporary relief should be sought via a motion for preliminary injunction separate from the prayer for relief contained in the complaint; quoting Fed. R. Civ. P. 65(a)(2) and C Wright & A. Miller, Federal Practice and Procedure § 2949 (1973) ("[t]he appropriate procedure for requesting preliminary injunction is by motion'")).

"Defendant") filed a petition under chapter 11 of title 11 in the United States Bankruptcy Court for the Western District of North Carolina, and elected to proceed under subchapter V.  Case No. 22-10507, ECF No. 1.  On September 21, 2022, Plaintiff initiated this adversary proceeding against Debtor in the same court.  ECF No. 1. On October 3, 2022, the United States Bankruptcy Court for the Western District of North Carolina entered its order: (1) permitting the Container Goods to be shipped to Debtor's facility in Albemarle, North Carolina; (2) temporarily enjoining Debtor and anyone acting on behalf of Debtor from selling, transferring, encumbering, or otherwise disposing of the Container Goods for ten days; (3) requiring Debtor to segregate the Container Goods from its other inventory; and (4) permitting Plaintiff to inspect the Container Goods at Debtor's facility.  ECF No. 16.  On October 4, 2022, the United States Bankruptcy Court for the Western District of North Carolina transferred venue to this Court.  Id., ECF No. 8.

On October 16, 2022, Plaintiff filed its *Memorandum of Law in Support of its Claim for Declaratory Judgment and Motion for Preliminary Injunction*.  ECF No. 17.  On October 17, 2022, Ashley Rusher, as subchapter V trustee ("Trustee"), filed a response and objection to Plaintiff's motion, to which the United States Bankruptcy Administrator ("BA") joined the following day.[3]   ECF

---

[3] Trustee has standing to appear and be heard in this adversary proceeding.  See 11 U.S.C. § 1109(b); 7 Collier on Bankruptcy ¶ 1109.04 (16th ed.) ("Collier").

Nos. 17 and 21, respectively.  On October 17, 2022, Debtor filed its brief in opposition.  ECF No. 20.  On October 20, 2022, the Court conducted an evidentiary hearing on Plaintiff's motion for preliminary injunction, continued the hearing until November 22, 2022, and afforded the parties through November 4, 2022 to file supplemental authority.[4]  The parties reported at the hearing that they had agreed to maintain the requirements of the prior injunction issued in the Western District of North Carolina for beyond the ten days provided in the temporary injunction to permit the matter to be heard by this Court.  To permit time for supplemental authority and for the Court to consider Plaintiff's motion, the parties further agreed to extend the term of the temporary restraining order by consent as reflected in this Court's November 2, 2022 Order, ECF No. 28, which was yet further extended

---

The BA similarly has standing to appear and be heard.  See id.; Pub. L. No. 101-650, § 317(b) (1990); Collier ¶ 1112.04[1] n.5.  It is particularly appropriate for the subchapter V trustee and the BA to be heard on matters affecting whether property is property of the estate.

[4] On November 4, 2022, Plaintiff filed a Motion to Extend Time to File Additional Memorandum; the Court granted that motion the same day and extended the time for Plaintiff to file an additional memorandum to November 11, 2022. On November 14, three days late, Plaintiff filed its Memorandum of Law in Support of Claim for Declaratory Judgment and Motion for Preliminary Injunction.  On November 16, Debtor filed an Objection to Plaintiff's memorandum on the grounds that, among other things, it was not timely filed.  On November 18, 2022, Plaintiff filed its Response to Objection to Late Filed Memorandum of Law in which it showed that the CM/ECF system for the Clerk of the United States Bankruptcy Court for the Middle District of North Carolina was inaccessible for electronic filing between 6:00 a.m. on Friday, November 11, 2022 until 8:00 a.m. on Monday November 14, 2022.  Because it was not possible for Plaintiff to electronically file its memorandum between November 11 and November 14, 2022, the Court will overrule Debtor's objection and consider Plaintiff's Memorandum of Law in Support of Claim for Declaratory Judgment and Motion for Preliminary Injunction, filed on November 14, 2022, as timely filed.

through November 29, 2022 by consent of the parties and this Court's November 18, 2022 Order.  ECF No. 44.  The motion is now ripe for adjudication.

## Jurisdiction and Authority

The Court has jurisdiction over the subject matter of this proceeding under 28 U.S.C. § 1334(b) and (e).  This is a statutorily core proceeding under 28 U.S.C. § 157(b)(1) and (2). This Court also has exclusive subject matter jurisdiction over property of the estate.  28 U.S.C. § 1334(e)(1).  "It is generally recognized that '[a] proceeding to determine what constitutes property of the estate . . .  is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (E),' . . . and that '[w]henever there is a dispute regarding whether property is property of the bankruptcy estate, exclusive jurisdiction is in the bankruptcy court.'"  In re Cox, 433 B.R. 911, 920 (Bankr. N.D. Ga. 2010) (citations omitted); In re Foxwood Hills Prop. Owners Ass'n, Inc., No. AP 20-80049-HB, 2021 WL 1812668 (Bankr. D.S.C. May 5, 2021) ("'bankruptcy court has core and exclusive jurisdiction to determine what is property of the estate'" (and cases cited therein)).  Plaintiff has consented to the Court determining the matters set forth herein, ECF No. 1, ¶ 6; and this Court has constitutional authority to enter final judgment.  See Wellness Int'l. Network, Ltd. v. Sharif, 575 U.S. 665, 684 (2015); and Wiswall v. Campbell, 93 U.S.

347, 350-51 (1876).[5]  Venue of this proceeding is proper under 28 U.S.C. §§ 1408 and 1409.

**Facts**

Suliban Deaza ("Deaza") is the Debtor's managing member and holder of 90% of the Debtor.  Jamin McCallum ("McCallum") is the founder, an owner, and current Chief Executive Officer of JJE Capital Holding, LLC ("JJE Capital").  JJE Capital is the owner of Plaintiff.  Ben Fortin ("Fortin") was an employee of Plaintiff and Deaza's primary point of contact with Plaintiff.

In June of 2021, Deaza met with employees of Plaintiff, including Fortin and McCallum, several times regarding an opportunity to purchase certain weapons from Montenegro.  At these meetings, Deaza represented that he could obtain 8,000 "stamped, new AK-47s," and proposed to sell the weapons to Plaintiff.  Deaza showed McCallum and Fortin pictures of weapons in crates; and McCallum testified that, based on the pictures, he could discern that these weapons were new and stamped.  Current regulations require that this type of weapon be cut into at least three pieces before being imported to the United States, and the stamped version would therefore have a much greater market value than the alternative milled version of the weapons because it can be easily cut into three pieces without damaging certain internal

---

[5] Plaintiff has filed a proof of claim arising out of the same facts, circumstances, and transactions asserted in the Complaint.

components. McCallum testified that these weapons were "the equivalent of a rare Mustang or Corvette, found in a garage in a time capsule from 1960-whatever, with like two miles on it." McCallum further testified that "[i]t was an absolute slam dunk, it would have been a fantastic business opportunity," and that "[w]ithin thirty days, [Plaintiff] would have doubled [its] money."

On June 16, 2021, Plaintiff and Debtor entered into a Purchase Agreement whereby Debtor agreed to sell, and Plaintiff agreed to purchase, "AK-47 kits;" "5,500 Yugoslavian AK M70 Kit of Parts – Underfold Stock;" "2,500 Yugoslavian AK M70 Kit of Parts – Fixed Stock" (defined in the Original Agreement and referred to herein as the "Product") at a price of $3,760,000.00 (the "Original Agreement").[6] The Original Agreement provided that "transfer of title to the Product occurs when the Seller has been paid 100% of the Total Amount Due." ECF No. 24, Ex. A, ¶ 4.(d). Either party could cancel the agreement in the event of breach, and, if Plaintiff terminated the agreement due to Debtor's breach, Plaintiff "waives any and all claims for damages of any kind or nature against Seller, and as [Plaintiff's] sole and exclusive remedy Seller shall return the Buyer's Deposit in accordance with Buyer's written instructions." Id. ¶ 6.(a), (c).

---

[6] Plaintiff's in-house counsel drafted the agreements between the parties.

The day after entering the Original Agreement, on June 17, 2021, Debtor and Plaintiff entered an Amendment to the Purchase Agreement (the "First Amendment"), requiring Plaintiff to pay the entire purchase price up front. Id., Ex. B.  The same day, as required by the Original Agreement, Plaintiff paid Debtor $1,880,000.00 (half of the purchase price).  Ex. 3-14.  In the First Amendment, Debtor (as "Seller") pledged to transfer to Plaintiff 100% of the "Stock" in the Debtor "if for any reason the Buyer does not receive the products FOB Charleston, SC on or before November 30th, 2021, or receive a full refund of all monies paid by the same date."  Neither Deaza, nor any other holder of interests in Debtor, signed the First Amendment in their individual capacity.

On June 18, 2021, Debtor paid $1,212,500.00 to a business known as "Michael's Machines."  Deaza testified that this payment was a one-half deposit for the Product under the Original Agreement, and that Michael's Machines was the initial weapons broker through whom Deaza intended to acquire the Product.

Thereafter, Deaza stated that he would not be able to begin cutting the weapons as required for importation before he received the full purchase price from Plaintiff.  McCallum told Deaza that he would not transfer the remainder of the purchase price until an employee of Plaintiff physically verified the existence of the weapons.  Plaintiff intended to send an employee to accompany Deaza

to the site of the weapons to verify the existence of the weapons before paying the second 50% owed under the Purchase Contract; however, purportedly due to Fortin's inability to obtain a passport, the parties agreed instead to a visual verification over FaceTime.

In August of 2021, Plaintiff paid for Deaza's travel expenses to visit Montenegro and inspect the weapons.  Deaza called McCallum and claimed that he was in Montenegro at the Ministry of Defense viewing the weapons but that the Ministry of Defense would not allow him to FaceTime on the military base.  Deaza represented to Plaintiff that upon deposit of the remainder of the purchase price, he would begin cutting the weapons and preparing them for transport to the United States.  Deaza later admitted that he was not in Montenegro at that time and that he never viewed the weapons. Nonetheless, on August 20, 2021, Plaintiff paid Debtor the second half of the agreed purchase price ($1,880,000.00).

A few days later, Deaza contacted Plaintiff and stated that he had found other weapons that he would be able to obtain and sell to Plaintiff.  McCallum testified that the guns which were the subject of this proposed second transaction were "absolute unicorns, that the civilian market in the U.S. had not seen, and so desirable."  On August 31, 2021, Plaintiff and the Debtor entered a second agreement whereby Plaintiff agreed to purchase from the Debtor an additional number of firearms kits made from

9

firearms manufactured by Zastava Arms (the "Second Agreement"). Plaintiff agreed to pay $3,722,520.00 for the Zastava Arms and to advance 20% of the purchase price ($744,504.00) to the Debtor.  On September 1, 2021, Plaintiff deposited $744,504.00 into the Debtor's bank account.  Deaza testified that, at some point, Michael's Machines had put Deaza in contact with another weapons broker called "IZOP-K."   On September 2, 2021 Deaza paid $363,816.60 to IZOP-K purportedly as a deposit for the weapons under the Second Agreement.

On September 27, 2021, Michael's Machines refunded the $1,212,500.00 deposit to Debtor.  Deaza testified that Michael's Machines backed out of the transaction over a disagreement regarding the refundability of the deposit. On September 29, 2021, Debtor paid $1,862,000.00 to IZOP-K.  Deaza testified that this payment represented a payment in full for the Product contemplated under the Original Agreement.

In September and October of 2021, Deaza frequently was in contact with Plaintiff and informed that there were a number of delays in preparing the weapons for transport to the United States. Deaza requested a meeting with McCallum and Fortin in person in South Carolina in early November.  At this meeting, Deaza advised that he had already cut thousands of weapons but had received a stop order from the government and that he needed an extension to complete the job.  Deaza testified that the delays were due to

10

mixed communications with local brokers, a chaotic transition of power in the Montenegrin government, the start of the Russia-Ukraine war, and Covid-19 restrictions; however, he later admitted to Plaintiff that he had never seen or cut any of the contracted-for weapons despite his previous statements to Plaintiff, but rather was relying on the statements of the broker.

McCallum testified that after the November 2021 meeting, Deaza informed him that Debtor already had imported a "significant portion" of the weapons under the Original Agreement and that those weapons were in containers in the Port of Charleston. Deaza further informed Plaintiff that he would not be able to return to Montenegro to continue work until after January 2022 because the "Balkans take December off [and] all government institutions . . . close down for December," and due to his attendance at an important convention in January of 2022 in the United States. Following the meeting, on November 6, 2021, Plaintiff and Debtor amended the Original Agreement to extend the delivery date to March 1, 2022.

In February 2022, as the new deadline approached, the parties entered discussions regarding another extension for delivery of the weapons. The parties dispute whether Plaintiff or Deaza sought the second extension beyond the March 1, 2022 deadline; but, regardless, on February 28, 2022, the parties agreed to extend the delivery date "for a period not exceeding ninety (90) days through

11

June 1, 2022." ECF No. 24, Ex. E. As part of this extension, Deaza executed a personal guarantee of performance under both the Original Agreement and the Second Agreement. Deaza signed this "Second Amendment to Purchase Agreement" both in his personal capacity and on behalf of the Debtor.

On March 11, 2022, Deaza conducted a Zoom Presentation with Plaintiff during which he represented that he was still encountering delays but intended to deliver the weapons as agreed under both purchase agreements.

On June 1, 2022, Debtor had not delivered any firearms to Plaintiff under either Purchase Agreement. On June 2, 2022, Plaintiff sent a notice of default to Debtor and demanded that the default be cured within 30 days, either by delivering the products or refunding the purchase price.

On June 15, 2022, Deaza gave a Zoom presentation to Plaintiff in which he proposed for Plaintiff to become an investor in and part owner of the Debtor. Plaintiff rejected the proposal and filed a complaint in the Court of Common Pleas for Lexington County, South Carolina on July 6, 2022, asserting numerous claims against Debtor and Deaza.

On September 2, 2022, Debtor filed its chapter 11 petition in the Western District of North Carolina. That court held a hearing on first-day motions in the case on September 8, 2022. At this hearing, Debtor's counsel represented that Debtor was in

possession of containers of parts, firearm kits, and other merchandise which were either en route to or located at the Port of Charleston (the "Container Goods"). Debtor asserts that the contents of these three containers were shipped to Debtor by AC Unity pursuant to a contract between Debtor and AC Unity under which Debtor agreed to sell the contents of the containers on behalf of AC Unity.[7] Debtor provided Plaintiff with a packing list representing the inventory of the containers and agreed to allow Plaintiff to inspect the containers to verify that the contents of the containers did not include any weapons or products described in any purchase agreement between Debtor and Plaintiff. Plaintiff inspected the containers and concluded that the contents of the containers matched the representations on the packing list and that the containers did not hold any weapons or products for which Plaintiff contracted with Debtor.

Debtor testified that he is still working to obtain delivery of the Product, or that he is alternatively willing to seek a refund from IZOP-K.

## Discussion

## I.    Preliminary Injunction Standard of Review

Fed. R. Bankr. P. 7065 makes applicable Fed R. Civ. P. 65 to

---

[7] AC Unity has filed an application for allowance of an administrative expense under 11 U.S.C. § 503(b)(9), asserting that it sold the Container Goods to Debtor on credit in the ordinary course of business and that the goods were delivered to Debtor within 20 days of the petition date. ECF No. 161.

this adversary proceeding and authorizes this Court to enter a preliminary injunction on application by Plaintiff and notice to the adverse party. Matter of Fisher, 80 B.R. 58, 61 (Bankr. M.D.N.C. 1987). When deciding whether to grant injunctive relief under Rule 7065, the Bankruptcy Court must determine whether the moving party has established four essential elements. Id. at 60.

A preliminary injunction is "an extraordinary remedy never awarded as of right." Benisek v. Lamone, 138 S. Ct. 1942, 1943 (2018) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)). The remedy only may be awarded upon a "clear showing" that the plaintiff is entitled to such relief. Winter, 555 U.S. at 22. To obtain a preliminary injunction, the moving party must establish: "[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated in part on other grounds, 559 U.S. 1089 (2010) (quoting Winter, 555 U.S. at 20). Where an entity other than a debtor, debtor in possession, or trustee requests an injunction, a court may issue the injunction under Rule 65 "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

14

Fed. R. Civ. P. 65(c).

At this stage in the litigation, Plaintiff has failed to make a clear showing on any of the four requirements.

**II.   Plaintiff did not make a clear showing that it is likely to succeed in establishing that any property is not property of the estate.**

Plaintiff has not established that it has an interest in any funds or property in the possession of Debtor.

**A.    Plaintiff did not become an owner of the Container Goods when it paid the full amount under the contract for the Product.**

Plaintiff contends that it is entitled to ownership of the Container Goods because it paid in full for the Product.  The contract provided that title to the Product would transfer when payment was made in full.  Ex. 3-14 ¶ 4.(d).  There is no dispute that Plaintiff paid the full purchase price for the Product.  However, there similarly is no dispute that neither the Container Goods, nor any other goods in Debtor's possession, are the Product.  Therefore, Plaintiff did not establish that title to the Container Goods transferred to Plaintiff upon payment for the Product under the terms of the parties' agreements.

**B.    Earmarking Doctrine does not apply.**

Earmarking doctrine is recognized in bankruptcy in the Fourth circuit as "a judicially created exception to the statutory power of the bankruptcy trustee to avoid or set aside an otherwise preferential transfer of assets" when "the debtor borrows money

from one creditor and the terms of that agreement require the debtor to use the loan proceeds to extinguish specific, designated, existing debt." In re ESA Env't Specialists, Inc., 709 F.3d 388, 394, 396 (4th Cir. 2013).  To establish the earmarking defense, the doctrine further requires that the funds received by the debtor were used for the intended purpose. Id. at 397. The doctrine must be "narrowly construed." Id. at 395 n. 5.  This is not a preference or avoidance action, and Plaintiff did not provide a loan to Debtor to extinguish a specific debt.  Plaintiff did not present evidence that Debtor obtained the Container Goods with funds from Plaintiff. On the contrary, AC Unity has asserted claims in this case for the purchase price of those goods.  Even if its funds had been used to acquire the Container Goods, Plaintiff has not offered any cases in which the earmarking doctrine has been expanded under the circumstances in this case, and narrow construction of the doctrine does not permit such an expansion by this Court.

### C.   Plaintiff does not hold an interest in the contents of the containers under a resulting trust.

A resulting trust is an "equitable remedy designed to prevent unjust enrichment and to ensure that legal formalities do not frustrate the original intent of the parties." In re Alston, 355 B.R. 529, 531 (Bankr. M.D.N.C. 2006) (citing Am. Hotel Mgmt. Assocs., Inc. v. Jones, 768 F.2d 562 (4th Cir. 1985) (interpreting North Carolina law)).  In re Alston presented a "classic resulting

16

trust factual scenario," and the court explained that "[i]n North Carolina, the resulting trust remedy is invoked when a person uses the money of another to acquire legal title in property." 355 B.R. at 531. In that case, the debtor's sister conveyed real property to the debtor without receiving payment so that the debtor could obtain financing and title to a mobile home that the debtor would have been unable to obtain otherwise. Id. at 530. Although legal title to the real property vested in the debtor, the intention of the debtor and the debtor's sister was to convey the property back to the sister once the loan was paid in full and the lien was extinguished. Id. On these facts, the bankruptcy court found that the sister was the beneficial owner of the property, which the debtor held in resulting trust for her. Id. at 531.

The Court further explained that "North Carolina courts have recognized equitable liens when the parties have an agreement whereby some 'particular property is charged with a specific debtor,' or where the general considerations of equity and justice require imposition of an equitable lien." Id. (quoting Garrison v. Vermont Mills, 154 N.C. 1, 6, 69 S.E. 743 (1910)) (citing In re Surplus Furniture Liquidators, Inc., 199 B.R. 136, 144 (Bankr. M.D.N.C. 1995)).

Unlike the debtor's sister in Alston, Plaintiff did not convey the Container Goods to Debtor to hold for its benefit or otherwise. Moreover, Plaintiff did not establish that Debtor used any of

17

Plaintiff's funds to obtain the Container Goods, and the Container Goods were not purchased for the benefit of Plaintiff.  Under these circumstances, general considerations of equity and justice do not require this Court to confer an equitable lien on any property obtained by Debtor from AC Unity.  Therefore, Plaintiff is not entitled to an injunction based on a resulting trust.

>    **D.    The doctrines of Equitable Lien and Equitable Title do not apply.**

Under North Carolina law, where an equitable lien arises from a written contract, the contract must show "an intention to charge some particular property with a debt or obligation."  In re 222 S. Caldwell St., Ltd. P'ship 409 B.R. 770 (Bankr. W.D.N.C. 2009). Plaintiff failed to demonstrate any intention to charge the Container Goods with any debt owed by Debtor to Plaintiff.  Even if an equitable lien had arisen, such lien would not confer on Plaintiff an ownership interest in any property, but merely an encumbrance against the property; thus, Plaintiff would not be entitled to prevent the sale of such property by debtor or trustee. Surplus Furniture, 199 B.R. at 144.

>    **E.    At this stage in litigation, Plaintiff has not made a clear showing that it is likely to establish that it is entitled to the imposition of a constructive trust on any of the Debtor's assets, and particularly the Container Goods.**

Although 11 U.S.C. § 541(a) broadly sweeps property of the debtor into the bankruptcy estate at commencement, § 541(d)

18

operates to exclude from the bankruptcy estate property to which
the debtor holds "only legal title and not an equitable interest."
11 U.S.C. § 541(d); see Surplus Furniture, 199 B.R. at 142 ("It is
generally held that [§ 541(d)] excludes from the bankruptcy estate
property which is subject to a constructive or other trust.").

> The significance of the constructive trust and resulting
> trust doctrines in the bankruptcy court derives
> primarily from Section 541(d) of the Code. This
> provision provides: (d) Property in which the debtor
> holds, as of the commencement of the case, only legal
> title and not an equitable interest ... becomes property
> of the estate under subsection (a)(1) or (2) of this
> section only to the extent of the debtor's legal title
> to such property, but not to the extent of any equitable
> interest in such property that the debtor does not hold.

Surplus Furniture, 199 B.R. at 142.

There is some authority for the proposition that imposing a
previously unrecognized constructive trust upon property that
otherwise would be property of the estate is an anathema to the
presumption of a ratable distribution in bankruptcy and should not
be recognized by a bankruptcy court unless the remedy was awarded
to the creditor pursuant to a prepetition judgment.  In In re
Omegas Group, Inc., the Sixth Circuit held that a bankruptcy court
should not impose the remedy of constructive trust for alleged
fraud committed against the creditor by the debtor in the course
of their business dealings because this would allow a creditor to
take ahead of all creditors and ahead of the trustee where the
creditor would have an adequate remedy at law.  16 F.3d 1443, 1451

(6th Cir. 1994).  The court held that "a claim filed in bankruptcy court asserting rights in certain assets 'held' in constructive trust' for the claimant is nothing more than that: a claim."  Id. at 1449.  The court further concluded that, "[u]nless a court has already impressed a constructive trust upon certain assets . . . the claimant cannot properly represent to the bankruptcy court that he was, at the time of the commencement of the case, a beneficiary of a constructive trust held by the debtor."  Id.  The opinion in Omegas has been criticized as painting too broad a brush.  See e.g., In re Paul J. Paradise & Assocs., Inc., 249 B.R. 360, 370-71 (D. Del. 2000) (observing that the court in Omegas cited no law in support of its holding, concluding that the effectiveness of the right to imposition of a constructive trust is a matter of state law, and "the majority rule is that constructive trusts attach or relate back to the time of the unlawful act that led to the creation of the trust").

This Court concludes that a constructive trust may be recognized in bankruptcy in appropriate circumstances and at the discretion of the court.  Although the imposition of a constructive trust consistent with applicable state property law is within the discretion of the bankruptcy court, the remedy should not be imposed cavalierly.  In re Dameron, 206 B.R. 394, 400 (Bankr. E.D. Va. 1997); see also Matter of Haber Oil Co., Inc., 12 F.3d 426, 436 (5th Cir. 1994) ("Because the constructive trust doctrine can

wreak such havoc with the priority system ordained by the Bankruptcy Code, bankruptcy courts are generally reluctant to 'impose constructive trusts without a substantial reason to do so.'" (quoting Neochem Corp. v. Cehring Int'l, Inc., 61 B.R. 896, 902 (Bankr. N.D. Tex. 1986))).

Because the parties' rights and interests in the relevant property are determined by state law, an analysis of North Carolina law is required to determine whether Debtor held the Container Goods subject to a constructive trust on the petition date.  See Butner v. United States, 440 U.S. 48, 54-55 (1979).  Therefore, the Court must consider whether Plaintiff has made a clear showing that the Court will likely determine that the Container Goods were subject to a constructive trust in its favor on the petition date under North Carolina law.

### 1.    Constructive Trusts under North Carolina law

A constructive trust under North Carolina law is a remedy granted to prevent unjust enrichment.  Roper v. Edwards, 323 N.C. 461, 464, 373 S.E.2d 423, 425 (1988).  Despite being referred to as a trust, a constructive trust is an "equitable device [that] belies its name, for no ongoing trust relationship is created when a court imposes a constructive trust."  Id.[8]   Instead, a

---

[8] Because the Court determines that Plaintiff has failed to make a clear showing that it would be entitled to a constructive trust, the Court does not need to determine at this stage whether such a remedy arises at the time of the predicate act(s) or at the time of imposition of the remedy under North Carolina law for

constructive trust is a remedy of specific performance, requiring the defendant to transfer specific property to the plaintiff.  Id. at 464-65, 373 S.E.2d 425 (quoting D. Dobbs, Remedies § 4.3, at 241 (1973)).

While breach of a fiduciary duty (beyond a mere contractual duty) or a confidential relationship are common factors in a constructive trust fact pattern, they are not required elements.

> A constructive trust is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.... [A] constructive trust is a fiction of equity, brought into operation to prevent unjust enrichment through the breach of some duty or other wrongdoing. It is an obligation or relationship imposed irrespective of the intent with which such party acquired the property, and in a well-nigh unlimited variety of situations.... [T]here is a common, indispensable element in the many types of situations out of which a constructive trust is deemed to arise. This common element is some fraud, breach of duty or other wrongdoing by the holder of the property, or by one under whom he claims.

Id. at 464, 373 S.E.2d 424-25 (quoting Wilson v. Crab Orchard Dev. Co., 276 N.C. 198, 211-12, 171 S.E.2d 873, 882 (1970)).  The Roper court continued, "'Inequitable conduct short of actual fraud will give rise to a constructive trust where retention of the property by the holder of the legal title would result in his unjust enrichment.'"  Roper at 425 (quoting 4A R. Powell, Powell on Real

---

purposes of § 541(d), or whether such a remedy would be subject to the powers of a debtor in possession or a trustee under §§ 544(a) or (b).

Property §596[1], at 48-23 (1986)).

A constructive trust will not arise in North Carolina where
there is no fiduciary relationship and there is an adequate remedy
at law.  In re Gertzman, 115 N.C. App. 634, 640, 446 S.E.2d 130,
135 (1994) (quoting Sec. Nat'l Bank of Greensboro v. Educators
Mut. Life Ins. Co., 265 N.C. 86, 95, 143 S.E.2d 270, 276 (1965),
for the proposition that "[a] constructive trust does not arise
where there is no fiduciary relationship and there is an adequate
remedy at law").  Moreover, the wrongful acts of which a plaintiff
complains must have directly led to the acquisition of the subject
property by the defendant; and, therefore, a plaintiff must trace
its funds to the property in which it claims constructive trust.
Id.

> **2.   The evidence presented at the hearing is
> insufficient to impose a constructive trust in the
> Container Goods.**

Plaintiff asserts that the Debtor fraudulently induced
Plaintiff to deposit $3,760,000.00 under the First Agreement and
$744,504.00 under the Second Agreement, that Debtor had no
intentions of honoring its obligations under either agreement, and
that Plaintiff is entitled to have a constructive trust declared
in the Container Goods because Debtor had no money other than that
paid by Plaintiff with which to obtain the goods.

Plaintiff offered evidence of misrepresentations by Deaza in
his dealings with Plaintiff; and the Court has substantial concerns

with the evidence of Deaza's conduct in this case.  At the hearing, McCallum testified on behalf of Plaintiff. McCallum testified that before signing the First Agreement, Deaza, on behalf of Debtor, showed him pictures on his phone of 8,000 certain desirable firearms ("stamped, new AK-47's") and represented that he could deliver those firearms to Plaintiff.  Although Plaintiff asserts that Deaza knew that he would not be able to deliver the particular firearms and he showed the pictures to McCallum to induce a large payment with no intention of honoring his promise of delivery of such firearms, the record belies Plaintiff's assertion that Deaza had no intention to acquire the Product.

Deaza testified that, after he was contacted by an employee of Plaintiff informing him that Plaintiff was interested in obtaining "20-25,000 AK's," he inquired with various brokers seeking the types of weapons kits which Plaintiff sought.  One broker with whom Deaza had previous business relations, "Mike's Machines", replied that he had 8,000 of the kits available in Montenegro.  Deaza testified that he informed Plaintiff of the availability of the guns, "got the pictures," and executed the contract with Plaintiff after conferring again with the broker, Mike's Machines, about certain terms.  Mike's Machines specified that half of the total purchase price must be paid upfront, and otherwise signaled that it was ready to enter a transaction to sell the weapons kits.  Deaza testified that he told an employee

24

of Plaintiff, Fortin, that payment of 50% of the purchase price was required up-front with the second 50% being paid "when we get there and see the guns." After the parties executed the agreement, Deaza wired Michael's Machines "the money . . . for his half." The Debtor's bank records indicate that the Debtor made a payment to a business named Michael's Machines of $1,212,500.00 on June 18, 2021, one day after Plaintiff made its deposit of $1,880,000.00 into the Debtor's bank account.[9]

Although Plaintiff makes several assumptions about Debtor's relationship with Mike's Machines, Plaintiff did not produce any evidence demonstrating that this transfer to Michael's Machines was fraudulent; that Michael's Machines is not an authentic broker of firearms; that Plaintiff is in a conspiracy with Michael's Machines; or that when the Debtor transferred $1,212,500.00 to Michael's Machines, it had any intentions besides hiring a broker in an attempt to fulfill its obligations under the First Agreement.

In any event, after Michael's Machines was unable to deliver the Product, Debtor was able to obtain a full refund of the $1,212,500.00 deposit. After receiving the refund from Michael's Machines in September of 2021, Deaza testified that he began working with a new broker, "IZOP-K," in an attempt to fulfill his

---

[9] McCallum testified that he believes that Deaza set up "slush funds" when he was invoicing Mike's Machines and, later, IZOP-K and that these funds were used for other projects overseas. See also Attachment B to Declaration of Jamin McCallum at pp. 4, 8-10. Plaintiff did not offer sufficient evidence to substantiate these suspicions.

obligations under the contract.  Defendant produced contracts with
IZOP-K for weapons matching the description of the Product.
Plaintiff did not produce evidence that IZOP-K is not an authentic
broker in firearms or that Deaza did not, in fact, work with IZOP-
K in an attempt to fulfill his obligations under the First and
Second Agreement.  Deaza's personal guarantee of the Debtor's
performance under both the First and Second Agreement in exchange
for further extensions after all funds had been paid is further
evidence of his intent for the transactions to succeed.

Plaintiff has presented evidence of misrepresentations made
to Plaintiff by Deaza after all funds had been transferred in March
and June of 2022 regarding continued delays in the delivery of the
weapons.  Plaintiff offered into evidence a Zoom presentation
delivered to Plaintiff by Deaza on March 11, 2022.  At the hearing,
Deaza admitted that the presentation stated that 1,930 weapons
kits had been cut, when in fact, Deaza knew at that time that none
had been.  Deaza also admitted that he stated to Plaintiff that he
received a "stop-work order" on November 15 which prevented him
from de-milling AK's under the First Agreement, but that that
representation was false, and he knew that it was false when he
made it.  Deaza further admitted that he included in the
presentation pictures, without knowing who took the pictures or
where those pictures came from.  Deaza admitted that neither he,
nor his brother ever cut and de-milled weapon kits, in

contradiction of their representations to Plaintiff. Again, on June 15, 2022, Deaza represented to the officers of Plaintiff that 1,940 weapons kits had been cut under the First Agreement, and he knew the representation was false when he made it. Plaintiff did not make any showing of a misstatement regarding the second contract.

As stated above, the Court has grave concerns about Deaza's conduct, and that conduct may have consequences and liability in this adversary proceeding, the feasibility of any proposed plan, the ultimate resolution of the underlying bankruptcy case, and any litigation by Plaintiff against Deaza individually. At this stage in litigation, however, the evidence offered by the parties does not rise to the level that would warrant awarding Plaintiff a constructive trust in the Container Goods. The evidence has painted a picture of Plaintiff knowingly entering a risky international weapons deal due to the unique opportunity and potentially immense profits which would be gained if the transaction should be successful. McCallum testified that the weapons which were the subject of the first transaction were "the equivalent of a rare Mustang or Corvette, found in a garage in a time capsule from 1960-whatever, with like 2 miles on it. This was an absolutely unique opportunity." ECF No. 25 at 1:28:30-1:28:45. McCallum further testified that "within 30 days [of the delivery of the firearms], we would have doubled our money." Id.

at 1:35:37-1:35:42.   Further, for the reasons stated below, none of Deaza's misrepresentations resulted in the acquisition of the Container Goods from AC Unity.

The Court, therefore, concludes that Plaintiff has failed to make a clear showing that it is likely to demonstrate sufficient wrongful conduct connected to Debtor's acquisition of the Container Goods to establish that the Container Goods were held in a constructive trust for Plaintiff's benefit.

      **3.**      **Even if the Debtor's allegedly wrongful activities were sufficient to support a claim for imposition of a constructive trust, Plaintiff would not be entitled to a constructive trust in the Container Goods.**

            **a.**    **The parties are not in a fiduciary relationship and Plaintiff has an adequate remedy at law.**

North Carolina courts have held that a constructive trust does not arise where there is no fiduciary relationship, but rather merely a relationship of debtor and creditor, and there is an adequate remedy at law.   <u>Gertzman</u>, 446 S.E.2d at 135 (quoting <u>Security Nat'l Bank of Greensboro v. Educators Mut. Life Ins. Co.</u>, 143 S.E.2d 270, 276, 265 N.C. 86, 95 (1965)).   Stated another way, the remedy of a constructive trust may be awarded in the absence of a fiduciary relationship between the parties (<u>See</u> <u>Roper,</u> 373 S.E.2d at 425); but in such absence, in addition to the other elements entitling the plaintiff to the imposition of a constructive trust, the plaintiff must also establish that it is

28

without an adequate remedy at law unless a constructive trust is imposed.

Here, there is no special fiduciary relationship between Plaintiff and Debtor; the relationship between Debtor and Plaintiff is merely that of debtor and creditor.

> The [fiduciary] relation may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence. 'It not only includes all legal relations, such as attorney and client, broker and principal, executor or administrator and heir, legatee or devisee, factor and principal, guardian and ward, partners, principal and agent, trustee and cestui que trust, but it extends to any possible case in which a fiduciary relation exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.

Abbit v. Gregory, 201 N.C. 577, 160 S.E. 896, 906 (1931) (citation omitted). The agreements between the Debtor and Plaintiff were nothing more than transactions between merchants for the sale of goods; there appears no reason for Plaintiff to have reposed any special confidence in Debtor.

Furthermore, Plaintiff has not established that it is without an adequate remedy at law. "The question of adequacy is one of fact, to be analyzed and determined in each case." Rose v. Rose, 66 N.C. App. 161, 163, 310 S.E.2d 626, 628 (1984) (citing Munchak Corp. v. Caldwell, 301 N.C. 689, 273 S.E.2d 281 (1981)). Here, money would be an entirely adequate remedy at law; and although Plaintiff may argue that a money judgment is inadequate because

Debtor is insolvent, Plaintiff did not establish that Debtor is incapable of rendering performance by either acquiring the Product or refunding the purchase price through repayment via a reorganization plan. Therefore, Plaintiff has not established that it is without an adequate remedy at law.

> **b.    Plaintiff did not present sufficient evidence to trace its funds to any particular property of Debtor, including the Container Goods.**

To be entitled to a constructive trust under North Carolina law, a plaintiff must trace its property or funds to the property on which the trust is to be imposed. Gertzman, 115 N.C. App. at 446. Thereafter, the funds or property must remain traceable under federal law. In the motion, Plaintiff seeks a constructive trust in the Container Goods only. For the reasons stated above, Plaintiff cannot trace its funds to Debtor's acquisition of the Container Goods, and the motion will be denied on that basis alone. Nevertheless, for the purposes of the continued use of cash collateral, and Plaintiff's objection based on an asserted right to the imposition of a constructive trust in all of Debtor's assets, the Court will address the inadequacies of Plaintiff's evidence as to the remaining funds on hand, including any proceeds ultimately derived from the Container Goods.

In the Fourth Circuit, a party claiming entitlement to funds or personal property held in trust has the burden to "identify a res of funds by identifying where the entrusted funds are

today." Herman v. Moseley (In re Alamance Knit Fabrics, Inc.), 251 B.R. 293, 295 (M.D.N.C. 1999) (citing In re Dameron, 155 F.3d 718, 723 (4th Cir. 1998)).   The importance of the tracing requirement as an indispensable element for the imposition of a constructive trust is illuminated in the context of claim priority in a bankruptcy case.   See Haley, Chisholm & Morris, Inc. v. Parrish, 127 B.R. 366, 370 (W.D. Va. 1991).   Generally, constructive trusts are not favored by bankruptcy courts "because they operate to elevate the trust beneficiaries to preferred-creditor status without the putative beneficiaries' having taken any affirmative actions to secure a preferred priority." In re Greenbelt Rd. Second Ltd. P'ship, 39 F.3d 1176 (4th Cir. 1994). Unlike creditors who gain priority over unsecured creditors by appropriately, timely, and "openly announc[ing] their claims by recording perfected security interests," a party claiming a constructive trust attempts to obtain priority without similarly jumping "through all of the necessary hoops." Parrish, 127 B.R. at 370.

To establish similar "hoops" for claimants of constructive trusts, the Fourth Circuit requires claimants to trace the funds in question with specificity. Dameron, 155 F.3d at 723. Only a claimant who can sufficiently trace its funds into the specific funds or property for which it seeks to impose a constructive trust can recover the affected funds or property. Parrish, 127 B.R. at

31

370-71.  In other words, within the bankruptcy system, the tracing requirement reconciles a constructive trust beneficiary being given a priority position "in the same manner that the recording requirement justifies the priority position that secured creditors are given." Id. at 371.

When funds subject to a trust have been deposited or transferred into an account[10] with pre-existing non-trust funds, the funds are considered "commingled," and the Fourth Circuit requires claimants to use the lowest intermediate balance rule ("LIBR") when tracing the trust funds.  Dameron, 155 F.3d at 724. The LIBR is the basic proposition that "when faced with the need to withdraw funds from a commingled account, the trustee withdraws non-trust funds first, thus maintaining as much of the trust's funds as possible." Id.  If the non-trust funds have been completely depleted and trust funds have been reduced, the claimant is entitled to the lowest intermediate balance in the account. Id.  Thus, LIBR "assumes that the debtor spends his own money out of the account before he spends the [trust] funds." Sony Corp. of Am. v. Bank One, W. Virginia, Huntington, N.A., 85 F.3d 131, 138 (4th Cir. 1996) (quotation omitted).

---

[10] Solely for purposes of this section and due to the allegations of fraud, the Court has assumed without deciding that the entirety of the contractual purchase price would have been subject to a constructive trust, rather than only the portion of the purchase price required to obtain the weapons by Debtor.

Finally, "if the amount on deposit in the commingled fund has at all times equaled or exceeded the amount of the trust, the trust's funds will be returned in their full amount." Dameron, 155 F.3d at 724. However, if the commingled fund has been depleted entirely, the trust is considered lost and later-deposited non-trust funds do not replenish the trust funds. See United States v. Miller, 911 F.3d 229, 234 (4th Cir. 2018).

Plaintiff's tracing analysis of the claimed trust funds, through the Declaration of its expert, McCallum, is insufficient because the analysis fails to appropriately use the lowest intermediate balance rule for commingled funds and does not identify with specificity the res of property and funds to which Plaintiff lays claim.

It is undisputed that at least a portion of Plaintiff's funds were the source of certain deposits into the Debtor's account at First Bank, an account with existing non-trust funds. ECF No. 1, at 67–92. Thus, assuming that a constructive trust arose at the time these funds were deposited, the deposit created an account with commingled funds. The day after Plaintiff's initial deposit, there was a withdrawal of $1,212,500.00. This withdrawal fully depleted the existing non-trust funds within the First Bank account and began depleting the trust funds, yet Plaintiff seeks to have the putative constructive trust follow both the entirety of the removed funds and also fully remain in the First Bank account.

33

Id. at 70.  Regardless, Plaintiff fails to provide evidence tracing the funds that had been withdrawn or using the LIBR to analyze the trust funds remaining in the account after the withdrawal. Although Plaintiff provided certain bank statements in its Complaint and Declaration, the statements were limited to the months in which it deposited funds into Debtor's bank account (June, August, and September 2021) and the month it filed its cause of action (July 2022).  Id. at 67-92.  For the gap between June and August 2021, September 2021, and July 2022, the Court is left without evidence of the lowest intermediate balance in the account. Furthermore, Plaintiff additionally asserts that certain funds were removed from the account and used for personal purchases by Deaza in which Plaintiff also asserts a constructive trust.  To the extent that Plaintiff claims those funds constitute its proceeds, it cannot simultaneously assume that the LIBR is not commensurately reduced in Debtor's accounts.  Therefore, at this stage of the proceedings, Plaintiff's evidence falls short of the specific tracing analysis required for a constructive trust claim in the context of bank accounts with commingled funds and the use of those funds for the acquisition of property.

Furthermore, McCallum's Declaration focuses on, among other things, the amount of funds that would have been in the account if Plaintiff had not deposited its funds into the First Bank Account and whether the Debtor was "generally operating at a loss month-

34

to-month." Declaration of Jamin McCallum, ¶¶ 24, 28, 31, 36, 38. However, these factors are irrelevant in a constructive trust tracing analysis, which merely focuses on the lowest balance in the account, and not what the balance might have been. Finally, as to any trust funds or trust property in which Plaintiff is claiming an interest beyond those funds in the First Bank account, Plaintiff must trace, using LIBR, the specific funds and property in which it is claiming an interest. Plaintiff has not done so.

As discussed, bankruptcy courts are hesitant to grant the remedy of constructive trust as it offers priority to a claimant who would not otherwise have such priority. To earn such priority, claimants are required to clearly trace their funds to the property that they are claiming. In the Fourth Circuit, clearly tracing funds and property subject to a constructive trust requires a diligent analysis using the LIBR. Plaintiff has fallen short of this requirement at this stage and, as a result, it has made no clear showing that it is able to trace the funds and property to which it claims it is entitled to an interest as beneficiary of constructive trust.

**III. Plaintiff did not offer any authority or argument in either of its briefs filed with this Court in support of the other elements necessary for the imposition of a preliminary injunction.**

As discussed above, to be entitled to a preliminary injunction, a movant not only must demonstrate that it is likely

to succeed on the merits, but it also must show that the balance
of equities tip in its favor, that it will suffer irreparable harm
in the absence of an injunction, and that granting the requested
preliminary injunction is in the public interest.  If a movant
fails to demonstrate any one of these elements, it will not be
entitled to injunctive relief.  Real Truth About Obama, Inc. v.
Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009) (holding
that "all four requirements must be satisfied"), vacated in part
on other grounds, 559 U.S. 1089 (2010).  Having determined that
Plaintiff failed to make a clear showing that it is likely to
succeed on the merits, the Court need not consider the other
elements.  Nevertheless, although Plaintiff did not offer any
authority in support of any of the remaining three prerequisites
for injunctive relief, the Court will briefly address those issues.

   **A.  Plaintiff has not demonstrated that it will suffer
       irreparable harm.**

   Plaintiff must show that it will suffer irreparable harm, and
"that the harm is 'neither remote nor speculative, but actual and
imminent.'"  In re S. E. Materials, Inc., Adv. P. 11-6035, 2012 WL
899315, at *3 (Bankr. M.D.N.C. Mar. 15, 2012) (quoting Manning v.
Hunt, 119 F.3d 254, 263 (4th Cir. 1997)).  Economic injuries are
not generally considered irreparable.  Mountain Valley Pipeline,
LLC v. 6.56 Acres of Land, 915 F.3d 197, 218 (4th Cir. 2019)
(citing Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017)).

This is because financial loss is temporary and can be recovered by a prevailing party. See id. (citing Fed. Leasing, Inc. v. Underwriters at Lloyd's, 650 F.2d 495, 500 (4th Cir. 1981); and Hughes Network Sys. v. Interdigital Commc'ns Corp., 17 F.3d 691, 694 (4th Cir. 1994)); N.C. Growers' Ass'n, Inc. v. Solis, 644 F. Supp. 2d 664, 671 (M.D.N.C. 2009).

It is true, that the Fourth Circuit has found economic loss to be irreparable when the party "will not be able to recover those losses in this or any other litigation." Mountain Valley Pipeline, LLC, 915 F.3d at 218. "[I]rreparable harm may still exist . . . where 'damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected.'" Hughes, 17 F.3d at 694 (quoting Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 386 (7th Cir. 1984)). However, the Fourth Circuit has cautioned that "[t]hese situations are quite narrow, reflecting instances where the harm suffered by the plaintiff from denying the injunction is especially high in comparison to the harm suffered by the [other parties] from granting it." Hughes, 17 F.3d at 694.

Plaintiff did not establish a sufficient record to support irreparable harm. It is possible, although the record is unclear at this stage, that Debtor will be unable to reorganize. Plaintiff also has asserted certain claims against Deaza individually in the state court litigation, including that Deaza has various assets.

37

Plaintiff not only asserts claims against Deaza under his guarantee of performance, but also asserts that Deaza's assets are subject to the same equitable claims as are Debtors' assets.  A possibility of irreparable harm is not the correct standard, and Plaintiff presented an insufficient record to establish that any harm would be irreparable.  See BDC Capital, Inc. v. Thoburn Ltd. P'ship, 508 B.R. 633, 640 (E.D. Va. 2014) (denying a motion for stay pending appeal from the bankruptcy court based on the allegation that distribution of assets to diverse parties will render any recovery difficult and possibly moot any appeal, and noting that, in the Fourth Circuit, "the standard of review is 'likelihood' of irreparable harm, not 'possibility'").  At this stage of the litigation, the Court cannot determine that Plaintiff will suffer irreparable harm if the injunction is not granted.  The existing record indicates that Debtor has an active business and an intent to reorganize and pay its creditors as required by the Bankruptcy Code.

**B.    Any balancing of the equities must be balanced against the bankruptcy estate and the interests and claims of other creditors, rather than just Debtor or Deaza.**

Unlike litigation between only two parties, requests for preliminary injunctions in bankruptcy will affect the entirety of the creditor body, whose interests must be considered.  As explained by one court:

Irreparable harm in the bankruptcy context refers to

38

> either irreparable harm to the interest of a creditor or
> irreparable harm to the bankruptcy estate.  Of these two
> irreparable harm to the bankruptcy estate (or the
> debtor's ability to reorganize) is clearly of greatest
> relevance to the court.

Dore & Assocs. Contracting, Inc. v. Am. Druggists' Ins. Co., 54 B.R. 353, 357-58 (Bankr. W.D. Wis. 1985).  The relief requested by Plaintiff is sweeping and would, even as described by Plaintiff, eviscerate the entirety of the bankruptcy estate, despite other apparently legitimate creditors with substantial claims against Debtor and its assets.  This is precisely why courts approach requests for the imposition of constructive trusts in bankruptcy with trepidation.  If Plaintiff is accorded the drastic relief it seeks, it will be fatal to the estate and any chance of other creditors recovering on their claims.  The balance of the equities weighs in favor of the estate.

### C.   **Public policy weighs in favor of reorganization.**

Plaintiff did not offer any evidence or argument in support of why injunctive relief would be in favor of public policy.  It is well settled that bankruptcy policy favors reorganization.  See 7 Collier on Bankruptcy ¶ 1100.01 ("Chapter 11 embodies a policy that it is generally preferable to enable a debtor to continue to operate and to reorganize or sell its business as a going concern rather than simply to liquidate a troubled business.").  For these reasons, Plaintiff is not entitled to injunctive relief.

**Conclusion**

For the reasons set forth herein, the Court will enter its order denying Plaintiff's Motion for Preliminary Injunction.

[END OF DOCUMENT]

<u>Parties to be Served</u>

22-02021

All parties to this Adversary Proceeding.